**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Edith McCurry, | |
| Plaintiff, | |
| v. | Case No. 19-CV-04067 |
| Mars, Kenco Logistics Services, LLC, The Hartford Financial Services Group, Inc., The Reed Group and Dr. Koehler, | Judge Sharon Johnson Coleman<br>Magistrate Judge Gabriel A. Fuentes |
| Defendants. | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant, Kenco Logistic Services, LLC ("Kenco"), by and through its undersigned attorneys, submits this Memorandum of Law in support of its Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56.

## INTRODUCTION

Plaintiff Edith McCurry has not worked for Kenco since 2015. She has spent the last six years harassing her former employer with meritless litigation. The United States Court of Appeals for the Seventh Circuit already affirmed summary judgment for Kenco, finding that Kenco did not discriminate against McCurry during her employment in *Edith McCurry v. Kenco Logistic Services, LLC, et al.*, No. 18-3206.

Undeterred by prior rulings and prior sanctions, in the instant lawsuit, McCurry now alleges that Kenco discriminated against her, and violated ERISA, by delaying or denying her short- and long-term disability benefits. But Kenco's employee disability plan was insured and administered by The Hartford, the STD and LTD Plans' obligor. Kenco played no role, and had no influence, in any benefits decisions. Accordingly, Kenco is not a proper defendant in an ERISA claim for unpaid benefits because Kenco had no involvement in the alleged benefits denial. Likewise, McCurry's allegation that Kenco engaged in employment discrimination fails because the alleged discriminatory action—denying disability benefits—was not an action taken by Kenco. Summary judgment should be granted in Kenco's favor in accordance with Fed. R. Civ. P. 56.

## FACTUAL BACKGROUND

Plaintiff Edith McCurry was employed by Kenco at a Mars warehouse in Manteno, Illinois from 2013 until March of 2015, when Kenco lost its contract with Mars and all Kenco employees at the warehouse were terminated. (Def.'s Statement of Undisputed Facts, ¶¶ 5, 7–9, ECF No. 158 ("SOF")). McCurry does not allege that her termination of employment was discriminatory. (SOF

at ¶ 9).

During the time period of 2013 through 2015, Kenco offered short-term disability ("STD") and long-term disability ("LTD") benefits to its employees under a group insurance policy issued by its third-party benefits administrator, Hartford Life and Accident Insurance Company ("The Hartford"). (SOF at ¶ 11). Kenco was the plan administrator for the short-term disability plan ("STD Plan") and long-term disability plan ("LTD Plan") (collectively, the "STD and LTD Plans"), but these plans expressly delegated sole authority to The Hartford to make benefits determinations and pay benefits. (SOF at ¶ 13). The STD Plan and LTD Plan both state that "[t]he Plan has designated and named the Insurance Company [(*i.e.*, The Hartford)] as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company *full discretion and authority* to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (SOF at ¶ 14) (emphasis supplied).

Prior to McCurry's end of employment with Kenco, on January 3, 2015, McCurry alleges that she became disabled on or about January 3, 2015 and unable to return to work. (SOF at ¶ 22). She further alleges that she informed The Hartford of her inability to return to work, that The Hartford informed her of the amount of disability benefits she would receive, and that she experienced interruptions of her short- and long-term disability benefits that were ultimately reinstated on July 13, 2016. (SOF at ¶ 23). Consistent with Kenco's standard practices, Kenco never influenced The Hartford in its determinations relative to McCurry's claims for disability benefits. (SOF at ¶ 28). The extent of Kenco's involvement regarding the status of McCurry's claims for benefits was limited to being copied on the correspondence from The Hartford to McCurry, as well as the basic claim status information that The Hartford posted on its secure website in which Cathy Phillips (Kenco's Senior Benefit's Manager) was able to log-in and view.

(SOF at ¶ 26).

**SUMMARY JUDGMENT STANDARD**

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," supported by "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials." (Fed. R. Civ. P. 56). The legal standard at summary judgment is simply whether the evidence would permit a reasonable factfinder to conclude that the employee's protected status caused the adverse employment action. (*Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016)). Summary judgment is warranted where "a rational trier of fact could not find for the non-moving party." (*Rogers v. City of Chicago,* 320 F.3d 748, 752 (7th Cir. 2003) (overruled on other grounds) (internal citations omitted)). Discrimination claims under Title VII of the Civil Rights Act of 1964 ("Title VII") are analyzed under the same standard as those brought under 42 U.S.C. §1981 ("Section 1981"). (*Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 403 (7th Cir. 2007)).

**ARGUMENT**

**I.      McCurry's Claims Fail Because the Alleged Harms Do Not Involve Any Action Taken by Kenco.**

McCurry asserts that Kenco engaged in employment discrimination in violation of Title VII and Section 1981, and that Kenco violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), through improper decisions related to her STD and LTD benefits. But regardless of which statute is involved, McCurry's claims summarily fail for one simple reason: the harm McCurry alleges cannot be attributed to Kenco. Kenco's disability benefits plans were insured and administered by The Hartford, and Kenco played no role, and had

3

no influence, in any such decisions.[1] (*See* SOF at ¶ 11, 13–14, 18, 20, 26, 28). The STD and LTD Plans themselves state that "[t]he Plan has designated and named the Insurance Company [(*i.e.,* The Hartford)] as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company *full discretion and authority* to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (SOF at ¶ 14) (emphasis added). The undisputed testimony from Kenco further supports that Kenco operated in accordance with the STD and LTD Plans themselves, and Kenco did not influence The Hartford in its determinations over McCurry's STD or LTD benefits. (SOF at ¶ 28). Indeed, Kenco's limited ability to log into the "Employer View" status of a benefits claim allowed it to see whether an employee was approved to be off work and receive benefits, but Kenco never participated in the decision-making or influenced The Hartford. (SOF at ¶¶ 26–28). Kenco employees were responsible for applying for disability benefits through The Hartford. (SOF at ¶ 10). All information was shared directly between the employee (here, McCurry) and The Hartford, in accordance with Kenco's policies, the STD and LTD Plans, and all surrounding communications. (SOF at ¶ 15). McCurry's claims cannot survive summary judgment because her claimed injury—namely, delays or denials in the receipt of disability benefits from The Hartford—was not caused by Kenco.

---

[1] Not only did Kenco not take part in the benefits delays and denials at issue, but all action taken by Kenco relative to McCurry is time-barred, and was fully litigated in McCurry's prior lawsuit, *McCurry v. Kenco Logistic Services LLC et al.*, No. 16-cv-02273-CSB-EIL (C.D. Ill.). McCurry's last day of employment with Kenco was March 29, 2015. (SOF at ¶ 8). She did not file her charge of discrimination pertaining to this lawsuit, Charge No. 440-2018-04640, until more than three years later, on April 17, 2018. (SOF at ¶ 36). Accordingly, to the extent McCurry may be alleging any discrimination during her employment, she is time-barred. (*See Salas v. Wis. Dep't of Corr.,* 493 F.3d 913, 921 (7th Cir. 2007) (holding that charges of discrimination must be filed within 300 days after the occurrence of an alleged unlawful employment practice)). Not only that, but McCurry already fully litigated claims related to her employment at Kenco, and lost. In *McCurry v. Kenco Logistic Services LLC et al.*, No. 16-cv-02273-CSB-EIL (C.D. Ill.), the Court granted Kenco's motion for summary judgment, and the Seventh Circuit Court of Appeals affirmed, calling McCurry's appeal "patently frivolous" and a "shameful waste of judicial resources." (SOF at ¶ 35). Thus, any claims asserted by McCurry stemming from her employment at Kenco are not only time-barred but barred by *res judicata*. (*See* Def.'s Mem. in Supp. of Its Mot. to Dismiss at 5–7, ECF No. 18 (citing *Ross ex. rel. Ross v. Bd. of Educ. of Twp. High Sch. Dist. 211,* 486 F.3d 279, 283 (7th Cir. 2007)).

## II.    McCurry's ERISA Claim Fails as a Matter of Law.

### A.    McCurry's ERISA Section 1132(a)(1)(B) Claim for Unpaid Benefits Fails Because The Hartford Was Solely Responsible for Determining Eligibility and Paying Benefits.

McCurry alleges that Kenco (and the other now-dismissed defendants) violated her rights under many laws (statutory and common law), including ERISA, by denying her the full amount of disability benefits due and owing under the STD and LTD Plans. McCurry's sole remedy therefore lies under ERISA, specifically 29 U.S.C. § 1132(a)(1)(B) ("Section 1132(a)(1)(B)").

Section 1132(a)(1)(B) specifically authorizes a participant "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." (29 U.S.C. § 1132(a)(1)(B)). The allegations in the Complaint make clear that McCurry's lawsuit seeks to do exactly that—recover disability benefits she alleges are due. (*See, e.g.,* Compl. at 53–54, ECF No. 1).

As is the case with many plans that provide disability benefits, the STD Plan and LTD Plan fund disability benefits through a group policy of insurance issued by The Hartford. (SOF at ¶ 11). Here, Kenco played no role whatsoever in the administration of McCurry's claim, the determination of whether she is entitled to benefits at all, and at what amount. Kenco is the plan administrator[2] for the STD and LTD Plans generally. (SOF at ¶ 13). But as the plan administrator,

---

[2] The complaint as to Kenco should be dismissed for the additional reason that the proper defendant in an ERISA claim for benefits is the STD and LTD Plans themselves. (*Mote v. Aetna Life Ins. Co*., 502 F.3d 601, 610 (7th Cir. 2007) ("Generally, in a suit for ERISA benefits, the plaintiff is 'limited to a suit against the Plan.'"). Indeed, an ERISA claim for benefits lies against the entity responsible for paying claims and making benefits determinations. *Robinson v. Aetna Life Ins. Co.*, No. 20-cv-04670, 2021 U.S. Dist. LEXIS 176346, at *27 (N.D. Ill. Sep. 15, 2021) ("As to the proper defendant against whom to make an ERISA claim, it may ordinarily be true that, especially in a suit for benefits, a plaintiff should name the plan as a defendant, rather than the employer or plan administrator.") (internal quotations omitted) (dismissing the employer as a defendant in a Section 1132 (a)(1)(B) claim because it was "not responsible for paying claims or making benefits determinations under the Plan.")). The law on this is clear, and at no time has McCurry ever sued the STD or LTD Plans.

Kenco delegated full authority to determine eligibility for benefits to The Hartford. (SOF at ¶ 13). Indeed, the facts make clear that The Hartford was designated as the STD and LTD Plans' claims fiduciary and tasked with sole authority over making the decisions that give rise to McCurry's lawsuit.[3] (*See, e.g.,* SOF at ¶¶ 13–21, 24–28). Accordingly, McCurry's ERISA claim fails. (*See Robinson v. Aetna Life Ins. Co.*, No. 20-cv-04670, 2021 U.S. Dist. LEXIS 176346, at *28–30 (N.D. Ill. Sep. 15, 2021) (dismissing employer who was the "plan administrator" as a defendant because the plan delegated full fiduciary authority to the insurer)).[4]

The STD and LTD Plans provide unambiguously that The Hartford is the sole obligor[5] and pays all benefits due under the STD and LTD Plans. For instance, the STD Plan's "Benefits" section states that the Hartford "will pay the Weekly Benefit" if a participant satisfies the criteria for coverage, and the LTD Plans' "Benefits" sections states that The Hartford "will pay You [the eligible participant] a Monthly Benefit" if a participant satisfies the criteria for coverage. (SOF at ¶ 19). The remainder of the STD and LTD Plans further affirm that The Hartford is solely responsible for making benefits decisions and paying benefits under the STD and LTD Plans. For example, provisions in the STD and LTD Plans state: "We [The Hartford] will not pay a benefit

---

[3] In asserting that Kenco is not responsible for deciding claims for benefits under the STD and LTD Plans, Kenco is in no way taking issue with The Hartford's decision and its decision-making process. Rather, Kenco presumes that The Hartford's decision is supported fully by the record and that its decision-making process complied fully with the STD Plan and LTD Plan, ERISA, and ERISA's regulations.

[4] In accordance with the Court's instructions on its website, cited authorities that are only published on electronic databases are attached to this memorandum, in the order they are cited herein.

[5] Earlier in this case, this Court applied the well-settled principle that generally, only the "obligor—the party which allegedly owes the benefits due" is an appropriate defendant in an ERISA claim for benefits. (Memorandum Order and Opinion at 9, Oct. 15, 2020, ECF No. 96) (citing *Larson, Larson v. United Healthcare Insurance Co.*, 723 F.3d 905, 913 (7th Cir. 2013) (dismissing McCurry's ERISA claim against Mars, Inc. because she did not allege Mars was an obligor of the Plan)). The same logic applies here: McCurry's own allegations, the STD and LTD Plans, and supporting testimony from Cathy Phillips establish unequivocally that The Hartford is the STD and LTD Plans' only obligor. (*See, e.g.,* SOF at ¶¶ 13–14, 18–21).

for, any Disability . . . ”); “We [The Hartford] will pay accrued benefits . . . ”); “If benefits are overpaid on any claim, You [the participant] must reimburse Us [The Hartford] within 30 days.” (SOF at ¶ 19).

The terms of the STD and LTD Plans make clear that The Hartford, and not Kenco, was tasked with: (1) the sole responsibility and discretion for evaluating and deciding claims; and (2) the sole responsibility to pay claims. (SOF at ¶¶ 13–21). Specifically, the STD and LTD Plans provide that The Hartford maintained “full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy.” (SOF at ¶ 14). Consistent with the STD and LTD Plans, The Hartford made all decisions concerning McCurry’s claims for disability benefits. (SOF at ¶¶ 18–20). McCurry does not genuinely dispute that The Hartford retained full authority to decide claims and pay benefits. (*See* Compl. at 7 ¶ 10, ECF No. 1). Indeed, even The Hartford agrees. (SOF at ¶ 21).

Because the STD and LTD Plans vested all authority to make benefits determinations with The Hartford, Kenco cannot be held liable under ERISA Section 1132(a)(1)(B) for any decision made by The Hartford with respect to McCurry’s benefits. (*Larson v. United Healthcare Insurance Co.*, 723 F.3d 905, 915–16 (7th Cir. 2013) (“[W]here the plaintiff alleges that she is a participant . . . and the insurance company decides all eligibility questions and owes the benefits, the insurer is a proper defendant in a suit for benefits due under § 1132(a)(1)(B).”); *Caffey v. Mansur Grp., Inc.*, 67 F. App'x 370, 374 (7th Cir. 2003) (“with certain exceptions not applicable here, beneficiaries seeking disability benefits under ERISA must sue the Plan as an entity, rather than their employer.”)). The Court should enter judgment in Kenco’s favor on McCurry’s ERISA claim.

### B. McCurry’s Unlawful Interference Claim Fails Because Kenco Did Not Interfere With Her Claims for Benefits.

McCurry alleges that Kenco improperly interfered with her ability to pursue her rights

under ERISA, but she couches these allegations as violations of Title VII and Section 1981. These statutes, however, address discrimination based on race and gender. They do not address discrimination or retaliation related to employee benefits. ERISA Section 1140 does. It states, in pertinent part, that:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, this subchapter, section 1201 of this title, or the Welfare and Pension Plans Disclosure Act [29 U.S.C. 301 et seq.], or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, this subchapter, or the Welfare and Pension Plans Disclosure Act.

(29 U.S.C. § 1140 ("Section 1140"). The parties have already litigated in *McCurry v. Kenco Logistic Services LLC et al*., No. 16-cv-02273-CSB-EIL (C.D. Ill.), whether McCurry's separation violated any employment law, and the Northern District of Illinois and Seventh Circuit have concluded that it did not. (SOF at ¶¶ 34–35). McCurry herself agrees that her termination was not discriminatory as all employees were terminated when Kenco lost the Mars contract. (SOF at ¶ 9).

Assuming *arguendo* that the Court finds that McCurry's complaint raises a Section 1140 claim (it does not), McCurry's ERISA claim fares no better because Kenco did not deprive her of any rights to benefits. To maintain a Section 1140 unlawful interference claim, McCurry must submit evidence that proves that Kenco acted with "specific intent to deprive [her of her] plan rights." (*Isbell v. Allstate Insurance Co*., 418 F.3d 788, 796 (7th Cir. 2005) (affirming employer's motion for summary judgment)). Indeed, McCurry must show that "a desire to frustrate attainment or enjoyment of benefit rights contributed toward the employer's decision." (*Id.*).

Ultimately, McCurry cannot establish unlawful interference because the undisputed facts in the record demonstrate that Kenco did not "interfere"—Kenco played no role whatsoever in the administration of her claim for disability benefits. (SOF ¶¶ 20, 28–29). There is no evidence that

8

Kenco took any affirmative steps to frustrate McCurry's claims. Therefore, McCurry cannot establish an ERISA claim for interference with benefits.

### C. McCurry's Breach of Fiduciary Duty Claim Is Impermissibly Duplicative of Her Claim For Benefits, And McCurry Seeks Legal, Not Equitable, Relief.

#### 1. McCurry's Breach of Fiduciary Duty Claim Improperly Duplicates Her Claim For Benefits.

Breach of fiduciary duty claims under ERISA brought by individuals are remedied through 29 U.S.C. § 1132(a)(3) ("Section 1132(a)(3)"), which authorizes a cause of action by a participant to "obtain other appropriate equitable relief" to redress violations or to enforce provisions of the plan or ERISA. (29 U.S.C. § 1132(a)(3)). This provision is a catch-all, and is intended to provide a remedy for violations of a plan or ERISA that are not remedied by other provisions within ERISA. (*Varity Corp. v. Howe*, 516 U.S. 489, 518–19 (1996)). When relief is available under Section 1132(a)(1)(B), as is the case here (albeit against The Hartford), then the plaintiff/participant cannot seek relief under Section 1132(a)(3). (*Id.*; *Schatzel v. Central States Southeast & Southwest Areas Pension Fund,* 941 F. Supp. 2d 999, 1008 (N.D. Ill. 2013); *Zuckerman v. United of Omaha Life Insurance Co*., No. 09-cv-04819, 2010 U.S. Dist. LEXIS 73207, at *24–25 (N.D. Ill. July 21, 2010) (dismissing breach of fiduciary duty claim because remedies were available under Section 1132(a)(1)(B))).

The Court previously dismissed McCurry's state law claims, including breach of fiduciary duty, with prejudice. (Memorandum Order and Opinion, Oct. 15, 2020, ECF No. 96). To the extent McCurry's breach of fiduciary duty claim it is cognizable under ERISA, it is impermissibly duplicative of her claim for benefits and the interference claim, so it fails for the same reasons. Even if a breach of fiduciary duty claim under Section 1132(a)(3) is properly before the Court, as addressed above, there is no evidence that Kenco interfered with McCurry's claim such that it

breached its duties to McCurry. Again, the only interaction with The Hartford in the record reflects that The Hartford kept Kenco abreast of its claims handling decisions. (SOF at ¶¶ 24–27). For these reasons, McCurry's breach of fiduciary duty claim should be dismissed with prejudice.

## 2. McCurry Seeks Legal Relief, Which Is Not Available Under Either ERISA Section 1132(a)(3) or Section 1140.

McCurry's relief under ERISA is limited to equitable remedies and not legal relief in the form of compensatory damages. (*Campbell v. Whobrey*, No. 16-cv-04631, 2019 U.S. Dist. LEXIS 6185, at *16–18 (N.D. Ill. Jan. 14, 2019) (dismissing Section 1140 claim); *see also Cent. States, SE & SW Areas Health & Welfare Fund by Bunte v. Am. Int'l Grp., Inc*., 840 F.3d 448, 453 (7th Cir. 2016) (to recover money damages in equity, a plaintiff must point to "specifically identifiable funds in the defendant's possession to which an equitable lien could attach.")). Here again, McCurry wants unpaid benefits, which in turn are provided pursuant to an insurance policy issued by The Hartford, and are paid by The Hartford, not Kenco. (SOF at ¶ 19). Kenco did not pay McCurry's disability benefits so McCurry cannot seek to recover such benefits from Kenco. The relief sought by McCurry is inherently legal relief, which is not available under either Section 1132(a)(3) or Section 1140. (*Central States*, 840 F.3d at 452–53 (instructing that when the "relief sought was money damages from the [defendant's] general assets", then it is "a quintessentially *legal* remedy."). Accordingly, McCurry's claims fail for the additional reason that McCurry incorrectly seeks relief that is unavailable to her under either Section 1140 or Section 1132(a)(3).

## III. McCurry Was Not Subjected to Discrimination or Retaliation.

### A. McCurry's Title VII and Section 1981 Discrimination Claims Arise From a Disability Benefits Denial And Are Preempted By ERISA.

McCurry has not worked at Kenco since 2015. (SOF at ¶ 8). Outside of what is time-barred

or otherwise barred by the findings in her prior lawsuit,[6] all that remains in McCurry's lawsuit is a claim alleging improper delays or denials in her post-employment disability benefits. Kenco played no role in those decisions. It follows that McCurry cannot pursue discrimination claims against Kenco for action that was not taken or influenced by Kenco.

Further, it is undisputed that ERISA is the exclusive statute for resolution of such benefits claims, so McCurry has no viable cause of action against Kenco under Title VII or Section 1981. "[C]laims by a beneficiary for wrongful denial of benefits (no matter how they are styled) have been held by the Supreme Court to 'fall[] directly under § 502(a)(1)(B) of ERISA [29 U.S.C. § 1132(a)(1)(B)], which provides an exclusive federal cause of action for resolution of such disputes.'" (*Vallone v. CNA Financial Corp.,* 375 F.3d 623, 638 (7th Cir. 2004).

Here, although McCurry has labeled additional claims in her Complaint as employment discrimination in violation of Title VII and Section 1981, the factual allegations in her employment discrimination claims appear to mirror those allegations in the ERISA claims—that she was allegedly discriminated or retaliated against by wrongful delays or denials surrounding her receipt of disability benefits. (*Compare* Compl. at 35 ¶ 94, ECF No. 1 (asserting that McCurry's "inequitable and vexatiously delayed disability benefits" forms the basis of her claim of intentional discrimination) *with* Compl. at 48 ¶ 166, ECF No. 1 (alleging that defendants violated ERISA through irregularities including "a reversal of a benefits determination without additional evidence")). In such circumstances, ERISA is the exclusive federal remedy available for such alleged wrongs, so McCurry's employment discrimination claims are preempted.

## B. Kenco Did Not Discriminate Against McCurry.

Even if McCurry's discrimination claims were not preempted by ERISA, the claims

---

[6] (*See supra* note 1).

nonetheless fail because McCurry is not actually alleging that Kenco took any discriminatory action against her—the alleged action was taken by The Hartford.

"A[] plaintiff states a claim for employment discrimination when [s]he alleges that *an employer took a specific adverse action* against [her] because of a prohibited animus." (*Mounts v. UPS of Am., Inc.*, No. 09-cv-01637, 2009 U.S. Dist. LEXIS 77656, *13–14 (N.D. Ill. Aug. 31, 2009) (emphasis added)). To survive summary judgment on this claim, McCurry therefore must produce evidence that would allow a reasonable jury to conclude that her protected status caused Kenco to deny or delay her disability benefits. (*Ortiz v. Werner Enters., Inc.,* 834 F.3d 760, 765 (7th Cir. 2016)). She cannot do so. This conclusion is reached easily. Kenco did not play any role in the decisions surrounding McCurry's disability benefits, nor did Kenco influence the decisionmaker, The Hartford. (SOF at ¶¶ 18, 20, 26, 28–29).

### 1. Kenco Did Not Influence the Decisions Regarding McCurry's Benefits, So McCurry Fails to Allege an Adverse Action by Kenco.

McCurry alleges that the decisions delaying or denying her disability benefits amounted to discrimination, harassment, and retaliation. (*See generally* Compl. at 3–4 ¶ 1, 92, ECF No. 1). She alleges discrimination both in violation of Title VII and Section 1981. Under either statute, the claims fail for the same reasons.

In short, McCurry's discrimination claims against Kenco summarily fail because McCurry does not allege any adverse action taken against her by Kenco. The only alleged adverse action McCurry claims relates to purported delays or denials in her receipt of STD and LTD benefits. And Kenco did not play any role in that determination. (SOF at ¶¶ 18, 20, 26, 28–29).

Seventh Circuit case law requires a granting of summary judgment under such circumstances where the alleged adverse action is a benefits decision carried out by a third-party and not the employer. In *Roney,* the plaintiff alleged that his former employer, IDOT, retaliated

against him after his termination of employment when it caused the IDES to deny his unemployment benefits. (*See Roney v. Ill. DOT,* 474 F.3d 455, 462 (7th Cir. 2007) (affirming summary judgment and reasoning that "there is no evidence that IDES's ultimate denial of benefits to Roney could be attributed to IDOT.")).

So too, here. There is no shred of evidence in this case that The Hartford's decisions surrounding McCurry's STD or LTD benefits can be attributed to Kenco. In fact, all admissible evidence supports the opposite conclusion. Both the STD and LTD Plans themselves, and the supporting testimony of Cathy Phillips, establish that The Hartford acted as the claims fiduciary and possessed sole decision-making authority as to McCurry's claim for STD and LTD benefits. (SOF at ¶¶ 13–14, 18–20).

Indeed, numerous other cases within the Northern District have considered virtually identical facts and found that an employer cannot be liable for discrimination surrounding benefits decisions where such decisions were made by a third-party, including the insurance company. (*See, e.g., Keen v. Teva Sales & Mktg.,* 303 F. Supp. 3d 690, 723 (N.D. Ill. 2018) (granting employer's motion for summary judgment)). In *Keen,* the plaintiff alleged that she was improperly denied disability benefits and worker's compensation benefits because of her disability. (*Id.*). In granting the employer's motion for summary judgment, the Court held that such decisions were made by third-party vendors, not the employer, and furthermore, the plaintiff failed to present any evidence that she would have received the benefits but for her protected status. (*Id.*; *accord Szplett v. Kenco Logistic Services, LLC,* 2020 U.S. Dist. LEXIS 70661, *19 (N.D. Ill. April 22, 2020) (granting motion to dismiss alleged discrimination claim based on denial of disability benefits and stating that "Szplett's briefs do not explain how Kenco or Mars could be liable for *Hartford's* decision to deny his disability benefits.") (emphasis in original)). McCurry's baseless discrimination claims

13

fail for the same reasons.

Similarly, McCurry's unsupported assertions that Kenco may have influenced disability benefits decisions do not hold weight. (*See Carr v. Ameritech Corp.,* No. 99-cv-08403, 2002 U.S. Dist. LEXIS 5490, *28 (N.D. Ill. Mar. 26, 2002) (granting motion for summary judgment)). In *Carr,* the employee's claim surrounding purported discriminatory denials of disability benefits failed where the plan documents established that an "Administrator or the Benefits Committee" possessed the ultimate authority for determining whether an employee should receive disability benefits. Furthermore, the employee lacked any evidence that the decisions made by the Benefits Committee were tainted by any discriminatory or retaliatory animus. (*Id.; accord Keen,* 878 F. Supp. 3d at n.16 ("Plaintiff could not identify the particular person who dealt with her disability benefits claims, much less the motivation behind that person's decision")). Much like in *Carr* and *Keen,* McCurry lacks any evidence that Kenco influenced The Hartford's decisions, because Kenco did not. (SOF at ¶¶ 13–14, 18–20, 26–29). *See also Pough v. SBC Communs., Inc.,* 570 F. Supp. 2d 1006, 1018–19 (N.D. Ill. 2008) (granting summary judgment where there was no evidence that employer interfered with her rights to receive disability benefits)). Kenco played no role in The Hartford's benefits decisions, so those decisions cannot amount to discrimination by Kenco.

## 2. McCurry's Benefits Were Ultimately Approved, So There Is No Materially Adverse Action.

Even putting aside that Kenco has no place in McCurry's litigation over disability benefits because it played no role in the decisions, there is still an additional problem with McCurry's claims: she has not alleged a material harm that is actionable under Title VII. Notably, "an adverse action does not include an employer's refusal to grant an employee a discretionary benefit to which she is not automatically entitled." (*Keen,* 303 F. Supp. 3d at 720 (denial of excess insurance

coverage was not an adverse action)). Kenco was not required to grant disability benefits to McCurry if The Hartford determined that she was not eligible. Moreover, the documents attached to McCurry's Complaint reflect that McCurry ultimately received the disability benefits, (which were retroactively paid), making her claim of any alleged harm even more baseless. (SOF at ¶¶ 23, 30). When an employee premises an adverse employment action on the basis of a delay in receiving disability benefits, she must present evidence "show[ing] what harm she suffered as a result of the alleged delay." (*Barren v. Ne. Ill. Reg'l Commuter R.R. Corp.,* 2016 U.S. Dist. LEXIS 28421, *26 (N.D. Ill. 2016) (granting the employer's motion for summary judgment)). McCurry has not done so, and therefore, Kenco is entitled to summary judgment.

## CONCLUSION

McCurry's rambling complaint seeks to obscure and confuse the facts, but ultimately, the facts before the Court at summary judgment could not be more straightforward. McCurry is challenging the decisions surrounding her disability benefits and Kenco played no part in those decisions. As stated in the STD and LTD Plans, Kenco delegated all authority to determine eligibility for benefits, and pay benefits, to The Hartford. Kenco did not influence, or participate in, decisions surrounding McCurry's disability benefits nor did it handle the payment of such benefits. Accordingly, McCurry's claims, whether styled as ERISA claims or discrimination under Title VII and Section 1981, must fail. The purported injury that McCurry seeks to remedy was not caused by Kenco. Kenco therefore requests that the Court grant its request for summary judgment, dismiss McCurry's complaint in its entirety and with prejudice and grant any additional relief deemed proper.

Dated: October 25, 2021    Respectfully submitted,

            **KENCO LOGISTIC SERVICES, LLC**

            */s/ Julia Pearce Argentieri*
            One of Its Attorneys

            Julia Pearce Argentieri
            J. Casey Leech
            Jackson Lewis P.C.
            150 North Michigan Avenue, Suite 2500
            Chicago, Illinois 60601
            Telephone: (312) 787-4949
            Facsimile: (312)787-4995
            julia.argentieri@jacksonlewis.com
            casey.leech@jacksonlewis.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney, hereby certifies that on October 25, 2021, she electronically caused to be filed a copy of the foregoing **DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send a notice of the electronic filing to those registered on the Court's CM/ECF system, and that a copy was also sent via email and U.S. Mail to:

Edith McCurry
6239 South 13110 East Road
Pembroke Township, IL 60958
emccurry1@gmail.com

By: */s/ Julia Pearce Argentieri*
One of Defendant's Attorneys

# Robinson v. Aetna Life Ins. Co.

United States District Court for the Northern District of Illinois, Eastern Division

September 15, 2021, Decided; September 15, 2021, Filed

No. 20 C 4670

**Reporter**

2021 U.S. Dist. LEXIS 176346 *; 2021 WL 4206785

LAVERNE ROBINSON, Plaintiff, v. AETNA LIFE INSURANCE CO., and MONDELEZ GLOBAL LLC Defendants.

**Counsel:** [*1] For Laverne Robinson, Plaintiff: William T. Reynolds, IV, Matthew T. Maloney, DeBofsky Sherman Casciari Reynolds, P.C., Chicago, IL.

For Aetna Life Insurance Company, Defendant: W. Sebastian von Schleicher, LEAD ATTORNEY, Smith, von Schleicher & Associates, Chicago, IL.

**Judges:** REBECCA R. PALLMEYER, United States District Judge.

**Opinion by:** REBECCA R. PALLMEYER

# Opinion

## MEMORANDUM OPINION AND ORDER

Laverne Robinson seeks payment of long-term disability ("LTD") benefits that she believes are owed to her under the terms of an employee benefit plan. Robinson's LTD plan is underwritten and administered by Aetna Life Insurance Company ("Aetna") for the benefit of employees of Mondelez Global LLC ("Mondelez"). Robinson brings this civil action against Aetna and Mondelez, her former employer, under Section 502(a)(1)(B) of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA"). Defendants have moved to dismiss to the Complaint under FED. R. CIV. P. 12(b)(6). Specifically, Defendants argue that under the terms of the plan, Robinson has become ineligible for continued LTD benefits because she was not awarded Social Security disability benefits within 24 months of her initial receipt of LTD benefits. Defendants contend, as well, that the court should

dismiss the suit as time-barred. For the reasons set forth [*2] below, the motion is granted with respect to Defendant Mondelez, and otherwise denied.

## BACKGROUND

At this stage of the proceedings, the court accepts the factual allegations in the Complaint as true. Beginning in 2005, Plaintiff worked for Mondelez as a full-time Machine Operator, a skilled and medium-exertion level occupation. (Compl. [1] ¶ 12.)[1] Robinson has a history of various cardiac impairments that have required her to undergo multiple open-heart surgeries, a mitral valve replacement, and implantation of a pacemaker. (*Id.* ¶ 13.) As a result of those permanent and debilitating conditions, Plaintiff ceased working on April 29, 2016 and has not returned to work in any capacity. (*Id.* ¶¶ 14, 47.) Mondelez terminated her employment effective October 31, 2018. (*Id.* ¶ 14.) Beginning months earlier, and continuing for years, Robinson filed claims for disability benefits and multiple appeals from denials of those claims, as described below.

As a benefit of her employment and union membership, Plaintiff was entitled to LTD coverage under the Mondelez Global LLC Employee-Paid Group Benefits Plan ("Plan"). (*See* Plan, Ex. B. to Compl. [1-2].)[2] The Plan is sponsored [*3] by Mondelez and underwritten and administered by Aetna. (Compl. ¶ 10.) For six months after she ceased work, Robinson received short-

---

[1] The record does not reveal the nature of Mondelez's business, but the court understands the company is a snack food manufacturer. *See generally* MONDELEZ INTERNATIONAL, https://www.mondelezinternational.com/ (last visited Sept. 13, 2021).

[2] The court may consider exhibits attached to a complaint when deciding a motion to dismiss under Rule 12(b)(6). *See* FED. R. CIV. P. 10(c); *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013).

term disability ("STD") benefits until on or around October 29, 2016. (*Id.* ¶ 15.) Following her exhaustion of STD benefits, she received LTD benefits for 24 months, beginning on October 30, 2016 and continuing until October 30, 2018. (*Id.* ¶¶ 16, 27-28.) The Summary Plan Description ("SPD") refers to this combined 30-month period as "Own Occupation" disability, meaning that an employee is "continuously unable to perform the Material and Substantial Duties" of the occupation the employee had when she stopped working due to injury or sickness. (SPD, Ex. A to Compl. [1-1] at 12; *id.* at 7 (defining "Own Occupation").)[3] To qualify for "Any Occupation" disability and continue receiving LTD benefits, Robinson needed to satisfy several conditions set forth in the Plan. The relevant provision states:

**After 30 Months of Disability**

**"Any Occupation"** Disability (applies after the end of the "Own Occupation" disability period)

After you have been determined by the [Disability Claims Administrator (DCA), here Aetna] to have been disabled under the LTD Plan for 30 months, [*4] (the 6 month [STD] period followed by the initial 24 months of LTD) you will be considered disabled for LTD Plan purposes if, due to a physical impairment caused by an Injury or Sickness the DCA determines that:

• You are continuously unable to engage in Any Occupation that provides you with a salary of at least 60% of your Pre-Disability Earnings, and exists within your geographic area AND

• You are not Gainfully Employed, except for partial disability or rehabilitative employment for which you have Disability Earnings AND

• *You must be receiving Social Security Disability Income (SSDI) benefits by the end of the 24th*

*month of LTD in order to be considered disabled beyond the first 24 months of LTD.*

(SPD at 12 (emphasis added).) Although Robinson had applied for SSDI benefits in January 2017, she was not yet "receiving" those benefits by October 30, 2018 because her SSDI claim was still pending. (Compl. ¶ 27.) Aetna terminated Plaintiff's LTD benefits on October 30, 2018, citing the Plan provision quoted above. (*Id.* ¶¶ 27-28.) Robinson nonetheless contends that the fact that she was not receiving SSDI benefits by October 2018 should not bar her from recovering plan benefits because, on [*5] March 27, 2020, the Social Security Administration ("SSA") ultimately did conclude that she was entitled to SSDI benefits. (*Id.* ¶ 44.) In that March 2020 award, the SSA retroactively deemed her disabled effective April 30, 2016 and concluded that she was entitled to SSDI benefits beginning October 1, 2016. (*Id.*)

As noted, Plaintiff began the application process for SSDI benefits in January 2017, but it took more than three years before the SSA found that she was entitled to benefits. (*Id.* ¶¶ 20, 44.) On October 28, 2016, when Plaintiff had almost exhausted her six months of STD benefits, Aetna informed Plaintiff that Allsup, a third-party vendor that assists insureds in applying for SSDI benefits, would review her SSDI claim and determine whether to represent her. (*Id.* ¶ 17.) On November 3, 2016, Aetna learned that Allsup had declined to represent Robinson, but Aetna did not inform her of Allsup's decision. (*Id.* ¶ 18.) On January 9, 2017, Plaintiff called Aetna to ask whether a vendor would contact her to assist her with her SSDI claim. (*Id.* ¶ 19.) On January 11, Aetna returned her call and provided her with Allsup's phone number, but Aetna evidently did not notify Plaintiff that [*6] Allsup had declined to represent her. (*Id* ¶ 20.) During the January 11 call, Plaintiff informed Aetna that she had applied for SSDI benefits on her own on January 10. (*Id.*) On August 22, 2017, Plaintiff informed Aetna that the SSA had denied her SSDI claim but that she intended to continue pursuing it. (*Id.* ¶ 21.) On August 31, for reasons that are unclear from the Complaint, Allsup determined that Robinson was a viable candidate for SSDI claim assistance and commenced its representation of her claim on or around October 16, 2017. (*Id.* ¶¶ 22-23.) Allsup filed a new SSDI application on Plaintiff's behalf on October 30, 2017. (*Id.* ¶ 23.)

---

[3] The parties refer to the SPD and the Plan itself somewhat interchangeably and have not identified any inconsistencies between the two. Accordingly, the court will refer to both documents as "the Plan." *Cf. Schwartz v. Prudential Ins. Co. of America*, 450 F.3d 697, 699 (7th Cir. 2006) ("When [ ] the plan and the summary plan description conflict, the former governs, being more complete . . . unless the plan participant or beneficiary has reasonably relied on the summary plan description to his detriment.") (quoting *Health Cost Controls of Illinois, Inc. v. Washington*, 187 F.3d 703, 711 (7th Cir.1999)).

The SSA issued an initial denial of Plaintiff's SSDI claim (the one filed by Allsup) on February 8, 2018. (*Id.* ¶ 24.) Allsup agreed to represent Plaintiff in her request for reconsideration of that decision, but the effort was unsuccessful; on May 19, 2018, the SSA denied her request for reconsideration. (*Id.* ¶ 25.) On May 30, Plaintiff requested a hearing before an administrative law judge.[4] (*Id.* ¶ 26.) While Plaintiff's SSDI claim was still pending, Aetna notified Robinson on September 24, 2018 that it planned to terminate her benefits effective October [*7] 30, 2018, "based exclusively on the Plan provision requiring that Plaintiff be receiving SSDI benefits within the first 24 months of her receipt of LTD benefits." (*Id.* ¶ 27.) The Plan provides for two levels of appeal with Aetna for exhaustion purposes before a participant may file a civil action under ERISA. (SPD at 22-23.) Robinson timely submitted a first-level appeal of Aetna's decision, but Aetna upheld its termination decision on April 10, 2019. (Compl. ¶¶ 28-29.) On April 11, Allsup informed Aetna that Plaintiff's SSDI hearing was scheduled for August 5, 2019. (*Id.* ¶ 30.) Plaintiff, through counsel, requested that Aetna toll the deadline for her second-level LTD benefit appeal, which was set to expire on June 9, 2019, until after the hearing.[5] (*Id.* ¶ 31.) Hartford Life and Accident Insurance Company ("Hartford"), which had acquired Aetna and begun administering Plaintiff's LTD claim, denied that request. (*Id.* ¶ 32.) Plaintiff then timely submitted a second-level appeal, and Plaintiff's counsel requested that Hartford toll its review of her claim until October 31, 2019 so that the SSA would have more time to render a decision. (*Id.* ¶ 33.) Hartford denied this second tolling request, [*8] as well, and upheld its prior termination of benefits decision on June 30, 2019. (*Id.* ¶ 34.) Once again, Hartford's decision was based exclusively on the Plan provision requiring that Robinson be receiving SSDI benefits by the end of her 24th month of LTD benefits.

Hartford informed Plaintiff that she had a right to bring a civil action under ERISA, or that she could file a "voluntary appeal" with Mondelez's benefits department. (*Id.*) On September 19, 2019, Plaintiff submitted a voluntary appeal to the benefits department.

(*Id.* ¶ 40.) The Complaint does not specify what arguments Plaintiff made in this appeal. On October 9, 2019, an unidentified representative of Mondelez informed Plaintiff that Mondelez would not address her appeal but suggested that she "appeal this decision with Hartford again, or possibly inquire about a next-level appeals process with them." (*Id.* ¶ 41.) Plaintiff's counsel wrote to Hartford on November 1, 2019, requesting that it consider her voluntary appeal in light of Mondelez's refusal to do so. (*Id.* ¶ 42.) Hartford responded on March 4, 2020 that it would take no further action on Plaintiff's claim, which Hartford stated was "being handled by Mondelez," and [*9] that Plaintiff had exhausted her administrative remedies. (*Id.* ¶ 43.) Then on March 27, 2020, the SSA informed Robinson that she was entitled to SSDI benefits and retroactively deemed her disabled effective April 30, 2016. (*Id.* ¶ 44.)

Plaintiff filed this suit on August 7, 2020 under Section 502(a)(1)(B) of ERISA, codified at 29 U.S.C. § 1132(a)(1)(B). She contends that Defendants failed to meet their fiduciary obligations under ERISA by engaging in a "meaningless appeals process" and refusing to toll her appeal until the SSA reached a decision on her SSDI claim. (*Id.* ¶ 46.) Furthermore, she argues that the SSA's retroactive award of SSDI benefits effectively satisfies the Plan's requirement that she "be receiving" SSDI benefits by the end of her 24th month on LTD. (*Id.* ¶ 47.) Plaintiff requests all past due LTD benefits to which she is entitled under the Plan, along with prejudgment interest. (Compl. at 10.) She also seeks an order that Defendants maintain her benefits, so long as she continues to meet the Plan's terms and conditions, until her 65th birthday. (*Id.*)

Defendants note that this is the second lawsuit Plaintiff has filed challenging the denial of LTD benefits under the Plan. (Defs.' Mem. in Support of Mot. to Dismiss (hereinafter [*10] "Defs.' Mem.") [16] at 3.) Robinson's first suit was against Hartford, rather than Aetna, and she did not name Mondelez as a Defendant.[6] On August 6, 2020, Plaintiff moved for voluntary dismissal of that case under FED. R. CIV. P. 41(a)(1), and Judge Gettleman granted the motion, dismissing that earlier

---

[4] The Complaint does not make clear whether Allsup supported Plaintiff in making this request for a hearing.

[5] The Complaint does not state when Plaintiff retained counsel or whether counsel ultimately represented her at the SSDI hearing.

[6] *See* Compl., *Robinson v. Hartford Life & Accident Ins. Co.*, No. 20-cv-2383 (N.D. Ill. Apr. 17, 2020). The court may take judicial notice of public records, including court filings. *See* Fed. R. Evid. 201(b).

case without prejudice.[7] Robinson filed this suit the next day. Because the dismissal of her first suit was without prejudice, the court rejects Defendants' suggestion that Plaintiff's decision to name Aetna and Mondelez as defendants in this suit was somehow nefarious. (*See* Defs.' Mem. at 4.) For simplicity, and because defense counsel does not challenge the propriety of naming Aetna as a Defendant,[8] the remainder of this opinion will refer to Hartford as Aetna.

## LEGAL STANDARD

To survive a motion to dismiss under FED. R. CIV. P. 12(b)(6), a complaint must contain "enough factual matter (taken as true)" to suggest that a plaintiff is entitled to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). Courts generally "do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on [*11] its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (citing *Twombly*, 550 U.S. at 556).

## DISCUSSION

Defendants move to dismiss Plaintiff's Complaint on three grounds. First, Defendants argue that Plaintiff failed to satisfy the Plan's "Any Occupation" definition of disability because she was not receiving SSDI benefits by the end of her 24th month on LTD benefits. Second, Defendants argue that her Complaint is time-barred because she did not file suit within one year of the date of Aetna's decision on her last appeal. Finally, Defendants contend that Mondelez is not a proper defendant under 29 U.S.C. § 1132(a)(1)(B) because

---

[7] *See* Notice of Voluntary Dismissal, *Robinson v. Hartford Life & Accident Ins. Co.*, No. 20-cv-2383 (N.D. Ill. Aug. 6, 2020); Minute Entry, *Robinson v. Hartford Life & Accident Ins. Co.*, No. 20-cv-2383 (N.D. Ill. Aug. 6, 2020) ("[P]ursuant to Federal Rule of Civil Procedure 41(a)(1), this case is dismissed without prejudice.").

[8] Indeed, Defendants state: "All parties including Robinson agree that Aetna is a proper party to her claim for benefits under 29 U.S.C. § 1132(a)(1)(B)." (Reply [24] at 15.)

Mondelez is not responsible for payment of LTD benefits.

## I. Merits

Defendants contend that the plain language of the Plan defeats Plaintiff's claim: she was not yet "receiving" SSDI benefits by the end of her 24th month on LTD benefits. The Plan states: "You must be receiving [SSDI] benefits by the end of your 24th month of LTD in order to be considered disabled for LTD purposes beyond the first 24 months of LTD." (SPD at 12.) This requirement appears three additional [*12] times in the SPD. (*Id.* at 4, 10, 11.) Robinson received LTD benefits for 24 months, from October 30, 2016 to October 30, 2018. (Compl. ¶¶ 10, 27.) Because Robinson did not begin receiving SSDI until after March 27, 2020 (*id.* ¶ 44), Defendants argue that she is no longer eligible for LTD benefits. Plaintiff responds that the Plan is silent as to retroactive awards of SSDI benefits, and any ambiguity in the Plan should be construed against the insurer. (Opp'n [20] at 7-8 (citing *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652 (7th Cir. 2005).) According to Plaintiff, the SSA's determination that she was eligible for SSDI beginning October 1, 2016 satisfies the Plan's requirements for continued receipt of LTD benefits.

### A. Retroactive Award Theory

As a general matter, "the rule that contractual provisions ordinarily should be enforced as written is especially appropriate when enforcing an ERISA welfare benefits plan." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435, 135 S. Ct. 926, 190 L. Ed. 2d 809 (2015) (citation and alterations omitted). The terms of a plan are "given [their] plain and ordinary meaning, and the plan must be read as a whole, considering separate provisions in light of one another and in the context of the entire agreement." *Est. of Jones v. Children's Hosp. & Health Sys. Inc. Pension Plan*, 892 F.3d 919, 923 (7th Cir. 2018) (quoting *Schultz v. Aviall, Inc. Long Term Disability Plan*, 670 F.3d 834, 838 (7th Cir. 2012)). District courts review a denial of benefits determination *de novo* "unless the plan [*13] grants to the plan administrator the discretionary authority to construe policy terms." *Ruttenberg*, 413 F.3d at 659 (citing *Firestone Tire & Rubber Co. v. Bunch*, 489 U.S. 101,

115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)). If a plan grants such discretion to its administrator, courts apply a deferential "arbitrary and capricious" standard, meaning that "the reviewing court must ensure only that a plan administrator's decision has rational support in the record." *Est. of* Jones, 892 F.3d at 923 (citations omitted). "The requirement that [courts] give deference to the plan administrator's interpretation is especially applicable when plan language is ambiguous, for that is precisely when the administrator exercises his grant of discretion." *Est. of* Jones, 892 F.3d at 926 (quoting *Hess v. Reg-Ellen Mach. Tool. Corp.*, 423 F.3d 653, 662 (7th Cir. 2005)).

The Plan's definition of "Any Occupation" disability is not, at first glance, ambiguous. The use of the present-tense phrase "must be receiving" suggests that a plan participant is not eligible for LTD benefits unless the participant begins to receive SSDI within 24 months. (SPD at 12.) The provision is silent as to the effect of retroactive SSDI awards on eligibility for LTD benefits, however, and the Plan clearly grants the plan administrator the discretionary authority to construe policy terms. (*See* SPD at 24 ("The Plan Administrator has complete discretionary authority to interpret and [*14] construe the terms of the Disability Plan . . . .").) The Plan identifies "Mondelez Global LLC Administrative Committee" as the Plan Administrator and Aetna as the Disability Claims Administrator ("DCA"). (SPD at 25.) The Plan further grants the DCA "full discretionary authority over benefit determinations." (*Id.*) Thus, the court will apply an arbitrary and capricious standard of review to Defendants' denial of benefits determination.

Plaintiff disputes the application of the arbitrary and capricious standard of review in this case, pointing to an Illinois insurance regulation that prohibits health insurers from reserving discretion to interpret the terms of policies offered or issued within Illinois. *See* 50 Ill. Admin. Code § 2001.3. The Seventh Circuit has held that § 2001.3 is not preempted by ERISA. *Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 886 (7th Cir. 2015). Defendants contest the relevance of this provision, arguing that it applies only to insured plans, not employee-funded plans like Plaintiff's. (Reply [24] at 8-9.) In any event, Defendants assert, their motion "does not turn on the ERISA standard of review." (*Id.* at 8.) The court agrees with that assertion, but not with

Defendants' ultimate conclusion.

Even under a deferential arbitrary and capricious standard of review, [*15] Defendants' interpretation of the Plan's eligibility requirements for LTD benefits was not reasonable. Their reading would deny Plaintiff benefits to which she was otherwise entitled for a reason over which she had no control: the fact that the SSA took more than 24 months to process her claim. Defendants themselves concede that the SSA disability process "might take many years, as it did in Robinson's case." (*See* Defs.' Mem. at 11.) Consider two claimants, identical in every respect and equally physically challenged. Both seek SSDI benefits. One receives them promptly and the other, due to administrative delays at the SSA, does not. To deny the second claimant disability benefits under an ERISA plan seems, in the court's view, clearly arbitrary and capricious. This is not a case where plan administrators, having concluded that a claimant is not disabled, are asked to reconsider their finding because the Social Security Administration has ruled otherwise. At least as alleged in the complaint, Plaintiff does meet all of the requirements for benefits, save one over which she has no control. Where, as in this case, a claimant is otherwise eligible for benefits, but the Plan's terms make [*16] receipt of SSDI benefits dispositive, plan administrators may not turn a blind eye to a favorable award that comes after the Plan's file is closed.

Defendants cite to an unreported, out-of-circuit case as an example of a court rejecting Plaintiff's theory that the SSA's award of benefits should have retroactive effect on her claim for disability benefits under an ERISA plan. *See Northrup v. Penford Prods. Co.*, No. C05-0012-LRR, 2006 U.S. Dist. LEXIS 17146, 2006 WL 753218 (N.D. Iowa, Mar. 23, 2006). This court reads that case differently. In *Northrup*, an employee was terminated from his employment for falsifying records and lying to his supervisors. 2006 U.S. Dist. LEXIS 17146, [WL] at *5. He later applied for Social Security disability benefits and, in awarding those benefits, the SSA determined that he had become disabled, due to a variety of mental health conditions, approximately one week before his termination. *Id.* Several years after his termination, the now-former employee sought disability benefits from his former employer, which informed him that he was not eligible because he had been terminated. *Id.* Aetna and Mondelez are correct that the plan at issue

in *Northrup* conditioned receipt of disability benefits upon receipt of SSDI benefits, 2006 U.S. Dist. LEXIS 17146, [WL] at *2, but the basis for the employer's denial of benefits was that the plaintiff was no longer an [*17] employee, not the plaintiff's inability to obtain SSDI benefits within a pre-determined period of time. 2006 U.S. Dist. LEXIS 17146, [WL] at * 16 ("Northrup simply is not entitled to benefits because he was not an employee at the time he began receiving Social Security Disability payments.") *Northrup* is therefore distinguishable from this case; although Robinson ceased work in April 2016, she was not terminated until October 2018, when the 30-month "Own Occupation" period expired. Had the plaintiff in *Northrup* remained an employee but taken a leave of absence due to his disability, as Robinson did, he likely would have been eligible for benefits because he satisfied the remaining terms of the plan. 2006 U.S. Dist. LEXIS 17146, [WL] at *9.

## B. Fiduciary Duty

Defendants also ask the court to reject Plaintiff's alternative theory of liability: that Defendants violated their fiduciary duties under ERISA by refusing to toll her internal appeals until after her SSA hearing. (Opp'n at 9.) According to Robinson, "Defendants' haphazard and self-serving administration of [her] LTD benefit claim deprived her of the opportunity to resolve her deficient administrative record," by which she apparently means the SSA's final decision in her favor. (Opp'n at 10.) Defendants' "repeated [*18] interference with and delay of" her SSDI application "made it impossible" for her to obtain SSDI benefits within 24 months. (*Id.*) Defendants counter that they are not responsible for the SSA's protracted consideration of her claim, and tolling would not have changed the fact that she was not receiving SSDI benefits by October 30, 2018. (Reply at 10.)

Plaintiff has suggested that Defendants are in fact responsible for the SSA delays, in that Aetna and/or Allsup provided inadequate assistance her with SSDI application. She also argues that Aetna should have tolled its review of her internal appeal until after an administrative law judge had reviewed her claim. The court is not moved by the first argument; there is no obvious basis for the conclusion that Robinson would

have received a favorable disability determination from the SSA within 24 months of being on LTD, had Allsup begun assisting her with her SSDI claim sooner. Both SSDI applications—the one that Robinson filed on her own and the one that Allsup filed on her behalf—were denied, suggesting that Allsup's assistance or lack thereof was irrelevant. The SSA ultimately concluded that she was eligible for SSDI in March 2020—two and [*19] a half years after Allsup filed her application, and one and a half years after the Plan's October 30, 2018 deadline for receiving SSDI benefits.[9]

Plaintiff's second argument is that the Plan "explicitly permits" the indefinite tolling of an appeals period when, as here, a plan participant is awaiting review of an adverse SSA decision. (Opp'n at 11.) The Plan language she cites, however, applies to situations in which the administrator actively requests additional information from the claimant that is necessary to decide an appeal. The Plan states: "If such an extension is necessary due to a failure of the Claimant to submit the information necessary to decide the Claim, the period in which the Claims Administrator is required to make a decision will be tolled from the date on which the Notification is sent to the Claimant until the Claimant adequately responds to the request for additional information." (Plan at 27.) The text of this provision suggests that the Plan tolls deadlines for the administrator, not the claimant, when the claimant fails to submit essential information. The Plan does not explicitly impose a duty to toll deadlines for a claimant whenever an administrator [*20] is on notice that a final decision from the SSA is pending.

The absence of such an explicit duty does not, however, satisfy the court that a plan administrator may never waive a deadline that a claimant is unable to meet. The caselaw Defendants cite does not support such a harsh interpretation. In *Fessenden v. Reliance Standard Life Ins. Co.*, the Seventh Circuit enforced an administrative deadline that favored the plan beneficiary, not the administrator. *See* 927 F.3d 998, 1000 (7th Cir. 2019)

---

[9] Moreover, although the parties did not brief this point, the Seventh Circuit has observed that suits for interference with a person's opportunity to become eligible for plan benefits are properly brought under ERISA § 502(a)(3), not § 502(a)(1)(B). *See Ponsetti v. GE Pension Plan*, 614 F.3d 684, 695-96 (7th Cir. 2010) (calling plaintiff's attempt to sue ERISA plan for breach of fiduciary duty under § 502(a)(1)(B) a "novel theory").

(rejecting plan administrator's request that it be excused from missing deadline for deciding beneficiary's long-term disability benefits claim and denying administrator the benefit of deferential arbitrary and capricious review). And in *Edwards v. Brigg & Stratton Ret. Plan*, the court merely concluded that a beneficiary who failed to timely appeal a denial of benefits had not exhausted her administrative remedies. 639 F.3d 355, 362 (7th Cir. 2011) (declining to extend the substantial compliance doctrine to excuse claimant from ERISA's exhaustion requirement). These cases are not inconsistent with the conclusion that a plan administrator may, in its discretion, waive a deadline in favor of a claimant.

The parties disagree over the proper interpretation of *Reich* [*21] *v. Ladish Co.*, where the Seventh Circuit held that a former employee was entitled to disability benefits, even though his claim for SSDI benefits was still pending at the time his employment terminated. 306 F.3d 519, 525 (7th Cir. 2002). The plan administrator in *Reich* argued that only current employees were eligible for disability benefits, and the plaintiff was no longer an employee at the time of the administrator's benefits determination. *Id.* at 521. The Seventh Circuit rejected the administrator's interpretation as arbitrary and capricious because, elsewhere in the same plan, current employment was not a prerequisite to receiving retirement benefits. *Id.* at 525. Moreover, the plan unambiguously provided that the former employee was entitled to disability benefits beginning on the date of the SSA's disability determination. *See id.* ("The parties agree that the appropriate date is April 2, 1998, and that Reich is not entitled to accrued benefits before that date even though the SSA's decision was retroactive to August 22, 1994."). The plan at issue in *Reich* is distinguishable from Robinson's, which does not contain these features. But the Plan does make receipt of SSDI benefits a requirement for continued receipt of disability benefits. [*22] The timing of such an award is beyond the claimant's control. In these circumstances, it may well be incumbent upon an administrator to await a final SSA determination.[10]

* * *

Plaintiff has argued that plan administrators have a fiduciary duty to toll deadlines indefinitely pending a disability determination from the SSA. Whether or not that theory has merit, the court concludes that Plaintiff has stated a claim for LTD benefits under the terms of the Plan itself. Because the SSA concluded that she was entitled to SSDI benefits beginning October 1, 2016, she effectively became eligible for continued receipt of LTD benefits within the Plan's 24-month window. Defendants' contrary interpretation of the Plan is unreasonable, even under a deferential arbitrary and capricious standard of review. Accordingly, the court denies Defendants' motion to dismiss her claim on the merits.

## II. Time Bar

As a second basis for dismissal, Defendants argue that Plaintiff's suit is time-barred. Courts generally uphold time limits in ERISA plans for filing legal actions as valid and enforceable. *Heimeshoff v. Hartford Life & Accident Ins. Co.*, 571 U.S. 99, 105-06, 134 S. Ct. 604, 187 L. Ed. 2d 529 (2013) ("Absent a controlling statute to the contrary, a participant and a plan may agree by contract to a particular [*23] limitations period . . . as long as the period is reasonable."). In *Heimeshoff*, the Supreme Court held that a contractual limitations provision for seeking judicial review of an insurer's denial of LTD benefits was enforceable, even though the limitations period started running before the insurer could complete its internal review of the claim. *Id.* at 109-10. The Court observed that "employers have large leeway to design disability and other welfare plans as they see fit," and that ERISA's "statutory language speaks of '*enforc[ing]*' the 'terms of the plan,' not of *changing* them." *Id.* at 108 (citations and quotations omitted, emphasis in original). Moreover, "even in the rare cases where internal review prevents participants from bringing § 502(a)(1)(B) actions within the contractual period, courts are well equipped to apply

---

[10] Plaintiff also cites a number of cases that purportedly recognize an obligation on the part of a plan administrator to seek out additional information—such as an SSA disability determination—before making its own benefits determination. *See Reipsa v. Metro. Life Ins. Co.*, No. 1 C 3407, 2002 U.S. Dist. LEXIS 13188, *17-18 (N.D. Ill. June 11, 2002); *Montour v. Hartford Life & Accident Ins. Co.*, 588 F.3d 623, 636 (9th Cir. 2009); *Culver v. NXP USA Inc. Long Term Disability Ins. Plan*, 391 F. Supp. 3d 902, 907 (D. Ariz. 2019); *Gaither v. Aetna Life Ins. Co.*, 394 F.3d 792, 807 (10th Cir. 2004). The court need not discuss these cases at length because it concludes that Plaintiff has stated a claim for relief under the terms of the Plan itself.

traditional doctrines that may nevertheless allow participants to proceed," such as waiver, estoppel, or equitable tolling. *Id.* at 114-15.

Robinson's LTD Plan requires participants to pursue two levels of appeal to exhaust their administrative remedies. (SPD at 23.) According to the Plan's terms, "[a]ny civil action must be filed within one year after the date of the decision on the last level of appeal." (*Id.*) [*24] The court assumes that the Plan's reference to "last level of appeal" is synonymous with "second-level appeal," and Plaintiff does not argue otherwise. Aetna notified Robinson of its decision regarding her second-level appeal on June 30, 2019. (Compl. ¶ 34.) But Plaintiff did not file her Complaint in this case until August 7, 2020, 38 days after June 30, 2020. In response to the contention that her claim is now barred, Plaintiff urges that the one-year time limit was tolled while she pursued voluntary appeals, first with Mondelez and then with Aetna. (Opp'n at 6.)

ERISA regulations provide that "any statute of limitations or other defense based on timeliness is tolled during the time that any such voluntary appeal is pending." 29 C.F.R. § 2560.503-1(c)(3)(ii). When Aetna denied Robinson's second-level appeal on June 30, 2019, it informed her that she could file a voluntary appeal with Mondelez's benefits department. (Compl. ¶ 34.) Plaintiff did so on September 19, 2019. (*Id.* ¶ 40.) Mondelez responded on October 9 (20 days later), declining to address her appeal and suggesting that she "appeal this decision with [Aetna] again, or possibly inquire about a next-level appeals process with them." (*Id.* ¶ 41.) Defendants [*25] argue that her voluntary appeal with Mondelez extended the deadline for filing suit by 20 days—until July 20, 2020 at the latest—so her suit was untimely filed on August 7. (Defs.' Mem. at 13.) But the relevant ERISA regulation also suggests that the deadline for filing suit was tolled while her voluntary appeal with Aetna was pending, between November 1, 2019 and March 4, 2020. (Compl. ¶¶ 41-42.) That would give her at least four additional months to file suit.

Defendants argue that ERISA regulations permit tolling while a voluntary appeal is pending only "[t]o the extent that a plan offers voluntary levels of appeal." 29 C.F.R. §§ 2560.503-1(c)(3). As explained above, the Plan grants authority to Aetna to decide initial LTD claims and two levels of administrative appeal. Defendants are

correct that the Plan does not explicitly contemplate a third level of appeal with Aetna. (*See* SPD at 22-23.) Assuming the truth of the facts alleged in the Complaint, however, the court concludes that Plaintiffs' requests for reconsideration, first with Mondelez and then with Aetna, were voluntary appeals offered by the Plan because both Defendants informed her that she could file an additional voluntary appeal. (*See* Compl. ¶ [*26] 34 (Aetna informed Robinson that she could file a voluntary appeal with Mondelez's benefits department), ¶ 41 (Mondelez suggested that Robinson "appeal this decision with [Aetna] again, or possibly inquire about a next-level appeals process with them").) Defendants have not explained why the Plan contemplates voluntary appeals only with Mondelez, but not with Aetna. Accordingly, the court concludes that the limitations period was tolled for at least 4.5 months during the pendency of those appeals, rendering Plaintiff's suit timely.

### III. Whether Mondelez is a Proper Defendant

Alternatively, Defendants argue that Mondelez is not a proper defendant in a suit for benefits under 29 U.S.C. § 1132(a)(1)(B). According to Defendants, only the entity responsible for making payment (here, Aetna) is a proper defendant.[11] (Defs.' Mem. at 14.) The Plan names Aetna as the Disability Claims Administrator and vests it with discretionary authority to determine LTD benefit eligibility. (*See* SPD at 6, 24-25.) The Plan itself is funded solely by employee contributions, which are held in trust by the Mondelez Global LLC Group Benefits Trust-II, with JPMorgan Chase Bank as plan trustee. (*Id.* at 25.) Plaintiff counters that the Plan [*27] designates Mondelez as the "Plan Administrator," and plan administrators are subject to ERISA suits. (Opp'n at 13-14 (citing *Mein v. Carus Corp.*, 241 F.3d 581 (7th Cir. 2001)).)[12] Plaintiff further argues that "under *Mein*,

---

[11] Defendants appear to be relying on 29 U.S.C. § 1132(d)(2), which provides: "Any money judgment under this subchapter against an employee benefit plan shall be enforceable only against the plan as an entity and shall not be enforceable against any other person unless liability against such person is established in his individual capacity under this subchapter."

[12] Defendants respond that the Plan identifies "Mondelez Global LLC Administrative Committee," not Mondelez, as the "Plan Administrator." (SPD at 25; Reply at 14.) But the mailing address provided for the "Administrative Committee" is the same as the

Mondelez is a proper defendant under ERISA because it is the plan administrator, its benefits Plan is closely intertwined with the SPD, and the SPD lists Mondelez's address for service of legal process." (Opp'n at 14 (citing *Mein*, 241 F.3d at 585).)

ERISA defines an "administrator" as "(i) the person specifically so designated by the terms of the instrument under which the plan is operated; [or] (ii) if an administrator is not so designated, the plan sponsor; . . . ." 29 U.S.C. § 1002(16)(A). ERISA further defines "plan sponsor" as "the employer in the case of an employee benefit plan established or maintained by a single employer." 29 U.S.C. § 1002(16)(B)(i). "As to the proper defendant against whom to make an ERISA claim, it may ordinarily be true that, especially in a suit for benefits, a plaintiff should name the plan as a defendant," rather than the employer or plan administrator. *Mein*, 241 F.3d at 584; *see also Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 673 (7th Cir.2011) ("The proper defendant in a suit for benefits under an ERISA plan is . . . normally the plan itself."). Yet the Seventh Circuit has allowed cases to proceed with an employer named as a defendant [*28] where the employer and the plan are "closely intertwined." *Mein*, 241 F.3d at 584-85 (collecting cases). Plaintiff is therefore correct that employers who act as plan administrators may be subject to ERISA suits. That said, Mondelez is not analogous to the employer in *Mein*. There, the Seventh Circuit held that an employer was subject to suit where "the exact relationship between [the employer] and the plan is not clearly set out in the plan documents." *Id.* at 585. The plan at issue in *Mein* was an employer-funded 401(k) plan, and there was no insurance company acting as administrator of the plan. *Id.* at 583-84. Here, by contrast, the Plan is funded by employee contributions held in trust, and the terms state that all benefits "shall be paid or provided for solely by the Trust." (Plan at 11.) Confusingly, Robinson's Plan designates two administrators: Aetna as the Disability Claims Administrator, and Mondelez as the Plan Administrator. (*See* SPD at 25.) But the Plan elsewhere declares that "[t]he Plan Administrator [Mondelez] has delegated full fiduciary authority involving the

determination of disability or Benefits under the Disability Plan to Aetna." (SPD at 6.) Reading the Plan as a whole, Mondelez is not the sort of "plan administrator" [*29] subject to suit under *Mein*.

Plaintiff notes that the Plan also designates Mondelez as "Plan Sponsor," suggesting that Mondelez may be subject to suit on that basis. (SPD at 25.) But ERISA defines an administrator as a plan sponsor only if the plan does not designate an administrator in the plan itself. *See* 29 U.S.C. § 1002(16)(A)(ii). Plaintiff's reliance on *Friedman v. Pension Specialists, Ltd.*, No. 11-cv-5057, 2012 U.S. Dist. LEXIS 50531, 2012 WL 983784 (N.D. Ill. Mar. 19, 2012), is not to the contrary. In *Friedman*, the court held that a plan sponsor could be sued "because it acted as the Plan administrator and controlled benefit distribution payments." 2012 U.S. Dist. LEXIS 50531, [WL] at *3. As discussed above, however, Mondelez does not control benefit distribution payments, and Aetna, not Mondelez, makes benefit eligibility determinations. Moreover, the plaintiff in *Friedman* brought suit for breach of fiduciary duty, among other state law theories. 2012 U.S. Dist. LEXIS 50531, [WL] at *2-3 (construing claims as seeking relief under 29 U.S.C. §§ 1109, 1132(a)(2)). Robinson, meanwhile, has styled her Complaint as one under § 1132(a)(1)(B) for payment of benefits. (*See* Compl. ¶¶ 1, 6, 47.) Thus, of the two named defendants, only Aetna is a proper defendant to this suit. *See Larson v. United Healthcare Ins. Co.*, 723 F.3d 905, 913-16 (7th Cir. 2013) (holding that an insurer may be a proper defendant in a suit for benefits due under § 1132(a)(1)(B)).

Because Mondelez is not responsible for paying claims or making benefits determinations under [*30] the Plan, it is not subject to suit under Section 502(a)(1)(B). The court therefore dismisses Mondelez as a defendant.[13]

## CONCLUSION

_____

[13] The dismissal of Mondelez as a Defendant does not affect the court's time-bar analysis. As explained in Part II, the deadline to file suit was tolled during the pendency of Plaintiff's voluntary appeals. Even if Plaintiff's voluntary appeal with Mondelez is no longer considered, she still gained four additional months to file suit while her voluntary appeal with Aetna was pending. Because she filed suit on August 7, 2020, less than four months after the June 30, 2020 deadline, her suit remains timely.

_____

address provided for Mondelez itself—the only difference being that the Administrative Committee's address includes "c/o Benefits Department." (SPD at 25.) In any event, the court fails to see how this technicality alone means that Mondelez is not designated as the plan administrator.

2021 U.S. Dist. LEXIS 176346, *30

For the foregoing reasons, Defendants' motion to dismiss [15] is granted in part and denied in part. Mondelez is dismissed as a Defendant in this case, and Aetna is directed to file an Answer to the Complaint on or before October 8, 2021.

ENTER:

/s/ Rebecca R. Pallmeyer

REBECCA R. PALLMEYER

United States District Judge

Dated: September 15, 2021

# Zuckerman v. United of Omaha Life Ins. Co.

United States District Court for the Northern District of Illinois, Eastern Division

July 21, 2010, Decided; July 21, 2010, Filed

Case No.: 09-CV-4819

**Reporter**

2010 U.S. Dist. LEXIS 73207 *; 2010 WL 2927694

RACHEL ZUCKERMAN, Plaintiff, v. UNITED OF OMAHA LIFE INSURANCE COMPANY, AMERICAN PHARMACEUTICALS PARTNERS, INC., and AMERICAN PHARMACEUTICALS PARTNERS, INC. EMPLOYEE BENEFIT PLAN, Defendants.

**Subsequent History:** Motion denied by, Motion to strike granted by Zuckerman v. United of Omaha Life Ins. Co., 2011 U.S. Dist. LEXIS 57875 (N.D. Ill., May 31, 2011)

**Counsel:** [*1] For Rachel Zuckerman, Plaintiff: Leonard D. Saphire Bernstein, Whitfield McGann & Ketterman, Chicago, IL; Mark D. DeBofsky, Daley, DeBofsky & Bryant, Chicago, IL.

For United of Omaha Life Insurance Company, Defendant: William A. Chittenden , III, LEAD ATTORNEY, Joseph R. Jeffery, Chittenden, Murday & Novotny, LLC, Chicago, IL.

For American Pharmaceuticals Partners Co., Defendant: Ian H. Morrison, LEAD ATTORNEY, Barbara Holly Borowski, Seyfarth Shaw LLP, Chicago, IL.

**Judges:** Robert M. Dow, Jr., United States District Judge.

**Opinion by:** Robert M. Dow, Jr.

# Opinion

## MEMORANDUM OPINION AND ORDER

Currently before the Court are two motions to dismiss in part Plaintiff Rachel Zuckerman's first amended complaint, one filed by Defendant United of Omaha Life Insurance Company ("United of Omaha") [17] and the other filed by American Pharmaceuticals Partners,

Inc. ("APP") [24]. Also pending is Defendant United of Omaha's motion to strike jury demand [26]. For the reasons stated below, the Court grants both motions to dismiss [17 & 24] and denies as moot the motion to strike jury demand [26].

**I. Background** [1]

Plaintiff Rachel Zuckerman worked for Defendant APP as a Senior Scientist-project. Defendant AAP sponsored the American Pharmaceuticals Partners, Inc. Employee Benefit Plan ("Plan"). APP purchased Group Policy No. GUD-252C from Defendant United of Omaha to fund the long-term disability benefits offered under the Plan. As the insurer, United of Omaha agreed to pay certain benefits to eligible Plan participants "subject to the terms, conditions, and limitations of [the] Policy."

On April 4, 2006, Plaintiff stopped working for APP due to the combined effects of headaches, fibromyalgia, difficulty sleeping, and cognitive impairments, which Plaintiff believes were the result of chemical exposure in the workplace. After leaving her employment, Plaintiff filed a claim for worker's compensation benefits. She also applied for Social Security disability benefits, which she recently was awarded. APP advised Plaintiff that she was not eligible to apply for LTD benefits while also seeking worker's compensation benefits. APP later confirmed that position in a letter sent by APP to United of Omaha [*3] on August 12, 2008. The letter states that APP "instructed" Plaintiff not to file her disability claim until after her Worker's Compensation claim was resolved. Contrary to APP's advice, Plaintiff was eligible for LTD benefits regardless of causation because the LTD policy treats

---

[1] For purposes of Defendants' motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the first [*2] amended complaint. See, e.g., Killingsworth v. HSBC Bank Nevada, N.A., 507 F.3d 614, 618 (7th Cir. 2007).

workers' compensation benefits as an offset against LTD benefits, but does not exclude benefit eligibility in the event of work-related injuries or illnesses.

In reliance on APP's representations, Plaintiff did not apply for LTD benefits until 2008. At the time that she applied, she was approved to receive short-term disability benefits by Disability Management Services ("DMA"), which acted on behalf of the Plan with respect to short-term benefits. Then, on November 24, 2008, Defendant United of Omaha issued a determination that Plaintiff was not disabled. Plaintiff appealed this determination, but United of Omaha upheld its decision and refused to pay benefits. In addition to affirming its decision that Plaintiff was not disabled, United of Omaha raised an additional reason for the denial, which previously had not been communicated to Plaintiff -- namely, that the claim was denied due to late notice of the [*4] claim and the failure to timely submit proof of loss.

## II. Legal Standard On Motion To Dismiss

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint, not the merits of the case. See *Gibson v. City of Chicago,* 910 F.2d 1510, 1520 (7th Cir. 1990). To survive a Rule 12(b)(6) motion to dismiss, the complaint first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957)). Second, the factual allegations in the complaint must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly,* 550 U.S. at 563. [*5] The Court accepts as true all of the well-pleaded facts alleged by the plaintiff and all reasonable inferences that can be drawn therefrom. See *Barnes v.*

*Briley,* 420 F.3d 673, 677 (7th Cir. 2005).

On a Rule 12(b)(6) motion to dismiss, the Court generally must confine its inquiry to the factual allegations set forth within the four corners of the operative complaint. See *Rosenblum v. Travelbyus.com,* 299 F.3d 657, 661 (7th Cir. 2002). In the usual case, therefore, if a party moving for a 12(b)(6) dismissal submits documents with its motion to dismiss, the Court either must ignore the documents or convert the motion to one for summary judgment. See Fed. R. Civ. Pro. 12(b); *Venture Assoc. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir. 1993). However, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings," and may be considered on a motion to dismiss, "if they are referred to in the plaintiff's complaint and are central to her claim." *Venture,* 987 F.2d at 431. Documents that fall within this "narrow" exception must be "concededly authentic." *Tierney v. Vahle,* 304 F.3d 734, 738 (7th Cir. 2002).

Applying that standard, the Court will [*6] consider the following documents that are referred to in Plaintiff's complaint and central to her claims: (1) APP's Group Policy No. GUD-252C, which APP purchased from United of Omaha to fund long-term disability benefits offered under the APP Employee Benefit Plan ("Plan"); and (2) a letter dated August 12, 2008, from APP to United of Omaha, advising United of Omaha that APP advised Plaintiff not to file her disability claim until after her Worker's Compensation claim was resolved.

## III. Analysis

### A. United of Omaha's Motion to Dismiss

#### 1. Proper Defendant

In Count I, asserted against Defendant United of Omaha and/or the Plan, Plaintiff claims she is entitled to her LTD benefits under § 502(a)(1)(B) of the Employee Retirement Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). In its motion to dismiss Count I of Plaintiff's first amended complaint, United of Omaha first asserts that it is not a proper defendant and that only the benefit plan can be sued under ERISA. In response, Plaintiff contends that the party rendering the

claim determination is a proper party to a suit seeking benefits due under ERISA and that United of Omaha underwrote the benefit plan, is the party responsible for paying [*7] benefits, and was the party that made the claim determination.

The Seventh Circuit has held that "[g]enerally, in a suit for ERISA benefits, the plaintiff is 'limited to a suit against the Plan.'" *Mote v. Aetna Life Ins. Co.,* 502 F.3d 601, 610 (7th Cir. 2007) (quoting *Blickenstaff v. R.R. Donnelley & Sons Co. Short Term Disability Plan,* 378 F.3d 669, 674 (7th Cir. 2004)). In limited circumstances, however, individuals have been permitted to sue a party other than the plan in a claim for ERISA benefits. Specifically, the Seventh Circuit has recognized exceptions to its general rule where: (1) the employer and plan are closely intertwined; or (2) the ERISA plan documents refer to the employer and plan interchangeably. *Mein v. Carus Corp.,* 241 F.3d 581, 584-85 (7th Cir. 2001) (allowing plaintiff to sue his employer to recover ERISA benefits because the employer and the plan were closely intertwined); *Riordan v. Commonwealth Edison Co.,* 128 F.3d 549, 551 (7th Cir. 1997) (permitting a plaintiff to sue employer to recover ERISA benefits because the plan documents referred to the employer and plan interchangeably). In essence, these two exceptions allow a plaintiff to proceed against a party [*8] other than the plan -- specifically the employer -- when the identity of the plan is not discernable because of the close relationship between the employer and the plan.

The Court concludes that the exceptions recognized by the Seventh Circuit in *Mein* and *Riordan* do not apply because here, unlike in *Mein* and *Riordan,* the identity of the Plan is discernable. Indeed, Zuckerman identifies the name of the Plan in her complaint. This conclusion is consistent with the decisions of other judges in this district which have dismissed claims for ERISA benefits against insurers on the ground that the insurers are improper defendants. See, *e.g., Mote,* 502 F.3d at 610-11 (affirming district court's dismissal of an insurance company serving as plan administrator in a suit for ERISA benefits on proper defendant grounds); *Schultz v. Prudential Ins. Co. of America,* 678 F. Supp. 2d 771, 775-77 (N.D. Ill. 2010); *Eidmann v. Unum Life Ins. Co. of Am.,* 2005 U.S. Dist. LEXIS 20819, 2005 WL 2304801, at *1-3 (N.D. Ill. Sept. 20, 2005) (dismissing a claim for benefits against insurer on proper defendant

grounds); *Moffat v. Unicare Health Ins. Co. of the Midwest,* 352 F. Supp. 2d 873, 876-79 (N.D. Ill. 2005) (applying the Seventh Circuit's [*9] general rule and holding that an insurance company was not the proper defendant in an action for benefits brought under Section 1132(a)(1)(B)); *Matuszak v. Anesi, Ozmon, Rodin, Novak, & Kohen Ltd. Long Term Disability Plan,* 2004 U.S. Dist. LEXIS 21920, 2004 WL 2452733, at *1-3 (N.D. Ill. Nov. 1, 2004) (same).

In response, Zuckerman relies primarily on two cases in arguing that United of Omaha is a proper defendant for Count I: *Penrose v. Hartford Life and Accident Insurance Company,* 2003 U.S. Dist. LEXIS 13497, 2003 WL 21801214 (N.D. Ill. Aug. 4, 2003) and *Madaffari v. Metrocall Companies Group,* 2004 U.S. Dist. LEXIS 12739, 2004 WL 1557966 (N.D. Ill. July 6, 2004). [2] In *Penrose,* the court allowed a Section 1132(a)(1)(B) claim to proceed against the insurance company which issued the plan. 2003 U.S. Dist. LEXIS 13497, 2003 WL 21801214, at *3. After initially dismissing the case against the insurance company on proper defendant grounds, the court subsequently reinstated the claim for benefits against the insurer because, even after limited discovery, the identity of the plan was unknown. 2003 U.S. Dist. LEXIS 13497, [WL] at *1-3. While acknowledging the Seventh Circuit's general proper defendant rule in ERISA benefits cases, the court in *Penrose* allowed the suit to proceed because it determined that "the court of appeals is unlikely [*10] to hold that where the employer and/or administrator have failed to create or identify an entity known as a plan which can be sued, then a plaintiff is without a remedy in a suit to recover benefits." *Id.* Similarly, in *Madaffari,* the court also allowed an ERISA benefits suit to proceed against an insurance company because there was ambiguity regarding the identity of the plan. 2004 U.S. Dist. LEXIS 12739, 2004 WL 1557966, at *2-5.

The Court finds that neither *Penrose* nor *Madaffari* support Zuckerman's position because, here, unlike in those cases, there is no ambiguity or uncertainty

---

[2] Plaintiff also cites several decisions from other circuit courts and district courts outside the Seventh Circuit in arguing that United of Omaha is a proper defendant for Count I. Even if these cases stand for the proposition urged by Plaintiff, the Court would be constrained to disregard them because they contradict governing Seventh Circuit precedent.

regarding the identity of the plan. To be sure, the Court appreciates the logic in Plaintiff's position -- that the party that underwrote the benefit plan, pays the benefits, and made the claim determination is a proper defendant. In Plaintiff's complaint, she alleges that APP is "the [*11] plan sponsor and administrator." FAC at PP 1, 7, 18, 20. However, she also alleges in her complaint that Defendant United of Omaha was "engaged * * * in the administration of benefits under the aforementioned policy of insurance." Id. at P 6. Then, in her response brief, she states that United of Omaha made all the relevant decisions, duties typically associated with plan administrators. Even accepting those allegations as true, under *Mote,* regardless of who administers the relevant plan, the proper defendant is the plan itself unless one of the exceptions discussed above applies. Notably, in *Mote,* the Seventh Circuit did not apply any of those exceptions even though the plan administrator underwrote the plan and made all the decisions regarding benefits. 502 F.3d at 610-11. Thus, under Seventh Circuit law, [3] as most recently articulated in *Mote,* the Plan is the proper defendant in a claim for benefits under Section 1132(a)(1)(B). [4] Therefore, Defendant United of Omaha is dismissed as a

---

[3] In *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,* the court concluded that the insurer was the proper defendant in an ERISA case, [*12] despite the insurer's argument that the proper defendant was the plan. 2010 U.S. Dist. LEXIS 49151, 2010 WL 1979569, at *12-13 (N.D. Ill. May 17, 2010). In denying Blue Cross's motion to dismiss, the court stated, "Though the insurance coverage may have been provided by an employee benefit plan, it appears from plaintiffs' allegations that the BCBS entities had the sole authority to make the decisions that give rise to the plaintiff's claims * * * * therefore [BCBS is] clearly intertwined with the plans themselves." 2010 U.S. Dist. LEXIS 49151, 2010 WL 1979569, at *13. As noted above, the Court sees the logic in the approach taken by the court in *Pennsylvania* Chiropractic and advocated by Plaintiff here. However, the Court does not find any circumstances present in this case that would take it outside of the teaching of *Mote* that "[g]enerally, in a suit for ERISA benefits, the plaintiff is 'limited to a suit against the Plan.'" 502 F.3d at 610.

[4] To be sure, the Seventh Circuit has allowed a suit to proceed against a plan administrator where the administrator failed to raise an objection in the district court. See *Mote,* 502 F.3d at 611 (citing *Riordan v. Commonwealth Edison Co.,* 128 F.3d 549, 551 (7th Cir. 1997)). Here, because United of Omaha [*13] explicitly has raised the issue, the Court follows the Seventh Circuit's pronouncement in *Mote* that "[g]enerally, in a suit for ERISA benefits, the plaintiff is 'limited to a suit against the Plan.'" 502 F.3d at 610 (7th Cir. 2007).

---

Defendant. [5] Count I remains pending as to the Plan.

## B. APP's Motion to Dismiss Claims Under ERISA § 502(a)(3) (Count II)

In Count I, asserted against Defendant United of Omaha and/or the Plan, Plaintiff claims that she is entitled to all LTD benefits due since September 19, 2006, and that such benefits must continue until she recovers from disability, dies, or reaches the age of 65. Plaintiff brings Count I pursuant to § 502(a)(1)(B), which provides that "a civil action may be brought by a participant or beneficiary [of an ERISA plan] to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B); see also *Pennsylvania Chiropractic Ass'n v. Blue Cross Blue Shield Ass'n,* 2010 U.S. Dist. LEXIS 49151, 2010 WL 1979569, at *12 (N.D. Ill. 2010).

In Count [*14] II, pled "in the alternative" and asserted against APP, Plaintiff also claims she is entitled to all LTD benefits due to her under the Plan. Plaintiff brings Count II under § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), alleging that APP breached its fiduciary duty to Plaintiff to act exclusively in her interest in relation to her entitlement to benefits and violated 29 U.S.C. § 1140 (enforced under § 502(a)(3)) by "unlawfully interfer[ing] with Plaintiff's attainment of benefits" FAC at P 19. Section 502(a)(3) provides that a civil action may be brought "by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

APP moves to dismiss Count II on the grounds that (1) equitable relief under § 502(a)(3) is not available as a matter of law because Plaintiff has a claim for benefits under § 502(a)(1)(B) (Count I); and (2) even if Plaintiff could assert a claim under § 502(a)(3), the monetary relief that she seeks [*15] is not "appropriate equitable relief" within the meaning of the statute. In arguing that

---

[5] Because Defendant United of Omaha no longer will be a defendant in this action, its motion to strike Plaintiff's jury demand [26] is denied as moot.

2010 U.S. Dist. LEXIS 73207, *15

Plaintiff cannot maintain a claim under § 502(a)(3) because she has an adequate remedy under § 502(a)(1)(B), APP relies on the Supreme Court's discussion of § 502(a)(3) in *Varity Corporation v. Howe,* 516 U.S. 489, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996). In *Varity,* the Court described § 502(a)(3) as a "catchall" provision that acts "as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 does not elsewhere adequately remedy." 516 U.S. at 512. The Court noted that "the statute authorizes [only] '*appropriate*' equitable relief," and stated that "equitable relief * * * normally would not be 'appropriate' * * * where Congress elsewhere provided adequate relief for a beneficiary's injury." *Id.* at 515.

The Seventh Circuit has not expressly determined whether, under *Varity,* a claim for benefits under § 502(a)(1)(B) bars a § 502(a)(3) claim for equitable relief. However, as the Seventh Circuit recently recognized, "a majority of the circuits" have interpreted *Varity* to mean that "if relief is available to a plan participant under subsection (a)(1)(B), then that relief is *unavailable* under subsection (a)(3)." [*16] *Mondry v. American Family Mut. Ins. Co.,* 557 F.3d 781, 805 (7th Cir. 2009) (citing *Korotynska v. Metro. Life Ins. Co.,* 474 F.3d 101, 106 (4th Cir. 2006) (joining the 5th, 6th, 8th, 9th, and 11th Circuits in holding that "a claimant whose injury creates a cause of action under § 1132(a)(1)(B) may not proceed with a claim under § 1132(a)(3)")). Likewise, a number of "judges of this court have interpreted [*Varity*] to mean that a claim for equitable relief under § 1132(a)(3) must be dismissed if relief may be obtained under § 1132(a)(1)(B)." *Rice ex rel. Rice v. Humana Ins. Co.,* 2007 U.S. Dist. LEXIS 40740, 2007 WL 1655285, at *4 (N.D. Ill. June 4, 2007); see also *Heroux v. Humana Ins. Co.,* 2005 U.S. Dist. LEXIS 11712, 2005 WL 1377854, at *4 (N.D. Ill. June 8, 2005) (at motion to dismiss stage, stating that a § 1132(a)(3) claim "would be foreclosed by the relief [sought] * * * under § 1132(a)(1)(B)"); *Erikson v. Ungaretti & Harris-Exclusive Provider Plan,* 2003 U.S. Dist. LEXIS 21173, 2003 WL 22836462, at *3 (N.D. Ill. Nov. 24, 2003) (granting motion to dismiss § 502(a)(3) claim that rested "on the exact same basis as [plaintiff's] claims for denial of benefits" under § 502(a)(1)(B)); *Clark v. Hewitt Associates, LLC,* 294 F.Supp.2d 946, 950 (N.D. Ill. 2003) (holding that a [*17] plaintiff who has the right to bring a claim under ERISA §

502(a)(1)(B), regardless of its merits, may not seek relief under ERISA § 502(a)(3)); *Jurgovan v. ITI Enterprises,* 2004 U.S. Dist. LEXIS 11489, 2004 WL 1427115, at *4 (N.D. Ill. June 23, 2004) (granting motion to dismiss ERISA § 502(a)(3) claim under *Varity* where plaintiff had a claim for benefits under § 502(a)(1)(B)).

This is not to say that an ERISA plaintiff may never simultaneously bring claims under both § 502(a)(1)(B) and § 502(a)(3). See *Gore v. El Paso Energy Corp. Long Term Disability Plan,* 477 F.3d 833, 839-40 (6th Cir. 2007) (dismissal of § 502(a)(3) claim is appropriate where it is merely "a repackaged claim for individual benefits," but not where plaintiff's § 502(a)(3) claim and § 502(a)(1)(B) claim address "two separate and distinct injuries"). However, courts generally are in agreement that where a plaintiff's § 502(a)(3) and § 502(a)(1)(B) claims are materially indistinguishable (*i.e.,* "the equitable claims * * * are 'nothing more than repackaged denial of benefits claims"), the equitable claims must be dismissed. *Crummett v. Metropolitan Life Ins. Co.,* 2007 U.S. Dist. LEXIS 50956, 2007 WL 2071704, at *2 (D.D.C. July 16, 2007) (citation omitted). For example, courts [*18] consistently have dismissed § 502(a)(3) claims where a plaintiff seeks identical relief under §§ 502(a)(3) and 502(a)(1)(B). See *Rice,* 2007 U.S. Dist. LEXIS 40740, 2007 WL 1655285, at *4 (granting motion to dismiss ERISA § 502(a)(3) claim where plaintiff also asserted ERISA § 502(a)(1)(B) claim and sought identical relief under both claims); *Kaliebe,* 2003 U.S. Dist. LEXIS 17415, 2003 WL 22282379, at *3 (dismissing § 502(a)(3) claim where beneficiary sought the same remedy -- "restoration of the level of benefits that the beneficiary believes to have been required under the plan" -- for claims under §§ 502(a)(3) and 502(a)(1)(B)); *Erikson,* 2003 U.S. Dist. LEXIS 21173, 2003 WL 22836462, at *3 ("Unless [plaintiff] can state that she is entitled to some type of relief that would be unavailable to her under § 502(a)(1)(B), she may not bring a claim under § 502(a)[](3)."); *Jurgovan,* 2004 U.S. Dist. LEXIS 11489, 2004 WL 1427115, at *4 (plaintiff's "§ 502(a)(3) claim * * * must be dismissed because it seeks relief which duplicates the relief sought in her claim for benefits under § 502(a)(1)(B)"); *Wald v. Southwestern Bell Corp. Customcare Medical Plan,* 83 F.3d 1002, 1006 (8th Cir. 1996) (finding that plaintiff did "not have a cause of action under section 502(a)(3)" where she

sought "no different relief" [*19] under § 502(a)(3) than she did under § 502(a)(1)(B)). Similarly, courts have concluded that where a plaintiff's §§ 502(a)(3) and 502(a)(1)(B) claims rely on identical the factual allegations, the § 502(a)(3) claim must be dismissed. See *Jones v. American General Life and Acc. Ins. Co.,* 370 F.3d 1065, 1073 (11th Cir. 2004) ("the relevant concern in *Varity,* in considering whether the plaintiffs had stated a claim under Section 502(a)(3), was whether the plaintiffs also had a cause of action, based on the same allegations, under Section 502(a)(1)(B) or ERISA's other more specific remedial provisions"); *Moffat v. Unicare Midwest Plan Group 314541,* 2005 U.S. Dist. LEXIS 14849, 2005 WL 1766372, at *5 (N.D. Ill. July 25, 2005) (dismissing plaintiff's § 502(a)(3) claim where the same allegations supported plaintiff's § 502(a)(1)(B) claim).

By contrast, courts have declined to dismiss § 502(a)(3) claims that are not simply "repackaged" claims for benefits. See *Ehrman v. Standard Ins. Co.,* 2007 U.S. Dist. LEXIS 35124, 2007 WL 1288465, at *4 (N.D. Cal. May 2, 2007) (refusing to dismiss § 502(a)(3) claim at pleading stage where the plaintiff "alleged wrongful conduct that * * * [went] beyond the mere wrongful calculation of benefits" and thus § 502(a)(1)(B) [*20] might not provide complete relief); *Black v. Long Term Disability Ins.,* 373 F.Supp.2d 897, 902 (E.D. Wis. 2005) (motion to dismiss § 502(a)(3) claim should be denied under certain circumstances, including where plaintiff alleges one set of facts in support of § 502(a)(1)(B) claim and different facts in support of § 502(a)(3) claim); *Hill v. Blue Cross and Blue Shield of Mich.,* 409 F.3d 710, 718 (6th Cir. 2005) (holding that district court erred in dismissing § 502(a)(3) claim seeking injunctive relief to alter the manner in which defendant calculated benefits going forward because an award of benefits would not provide plaintiff with complete relief).

Here, Plaintiff asserts claims for "equitable" relief alleging that APP (i) breached its fiduciary duty to Plaintiff to act exclusively in her interest in relation to her entitlement to benefits and (ii) "unlawfully interfered with Plaintiff's attainment of benefits," which violates § 510 of ERISA. APP argues that, under *Varity* and its progeny, Count II must be dismissed.

In response, Plaintiff contends that it is too soon for the Court to determine whether Plaintiff can recover under §

502(a)(1)(B), and therefore dismissal of her § 502(a)(3) [*21] claims would be premature, as it could leave her without a remedy. But, as many courts have recognized, whether Plaintiff's § 502(a)(1)(B) claim ultimately will succeed is irrelevant; the pertinent inquiry is whether Plaintiff can state a claim under § 502(a)(1)(B). See *Katz v. Comprehensive Plan of Group Ins.,* 197 F.3d 1084, 1089 (11th Cir. 1999) (fact that plaintiff did not prevail on the merits of her § 502(a)(1)(B) claim was irrelevant because "the availability of an adequate remedy under the law for *Varity* purposes, does not mean, nor does it guarantee, an adjudication in one's favor"); *Tolson v. Avondale Indus., Inc.,* 141 F.3d 604, 610 (5th Cir. 1998) (that plaintiff "did not prevail on his claim under section 1132(a)(1) does not make his alternative claim under section 1132(a)(3) viable."); *Clark,* 294 F. Supp. 2d at 950 (rejecting plaintiff's argument that she should not be precluded from seeking relief under § 502(a)(3) because her claim under § 502(a)(1)(B) might fail, reasoning that the fact that she had "the *right* to bring a claim under § 1132(a)(1)(B), regardless of its merits," barred her § 502(a)(3) claim); *Kaliebe,* 2003 U.S. Dist. LEXIS 17415, 2003 WL 22282379, at *4 (rejecting argument that dismissal [*22] of equitable relief claim would be "premature" where it was "possible that Plaintiff [would] not recover under that theory," reasoning that "[i]t is always possible that a plaintiff will not recover, but the inquiry is adequacy not recoverability"). Therefore, Plaintiff's contention that her claims for equitable relief should not be dismissed because she may not prevail on her claim for benefits is not well-taken. See *Kenseth v. Dean Health Plan, Inc.,* 610 F.3d 452, 2010 U.S. App. LEXIS 13153, 2010 WL 2557767, at *24 (7th Cir. June 28, 2010) ("Notwithstanding the obstacles to relief under section 1132(a)(1)(B), Kenseth may not obtain comparable relief under the guise of a claim for breach of fiduciary duty").

Second, Plaintiff argues that dismissal of her § 502(a)(3) claims at this stage because would be inconsistent with Federal Rule of Civil Procedure 8(d)(2), under which she may plead two alternate theories of liability. A number of courts have addressed this argument, with mixed results. See *Kaliebe,* 2003 U.S. Dist. LEXIS 17415, 2003 WL 22282379, at *4 (stating that dismissal of § 502(a)(3) claim as duplicative on the pleadings contradicted Rule 8, but finding that *Varity* required that result); *Jurgovan,* 2004 U.S. Dist. LEXIS 11489, 2004

WL 1427115, at *4 ("the fact that alternative [*23] pleading is proper under the Federal Rules is irrelevant under this court's interpretation of *V[a]rity* because the existence of a claim for relief under § 502(a)(1)(B) (as opposed to the receipt of actual relief under than section) means that relief under § 502(a)(3) is not available as a matter of law"); *Rice,* 2007 U.S. Dist. LEXIS 40740, 2007 WL 1655285, at *4 (same); *Donaldson v. Pharmacia Pension Plan,* 435 F.Supp.2d 853, 869 n.5 (S.D. Ill. 2006) (under Federal Rule 8 "Plaintiffs are entitled to assert claims under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), in the same complaint, and are not required to elect a remedy before entry of final judgment"); *Black,* 373 F.Supp.2d at 902-03 (dismissing plaintiff's § 502(a)(3) claim "as duplicative at the pleading stage of a case would * * * violate Rule 8"); *Parente v. Bell Atlantic-Pennsylvania,* 2000 U.S. Dist. LEXIS 4851, 2000 WL 419981, at *3 (E.D. Pa. April 18, 2000) (permitting plaintiff to proceed under both §§ 502(a)(1)(B) and (a)(3) in light of "the longstanding principle of allowing parties to plead in the alternative").

The Court is not persuaded that dismissal would violate Rule 8. As discussed above, courts have interpreted *Varity* [*24] as prohibiting plaintiffs from repackaging "denial of benefits" claims as claims for equitable relief. In other words, *Varity* and its progeny bar plaintiffs from getting two bites at essentially the same apple by asserting identical claims under §§ 502(a)(3) and 502(a)(1)(B). In short, the dismissal of Plaintiff's equitable claims under *Varity* would not bar Plaintiff from asserting inconsistent legal theories, as Rule 8 allows, but from asserting the same legal theory twice under separate labels.

Here, Plaintiff seeks the same relief under her § 502(a)(3) claims as she does under her § 502(a)(1)(B) claim -- namely, all LTD benefits due since September 19, 2006, and continuing until she recovers from disability, dies, or reaches the age of 65. While Plaintiff's equitable claims also seek an order declaring that "APP is required to continue paying Plaintiff benefits so long as she meets the policy terms and conditions for receipt of benefits" (FAC at P 21(C)), that relief also is available under § 502(a)(1)(B). See *Rice,* 2007 U.S. Dist. LEXIS 40740, 2007 WL 1655285, at *4 (plaintiff's "request for an injunction against future

denial of benefits is available under § 1132(a)(1)(B)," which allows him to "clarify his [*25] right to future benefits under the plan"). "ERISA already creates a remedy for injuries inextricably tied to the denial of benefits. That remedy is a claim under § 502(a)(1)(B)." *Burns v. Orthotek Inc. Employees Pension Plan and Trust,* 2009 U.S. Dist. LEXIS 19936, 2009 WL 631245, at *4 (N.D. Ill. 2009); see also *Kenseth,* 610 F.3d 452, 2010 U.S. App. LEXIS 13153, 2010 WL 2557767, at *24 (finding that plaintiff's breach of fiduciary duty claim was essentially a denial-of-benefits claim and that "this is the sort of make-whole relief that is not typically equitable in nature and is thus beyond the scope of relief that a court may award pursuant to section 1132(a)(3)").

What separates Plaintiff's breach of fiduciary duty claim from others allowed to go forward is that in those other claims, there is some injury that is separate and distinct from the denial of benefits. For example, in *Rogers v. Baxter Intern., Inc.,* 521 F.3d 702, 704-05 (7th Cir. 2008), a plaintiff alleged that a plan's fiduciaries improperly encouraged participants to invest company stock that they knew was inflated and overpriced. Other acts for which a fiduciary may be found liable include failing to exercise due care in hiring, retaining, or training non-fiduciary agents (see *Schmidt v. Sheet Metal Workers' Nat'l Pension Fund,* 128 F.3d 541, 548 (7th Cir. 1997)); [*26] or a fiduciary's unilateral awarding of salary raises to the fiduciary himself or his family members (see *La Scala v. Scrufari,* 479 F.3d 213, 221 (2nd Cir. 2007)). In those cases, the harm could be done with or without an accompanying denial of benefits. In Plaintiff's case, her alleged injury came solely because of the denial of her benefits; absent the denial of benefits, there would be no injury.

Additionally, the allegations supporting Count II -- that APP misled her as to the time frame she had in which to file her claim for LTD benefits -- are included in Count I. Dismissal of Count II does not foreclose Plaintiff from pursuing the theory that APP's misrepresentation prevented her from filing a timely claim for benefits (and that consequently a denial of LTD benefits on that basis was wrong). In the event that case law exists that prevents Plaintiff from pursuing this theory through a § 502(a)(1)(B) claim, neither party has brought it to the Court's attention. As currently pled, Count II of Plaintiff's claim fails because the only injury claimed -- the denial of benefits -- creates a cause of action under §

2010 U.S. Dist. LEXIS 73207, *26

1132(a)(1)(B)) for monetary relief, making that relief "*unavailable* under [*27] subsection (a)(3)." *Mondry,* 557 F.3d at 805 (7th Cir. 2009); see also *Kenseth,* 610 F.3d 452, 2010 U.S. App. LEXIS 13153, 2010 WL 2557767, at *9 ("Where it is clear that the plaintiff is seeking legal rather than equitable relief, dismissal of the claim may be appropriate.").

### III. Conclusion

For the foregoing reasons, the Court grants Defendant United of Omaha's motion to dismiss [17] and grants Defendant APP's motion to dismiss [24]. The Court denies as moot Defendant United of Omaha's motion to strike jury demand [26].

Dated: July 21, 2009

/s/ Robert M. Dow, Jr.

Robert M. Dow, Jr.

United States District Judge

# Campbell v. Whobrey

United States District Court for the Northern District of Illinois, Eastern Division

January 14, 2019, Decided; January 14, 2019, Filed

No. 16 C 4631

**Reporter**

2019 U.S. Dist. LEXIS 6185 *; 2019 WL 184056

DORIS CAMPBELL, et al., Plaintiffs, v. CHARLES A. WHOBREY, et al., Defendants

**Subsequent History:** Summary judgment granted by, Motion denied by Campbell v. Whobrey, 2020 U.S. Dist. LEXIS 49098 (N.D. Ill., Mar. 22, 2020)

**Counsel:** [*1] For Doris Campbell, Timothy Campbell, Darrell Childress, Dennie Cooke, Joe Highfield, Russell Lee, Wayne Moore, Brad Davis, Al Hernandez, Pat Nugent, Randy Spillman, John O'Brien, Frederick Steinbach, Plaintiffs: Amanda S Amert, LEAD ATTORNEY, Caroline L. Meneau, Craig Christopher Martin, Jenner & Block LLP, Chicago, IL.

For Charles A. Whobrey, George J. Westley, Marvin Kropp, Arthur H. Bunte, JR., Gary F. Caldwell, Ronald Destefano, Greg R. May, Thomas Nyhan, Central States, Southeast and Southwest Areas Pension Fund, Defendants: James F. Hurst, LEAD ATTORNEY, Bradley Herman Weidenhammer, Kirkland and Ellis LLP, Chicago, IL; Howard Michael Kaplan, Kevin T. Van Wart, Kirkland & Ellis Llp, Chicago, IL; Robert Anthony Coco, Central States Law Department, Rosemont, IL.

For Gary Dunham, Defendant: Bradley Herman Weidenhammer, Kirkland and Ellis LLP, Chicago, IL.

**Judges:** Honorable Edmond E. Chang, United States District Judge.

**Opinion by:** Edmond E. Chang

# Opinion

## MEMORANDUM OPINION AND ORDER

The Plaintiffs are current or former employees of The Kroger Company, which is a nationwide grocery-store giant. The employees are enrolled in the Central States, Southeast and Southwest Areas Pension Plan. They are suing the Plan and [*2] its Trustees for an alleged breach of fiduciary duty and retaliation under the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.*[1] R. 98, First. Am. Supp. Compl.[2] The Plaintiffs assert that the Trustees neglected their duties of prudence and loyalty by refusing to consider a third-party's offer to take on the Plaintiffs' pension liabilities and thereby preserve their retirement benefits. *Id.* They also claim that the Defendants retaliated against them for filing their original complaint in this case by refusing to negotiate over the third-party offer after the complaint's filing. *Id., see also* R. 1, Compl. The Defendants now move to dismiss the retaliation claim, which is Count 3 of the First Amended & Supplemental Complaint. R. 101, Mot. Dismiss. For the reasons stated below, the motion is granted. Count 3 is dismissed with prejudice.

## I. Background

The Plan is a multiemployer defined-benefit pension plan set up under ERISA. Employers from a variety of industries contribute to the Plan on behalf of their employees. Until December 2017, Kroger contributed to the plan on behalf of certain current and retired employees (the Kroger Participants). The Plaintiffs are Kroger Participants. [*3]

At some point before July 2014, Kroger became concerned about the Plan's ability to continue paying the Kroger Participants' retirement benefits. Indeed, the Plaintiffs allege that the Plan is severely underfunded and will soon become insolvent. R. 98, First Am. Supp.

---

[1] This Court has subject matter jurisdiction under 28 U.S.C. § 1331.

[2] Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

2019 U.S. Dist. LEXIS 6185, *3

Compl. ¶¶ 52-56. On July 2, 2014, Kroger presented "an early version" of a potential lifeline for the Kroger participants (call it the Proposal for convenience's sake); the audience for the presentation were Plan Trustee Charles Whobrey and the Plan's Executive Director, Thomas Nyhan. *Id.* ¶ 79. Kroger and the International Brotherhood of Teamsters, which represents the Kroger Participants in collective bargaining, offered to set up a separate, fully-funded pension plan for the Kroger Participants—including the Plaintiffs. *Id.* ¶¶ 62-64. The new Kroger Plan would have taken on the Plan's liabilities to the Kroger Participants, freeing the Plan from the responsibility to pay the Participants' retirement benefits. *Id.* But there was a catch: in exchange for removing the Kroger Participants from the Plan, Kroger wanted to be discharged from its duty to pay ERISA's statutory withdrawal liability. *Id.*

Kroger and the Teamsters communicated [*4] the Proposal to the Plan Trustees in writing on April 10, 2015. R. 97-16, First Am. Supp. Compl. at Exh. 15, 4/10/15 Withdrawal Ltr. Within five days, the Plan Trustees responded with a letter rejecting the Proposal and laying out their reasons for doing so. R. 97-6, First Am. Supp. Compl. at Exh. 5, 4/15/15 Central States Resp. Ltr. The Trustees explained that they were "not authorized to accept the non-cash consideration offered by Kroger," emphasized that the Fund had a "firm policy against facilitating employer withdrawals in any way," and disputed that the Proposal would leave the Plan better off than if it held Kroger to its duty to make cash withdrawal payments. *Id.* at 1-2.

On April 25, 2016, the Plaintiffs filed their initial complaint in this case. R. 1, Compl. They alleged that the Trustees refused to negotiate over the Proposal or even consider it at all, thereby shirking their fiduciary duties and leaving *all* Plan participants—not just the Kroger Participants—worse off. *Id.* A few days later, the Defendants allowed the original deadline that the Plaintiffs had set for acceptance of the Proposal to pass without acting on it. First Am. Supp. Compl. ¶ 60; *see* R. 97-5, First Am. Supp. [*5] Compl. at Exh. 4, 5/5/15 Ltr. of Understanding. On May 4, 2016, apparently in response to the Plaintiffs' filing of their original complaint, Nyhan sent an email to Kroger stating that the trustees would "either negotiate or litigate but not both." R. 97-29, First Am. Supp. Compl. at Exh. 28, 5/4/16 Nyhan Email.

Nonetheless, negotiations seem to have continued after that date. On July 18, 2016, Defendant Nyhan met with Kroger and IBT and made a counteroffer to the Proposal. First Am. Supp. Compl. ¶ 104. But Kroger was not satisfied: on July 23, 2016, Kroger sent a letter to the Plan expressing concern that the Plan was not engaging in good-faith negotiation. R. 97-26, First Am. Supp. Compl. at Exh. 25, 7/23/16 Hoffman Ltr.; First Am. Supp. Compl. ¶ 109. Nyhan sent a brief email in response on July 29, 2016, but negotiations stalled until October 21, 2016. R. 97-24, First Am. Supp. Compl. at Exh. 23, 9/29/16 Nyhan Email. At that point, Kroger offered to pay an additional $50-$90 million under the Proposal. R. 97-9, First Am. Supp. Compl. at Exh. 8, 10/21/16 Kroger Counteroffer Ltr. at 4; First Am. Supp. Compl. ¶ 63. Nyhan responded on November 4 proposing additional changes. R. 97-25, First Am. Supp. Compl. at Exh. [*6] 24, 11/4/16 Nyhan Ltr.

Negotiations did not advance past that point, and Kroger withdrew from the Plan on December 10, 2017. R. 97-30, First Am. Supp. Compl. at Exh. 29, Settlement Agmt. at 2. Kroger and the Plan signed a settlement agreement on February 2, 2018 in which Kroger agreed to pay $418,546,581.91 for its withdrawal liability. *Id.* at 1, 11; First Am. Supp. Compl. ¶ 3. Under the agreement, the Plan is responsible for paying accrued benefits for Kroger's employees and retirees, and Kroger will "backstop" benefits for participants who were employed on the withdrawal date. First Am. Supp. Compl. ¶ 3.

On April 5, 2018, the Plaintiffs filed a First Amended and Supplemental Complaint. In addition to the claims made in the original complaint, the Plaintiffs added a third count, alleging that the Defendants had violated their rights under ERISA § 510 by refusing to negotiate over the Proposal after they filed their original complaint. First Am. Supp. Compl. ¶¶ 173-81. The Defendants filed a motion to dismiss that new count, arguing that it does not sufficiently plead a violation of § 510. Mot. Dismiss.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader [*7] is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and

plain statement must "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) (alteration in original) (cleaned up).[3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

ERISA § 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan." 29 U.S.C § 1140.

## III. Analysis

The Defendants [*8] make three primary arguments why Count 3 of the First Amended and Supplemental Complaint should be dismissed. First, they argue that the Plaintiffs did not adequately allege an adverse action under ERISA § 510. Mot. Dismiss at 8-9. Although the Defendants frame it as a distinct argument, they also claim that the behavior alleged by the Plaintiffs is

outside the scope of § 510. *Id.* at 14-15. Second, they argue that the Plaintiffs did not adequately allege that the Defendants had a specific intent to interfere with their benefits. *Id.* at 9-12. Third—and finally—they argue that ERISA does not authorize money damages for violations of § 510. *Id.* at 12-14. The Court will address each argument in turn.

### 1. Adverse Action

The Defendants argue that the Plaintiffs have failed to allege that they committed an "adverse action" that violated § 510. Mot. Dismiss at 8-9. The Defendants make two main arguments in support of this claim. First, they contend that they *did* negotiate with Kroger even after the Plaintiffs filed their original complaint. *Id.* at 8. And second, they argue that because their negotiations were against Kroger and not against the Plaintiffs themselves—both before and after the original complaint was filed—their actions could not be adverse to the [*9] Plaintiffs. *Id.* at 8-9. The Plaintiffs respond that the Seventh Circuit defines "adverse action" broadly and that they have alleged enough facts to raise an inference of retaliation. R. 106, Pl. Resp. at 1, 6-8.

"Adverse action" is really shorthand for the specific statutory terms in ERISA § 510, which makes it illegal to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising" particular rights (like suing under ERISA). 29 U.S.C. § 1140. The pertinent term at issue in this case is "discriminate." That term does encompass more than the typical punishment that an employer might impose against an employee. Indeed, the Seventh Circuit ever has resisted holding that only employers can be liable for violations of § 510. *See Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 826-27 (7th Cir. 2014) ("We are not saying that only employers can be liable for violating § 510—although some of our opinions can be read to suggest as much. As we have recently explained, this language was dicta, and any assumption that only employers can be liable under § 510 was ill founded.") (cleaned up). What's more, an adverse action (using the shorthand again) under § 510 need not even involve a direct interference with an employment relationship. *See Feinberg v. RM Acquisition, LLC*, 629 F.3d 671, 675-76 (7th Cir. 2011) (citing *Mattei v. Mattei*, 126 F.3d 794,

---

[3] This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

807 n.12 (6th Cir. 1997)) (explaining that language [*10] in prior cases limiting adverse actions to those that "deliberately [] alter the employment relation" was dicta, and that the language of § 510 leaves room for actions taken outside of the employment relationship or against participants or beneficiaries who are not employees).

But there still are limits to the types of acts that can plausibly be covered by § 510. In both *Teamsters* and *Feinberg*, the Seventh Circuit ultimately held that the plaintiffs had failed to allege adverse actions (that is, discrimination) under § 510. In *Feinberg*, the employer had opted not to assume pension liability for the plaintiffs when it acquired their former employer. *Feinberg*, 629 F.3d at 673. The Seventh Circuit reasoned that the employer could not be held responsible under § 510 for failing to do something it never had any legal obligation to do in the first place and concluded that the employer's choice not to assume the pension liability failed to qualify as discrimination. *Id.* at 675-76 ("A buyer of assets has, with exceptions inapplicable to this case, no obligation to assume the seller's liabilities"). In *Teamsters*, the Seventh Circuit refused to hold the defendant-employer responsible under § 510 when its contractor discharged the plaintiffs, who were employees [*11] of the contractor—not of the defendant-employer. *Teamsters*, 741 F.3d at 821. Because the defendant was not the plaintiffs' employer and did not discharge the employees, it could not possibly be liable for the discharge. *Id.* ("Although liability under [§ 510] is not limited to employers, the plaintiffs allege only an unlawful 'discharge,' which presumes an employment relationship. [The defendant was not the plaintiffs' employer], so the district court properly dismissed the § 510 claim."). *Teamsters* and *Feinberg* illustrate that there are limits on what can qualify as discrimination under § 510. At the very least, the challenged conduct must have been committed by the defendant (*Teamsters*) and cannot simply be something that the defendant has an absolute right to do (*Feinberg*).

It might very well be that another limit applies here, specifically, that a viable claim of § 510 discrimination must allege that the defendant treated the plan participants or beneficiaries *differently* from other plan participants or beneficiaries. After all, that is what "discriminate" typically means. *CSX Transp., Inc. v.*

*Alabama Dep't of Revenue*, 562 U.S. 277, 286-87, 131 S. Ct. 1101, 179 L. Ed. 2d 37 (2011) ("discriminates" means "to make a difference in treatment or favor on a class or categorical basis in disregard of individual merit") (quoting Webster's Third [*12] New International Dictionary 648 (1976)). If that meaning were to control here, then the Plaintiffs' retaliation claim would run into the obstacle that the alleged refusal to negotiate presumably does *not* differentiate amongst plan participants, so the Plan is not treating some participants one way and other participants in a different way. Indeed, the Plaintiffs' theory of discrimination is literally unprecedented: the Court has found no similar § 510 case against a Plan for refusing to negotiate with an employer. Having said that, there might be good reasons to interpret the term "discriminate" in a broader way for purposes of an anti-retaliation statute, or in the labor and employment context, *Mattei v. Mattei*, 126 F.3d 794, 803-06 (6th Cir. 1997). In any event, there is no need to decide that question, because the Plaintiffs' retaliation claim fails for an independent reason.

Specifically, the timeline that the Plaintiffs allege simply does not hold together because it is internally inconsistent. The Plaintiffs allege that "[f]ollowing the filing of [the] lawsuit, Defendant Nyhan, writing on behalf of the Trustees, stated that they were not willing to negotiate the Proposal, which would have preserved Plaintiffs' benefits, because of the [*13] lawsuit." First Am. Supp. Compl. ¶ 177. But the Plaintiffs also allege that the Defendants refused to negotiate the Proposal *before* they began this lawsuit: "*Before* this lawsuit was filed on April 25, 2016, Defendants simply refused to engage in negotiations with Kroger, and they refused to consider the Proposal." *Id.* ¶ 99 (emphasis added). If anything, the Defendants were *more* willing to negotiate (at least on the surface) after April 25, 2016: "After the lawsuit was filed, Defendants attempted to create the appearance of bargaining in order to gain a litigation advantage." *Id.* For example, before April 2016, the Defendants never made any kind of counteroffer to the Proposal. *Id.* ¶ 102. But after the first complaint was filed, in July 2016, they did. *Id.* ¶¶ 106-07. Ultimately, the Plaintiffs' own allegations of the Defendants' pre-lawsuit refusal to negotiate fatally undermine the plausibility of the retaliation claim, so Count 3 must be dismissed.

## 2. Specific Intent

The Defendants also argue that the Complaint fails to allege that "Defendants *intentionally* interfered with [Plaintiffs'] use or attainment of benefits." Mot. Dismiss at 9-12 (emphasis added). Liability under § 510 requires [*14] a "*specific intent* to violate the statute and to interfere with an employee's ERISA rights." *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 668 (7th Cir. 2008) (emphasis in original) (quoting *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein, P.C.*, 277 F.3d 882, 892 (7th Cir. 2001)). "The intent to frustrate the attainment of benefits must have been at least a motivating factor for the adverse action against the plan participant." *Teamsters*, 741 F.3d at 826.

The Plaintiffs counter that federal courts "do not require specific intent to be pled with great particularity." Pl. Resp. at 8. The Plaintiffs point to particular facts alleged in the Complaint suggesting that the Defendants intended to interfere with their benefits, particularly Nyhan's May 4, 2016 email, which said that the trustees would "either negotiate or litigate but not both." First Am. Supp. Compl. at Exh. 28, 5/4/16 Nyhan Email; First Am. Supp. Compl. ¶¶ 127, 179; *see* Pl. Resp. at 9.

Whether the Plaintiffs have sufficiently alleged that the Defendants had a specific intent to interfere with the Plaintiffs' benefits is a close question. It is one thing to allege a failure to act prudently or to breach a fiduciary duty, as the Plaintiffs try in the first two Counts. It is quite another to allege that the Defendants specifically *intended* to prevent employees from obtaining their benefits. Again, the Plaintiffs [*15] rely on the Nyhan email, which declared that there would be negotiation or litigation, but not both. *See* First Am. Supp. Compl. at Exh. 28, 5/4/16 Nyhan Email. It seems odd to draw an inference, even viewing the allegation in the Plaintiffs' favor, of intent to interfere from that email, because premising the retaliation claim on Nyhan's position puts the defense between a rock and a hard place: as part of the relief sought in this case, the Plaintiffs seek to compel the Plan (through an independent fiduciary) to negotiate with Kroger. First. Am. Supp. Compl. at 49. The Plan objects and so it is defending against the complaint. Yet the Plaintiffs seek to characterize the refusal to negotiate, combined with the defense against the complaint, as specific intent to interfere with the Plaintiffs' benefits. That in effect amounts to a demand that the Plan capitulate to the relief requested lest it face

a retaliation claim. Add to that the apparently undisputed fact (though it is not pled in the amended complaint) that Kroger funded the lawsuit, *see* Mot. Dismiss at 1 ("It is undisputed that Kroger funded and directed this lawsuit (including by selecting Plaintiffs' counsel) ..."), and the [*16] Defendants' refusal to negotiate appears to be a strategy intended to prevent *Kroger's* maneuver in instigating the lawsuit—not one intended to interfere with the *Plaintiffs'* benefits.

In any event, as discussed earlier, because the Plan refused to negotiate even before the lawsuit's filing, there is no plausible retaliation claim and there is no need to definitively decide whether specific intent was adequately alleged.

## 3. Monetary Relief

Finally, the Defendants argue that "the relief [Plaintiffs] seek is not available under ERISA," Mot. Dismiss at 12, and they specifically challenge any form of monetary relief. The remedies for § 510 (codified at 29 U.S.C. § 1140) are limited to those provided in § 502(a)(3), which in turn only provides for injunctive and other "appropriate equitable relief." ERISA § 502(a)(3), codified at 29 U.S.C. § 1132(a)(3). *See Teumer v. Gen. Motors Corp.*, 34 F.3d 542, 544 (7th Cir. 1994) ("Made enforceable by participants and beneficiaries through § 502(a)(3), § 510 protects employment relationships from disruptions."); *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1133 (7th Cir. 1992) ("A Section 510 claim is made enforceable through [ERISA] Section 502(a)(3)."). The Plaintiffs respond that equitable remedies can include restitution and other monetary relief, such as unpaid benefits. Pl. Resp. at 9-12. For the sake of completeness and to guide the parties going forward, the Court will discuss this dispute, [*17] even though Count 3 is dismissed on other grounds.

On Plaintiffs' request for restitution, § 502(a)(3) only allows money damages when they qualify as "equitable relief." The Plaintiffs point to cases decided by the District Court from 1986 to 2003 allowing broader types of monetary damages under § 510. *See* Pl. Resp. at 9-10. In 2002, however, the Supreme Court held that "for restitution to lie in equity, the action generally must seek ... to restore to the plaintiff particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 214, 122 S.

Ct. 708, 151 L. Ed. 2d 635 (2002); *see also Montanile v. Bd. of Trs. of Nat. Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651, 655, 193 L. Ed. 2d 556 (2016) (holding that a plan fiduciary may not recover expenses under § 502(a)(3) from a "participant's remaining assets" when the participant has already spent any recoverable funds "on nontraceable items"). In 2016, the Seventh Circuit made the requirement even more concrete: to state a viable claim for monetary relief under § 502(a)(3), the plaintiff must "point[] to specifically identifiable funds in the defendant's possession to which an equitable lien could attach." *Cent. States, SE & SW Areas Health & Welfare Fund by Bunte v. Am. Int'l Grp., Inc.*, 840 F.3d 448, 453 (7th Cir. 2016). There is no allegation that the Defendants have that sort of identifiable funds in their possession (much less that they gained them by their alleged refusal to negotiate the Proposal), so the Plaintiffs have no restitution [*18] to recover under § 510.

The Plaintiffs assert that the Defendants' damages argument as to Count 3 could apply equally to their breach of fiduciary duty claims because "the same provision of ERISA, § 502(a)(3), authorizes relief for both sets of claims." Pl. Resp. at 11. But that is not right. The Plaintiffs' breach of fiduciary duty claims are governed by 29 U.S.C. § 1109. Section 1109 has a broader set of remedies, described at § 1109(a):

> Any person ... shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate.

29 U.S.C. § 1109(a). Section 1132(a)(3) (ERISA § 502(a)(3)) simply does not apply to claims of breach of fiduciary duty under § 1109. Instead, § 1132 itself explicitly points those claims back to § 1109. 29 U.S.C. § 1132(a)(2) ("A civil action may be brought ... by the Secretary, or by a participant, beneficiary, or fiduciary for appropriate relief under section 1109 of this title."). The bottom line is that monetary relief is not available to the Plaintiffs on Count 3.

## IV. Conclusion

For the reasons above, Count 3 of the Plaintiffs' First

Amended and Supplemental Complaint [*19] is dismissed. The Plaintiffs did not suggest a possible amendment to the claim (and the complaint has already been amended and supplemented), so the dismissal is with prejudice. The parties shall confer about the next step of the litigation (no further discovery was needed on the first two claims, R. 66). By February 4, 2019, the parties shall file a status report on their respective positions on what remains to do in the case. The February 14, 2019 status hearing remains in place.

ENTERED:

/s/ Edmond E. Chang

Honorable Edmond E. Chang

United States District Judge

DATE: January 14, 2019

**End of Document**

# Mounts v. UPS of Am., Inc.

United States District Court for the Northern District of Illinois, Eastern Division

August 31, 2009, Decided; August 31, 2009, Filed

Case No. 09 C 1637

**Reporter**

2009 U.S. Dist. LEXIS 77656 *; 2009 WL 2778004

PAUL K. MOUNTS, SR., DOUGLAS P. CHAPMAN, and CARL KATARZYNSKI, Plaintiffs, v. UNITED PARCEL SERVICE OF AMERICA, INC. and UPS HEALTH AND WELFARE PACKAGE FOR RETIRED EMPLOYEES, Defendants.

**Counsel:** [*1] For Paul K. Mounts, Sr., Douglas P. Chapman, Sr., Carl Katarzynski, Plaintiffs: John Paul Madden, LEAD ATTORNEY, Margaret Megan O'Malley, O'Malley & Madden, P.C., Chicago, IL.

For United Parcel Service of America, Inc., UPS Health and Welfare Package for Retired Employees, Defendants: Gary R. Clark, John Allen Klages, LEAD ATTORNEYS, Andrew Fisher Hettinga, Quarles & Brady LLP, Chicago, IL.

**Judges:** Virginia M. Kendall, United States District Judge.

**Opinion by:** Virginia M. Kendall

# Opinion

## MEMORANDUM OPINION AND ORDER

Plaintiffs Paul Mounts ("Mounts"), Douglas Chapman ("Chapman") and Carl Katarzynski ("Katarzynski") (collectively "Plaintiffs") filed suit against Defendants United Parcel Service of America, Inc. ("UPS") and UPS Health and Welfare Package for Retired Employees ("the Plan") (collectively "Defendants") alleging violations of federal employment discrimination laws. Specifically, Plaintiffs allege that Defendants violated Title VII of the Civil Rights Act of 1965 ("Title VII"), 42 U.S.C. § 2000e *et seq.,* the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,* the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* and the

Employee Retirement Income Security Act of 1974 [*2] ("ERISA"), 29 U.S.C. § 1132. Pursuant to Fed. R. Civ. P. 12(b)(6), Defendants have moved to dismiss all claims. For the reasons stated, Defendants' Motion to Dismiss is granted in part and denied in part.

## PLAINTIFF'S ALLEGATIONS

The Court takes the following allegations as true, as it is required to do at the motion to dismiss stage. *See Murphy v. Walker,* 51 F.3d 714, 717 (7th Cir. 1995). Plaintiffs, retired Feeder Drivers for UPS, formed an independent organization to assist current and retired UPS employees file complaints with the EEOC and secure their medical and retirement benefits from UPS. (Compl. PP 11-16.) Because of their efforts, numerous UPS employees received charges of discrimination from the EEOC and benefits that UPS had previously denied them. (Compl. P 17.) During a 2001 meeting, UPS representatives pressured Chapman and Katarzynski to stop contacting federal agencies on behalf of UPS employees and to stop assisting UPS employees with charges of discrimination and complaints relating to medical and retirement benefits. (Compl. PP 18-19.) Despite the pressure they received from UPS representatives, Plaintiffs continued to offer their support to UPS employees filing charges [*3] and claims. (Compl. P 20.)

Eventually, UPS informed Chapman and his wife that they were no longer eligible for coverage under the Plan's group health insurance plan. (Compl. P 21.) On January 17, 2003, Chapman filed a charge of discrimination with the EEOC, claiming that Defendants discriminated against him on the basis of his disability and that they retaliated against him in violation of the ADA, ADEA and Title VII. (Compl. Ex. 2.) Mounts and Katarzynski assisted with the investigation into Chapman's charge of discrimination. (Compl. P 24.) In

April 2003, Chapman and UPS participated in an EEOC-sponsored mediation of his charge of discrimination but they did not resolve their dispute. (Compl. P 25.)

Several weeks after the mediation, Defendants removed Mounts and Katarzynski from the Plan. (Compl. P 27.) Chapman, Mounts and Katarzynski all contested their removal from the Plan but Defendants refused to reinstate them or grant them benefits under the Plan. (Compl. P 28.) Mounts and Katarzynski each filed a charge of discrimination with the EEOC on October 29, 2003. (Compl. Exs. 1, 3.)

After receiving their right to sue letters from the EEOC, Plaintiffs filed this action, alleging discrimination [*4] under the ADA and the ADEA, retaliation under Title VII, the ADA and the ADEA and violations of ERISA. Defendants have moved to dismiss, claiming that: 1) all ERISA claims are time-barred; 2) Chapman's claims in Counts I-III are time-barred; and 3) Plaintiffs have not satisfied the minimum federal pleading standards for their ADA, ADEA and Title VII claims. After Defendants filed their Motion to Dismiss, Plaintiffs voluntarily dismissed their ERISA claim arising under 29 U.S.C. § 1140 with prejudice.

## STANDARD OF REVIEW

When considering a motion to dismiss under Rule 12(b)(6), a court must accept as true all facts alleged in the complaint and construe all reasonable inferences in favor of the plaintiff. *See Murphy,* 51 F.3d at 717. To state a claim upon which relief can be granted, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need not allege all facts involved in the claim. *See Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.,* 40 F.3d 247, 251 (7th Cir. 1994). However, in order to survive a motion to dismiss for failure to state a claim, the claim must be supported by facts that, [*5] if taken as true, at least plausibly suggest that the plaintiff is entitled to relief. *See Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). Such a set of facts must "raise a reasonable expectation that discovery will reveal evidence" of illegality. *Id.* at 1965.

## DISCUSSION

### I. Timeliness of Plaintiffs' ERISA Claims

As previously noted, Plaintiffs voluntarily dismissed their claim arising under 29 U.S.C. § 1140 with prejudice. In the remaining ERISA claim, Plaintiffs bring a breach of fiduciary duty claim under 29 U.S.C. § 1332. Once a plaintiff has actual knowledge of a breach of fiduciary duty, he has three years to bring an ERISA claim to remedy the breach. *See* 29 U.S.C. § 1113(2); *S. Ill. Carpenters Welfare Fund v. Carpenters Welfare Fund of Ill.,* 326 F.3d 919, 924 (7th Cir. 2003). Here, at the latest, Plaintiffs all had actual knowledge that they had been removed from the Plan in 2003 when they filed their charges of discrimination with the EEOC. They did not file this action until 2009, after the three year limitations period for breach of fiduciary duty claims under ERISA expired.

While Plaintiffs concede that they filed suit outside of the three year limitations period, [*6] they claim that the Court should equitably toll the statute of limitations because EEOC inaction lulled them into inaction. Although Plaintiffs filed their charge of discrimination in 2003 for their ADA, ADEA and Title VII claims and the EEOC issued its determination in September 2006, they did not receive their right to sue letters until December 2008, when the three year limitations period for the ERISA claim had already expired. Equitable tolling applies when the plaintiff "has made a good faith error (e.g., brought suit in the wrong court) or has been prevented from filing his complaint in time." *Threadgill v. Moore U.S.A., Inc.,* 269 F.3d 848, 850 (7th Cir. 2001). When plaintiffs bring some claims that require exhaustion of administrative remedies as a prerequisite to suit and other claims that do not, participating in the administrative process for some claims does not operate to toll the statute of limitations for the claims that do not require exhaustion. *See Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 465-66, 95 S. Ct. 1716, 44 L. Ed. 2d 295 (1975) (pendency of Title VII administrative process does not toll statute of limitations for employment discrimination suits brought under 42 U.S.C. § 1981); [*7] *Herrmann v. Cencom Cable Assocs., Inc.,* 999 F.2d 223, 225 (7th Cir. 1993) (detailing options available to plaintiffs participating in the EEOC administrative process while the statute of limitations runs on other claims). Here, with respect to the ERISA claim, the three year limitations period

expired while Plaintiffs pursued their administrative remedies with the EEOC for their Title VII, ADA and ADEA claims. Because equitable tolling does not toll the limitations period for their ERISA claim, Plaintiffs' ERISA claim is untimely. Accordingly, Count IV is dismissed.

## II. Timeliness of Chapman's Title VII, ADA and ADEA Claims

After UPS originally filed its Motion to Dismiss, at a June 2, 2009 hearing, the Court expressed concern that it could not rule on the timeliness of Chapman's Title VII, ADA and ADEA claims without looking outside of the pleadings to consider letters that he wrote to Defendants in 2001 and 2002. The Court permitted UPS to file an Amended Motion to Dismiss to include the letters as exhibits pursuant to Fed. R. Civ. P. 12(d) and set a new briefing schedule to give the parties sufficient time to present material.

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside [*8] the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Because the Court gave the parties an opportunity to present argument relating to Chapman's letters, to the extent that UPS's Motion to Dismiss seeks to dismiss Chapman's Title VII, ADA and ADEA claims as untimely, the Court treats the motion as a motion for summary judgment. Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Based upon the Plan documents submitted in support of [*9] UPS' Amended Motion to Dismiss, retirees covered by the Plan become ineligible to receive coverage when the retiree becomes eligible for Medicare. (Def. Memo. Ex. 2.) On September 1,1999, Chapman began receiving Social Security Disability Insurance (SSDI) payments. (Def. Memo. Ex. 3.) After a two year waiting period, he received SSDI Medicare benefits. *(Id.)* Once he received SSDI Medicare benefits, the Plan denied one of his claims, stating, "Please be advised that benefits are not available for members with Medicare." *(Id.)* On December 6, 2001, Chapman sent a letter to one of the Plan's Support Consultants, Nancy Clark ("Clark"), to appeal the denial and to state his belief that the Plan's policy of excluding retirees when they become eligible for Medicare violates ERISA and other federal laws. *(Id.)* On March 14, 2002, Chapman's attorney sent a letter to Clark and the UPS Legal Department to appeal the denial, stating that Chapman "ha[s] been denied coverage for various health care services purportedly because [he is] eligible for Medicare. Importantly, [Chapman] became Medicare-eligible because [he] became disabled and received SSDI Social Security Disability payments for more than [*10] two years." (Def. Memo. Ex. 3.) On January 17, 2003, Chapman filed a charge of discrimination with the EEOC, claiming that the Plan discriminatorily excluded him from coverage from the group health insurance plan in violation of Title VII, the ADA and the ADEA. (Compl. Ex. 2.)

A claim of discrimination is time-barred if the plaintiff does not file a charge of discrimination within 300 days after the alleged unlawful employment practice occurred. *See* 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1); 42 U.S.C. § 12117(a). With respect to claims regarding discrete employment actions, "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act." *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 113, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002); *see also Roney v. Ill. Dep't of Transp.,* 474 F.3d 455, 460 (7th Cir. 2007) (A discrete act of discrimination "is an unlawful employment practice that must be brought to the EEOC's attention within 300 days of its occurrence."). The limitations period begins on the date of the adverse personnel action. *See Fairchild v. Forma Scientific, Inc.,* 147 F.3d 567, 574 (7th Cir. 1998).

Chapman claims that he learned of the Plan's decision to remove him from the [*11] insurance plan on April 16, 2002, as he indicated on the charge of discrimination he filed with the EEOC. However, Chapman's letters

demonstrate that as of December 1, 2001, he had knowledge of the Plan's determination that he was no longer eligible to receive benefits from the Plan once he received Medicare. Additionally, although Chapman claims that he wrote the December 1, 2001 letter to protest a single claim denial, that letter and the March 14, 2002 letter from Chapman's attorney to Clark protest the legality of the Plan's eligibility criteria. Accordingly, the record shows that Chapman had knowledge of the Plan's determination that he was not eligible to participate in the group health insurance as early as December 1, 2001. Because he did not file his charge of discrimination relating to that determination until January 17, 2003, more than 300 days after the Plan's determination that he was not eligible to receive benefits, Chapman's claims arising under Title VII, the ADA and the ADEA are untimely.

III. Sufficiency of Title VII, ADA and ADEA Allegations

I. Retaliation Claims

Mounts and Katarzynski allege that Defendants retaliated against them in violation of Title VII, the ADA [*12] and the ADEA when they found Mounts and Katarzynski to be ineligible to participate in the Plan. To state a claim for retaliation under Title VII, the ADA or the ADEA, a plaintiff must allege: 1) a statutorily protected activity; 2) an adverse employment action; and 3) a causal link between the protected activity and the employer's action. *See McClendon v. Ind. Sugars, Inc.,* 108 F.3d 789, 796 (7th Cir. 1997). To survive a motion to dismiss, a plaintiff must plead facts sufficient to allow the court to draw a reasonable inference that the defendant is liable for the conduct alleged. *See Ashcroft v. Iqbal,* __ U.S. __, 129 S.Ct. 1937, 173 L. Ed. 2d 868 (2009). The level of facts required varies with the type of claim asserted. *See Limestone Dev. Corp. v. Vill. of Lemont,* 520 F.3d 797, 803-04 (7th Cir. 2008). Complaints "alleging illegal retaliation on account of protected conduct must provide some specific description of that conduct beyond the mere fact that it is protected." *E.E.O.C. v. Concentra Health Servs., Inc.,* 496 F.3d 773, 781 (7th Cir. 2007). To survive a motion to dismiss, the complaint must put the defendants on notice of the plaintiff's allegations by specifying the plaintiff's protected [*13] conduct because "an allegation of retaliation for some unspecified act does not narrow the realm of possibility"

for the defendant. *Id.* at 782; *see also Higgs v. Carver,* 286 F.3d 437, 439 (7th Cir. 2002) ("Had [the plaintiff] merely alleged that the defendants had retaliated against him for filing a suit, without identifying the suit or the acts claimed to have constituted retaliation, the complaint would be insufficient.").

Here, Mounts and Katarzynski alleged that they assisted Chapman in the investigation relating to his charge of discrimination and that UPS removed them from the Plan because of that assistance. Because Mounts and Katarzynski assisted Chapman his claims relating to discrimination under the ADA and ADEA and retaliation under Title VII, the allegations in the Complaint are sufficient to state a claim for retaliation under those statutes. Therefore, Defendants are not entitled to dismissal of Counts I-III on the basis that they have failed to state claims for retaliation.

II. Discrimination Claims

In addition to their retaliation claims, Mounts and Katarzynski also claim that UPS found them to be ineligible to participate in the Plan because of their ages and disabilities [*14] in violation of the ADA and the ADEA. An plaintiff states a claim for employment discrimination when he alleges that an employer took a specific adverse action against him because of a prohibited animus. *See Tamayo v. Blagojevich,* 526 F.3d 1074, 1085 (7th Cir. 2008). In the ADEA context, a plaintiff states a claim for age discrimination by alleging that he is over 40 years old and that the employer took an adverse employment action against him because of his age. *See Hemsworth v. Quotesmith.Com, Inc.,* 476 F.3d 487, 490 (7th Cir. 2007). Here, Mounts and Katarzynski have each alleged that they are over 40 years old [1] and that UPS found them ineligible to participate in the Plan because of their age. Therefore, they have stated claims for age discrimination under the ADEA.

With respect to their ADA discrimination claims, to state a claim, a plaintiff must first allege [*15] a

_____

[1] Mounts and Katarzynski included their dates of birth on their charges of discrimination that they attached to their Complaint. Because they attached the charges of discrimination to the Complaint, the Court may consider them without converting the Motion to Dismiss to a motion for summary judgment. *See* Fed. R. Civ. P. 10(c).

disability. *See Duncan v. State of Wisc. Dept. of Health and Family Servs.,* 166 F.3d 930, 935 (7th Cir. 1999) (noting that "[t]he first hurdle a plaintiff must pass . . . is the requirement that the plaintiff must be 'disabled.'"). In relevant part, the ADA defines a disability as either "a physical or mental impairment that substantially limits one or more of the major life activities" of the individual or "a record of such impairment." 42 U.S.C. § 12102(2)(A)-(B). "Not every medical affliction amounts to, or gives rise to, a substantial limitation on a major life activity." *Cassimy v. Bd. of Educ. of Rockford Public Schs., Dist. No. 205,* 461 F.3d 932, 936 (7th Cir. 2006). A impairment substantially limits a major life activity when a person "is either unable to perform a major life activity or is significantly restricted as to the condition, manner or duration under which the individual can perform the major life activity as compared to the average person in the general population." *Furnish v. SVI Sys., Inc.,* 270 F.3d 445, 450 (7th Cir. 2001) (citations omitted). In assessing whether an impairment is substantially limiting, courts consider the nature and severity of the impairment, [*16] its duration or expected duration, and its permanent or long term impact or its expected impact. *See* 29 C.F.R. § 1630.2(j)(2).

Here, although Mounts and Katarzynski each claim that UPS found them ineligible to participate in the Plan because of their disabilities, neither Mounts nor Katarzynski have alleged that they suffer from an impairment, let alone an impairment that substantially limits their ability to perform a major life activity. Accordingly, Mounts and Katarzynski have failed to state a claim for discrimination under the ADA.

Anticipating that they did not include sufficient allegations to support a discrimination claim under the ADA, Mounts and Katarzynski have requested leave to replead their ADA allegations. A court may deny leave to amend a complaint if the proposed repleading would be futile. *See Garcia v. City of Chicago,* 24 F.3d 966, 970 (7th Cir. 1994). In the Complaint, Mounts and Katarzynski concede that they are not UPS employees; rather, they are retired, former employees. Retired employees have no right to bring discrimination suits under Title I of the ADA because they do not fall within the statutory definition of a "qualified individual with a

disability." [2] [*17] *See Morgan v. Joint Administration Bd., Retirement Plan of the Pillsbury Co. and Am. Federation of Grain Millers,* 268 F.3d 456, 457-58 (7th Cir. 2001); *E.E.O.C. v. CNA Ins. Cos.,* 96 F.3d 1039, 1044 (7th Cir. 1996). Accordingly, to the extent that Count II alleges that UPS discriminated against Mounts and Katarzynski because of their disabilities, the claim is dismissed with prejudice.

## CONCLUSION AND ORDER

For the reasons stated, Defendants' Amended Motion to Dismiss is granted in part and denied in part. With respect to Chapman's claims, Count IV is dismissed as time-barred and UPS is entitled to judgment as a matter of law for Counts I-III because those claims are time-barred. Accordingly, Chapman has no surviving claims. With respect to Mounts and Katarzynski, Count IV is dismissed as time-barred and Count II is dismissed with [*18] prejudice to the extent that it states a claim for discrimination rather than retaliation. The Amended Motion to Dismiss is denied with respect to the retaliation claims in Counts I-III and the age discrimination claim in Count II.

So ordered.

/s/ Virginia M. Kendall

Virginia M. Kendall, United States District Judge

Northern District of Illinois

Date: August 31, 2009

---

**End of Document**

---

[2] Although Mounts and Katarzynski cannot bring *discrimination* claims under Title I of the ADA, they may bring *retaliation* claims under Title I. *See Morgan,* 268 F.3d at 458 ("The statutory protections against discrimination are protections of 'otherwise qualified individuals with a disability,' but the retaliation provision protects individuals, period . . . .").

# Szplett v. Kenco Logistic Servs., LLC

United States District Court for the Northern District of Illinois, Eastern Division

April 22, 2020, Decided; April 22, 2020, Filed

19 C 2500

## Reporter

2020 U.S. Dist. LEXIS 70661 *; 2020 WL 1939388

LEONARD A. SZPLETT, Plaintiff, vs. KENCO LOGISTIC SERVICES, LLC, MARS, INC., THE HARTFORD, DAVID JABALEY, MARIO LOPEZ, TAMMI FOWLER, PAULA HISE, TRACE SPIER, ROBERT COFFEY, TODD MOORE, JAY ELLIOTT, DAVID CAINES, MICHAEL MANZELLO, DAVID CRAWLEY, and KELVIN WALSH, Defendants.

**Counsel:** [*1] Leonard A Szplett, an individual, Plaintiff, Pro se, Kankakee, IL.

For Kenco Logistic Services, LLC, a Tennessee Limited Liabiltiy Company, David Jabaley, Tammi Fowler, Paula Hise, Trace Spier, Jay Elliott, David Caines, Michael Manzello, David Crawley, Kelvin Walsh, Defendants: Jody Wilner Moran, LEAD ATTORNEY, Jackson Lewis P.C. (Chicago), Chicago, IL; Julia Pearce Argentieri, Jackson Lewis P.C., Chicago, IL.

For Mars, Inc., Robert Coffey, Todd Moore, Defendants: Kimberly J Overbaugh, Harmon & Davies Pc, Lancaster, PA; Thomas R. Davies, Harmon & Davies, P.C., Lancaster, PA.

For The Hartford, Defendant: Donald Alan Murday, Joseph R. Jeffery, LEAD ATTORNEYS, Chittenden, Murday & Novotny, LLC, Chicago, IL.

Mario Lopez, Defendant, Pro se.

**Judges:** Gary Feinerman, United States District Judge.

**Opinion by:** Gary Feinerman

# Opinion

## MEMORANDUM OPINION AND ORDER

Leonard Szplett, proceeding *pro se*, filed this suit against Kenco Logistics Services, LLC and its employees Kelvin Walsh, Paula Hise, Tammi Fowler, David Jabaley, Mario Lopez, Michael (Mike) Manzello, David Caines, Trace Spier, Jay Elliott, and David (Dwight) Crawley ("Kenco Defendants"); Mars, Inc. and its employees Robert Coffey and Todd Moore ("Mars Defendants"); and [*2] Hartford Life and Accident Insurance Company. Doc. 1. Szplett sought and was given leave to file an amended complaint. Docs. 21-22. The court dismissed the amended complaint without prejudice under Civil Rule 8(a)(2) due to its length and disorganization. Doc. 52. Szplett filed a second amended complaint, Doc. 53, which Defendants move to dismiss for failure to state a claim under Rule 12(b)(6), Docs. 55, 58, 61. The motions are granted.

## Background

In resolving a Rule 12(b)(6) motion, the court assumes the truth of the operative complaint's well-pleaded factual allegations, though not its legal conclusions. *See Zahn v. N. Am. Power & Gas, LLC*, 815 F.3d 1082, 1087 (7th Cir. 2016). The court must also consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Szplett's briefs opposing dismissal, so long as those additional facts "are consistent with the pleadings." *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1020 (7th Cir. 2013) (internal quotation marks omitted). The facts are set forth as favorably to Szplett as those materials allow. *See Pierce v. Zoetis, Inc.*, 818 F.3d 274, 277 (7th Cir. 2016). In setting forth the facts at the pleading stage, the court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

The operative complaint is difficult to parse. The relevant [*3] facts are set forth as best the court can

understand them.

Mars employed Szplett from 2001 until his termination on, at the latest, March 29, 2015. *Id.* at ¶¶ 2-3, 31-36, 89, 124, 493, 604. Szplett was also employed by Kenco, the property manager for the Mars facility where he worked, from April 2013 until his March 29, 2015 termination. *Id.* at ¶¶ 2-3, 6-7. The individual defendants held officer or supervisory positions with either Mars or Kenco. *Id.* at ¶¶ 10-21. Hartford is the third-party administrator for Mars's and Kenco's employee benefits programs. *Id.* at ¶ 22.

Szplett observed during his employment that Mars and Kenco had discriminatory corporate cultures and employment practices. *Id.* at ¶¶ 53-77, 255-276, 303-351, 390-392, 547-560. Szplett complained to management about discrimination, assisted other employees with discrimination issues, and acted as a witness in legal matters. *Id.* at ¶¶ 88, 129-133. As a result, Szplett was subjected to retaliation, including uneven discipline, harsher scrutiny, unwarranted suspensions, reduced overtime opportunities, reductions in duties, disciplinary actions, public humiliation, and psychological warfare. *Id.* at ¶¶ 89, 134-135, 142-145.

The [*4] retaliation culminated with his termination, which was made effective March 29, 2015. *Id.* at ¶¶ 89, 604. In late February 2015, Szplett was told that he would be terminated and was given a severance offer under which he would receive his severance pay and March salary if he agreed to waive certain claims that he might have against Defendants. *Id.* at ¶¶ 111-112; 116; 282-283; 688-690. At that time, Szplett's short-term disability benefits were stopped. *Id.* at ¶ 111. It appears that all this occurred while Szplett was on medical leave. *Id.* at ¶¶ 127, 364, 629, 702-703; Doc. 67 at 8-9. Szplett ultimately did not receive his March salary or severance pay. Doc. 53 at ¶¶ 119, 226. The decision to deprive Szplett of his March salary and severance pay became final sometime in April 2015, when he failed to timely accept or deny the severance offer. *Id.* at ¶¶ 116, 690. Szplett received a letter around April 9, 2015 from Hartford stating that his disability benefits had been retroactively denied as of February 28, 2015. Doc. 67 at 9.

In late August 2015, several months after his termination, Szplett learned that he had been demoted while on medical leave. *Id.* at ¶¶ 95, 615, 702. He does not allege [*5] that the demotion had any impact on his pay or other terms and conditions of his employment.

As for Hartford, the complaint alleges only that it assisted Mars Defendants and Kenco Defendants in their allegedly discriminatory actions by denying Szplett his benefits. *Id.* at ¶ 78.

**Discussion**

The complaint attempts to state claims under 42 U.S.C. § 1981, *id.* at ¶¶ 150-399, 478-509 (Counts 1-9, 12); 18 U.S.C. § 1001, *id.* at ¶¶ 400-450 (Count 10); 18 U.S.C. §§ 1503, 1505, 1512, and 1621, *id.* at ¶¶ 451-477 (Count 11); 42 U.S.C. § 1985, *id.* at ¶¶ 478-509 (Count 12); and the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, *id.* at ¶¶ 654-781 (Count 21); and for defamation, *id.* at ¶¶ 510-528 (Count 13); negligence, *id.* at ¶¶ 529-541 (Count 14); breach of fiduciary duty, *id.* at ¶¶ 542-560 (Count 15); conspiracy to commit breach of fiduciary duty, *id.* at ¶¶ 561-591 (Count 16); tortious interference with prospective economic advantage, *id.* at ¶¶ 592-605 (Count 17); intentional infliction of emotional distress, *id.* at ¶¶ 606-625 (Count 18); fraudulent concealment of adverse employment actions, *id.* at ¶¶ 626-637 (Count 19); and aiding and abetting, *id.* at ¶¶ 638-653 (Count 20). Because Szplett and some of the individual defendants are Illinois citizens, *id.* at ¶¶ [*6] 1, 10, 19-21, the state law claims fall under the court's supplemental jurisdiction, 28 U.S.C. § 1367(a), not under the diversity jurisdiction, 28 U.S.C. § 1332(a).

**I. Claims with a One-or Two-Year Statute of Limitations**

The last allegedly wrongful action identified in the complaint occurred in April 2015, Doc. 53 at ¶¶ 116, 691, and the latest point at which Szplett alleges he discovered relevant misconduct is August 2015, *id.* at ¶¶ 95, 615. Szplett filed this suit on April 12, 2019. Doc. 1.

Szplett's § 1985 (Count 12), defamation (Count 13), negligence (Count 14), and intentional infliction of emotional distress (Count 18) claims are subject to statutes of limitations of two years or less. *See Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 923 (7th Cir. 2003) ("Illinois imposes a one-year statute

of limitations on all defamation actions that begins to run when the defamatory statement was published."); *Manley v. City of Chicago*, 236 F.3d 392, 395 (7th Cir. 2001) ("[I]n Illinois, a two-year statute of limitations applies to claims brought under §§ 1983 and 1985."); *Feltmeier v. Feltmeier*, 207 Ill. 2d 263, 798 N.E.2d 75, 85, 278 Ill. Dec. 228 (Ill. 2003) ("[T]he applicable statute of limitations for intentional infliction of emotional distress is two years, because the tort is a form of personal injury."); 735 ILCS 5/13-202 ("Actions for damages for an injury to the person ... shall be commenced within 2 years next after the cause of action accrued ... ."). The portion [*7] of the complaint addressing negligence, Doc. 53 at p. 90, refers to 735 ILCS 5/13-205, which provides for a longer statute of limitations, but that statute does not govern negligence claims. *See* 735 ILCS 5/13-205 ("[A]ctions on unwritten contracts, expressed or implied, or on awards of arbitration, or to recover damages for an injury done to property, real or personal, or to recover the possession of personal property or damages for the detention or conversion thereof, and all civil actions not otherwise provided for, shall be commenced within 5 years next after the cause of action accrued."). Because the wrongs alleged by Szplett occurred more than two years before he filed this suit, and because his tolling argument (addressed on the merits below) would extend the commencement of the limitations period to August 2015 at the latest, those claims are dismissed as time-barred.

## II. Claims for Which There Is No Private Right of Action

The complaint purports to bring claims (Counts 10-11) under several criminal statutes that do not confer a private right of action. *See GwanJun Kim v. Grand Valley State Univ.*, 2017 WL 8294004, at *1 (6th Cir. Dec. 22, 2017) ("18 U.S.C. § 1621 ... does not create a private right of action."); *Lee v. United States Agency for Int'l Dev.*, 859 F.3d 74, 78, 429 U.S. App. D.C. 321 (D.C. Cir. 2017) ("18 U.S.C. § 1001 ... does not create a private cause of action."); *Farzan v. Bridgewater Assocs., LP*, 699 F. App'x 57, 58 (2d Cir. 2017) ("[O]bstruction of justice is a criminal charge, [*8] not a private cause of action."); *Greenblatt v. Klein*, 634 F. App'x 66, 69 (3d Cir. 2015) ("[T]here is no private cause of action under 18 U.S.C. § 1001."); *Fuller v. Unknown Officials from the Justice Dep't Crime Div.*,

387 F. App'x 3, 4 (D.C. Cir. 2010) ("[T]here is no private cause of action for perjury, 18 U.S.C. § 1621 ... ."); *Rowland v. Prudential Fin., Inc.*, 362 F. App'x 596, 596 (9th Cir. 2010) ("Dismissal of Rowland's claim[] brought under [18 U.S.C. § 1512] was proper because th[at] statute[] do[es] not provide a private right of action."); *Banks v. Kramer*, 2009 U.S. App. LEXIS 28756, 2009 WL 5526780, at *1 (D.C. Cir. Dec. 30, 2009) ("Appellant alleges violations of 18 U.S.C. §§ 1001, 1503, 1505, 1621, and 241, but there is no private right of action under these criminal statutes."); *Andrews v. Heaton*, 483 F.3d 1070, 1076 (10th Cir. 2007) ("18 U.S.C. §§ ... 1001 ... and 1503 ... are criminal statutes that do not provide for a private right of action and are thus not enforceable through a civil action."). Those claims accordingly are dismissed.

Szplett's fraudulent concealment claim (Count 19) purports to rest on a statute, 735 ILCS 5/13-215, that creates no cause of action. The statute instead provides a basis for extending the statute of limitations on certain claims where the defendant engaged in "affirmative acts or representations calculated to lull or induce a claimant into delaying filing of his or her claim, or to prevent a claimant from discovering a claim." *Orlak v. Loyola Univ. Health Sys.*, 228 Ill. 2d 1, 885 N.E.2d 999, 1009, 319 Ill. Dec. 319 (Ill. 2007). Because Szplett alleges only that Defendants did not tell him that he had been replaced, Doc. 53 at ¶¶ 628-630, the statute does not extend the limitations [*9] period for any of his claims. *See Orlak*, 885 N.E.2d at 1009 (holding that "[m]ere silence on the part of the defendant is insufficient" to justify applying section 13-215).

## III. Fiduciary Duty, Tortious Interference, and Aiding and Abetting Claims

Szplett's breach of fiduciary duty claim (Count 15), conspiracy to commit breach of fiduciary duty claim (Count 16), a portion of the tortious interference with prospective economic advantage claim (Count 17), and aiding and abetting claim (Count 20) are dismissed on the merits. As to the fiduciary duty claim, Szplett does not plead any facts establishing that Mars, Kenco, or the individual defendants owed him a fiduciary duty, *see Patel v. Boghra*, 2008 U.S. Dist. LEXIS 47207, 2008 WL 2477695, at *6 (N.D. Ill. June 18, 2008) ("An employer does not owe an employee a fiduciary duty

simply because they have entered into an employer/employee relationship together.") (citing *Gross v. Univ. of Chi.*, 14 Ill. App. 3d 326, 302 N.E.2d 444, 454 (Ill. App. 1973)), and the complaint alleges nothing suggesting that Hartford was implicated in any alleged breach of fiduciary duty. Because the breach of fiduciary duty claim fails, so too does the conspiracy claim. *See Anderson v. Aon Corp.*, 2008 U.S. Dist. LEXIS 94169, 2008 WL 4865574, at *7 (N.D. Ill. June 16, 2008) ("Under Illinois law, ... a civil conspiracy claim cannot survive without a separate, predicate tort.") (citing *Adcock v. Brakegate, Ltd.*, 164 Ill. 2d 54, 645 N.E.2d 888, 894, 206 Ill. Dec. 636 (Ill. 1994)).

Szplett appears to allege that his firing constituted tortious interference with his employment. [*10] But because he alleges that Mars and Kenco were his employers, Doc. 53 at ¶¶ 2-3, they cannot be liable for tortious interference with his employment. *See Ali v. Shaw*, 481 F.3d 942, 945 (7th Cir. 2007) ("[O]nly when the actions of a *third party* cause an employer to decide to fire an at-will employee, the third party might be liable in tort.") (emphasis added); *Trahanas v. Nw. Univ.*, 2017 U.S. Dist. LEXIS 104098, 2017 WL 2880879, at *7 (N.D. Ill. July 6, 2017) ("Although a person can have a reasonable expectation in continuing their employment, the tortfeasor cannot be a supervisor or the employer—it must be a third party interfering with a relationship.").

The question is far more uncertain for Szplett's tortious interference claims against Lopez, Jabaley, Hise, Moore, Coffey, and Fowler. "An action for tortious interference cannot be maintained against a plaintiff's supervisor for actions undertaken in the supervisor's professional capacity and in furtherance of her duties unless the supervisor acted for the purpose of furthering her own interests or out of a desire to harm the plaintiff." *Thakkar v. Station Operators Inc.*, 697 F. Supp. 2d 908, 930 (N.D. Ill. 2010). Because the parties did not brief the issue, it is not clear whether Szplett has alleged that the individual defendants acted with the purpose or desire required to state a tortious interference claim. And because, as explained below, the [*11] court is dismissing all Szplett's federal claims, the court must decide whether to retain or relinquish its supplemental jurisdiction over this portion of Szplett's tortious interference claim. "As a general matter, when all federal claims have been dismissed prior to trial, the

federal court should relinquish jurisdiction over the remaining [supplemental] state claims." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007); *see also Dietchweiler ex rel. Dietchweiler v. Lucas*, 827 F.3d 622, 631 (7th Cir. 2016). That general rule has three exceptions: "when the [refiling] of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim[s] [are] to be decided." *Williams*, 509 F.3d at 404; *see also RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 480 (7th Cir. 2012). Substantial judicial resources have not yet been committed to this claim, Illinois law provides Szplett one year to refile the claim in state court if its limitations period expired while the case was pending here, *see Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 515 (7th Cir. 2009) (citing 735 ILCS 5/13-217), and—by contrast to Szplett's other state law claims—it is not clearly apparent whether his tortious interference claim against the individual defendants should be dismissed. Accordingly, the court relinquishes its supplemental jurisdiction over that portion of his tortious interference [*12] claim.

Szplett alleges not that Hartford tried to oust him from his job, but that it "interfered with [his] ability to receive ... short term disability benefits." Doc. 53 at ¶ 598. Putting aside whether such conduct could serve as a basis for a tortious interference claim, Hartford rightly observes, Doc. 59 at 4-6—and Szplett does not dispute—that a tort claim based on the denial of disability benefits is preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1144(a). *See Di Joseph v. Standard Ins. Co.*, 776 F. App'x 343, 347 (7th Cir. 2019) ("State-law civil claims involving employee retirement and welfare benefits (including disability insurance) governed by ERISA are completely preempted by ERISA, with only a few narrow exceptions.") (citing *Aetna Health Inc. v. Davila*, 542 U.S. 200, 208, 124 S. Ct. 2488, 159 L. Ed. 2d 312 (2004)).

Szplett's aiding and abetting claim purports to rely on the Illinois statute governing legal malpractice, 735 ILCS 5/13-214.3. That statute has no relationship to his claims, and Szplett does not attempt to draw any connection. Indeed, "there is no tort of aiding and abetting under Illinois law." *Cenco Inc. v. Seidman & Seidman*, 686 F.2d 449, 452 (7th Cir. 1982). Rather,

"aiding and abetting is a theory for holding the person who aids and abets" others in committing a tort "liable for the tort itself." *Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006). Without any other actionable tort, aiding and abetting cannot serve as a theory [*13] of liability for any defendant.

## IV. Section 1981 and RICO Claims

The statute of limitations for Szplett's § 1981 (Counts 1-9, 12) and RICO (Count 21) claims is four years. *See Riley v. Elkhart Cmty. Sch.*, 829 F.3d 886, 891 (7th Cir. 2016) ("Section 1981 claims must be filed within four years of the alleged discriminatory act."); *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009) ("The statute of limitations for a civil RICO cause of action is a fairly generous four years. It begins to run when the plaintiffs discover, or should, if diligent, have discovered, that they had been injured by the defendants."). Because Szplett filed this case on April 12, 2019, more than four years after his March 29, 2015 termination, those claims can survive dismissal only if he (i) offers a basis for tolling the statute of limitations or (ii) points to post-termination conduct within the limitations period that provides a basis for liability. He makes no effort to do so in contesting Hartford's motion, and unsuccessfully attempts to do so in contesting Mars Defendants' and Kenco Defendants' motions.

Szplett offers no response to Hartford's argument that Counts 4-6 and 8-9 contain no allegations that implicate it. Doc. 59 at 8-9. Nor does Szplett respond to Hartford's argument that his benefits-related § 1981 claims (Counts 1-3) accrued when his benefits were terminated [*14] around April 9, 2015, and that those claims are therefore untimely. *Id.* at 4. He thereby forfeits any response to those arguments, and thus those claims. *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted); *Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Our system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they

are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.") (internal quotation marks omitted); *see also Boogaard v NHL*, 891 F.3d 289, 294-96 (7th Cir. 2018) (affirming the district court's holding that the plaintiffs forfeited their claims by failing to respond to the defendant's argument under Rule 12(b)(6) that they failed to state a claim). Because Szplett's remaining claims are either not directed at Hartford or already disposed of above, the complaint states no claim against Hartford.

Szplett appears to assert two new grounds for liability in his brief opposing Hartford's motion: (1) that Hartford is liable [*15] under a respondeat superior theory for the actions of Mars Defendants and Kenco Defendants, Doc. 69 at 3-6; and (2) that Hartford engaged in fraud when an unspecified person—who may or may not have been associated with Hartford—forwarded an incorrect job description to his physician, causing his benefits to be denied, *id.* at 6-8. Respondeat superior is a doctrine by which an employer may "be vicariously liable for an employee's torts" when the torts are "committed within the scope of the employment." *Pyne v. Witmer*, 129 Ill. 2d 351, 543 N.E.2d 1304, 1308, 135 Ill. Dec. 557 (Ill. 1989). As Hartford rightly notes, Doc. 71 at 5, Szplett does not allege that Hartford employed any of the other defendants, which means that Hartford cannot be held liable on a respondeat superior theory.

Szplett's other new argument against Hartford rests on an allegation of fraudulent conduct, so it must "meet the heightened pleading requirements of Rule 9(b)." *Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 589 (7th Cir. 2017). "Rule 9(b) requires the [plaintiff] to 'state with particularity the circumstances constituting fraud.'" *Haywood v. Massage Envy Franchising, LLC*, 887 F.3d 329, 333 (7th Cir. 2018) (quoting Fed. R. Civ. P. 9(b)). "That means that [the plaintiff] must specifically allege the who, what, when, where, and how of the fraud." *Ibid.* (internal quotation marks omitted). Because Szplett acknowledges he does not know "who sent [what] and when," Doc. 69 at 7, he [*16] cannot meet that requirement.

In opposing Kenco Defendants' motion, Szplett appears to argue that the statute of limitations should be tolled because, at the time he was fired, he was "under doctor's care for work related stress" and "his mental capacity was diminished" such that he could not "reasonably

understand, contemplate and assimilate what was actually occurring to him." Doc. 67 at 8-9. Szplett does not make clear on what theory his condition would excuse its untimely filing, but the court construes it as an argument either to apply an exception to the discovery rule or to give him the benefit of equitable tolling. Neither argument persuades.

A limited "exception" to the discovery rule arises "where the very injury of which a plaintiff complains prevents him or her from being aware of that injury." *Barnhart v. United States*, 884 F.2d 295, 298 (7th Cir. 1989). Even assuming—quite generously—that Szplett's "work related stress" stemmed from the injuries alleged in this case, that stress did not "prevent" him from being aware of his injury. The standard for applying the exception turns on the plaintiff's "awareness or ability to comprehend" his injury, and has generally been applied in extraordinary cases involving comas or lobotomies. *Id.* at 298-99 [*17] (collecting cases). That is far afield from the condition Szplett alleges.

Nor does Szplett's condition provide a basis for equitable tolling. "[A] litigant is entitled to equitable tolling of a statute of limitations only if the litigant establishes two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Knauf Insulation, Inc. v. S. Brands, Inc.*, 820 F.3d 904, 908 (7th Cir. 2016) (internal quotation marks omitted). Because "equitable tolling permits deferral of suit until the tolling event ceases and requires diligent action thereafter," Szplett's unexplained years-long delay in filing this suit bars his reliance on the doctrine. *Prime Eagle Grp. Ltd. v. Steel Dynamics, Inc.*, 614 F.3d 375, 379 (7th Cir. 2010) (holding, where the plaintiff "waited more than four years after" the claimed tolling period ended, that the plaintiff had "been anything but diligent and cannot use equitable tolling to justify the untimely filing"). Nor does suffering from "work related stress," without further explanation, suggest that Szplett was "prevent[ed] ... from managing his affairs and thus from understanding his legal rights and acting upon them," as required for equitable tolling. *Miller v. Runyon*, 77 F.3d 189, 191 (7th Cir. 1996).

Szplett also argues that he did not learn until August 2015 that he [*18] had been demoted at some point prior to his termination. Doc. 67 at 6, 10; Doc. 68 at 9. But Szplett does not allege that his pay, duties, or

benefits were altered as a result of this alleged demotion, or that any tangible action whatsoever was taken as to his employment. It is not clear, therefore, how that "demotion" (or at least what Szplett refers to as a demotion) could give rise to any cause of action. Having failed to make any argument that the "demotion" is actionable, Szplett forfeits it as a basis for opposing dismissal. *See G & S Holdings LLC*, 697 F.3d at 538; *Alioto*, 651 F.3d at 721; *see also Boogaard*, 891 F.3d at 294-96.

Szplett also alleges that around April 15, 2015, he learned that Kenco had mischaracterized his job title during another individual's administrative proceedings. Doc. 67 at 9; Doc. 53 at ¶¶ 636, 691. Szplett does not provide the date on which the mischaracterization occurred, and neither his complaint nor his briefs make clear whether he offers that mischaracterization as a basis for tolling the statute of limitations or as an injury that occurred within the limitations period. But that uncertainty is immaterial. Because Szplett does not allege any consequence stemming from the alleged mischaracterization, which apparently took place during [*19] the course of a different individual's administrative proceedings before the Illinois Department of Human Rights and the Equal Employment Opportunity Commission, Doc. 53 at ¶¶ 636, 691, the mischaracterization cannot provide the basis for any claim, let alone one within the relevant statute of limitations.

In addition to arguing for tolling, Szplett appears to argue that three events occurring after his termination and within the limitations period provide grounds for liability: the denial of his disability benefits, his March pay, and his severance pay. Doc. 67 at 9. Szplett claims that he was denied disability benefits, at the latest, around April 9, 2015—outside the four-year limitations period, as he filed suit on April 12, 2019. *Ibid.* Szplett contends that, because he learned from his doctor weeks after his termination that he had not been released to return to work, he could not have brought his disability-related claims earlier because he did not know they were based on mistaken health information. *Ibid.* But Szplett's briefs do not explain how Kenco or Mars could be liable for *Hartford's* decision to deny his disability benefits.

As for being denied March pay and severance, Szplett [*20] admits that the denial was communicated to him in an ultimatum in February, when he was

informed that he would not receive either unless he agreed to severance conditions that he ultimately did not accept. Doc. 53 at ¶¶ 111-112, 116, 283, 688. Even if those decisions took effect some weeks later, the statute of limitations began running when the adverse decision was communicated to him, not when he felt its effects. *See Librizzi v. Children's Mem'l Med. Ctr.*, 134 F.3d 1302, 1306 (7th Cir. 1998) ("Suppose the employer says: 'Your job ends 12 months from today; start looking for work.' Does the statute of limitations begin to run immediately, or does the claim accrue only when the paychecks stop? ... [I]t begins on the date the employee learns about the adverse decision—when the federal law was (or was not) violated—rather than when the financial consequences of the decision are felt.").

Szplett also briefly appears to advance something like a continuing violation argument in his response to Mars Defendants' motion. Doc. 68 at 9-10. But even if such an argument theoretically could apply here, it would require some actionable event within the limitations period that was a continuation of the prior violations. *See Barrett v. Ill. Dep't of Corr.*, 803 F.3d 893, 898 (7th Cir. 2015) ("Under the 'continuing violation' doctrine, [*21] a ... plaintiff may recover for otherwise time-barred conduct that is part of a single, ongoing unlawful employment practice if at least one related act occurs during the limitations period."). The foregoing discussion establishes that no such event exists. Accordingly, Szplett's § 1981 claims are time-barred. And because he does not argue that his RICO claim rests on any distinct conduct within the limitations period, it is time-barred as well.

## Conclusion

Defendants' motions to dismiss are granted. The court relinquishes jurisdiction over Szplett's tortious interference with prospective business advantage claims against Lopez, Jabaley, Hise, Moore, Coffey, and Fowler. The dismissal of Szplett's other claims is with prejudice, as he already amended his complaint after the first dismissal and does not request leave to further amend or suggest how another amendment might cure the defects identified by the present motions to dismiss. *See Haywood*, 887 F.3d at 335 ("Nothing in Rule 15, nor in any of our cases, suggests that a district court must give leave to amend a complaint where a party

does not request it or suggest to the court the ways in which it might cure the defects. To the contrary, we have held that courts are within [*22] their discretion to dismiss with prejudice where a party does not make such a request or showing."); *Gonzalez-Koeneke v. West*, 791 F.3d 801, 808 (7th Cir. 2015) ("A district court acts within its discretion in ... dismissing a complaint with prejudice ... when the plaintiff fails to demonstrate how [an] amendment would cure the deficiencies in the prior complaint."). Judgment will be entered in favor of Defendants and against Szplett.

April 22, 2020

/s/ Gary Feinerman

United States District Judge

---

# Carr v. Ameritech Corp.

United States District Court for the Northern District of Illinois, Eastern Division

March 26, 2002, Decided ; March 27, 2002, Docketed

Case Number: 99 C 8403

**Reporter**

2002 U.S. Dist. LEXIS 5490 *

HAROLD B. CARR, Plaintiff, v. AMERITECH CORPORATION, Defendant.

**Disposition:** [*1] Defendant's motion for summary judgment was granted. The case was terminated and all other pending motions were stricken as moot.

**Counsel:** For HAROLD B CARR, plaintiff: David Allan Beck, Craig A. Moen, Orner, Beck, Zydowsky, Moen & Splitt, Ltd., Ronald A. Orner, Orner, Beck, Zydowsky, Moen & Splitt, Chicago, IL.

For AMERITECH CORPORATION, defendant: Benjamin Ghess, Earl L. Neal & Associates, Daniel A. Kazlauski, Mark W. Lewis, Jeri Anne Lindahl-Garcia, Ameritech Corporation, Chicago, IL.

**Judges:** HON. RONALD A. GUZMAN, United States Judge.

**Opinion by:** RONALD A. GUZMAN

# Opinion

## MEMORANDUM OPINION AND ORDER

Plaintiff Harold B. Carr ("Carr") has sued Ameritech Corp. for race and gender discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Ameritech has moved for summary judgment. For the reasons provided in this Memorandum Opinion and Order, the Court grants Ameritech's motion.

## Facts

Carr, an African American, began his employment with Illinois Bell in 1969 and is currently employed by Ameritech as a Telecommunications Specialist in Chicago Illinois. [*2] (Def.'s LR 56.1(a)(3) P 2.) From 1995 through 1997, Jeff Kelmis ("Kelmis") was Carr's immediate supervisor. (*Id.* P 7.) Beginning in 1997, Carr reported to Fred Martin, but still continued to report to Kelmis for days off work and vacation scheduling. (Pl.'s LR 56.1(b)(3)(A) P 7.)

Carr alleges three types of adverse employment actions: (1) his seniority rights were violated in the manner in which vacation periods were determined, (2) he was denied medical benefits for time off from injury and illness, and (3) he was denied the opportunity to work overtime.

## A. Selection of Vacation Time

Carr claims that he has been discriminated against based on his race and gender with regard to the manner in which vacation time was scheduled. Carr has been with the company since 1969 and argues that because of his high seniority he was allowed to select whatever vacation dates he wanted. The employees select their vacation dates the year before they use them. (Def.'s Ex. 3, Carr Dep. ("Carr Dep.") at *14.) [1] Carr and the rest of the employees in his group made their date selections in late 1998 for 1999. (*Id.* at *15.) Carr had twenty days of vacation per year. (*Id.* at *29.) [*3] He customarily used his vacation days during holiday weeks such as Memorial Day and Labor Day so as to stretch out the amount of consecutive time off. (*Id.* at *29-*30.) In 1998, Carr used the combination of holidays and his

---

[1] The binding of defendant's exhibits rendered the pages of Defendant's Exhibit 3, Carr's Deposition Transcript without legible page numbers. Accordingly, the Court has assigned its own sequential numbering, pages *1 through *32, so that it may refer to such pages. The asterisk denotes that the page cited is according to the Court's sequential numbering, not the actual deposition page numbers.

twenty vacation days to pick six full weeks of vacation. (*Id.* at *30.) After he selected his vacation days, he was informed that while he was not losing any of his vacation days, employees could only use vacation days to accumulate five full weeks off. (*Id.*) This had not been the case in previous years. (*Id.* at *29-*30.) In order to pare down his six weeks to five, Carr chose to eliminate the full week of vacation during the week after the Thanksgiving holiday. (*Id.* at *30.) The next week he changed his mind. (*Id.*) Carr wanted to keep the week of Thanksgiving and eliminate his week off after Christmas. (*Id.* at *30-*31.) However, by that time a co-worker had picked the week after Thanksgiving. (*Id.* at *12-*13, *31.) Instead of starting the process over so Carr could change his selection of vacation dates, his supervisors decided to leave the schedule as it was. (*Id.* at *31.) In the end, Carr could not change his initial selection [*4] and he ended up with vacation during the week of Christmas instead of Thanksgiving. (*Id.*) As it turned out, Carr was on medical leave in November and December of 1999 with a partially torn Achilles tendon. (Def.'s LR 56.1(a)(3) P 44.) Carr received all the vacation time he was entitled to in 1999. (*Id.*)

## B. Disability Benefits

Carr's second claim is that he was discriminated against based on race and gender when he was denied medical benefits in 1995 and 1999. As a member of the International Brotherhood of Electrical Workers Local 165, Carr's employment is covered by a Collective Bargaining Agreement [*5] (CBA). (*Id.* P 14-15.) The CBA allows for payment of absences due to personal illness up to a maximum of five days. (*Id.* P 21.) After that, absences longer than seven consecutive days are determined by Ameritech's Sickness and Accident Disability Plan ("the Plan"). (*Id.*) Decisions relating to rights, eligibility of employees, and administration of the plan have been ultimately vested in a Benefits Committee. (*Id.* PP 21-28.) Furthermore, if an employee fails to provide proper information respecting his condition, he will not be entitled to benefits under the Plan. (*Id.*)

Carr points to two incidents in which he was denied medical benefits. The first occurred in 1995 when Carr had conjunctivitis. (*Id.* P 29.) After contracting conjunctivitis, Carr applied for and received short-term disability benefits from August 7 through August 14,

1995. (*Id.*) Starting on August 15, 1995, the Ameritech Employees' Benefit Committee denied Carr any further benefits under the Plan. (*Id.*) Carr was informed of the Committee's final decision denying him further benefits on a letter dated December 21, 1995. (*Id.* P 30.) Carr claims that the denial to him of additional disability [*6] benefits in 1995 was because of his race and his gender. Ameritech claims that Carr's additional benefits were denied by the Benefits Committee because the medical information that the Carr submitted did not indicate that he had any complications relating to conjunctivitis, failed to provide a plan of treatment beyond August 14, and showed he had not received medical care for almost one month. (*Id.*) Carr has stated that he has no reason to believe that the people on the Benefits Committee who denied his claim did so because of his race. (*Id.* P 32.)

The second instance in which Carr was denied medical benefits occurred in 1999. (*Id.* P 35.) In 1999, Carr sustained a partial tear of his Achilles tendon on the left foot while running, a non-work related injury. (*Id.*) Carr applied for and received short-term disability benefits for the period between August 17 through September 9, 1999. (*Id.*) On August 12, 1999, Carr's physician, Dr. Schick, informed Carr's case manager that he could return to work, that his foot was in a cast, and that he was to use crutches, was not to engage in continuous standing or bear weight on his left foot, and was not to walk more than ten [*7] yards. (*Id.* P 36.) At that time, Carr's employer told the case manager that his restrictions could not be accommodated at the work place. [2] (*Id.* P 36.) Nearly a month later, on September 8, 1999, Carr's superior, Fred Martin, told the case manager that Carr's restrictions could be accommodated and therefore, benefits would cease. (*Id.* P 37.) Around this time, Carr informed the case manager that he would need a wheelchair to return to work. (*Id.*) According to Carr, rather than providing a wheelchair, his

---

[2] Carr objects to defendant's reliance on documents from his administrative disability file in support of its motion for summary judgment because: (1) such documents are not affidavits, depositions or answers to interrogatories, which he perceives as a violation of LR 56.1(a); and (2) such documents are hearsay. The Court finds these arguments without merit. First, Carr has stipulated that these documents are admissible in the parties' Final Pre-trial Order. Second, even if he had not stipulated as such, such documents would be admissible under the business records exception to the hearsay rule. FED. R. EVID. 803(6).

supervisors, Fred Martin, John Hannon, and Matthew Robinson decided that he should stay home. (Pl.'s LR 56.1(b)(3)(A) P 37.) Carr did not return to work until December 17, 1999 because Ameritech did not provide him with a wheelchair. (Def.'s LR 56.1 (b)(3)(B) P 42.)

[*8] The Benefits Committee denied Carr any additional benefits starting on September 10, 1999. (Def.'s LR 56.1(a)(3) P 35.) Carr was informed of the Committee's final decision denying him further benefits by a letter dated December 30, 1999. (Id.) Kelmis played no role in the Benefits Committee's decision to deny Carr further disability benefits for his injured Achilles tendon in 1999. (Id. P 41.) The Benefits Committee based their denial of Carr's benefits on his medical information provided by Carr and his physician, Dr. Schick. (Id. PP 35-39.) The Benefits Committee concluded that the medical information that Carr submitted was conflicting and did not contain clear objective medical findings that sustained Carr's claim that he was so severely impaired as to prevent him from performing the duties of his job with the accommodations offered by Ameritech. (Id. P 40.)

Carr believes that he was denied additional benefits under the Plan in 1999 for his Achilles tendon because of his gender. (Id. P 42.) Carr refers to a female employee, Angie Shenault, as sustained more favorably. (Id.) According to Carr, Shenault told him that after having back surgery her doctor restricted [*9] her to a specially made chair for her return to work. (Id.) Moreover, she said that since the chair was not available when she first returned back to work, she had to go out on leave because the chair was not ready and that "she didn't lose any pay." (Id.) Carr claims that he could not return to work because he had not been provided with a wheelchair and foot elevation and therefore, he should have continued to receive benefits. (Pl.'s LR 56.1(b)(3)(A) P 42.)

## C. Opportunity for Overtime

Carr's third claim is that he was denied the opportunity to accept or deny overtime. Carr had previously filed two grievances, in October 1997 and April 1998, in which he complained, among other things, that his supervisor, Kelmis did not offer him the opportunity to accept or decline overtime. (Def.'s LR 56.1(a)(3) P 18.) At the end of 1998 or beginning of 1999, these

grievances were addressed at a meeting at which Carr, his superiors, and his union representatives were present. (Id. P 19.) According to Carr, some of the other employees had seventy or more hours of overtime while Carr had only 13 1/2 hours. (Pl.'s LR 56.1(b)(3)(A) P 19.) While Carr's second overtime grievance [*10] was settled for four days of overtime pay, his first overtime grievance was not settled at all. (Id.)

The disputed overtime work required special work called "provisioning." In 1994 Carr started working in the Technology Transport Center as a Telecommunications Specialist. (Def.'s LR 56.1(a)(3) P 6.) During this time Carr worked under Kelmis and performed work called "alarm acceptance testing." (Id. PP 6-7.) Alarm acceptance involves accessing equipment from a computer workstation to test the alarm systems of Ameritech's telecommunications equipment. (Id. P 6.)

Besides supervising Carr, Kelmis also supervised a group of employees who did provisioning work. (Id. P 8.) Provisioning involves using a computer workstation to assist in the process of turning up Ameritech facilities in different states. (Id.) In some states, provisioning requires remotely placing electronic cross connection to turn the facilities up. (Id.) During the time that Kelmis supervised Carr, it was the provisioning work that sometimes required employees for overtime. (Id. P 9.) Kelmis only gave overtime to those employees who remotely placed electronic cross connection during regular [*11] working hours. (Id. P 10.) Ameritech points to Sharon Prince and Delores Edwards, two African American employees who did electric cross connection and received provisioning overtime. (Id. P 10.) Ameritech also points to Joe Laurence, a Caucasian employee who did not perform electronic cross connection during regular working hours and did not receive provisioning overtime. (Id.)

Carr states that he had been trained to do electronic cross connections at the Ameritech center. (Pl.'s LR 56.1(b)(3)(A) P 6.) However, Carr did not do electronic cross connections every day during regular working hours. (Def.'s LR 56.1(a)(3) P 10; Pl.'s LR 56.1(b)(3)(A) P 12.)

Carr claims that Kelmis denied him overtime because of his race. He bases this conclusion on the fact that he was number two on the seniority list, but got very little

overtime. (Pl.'s LR 56.1(b)(3)(B) P 1.) Carr states that Kelmis never wanted to talk with Carr about his job function or ability to perform other tasks. (Pl.'s LR 56.1(b)(3)(A) P 13.) Carr heard second-hand that Kelmis made a racially derogatory statement. [3] (Id.)

[*12] On September 27, 1999, Carr filed his charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). In his charge he complained that he was denied overtime because of his race and that he was denied salary in 1999 because of his race and his gender. (Def.'s LR 56.1(a)(3) P 45.) On September 30, 1999, the EEOC issued to Carr a Dismissal and Notice of Rights.

### Discussion

Under Rule 56(c), summary judgment is proper once the moving party has established that no genuine issue of material fact requiring resolution at trial can be found in the record and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). In reviewing motions for summary judgment, courts must view the evidence in the light most favorable to the non-moving party, meaning that any doubt as to the existence of genuine issues of fact will be resolved against the moving party. Valley Liquors, Inc. v. Renfield Importers, Ltd., 822 F.2d 656, 659 (7th Cir. 1987). However, a party may not rest upon pleadings to oppose a motion for summary judgment and must set forth [*13] specific facts showing that there is a genuine issue of material facts for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

Where the party opposing a motion for summary judgment bears the burden of proof on an issue, he or she must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact requiring trial. Sarsha v. Sears Roebuck & Co., 3 F.3d

---

[3] Carr explains that several people, excluding himself, heard Kelmis make a racially derogatory comment while talking on the phone to another person. Carr explains that one of the people who overheard this comment told another person, who then told Carr. This is clearly inadmissable hearsay, and accordingly, the Court has not considered the statement when ruling on defendant's motion for summary judgment.

1035, 1041 (7th Cir. 1993). The nonmoving party's own affidavit or deposition can constitute affirmative evidence to defeat a summary judgment motion. Id.; Wilson v. Williams, 997 F.2d 348, 351 (7th Cir. 1993). Further, the summary judgment standard is applied "with added rigor in employment discrimination cases, where intent and credibility are crucial issues." Robinson v. PPG Indus., Inc. 23 F.3d 1159, 1162 (7th Cir. 1994). Still, "in an employment discrimination case, a claimant must present more than conclusory allegations to defeat a motion for summary judgment." Fisher v. Wayne Dalton Corp., 139 F.3d 1137, 1140 (7th Cir. 1998).

"A plaintiff can avert summary [*14] judgment for the defendant in an employment discrimination case either by putting in enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue or by establishing a prima facie case under the McDonnell Douglas formula." Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 940 (7th Cir. 1997). In order to establish a prima facie case of gender or race discrimination, a plaintiff must show: 1) that he belongs to a protected class, 2) that he performed his job satisfactorily, 3) that he suffered an adverse employment action, and 4) that his employer treated similarly situated employees outside of his classification more favorable. Markel v. Board of Regents of Univ. of Wis. Sys., 276 F.3d 906, 911 (7th Cir. 2002) (gender); Hughes v. Brown, 20 F.3d 745, 746 (7th Cir. 1994) (race).

If the plaintiff succeeds, the burden of production then shifts to the employer, who must articulate a "legitimate, nondiscriminatory reason" for the adverse action. See Pafford v. Herman, 148 F.3d 658, 665 (7th Cir. 1998) (citing Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)). [*15] "If the employer carries this burden, then the burden shifts back to the plaintiff to produce 'evidence that would, if believed by a trier of fact, show that the true reason for the employment action was discriminatory.'" Pafford, 148 F.3d at 665 (quoting Sattar v. Motorola, Inc., 138 F.3d 1164, 1169 (7th Cir. 1998)).

Carr has conceded that he does not have any direct evidence of discrimination and that all his claims must be considered using the burden shifting method in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 36

L. Ed. 2d 668, 93 S. Ct. 1817 (1973). (*See* Pl.'s Resp. Br. at 2.) Both parties agree that Carr is an African-American male, and thus he is a member of a protected class. The second prong of the *prima facie* case relates to job performance. The parties have not made Carr's job performance an issue in this case, which leaves the last two prongs.

Carr claims he has suffered three adverse employment actions. First, he claims that his request for particular vacation days was denied. Second, he argues that he was denied salary during medical leave in 1995 and 1999. Third, he claims that he was denied overtime opportunities.

[*16] **A. Selection of Vacation Time:**

In order to establish a *prima facie* case for discrimination, Carr must show that the denial of particular vacation dates was an adverse employment action. *See Hughes*, 20 F.3d at 746. Carr has failed to convince the Court that the events surrounding the choosing of vacation time for 1999 amounted to an adverse employment action. "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). "[A] materially adverse change in employment conditions must be more disruptive than a mere inconvenience . . . ." *Johnson v. City of Fort Wayne*, 91 F.3d 922, 932 (7th Cir. 1996).

In his reply to the motion for summary judgment Carr impressively cloaks this claim in ambiguity. [4] However, his deposition clarifies the matter. In his deposition, Carr states that for the 1999 work year he received twenty vacation days. (Carr Dep. at *11.) At no time does Carr allege that he actually lost any of these days. Rather, unlike in previous years in which [*17] he creatively selected his vacation days in combination with holidays such as Christmas and Thanksgiving and floating holidays to stretch his twenty days to cover six

full weeks, Carr was told that he could only use his twenty vacation days to cover five full weeks. (*Id.* at *11-*13.) Upon being told that policy, Carr decided to eliminate the full week of time off that directly followed the Thanksgiving holiday. (*Id.* at *12.) The next week, Carr realized he would rather eliminate his full week of vacation after the Christmas holiday. (*Id.* at *12-*13.) Carr attempted to change the schedule, but it was too late -- another employee had already picked that week off. (*Id.* at *13.)

[*18] Again, at no time does Carr put forward evidence that he lost any of his twenty vacation days. Rather, he complains that he was not allowed to use the vacation days in a manner that would allow him six full weeks instead of five and that he was not allowed to re-select his particular vacation dates when he changed his mind after his initial selection.

While the actual loss of vacation days may constitute a material loss of benefits, Carr has presented no evidence that such a deprivation of material benefits occurred. Besides the instruction that he may only use his twenty vacation days to take five full weeks instead of his usual six full weeks (using holidays and floating holidays etc.), Carr has presented no evidence regarding the initial selection of vacation dates, the usual process by seniority, or whether he lost any of his twenty paid vacation days. Carr merely has established that after his initial selection of vacation dates, he changed his mind and made a request to change his vacation dates. At worst, Carr was denied the opportunity to change his vacation schedule. Courts have held that a singled denied vacation request is not a material loss of benefits and thus is [*19] not an adverse employment action. *See Wilkosz v. Hudson Respiratory Care, Inc.*, No. 99 C 309, 2000 WL 1705252, at *10 (N.D. Ill. Nov. 14, 2000); *Rice v. Central DuPage Hosp.*, 1999 U.S. Dist. LEXIS 4732, No. 96 C 2405, 1999 WL 199241, at *5 (N.D. Ill. Mar. 31, 1999).

The Court finds *Wilkosz* and Rice persuasive and holds that Carr's denied vacation request is not a material loss of benefits. Accordingly, there was no adverse employment action relating to Carr's vacation time and Carr has failed to establish a *prima facie* case of discrimination. Even if the Court were to hold that Carr's denied vacation request was an adverse employment action, Carr also fails to establish a *prima facie* case because he has presented no evidence of a

---

[4] Carr's response to defendant's version of the events states only: "Harold Carr is allowed five weeks of vacation. After picking his vacation days, Harold Carr was told to give back a week. After picking days for the two previous years, Carr could no longer pick all his days. Kelmis said that Carr could no longer pick his weeks the same with no explanation." (Pl.'s LR 56.1(b)(3)(A) P 44.)

similarly situated employee that was treated more favorably. Accordingly, the Court grants defendant's motion for summary judgment as to Carr's gender and race discrimination claims based on denied vacation requests for particular vacation dates.

## B. Denial of Disability Benefits

Carr's second claim is that he was denied salary during medical leave in 1995 and 1999. We address each denial in turn.

### 1. Conjunctivitis: 1995

 [*20] In 1995, Ameritech denied Carr salary for missed days of work resulting from his conjunctivitis. Carr alleges that this denial was due to race and gender discrimination. This claim fails because it is untimely. Under section 1981, Carr's claims of discrimination are subject to Illinois' two-year personal injury statute of limitations. 735 ILL. COMP. STAT. 5/13-202; *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 807 (7th Cir. 1999). In addition, under Title VII, Carr was required to file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") or the Illinois Department of Human Rights, "within three hundred days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e); *see  Conley v. Vill. of Bedford Park*, 215 F.3d 703, 710 (7th Cir. 2000).

In a letter dated December 21, 1995, the Benefit Committee told Carr of its decision to deny him short term disability benefits. On September 27, 1999, almost four years later, Carr filed charges with the Equal Employment Opportunity Commission. (Def.'s LR 56.1(a)(3) P 45.) He filed the complaint in the instant case on December 27, 1999--well [*21] beyond the statutes of limitations of Title VII and section 1981. [5] With respect to Carr's discrimination claim for denied disability benefits for his conjunctivitis in 1995, summary judgment must be granted because the claim is time-barred.

Even if the Court were to hold that Carr's claim for conjunctivitis disability benefits was timely, which it

does not, this claim would still fail because Carr has not established the *prima facie* case necessary to infer discrimination. The record is devoid of evidence of a similarly situated employee outside of his class that was treated more favorably than he. Carr admits that in connection with his claim for additional disability benefits for conjunctivitis in 1995, he has not identified anyone who was similarly situated to him, was not African-American, but was treated more favorably. (Def.'s LR 56.1(a)(3) P 33.) That leaves only his gender discrimination claim. Carr's [*22] only evidence of gender discrimination is a reference he makes in his deposition to an African American woman named LaTanya Williams. (Carr Dep. at *8.) However, according to Carr, Williams received the *same* disability benefits as Carr. (*Id.* at *9.) Carr cannot identify anyone with conjunctivitis who was treated any better. (*Id.* at *8.) Because Carr cannot identify any similarly situated employee outside of his class that was treated *more* favorably, he has not established a *prima facie* case of racial or gender discrimination.

### 2. Torn Achilles Tendon: 1999

Carr's second claim for disability occurred in 1999 when he partially tore his Achilles tendon. Carr asserts that he was denied his disability benefits because of his gender. (*Id.* at 85-86.)

This claim also fails for want of a similarly situated employee who was treated more favorably than Carr. Carr's sole example of a similarly situated employee is Angie Shenault. Putting aside the hearsay issue, [6] which alone would preclude Carr from winning on this point, the claim fails because Shenault was not similarly situated. According to Carr, Shenault was treated more favorably because she "was provided [*23] with a special chair to accommodate her back injury, but no wheelchair or foot elevation was provided to Carr." (Pl.'s Ex., Carr. Aff. PP 12-13.) In addition, Shenault told Carr that during her absence "she didn't lose any pay," (Def.'s LR 56.1(a)(3) P 42), whereas Carr was not paid during his time off.

It would appear that Shenault was treated more

---

[5] Carr has not argued that either equitable estoppel or equitable tolling applies in this case.

[6] Carr's evidence is all based on statements he alleges Shenault made to him. *See Winskunas v. Birnbaum*, 23 F.3d 1264, 1268 (7th Cir. 1994) (stating hearsay cannot create a genuine issue of material fact).

favorably than Carr. She received a special chair and benefits for the time she spent away from work where Carr did not. (*See* Def.'s LR 56.1(a)(3) P 42.) However, Carr does not establish a sufficient level of similarity between himself and Shenault. While it may be true that both Carr and Shenault were told to stay home until they could attend work, that alone is insufficient to support the claim that they are similarly situated. Shenault [*24] never reported to Carr's old supervisor, Kelmis. (Def.'s LR 56.1(a)(3) P 43.) Furthermore, Carr has not put forward any evidence that he and Shenault had the same supervisor during the time period of both of their absences. A plaintiff is ordinarily required to show that a common supervisor made the relevant decision in order to establish substantial similarity. *See  Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000). "Different employment decisions, concerning different employees, made by different supervisors are seldom sufficiently comparable to establish a *prima facie* case of discrimination for the simple reason that different supervisors may exercise their discretion differently." *Id.* Besides providing no evidence that he and Shenault shared the same supervisor, Carr has not shown that their disability claims were reviewed by the same Benefits Committee. Carr has not produced any evidence of the nature, extent, or duration of Shenault's absence. Most importantly Carr has failed to address the difference between Shenault's doctor's orders, which required that she not go back to work without a special chair (Def.'s LR 56.1(a)(3) P 42), and his [*25] doctor's orders, which were significantly less clear as to the medical necessity of a wheelchair (Def.'s LR 56.1(a)(3) PP 35-39). Because the Benefits Committee relied on Carr's medical records to determine eligibility for disability benefits, such a distinction is of peak importance for Carr. In sum, given the undisputed facts in the record, Carr has failed to establish that a similarly situated female was treated more favorably. Therefore, the Court grants defendant's motion for summary judgment as to his gender discrimination claim based on the denial of disability benefits relating to his torn Achilles tendon in 1999.

### 3. Pretext

Finally, even if Carr's discrimination claims based on the 1995 disability benefits denial were not time-barred and even if had established *prima facie* cases of discrimination based on the 1995 disability benefits denial, in the face of legitimate race-neutral reasons proffered by Ameritech, Carr has failed to provide evidence that Ameritech's reasons for denying him medical benefits for his conjunctivitis or his torn Achilles tendon are a pretext for discrimination. *See Collier v. Budd Co.*, 66 F.3d 886, 889 (7th Cir. 1995). [*26] Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). "A 'pretext for discrimination' means more than an unusual act; it means something worse than a business error; 'pretext' means deceit used to cover one's tracks." *Id.* at 684. "On the issue of pretext, our only concern is the honesty of the employer's explanation." *O'Connor v. DePaul Univ.*, 123 F.3d 665, 671 (7th Cir. 1997). Even if Ameritech's reasons for denying Carr's disability benefits were "mistaken, ill considered or foolish, so long as [Ameritech] honestly believed those reasons, pretext has not been shown." *Jordan v. Summers*, 205 F.3d 337, 343 (7th Cir. 2000).

In support of the Benefits Committee's decision to deny Carr disability benefits, Ameritech points to the Collective Bargaining Agreement for the International Brotherhood of Electrical Workers. Carr's two claims for disability benefits would be governed by the 1989 Ameritech Sickness and Accident Disability Benefit Plan and the 1996 Ameritech Sickness and Accident Disability Benefit Plan. Under [*27] the respective plans, a Plan Administrator or the Benefits Committee possesses ultimate authority for determining whether an Ameritech employee should receive disability benefits. (Def.'s LR 56.1(a)(3) PP 21-28.) In 1995, the Benefits Committee denied Carr disability benefits beyond his first seven days of his illness because the medical information submitted by Carr did not indicate any complications, failed to provide a plan of treatment beyond August 14, 1995, and indicated that Carr had not received any medical care for almost one full month. (Def.'s LR 56.1(a)(3) P 32.) In 1999, the Benefits Committee denied Carr benefits because the medical information that Carr submitted had conflicting and unclear medical findings. The Benefits Committee determined that Carr had not submitted medical information that substantiated his claim that he was so impaired from his torn Achilles tendon that he could not perform his desk job with reasonable accommodations offered by Ameritech. (Def.'s LR 56.1(a)(3) PP 35-40.)

While the results of the Benefits Committee determinations may have been mistaken or unfair, even if we assume that Carr's medical records were flawlessly submitted, absent additional [*28] evidence, Carr has not presented any evidence which could lead a reasonable jury to conclude that the Benefits Committee's reasons for denying his disability benefits were a pretext for discrimination. Whether or not Carr should have received his benefits in the first place is not the question at hand. Rather, we must ask whether there is evidence sufficient to support a finding that he was denied those benefits as a pretext for discrimination. In both 1995 and 1999, it was the Benefits Committee that made the decisions regarding disability compensation. Although Carr does submit conclusory allegations about Kelmis, he has not put forward any evidence, beyond sheer speculation, that the Benefits Committee's decision was tainted or that its reasons for its denials of benefits were not the real reasons. Carr even admits in his deposition that he has no reason to believe that the decisions of the Benefits Committee in 1995 were discriminatory. (Def.'s LR 56.1 (a)(3) P 32.) Further, he fails to point to a single piece of evidence with regard to the Benefits Committee's decision in 1999 being a pretext for discrimination. For the reasons stated above, summary judgment is granted for Ameritech [*29] on both of Carr's discrimination claims based on the denial of disability benefits.

## C. Opportunity for Overtime

Finally, Carr claims racial and gender discrimination occurred when he was denied the opportunity to work overtime. Like Carr's other claims, the Court finds this claim fatally flawed.

Nowhere in the record does Carr provide a single specific example of a similarly situated employee outside of his protected class who was treated more favorably. Instead he makes a general argument that he was treated differently based on his race because "Kelmis offered overtime to other employees most of whom were white." (Pl.'s Mem. Law at 2.) Because Carr has failed to offer any specific evidence of a similarly situated employee outside of his class who was treated more favorably he has not established a *prima facie* case of racial or gender discrimination. Therefore, no discriminatory intent can be inferred.

Moreover, Ameritech has provided legitimate race-neutral reasons why Carr did not receive the opportunity to do overtime. Kelmis, Carr's supervisor, stated that he did not give provisioning overtime to employees who did not perform electronic cross connection during [*30] regular work hours. (*Compare* Def.'s LR 56.1(a)(3) P 10, *with* Pl.'s LR 56.1(b)(3)(A) P 10.) Although Carr had been trained to do electronic cross connections, he concedes that his work at Ameritech did not consist of performing electronic cross connections every day during regular work hours. (Pl.'s LR 56.1(b)(3)(A) P 12; Pl.'s Ex., Carr Aff. P 4.)

Finally, Ameritech has offered evidence that two African Americans who did work electronic cross connections during regular working hours were given provisioning overtime. (Def.'s LR 56.1(a)(3) P 10.) Ameritech has also offered evidence of a Caucasian male who, like Carr, did not perform electronic cross connections during regular working hours and did not receive provisioning overtime. (*Id.*)

Even if Carr had established a *prima facie* case of discrimination with regard to provisioning overtime opportunities, he ultimately fails to establish a genuine issue as to a material fact regarding whether Ameritech's race-neutral reasons for denying him provisioning overtime were a pretext for discriminations. Carr offers one hearsay statement [7] as well as some conclusory allegations that are insufficient to raise any questions of [*31] fact. Because Carr has failed to point to a similarly situated employee not in his protected class that was treated more favorably and because he has failed to raise a genuine issue as to a material fact regarding Ameritech's race-neutral reason for denying him the opportunity for provisioning overtime, the Court grants Ameritech's motion for summary judgment as to this claim.

## CONCLUSION

For the reasons provided in this Memorandum Opinion and Order, the Court grants Ameritech's motion for summary judgment [doc. no. 12-1]. This case is hereby terminated. All other pending motions are denied as moot.

---

[7] *See supra* n.3.

2002 U.S. Dist. LEXIS 5490, *31

**SO ORDERED**

**ENTERED: 3/26/02**

**HON. RONALD A. GUZMAN**

**United States Judge**

**JUDGMENT IN A CIVIL CASE**

Decision by Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that the Court grants Ameritech's motion for summary judgment [12-1]. This case is [*32] hereby terminated and all other pending motions are stricken as moot. This is a final and appealable order. Enter Memorandum Opinion and Order.

Date: 3/26/2002

---

**End of Document**

# Barren v. Ne. Ill. Reg'l Commuter R.R. Corp.

United States District Court for the Northern District of Illinois, Eastern Division

March 7, 2016, Decided; March 7, 2016, Filed

No. 13 CV 4390

**Reporter**

2016 U.S. Dist. LEXIS 28421 *

KIMBERLY BARREN, Plaintiff, v. NORTHEAST ILLINOIS REGIONAL COMMUTER RAILROAD CORPORATION, d/b/a METRA, Defendant.

**Prior History:** Barren v. Northeast Ill. Reg'l Commuter R.R. Corp., 2015 U.S. Dist. LEXIS 21035 (N.D. Ill., Feb. 23, 2015)

**Counsel:** [*1] Kimberly Barren, Plaintiff, Pro se, Lansing, IL.

For Northeast Illinois Regional Commuter Railroad Corporation, doing business as Metra, Defendant: Marivel Montes, LEAD ATTORNEY, NIRC/Metra Railroad, Chicago, IL; Stephen Gregory Goins, LEAD ATTORNEY, Northeast Illinois Regional Commuter Railroad Corp., Chicago, IL; Daniel J Hronek, Metra, Law Department, Chicago, IL; Kenneth Jones, Metra Law Department, Chicago, IL; Russal John Anderson, Sue-Ann Rosen, NIRC/Metra Railroad, Chicago, IL.

**Judges:** Young B. Kim, United States Magistrate Judge.

**Opinion by:** Young B. Kim

# Opinion

## MEMORANDUM OPINION and ORDER

Kimberly Barren brings this action against her employer, Northeast Illinois Regional Commuter Railroad Corporation ("Metra"), asserting claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* She also asserts a breach of contract claim. The parties have consented to this court's jurisdiction. (R. 21.) Before the court is Metra's motion for summary

judgment. (R. 107.) For the following reasons, the motion is granted:

## Background

### A. Local Rule 56.1

Local Rule ("L.R.") 56.1 requires movants to provide statements containing specific [*2] references to supporting materials, and failure to comply with L.R. 56.1 is a sufficient ground for courts to strike or disregard unsupported facts. *See Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). Before reaching the merits of Metra's motion, the court first notes that there are several instances in the parties' L.R. 56.1 statements in which they fail to cite to supporting evidence or fail to controvert an asserted fact. For example, in its statement of facts Metra sometimes cites to portions of the record which appear wholly unrelated to the asserted fact, (see, e.g., R. 109, DSOF[1] ¶¶ 11-12, 17-18, 22, 30), or cites generally to an entire document without specific reference to which parts actually support the fact asserted, (see, e.g., id. ¶¶ 17, 19). Barren makes similar errors, citing to exhibits that either do not exist or do not support the fact asserted. (See, e.g., R. 128, Pl.'s Resp. to DSOF ¶¶ 18, 23, 32, 77; R. 129, PSOF ¶¶ 1, 9.) Barren's L.R. 56.1(b) statement of additional facts also falls short because in some instances she cites only to her own affidavit or deposition testimony without explaining how she is qualified to offer such testimony. (See R. 129, PSOF ¶¶ 2, 3, 11; *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir.2009) (in a motion for summary judgment, factual

---

[1] "DSOF" refers to Metra's L.R. 56.1(a)(3) statement of material facts, and "Pl.'s Resp. to DSOF" refers to Barren's response to Metra's L.R. 56.1(a)(3) statement of material facts. "PSOF" refers to Barren's L.R. 56.1(b) statement of additional facts.

assertions must be competent [*3] evidence that is admissible at trial).

To the extent the parties' asserted facts are not properly supported, the court disregards them. *See Menasha Corp. v. News Am. Mktg. In-Store*, 238 F. Supp. 2d 1024, 1029 (N.D. Ill. 2003). Conversely, pursuant to L.R. 56.1(b)(3)(C), all material facts adequately set forth in Metra's statement which Barren does not properly controvert are deemed admitted. *See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003); *Jankovich v. Exelon Corp.*, No. 01 CV 7436, 2003 U.S. Dist. LEXIS 1466, 2003 WL 260714, at *5 (N.D. Ill. Jan. 31, 2003) (noting that evasive denials that do not directly oppose an assertion are improper and thus the contested facts are deemed to be admitted pursuant to L.R. 56.1). Similarly, because Metra did not respond to Barren's L.R. 56.1(b)(3) statement of additional facts, all properly supported facts therein are deemed admitted. *See* L.R. 56.1(a)(3). The following undisputed facts will be viewed in the light most favorable to Barren for purposes of ruling on Metra's motion. *See O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

## B. Facts

Barren, a black female, has worked for Metra as a trainman since May 2011. (R. 109, DSOF ¶ 4.) Trainmen, including conductors and assistant conductors, facilitate or supervise the movement of railroad equipment. (Id.) Barren's duties include collecting fare, [*4] working in rail yards, and working as a flagman. (See id.) As a member of the United Transportation Union ("UTU"), Barren is bound by a Collective Bargaining Agreement between UTU and Metra ("CBA"). (Id. ¶ 6.)

## 1. Efficiency Tests

Metra conducts random "efficiency tests," during which supervisors question trainmen on various aspects of their job. (R. 109, DSOF ¶ 7.) During an efficiency test in October 2012, Supervisor Janet Carbonelli asked Barren to recite the emergency exit announcement which Barren was required to know. (Id. ¶¶ 9-10, 24-25.) She was unable to recite the announcement successfully at that time, (see id. ¶ 26), but was able to

recite it during a subsequent re-test, (id. ¶ 28).

## 2. Work Schedule

Under the CBA, seniority plays a significant role in how jobs are assigned to trainmen. (See id. ¶¶ 12, 19.) For example, a trainman with higher seniority can displace or "bump" a junior trainman from his or her assigned work schedule. (See id. ¶ 19.) When that happens, Metra's Crew Management Center ("CMC") calls the displaced trainman to notify her of the bump. (Id.) That trainman must then call the CMC "within six hours after being released from the last service which they performed." [*5] (Id. ¶ 20.) If the trainman does not call within six hours, she is assigned to the "extra board" and must be available during certain hours to receive work assignments. (See id. ¶¶ 12, 21.) Once a trainman is placed on the extra board, she cannot claim an assignment for 30 days unless an assignment is released or a new assignment is created. (See id. ¶ 21.)

The CMC contacts trainmen using a Metra-issued Nextel telephone, pager, or cell phone. (See id. ¶¶ 13-14.) Because Metra requires trainmen to have a reliable means for the CMC to reach them, trainmen who use a cell phone as their primary means of contact must also provide a back-up number. (Id. ¶¶ 14-15.) Barren used her personal cell phone as a back-up means for the CMC to reach her. (See id. ¶ 15.) Trainmen are responsible for ensuring that their communication devices are in proper working order. (Id. ¶¶ 14, 16.) The failure of a trainman's communication device does not excuse her from responding to calls, and if the CMC leaves a voicemail with a trainman, she has 15 minutes to return the call. (See id. ¶¶ 16-17.) Under Metra's policy, failing to return a call within 15 minutes is considered "a violation of the schedule rules and [*6] agreement." (Id. ¶ 17; R. 113, Ex. 4 at 3.)

On November 5, 2012, Barren worked her scheduled shift from 5:07 p.m. until 12:26 a.m. the following morning. (R. 109, DSOF ¶ 34.) At 5:33 p.m., shortly after Barren started her shift, the CMC called Barren's Metra-issued Nextel phone and left a voicemail informing her that a more senior employee had bumped her from her assigned shift. (Id. ¶¶ 34, 36-37.) The CMC instructed Barren to return the call to select a new assignment. (Id. ¶ 37.) The CMC also called Barren's personal cell phone, but was unable to leave a message

because Barren's voice-mailbox was full. (Id. ¶ 38.) Under the CBA, Barren had until about 6:26 a.m. on November 6, 2012—six hours after being released from her shift—to return the CMC's call. (R. 109, DSOF ¶ 20.)

The next morning at 9:20 a.m. on November 6, 2012, the CMC left another message at each of Barren's contact numbers to tell her that she had been bumped and that she should contact the CMC. (Id. ¶ 40.) Barren called the CMC about 40 minutes later, at 10:03 a.m., and inquired about available assignments. (Id. ¶ 41.) After hearing her options, Barren said she would call the CMC back. (Id. ¶ 42.) According to Metra's [*7] records, Barren again contacted the CMC later that afternoon at 2:18 p.m. to ask which assignments were available, and again said she would call back. (Id. ¶ 43.) A few hours later Barren reported to work for her previously assigned shift beginning at 5:07 p.m. on November 6, 2012. (Id. ¶ 44.) But she called the CMC around 5:30 p.m. after she realized that another conductor was already working that shift, selected a new assignment, and then went home. (See R. 110, Barren Dep. Vol. I at 115:14-22; R. 109, DSOF ¶¶ 45-46; R. 128, Pl.'s Resp. to DSOF ¶ 46.) However, after conferring internally, the CMC determined that Barren had missed her six-hour window for choosing an assignment and called Barren at 6:02 p.m. to inform her that instead of working her new assignment, she would be placed on the extra board. (Id. ¶¶ 46-48.) Barren opposed her placement on the extra board and stated that she would work her chosen assignment instead. (Id. ¶ 49.) Barren did not work a shift that day. (R. 128, Pl.'s Resp. to DSOF ¶ 46.)

Barren then took a leave of absence on the following two days, November 7 and 8, 2012, then selected and worked a new assignment on November 9, 2012. (Id. ¶ 67.) Later that [*8] week Supervisor Carbonelli met with Barren and Barren's union representative. During that meeting Carbonelli informed Barren that the demands of her job as a trainman might occasionally prevent her from attending to personal matters. (See id. ¶ 62.) The following week, on November 15, 2012, Barren received two notices that she would be the subject of formal investigations. (See id. ¶ 65.) According to the CBA, the purpose of an investigation is to determine whether an employee violated Metra rules or policies, and if so, what discipline should be

imposed. (See id. ¶ 64.) The two notices arose from her failure to return the CMC's call on November 5, 2012, and her alleged refusal to take an assignment from the extra board on November 7, 2012.[2] (Id. ¶ 65.) Barren filed a charge with the EEOC on November 16, 2012, alleging retaliation and discrimination on the basis of her race and sex. (See id. ¶ 68; see also R. 43, Def.'s Answer to Am. Compl. ¶ 39.)

### 3. FMLA Leave

Barren applied for intermittent FMLA leave to care for her daughter [*9] on February 18, 2012. (R. 109, DSOF ¶ 29.) Acting on advice from a reviewing physician, Metra's medical department requested additional documentation from Barren's daughter's treating physician. (Id.) On July 10, 2012, Barren filed a charge with the EEOC and the Illinois Department of Human Rights alleging race discrimination because Metra failed to approve her requests for FMLA leave. (See id. ¶ 30.) Metra and Barren mediated the dispute on September 5, 2012, and the next day, Metra approved Barren's request for intermittent FMLA leave from February 2012 to February 2013. (Id. ¶¶ 30-31.) The parties also signed a settlement agreement on October 2, 2012 ("Mediation Agreement"), in which Metra agreed, among other things, to: (1) issue "special written instructions" to the CMC regarding appropriate questions to ask an employee who is requesting FMLA leave; (2) schedule a discussion between Metra's medical department and Barren about each party's responsibilities regarding FMLA paperwork; and (3) remind the medical department that employees' medical issues are confidential. (See id. ¶ 30; R. 129, PSOF ¶¶ 16-20; R. 77, Suppl. Compl., Ex. 1 at 2-3.)

On September 28, 2012, after Metra had [*10] approved Barren's request for intermittent leave, Barren requested leave to care for her daughter. (R. 109, DSOF ¶ 33.) Because of a clerical error, however, the CMC did not have a copy of Barren's FMLA approval on file so it initially denied Barren's request for the day off. (Id.) But her request was eventually granted and Barren was not required to report to work, and Metra did not discipline her for taking leave that day. (Id.) On November 20,

---

[2] Despite the fact that the notices were issued more than three years ago, these investigations have not occurred because Barren remains on medical leave. (Id. ¶ 70.)

2012, however, Metra denied Barren's request for FMLA leave to attend her own doctor's appointment because Barren's FMLA approval did not provide time off for such appointments. (Id. ¶ 69.) But Barren ultimately was given leave that day and was not subjected to discipline for taking the day off. (Id.)

The parties' L.R. 56.1 statements are unclear regarding what occurred in the period before and during the fall of 2013, but it is undisputed that from at least September 2013 through November 2013, Barren was placed on medical leave. (See id. ¶ 75.) Barren alleges that during that time, Metra's medical department "falsely reported" to the benefits department that she would return to work on October 2, 2013, even though Barren's physician submitted paperwork [*11] noting a return date of November 13, 2013. (See R. 41, Am. Compl. ¶¶ 44-45.) According to Barren, this caused her disability benefits to be unduly delayed. (Id. ¶ 46.) Barren filed a third EEOC charge on October 31, 2013, alleging retaliation and discrimination on the basis of her disability. (See id. ¶ 49.)

## 4. Medical Disqualification

Metra's practice is to evaluate employees for "medical disqualification" after they have been on medical leave for approximately one year. (R. 109, DSOF ¶ 78.) If medically disqualified, an employee no longer has to periodically submit medical paperwork to Metra's medical department to justify their continued leave of absence. (See id. ¶ 80.) Before designating an employee as medically disqualified, Metra's Chief Medical Officer ("CMO") reviews the employee's medical documentation to determine whether she is medically capable of performing her job. (Id. ¶ 79.) The parties do not dispute that medical disqualification has no adverse impact on the employee's status—the employee is not terminated, continues to accrue seniority, and suffers no loss of benefits. (Id. ¶ 82.) If the employee recovers from her medical condition, she can return to work as long as [*12] she passes a physical examination performed by Metra's CMO. (Id. ¶ 81.) According to Barren, Metra placed her on medically disqualified status on November 20, 2013. (R. 41, Am. Compl. ¶ 50.) Barren filed her fourth EEOC charge on November 26, 2013, this time alleging retaliation and discrimination on the basis of her race, sex, and disability. (Id. ¶ 52.)

## Analysis

Summary judgment is appropriate if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Although the facts will be viewed in Barren's favor, she "is not entitled to the benefit of inferences that are supported by only speculation or conjecture." See Nichols v. Mich. City Plant Planning Dep't, 755 F.3d 594, 599 (7th Cir. 2014) (internal quotation omitted). The court's role at this stage is not to "weigh the evidence or engage in fact-finding," but rather to "simply determine whether there is a genuine issue for trial." Hasan v. Foley & Lardner LLP, 552 F.3d 520, 527 (7th Cir. 2009). A genuine issue of material fact exists if "'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Hnin v. TOA (USA), LLC, 751 F.3d 499, 504 (7th Cir. 2014) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

## A. Race and Sex Discrimination Claims

Discrimination and retaliation claims are analyzed under the direct and indirect methods of proof. See Orton-Bell v. Indiana, 759 F.3d 768, 773 (7th Cir. 2014). Because [*13] Barren bases her race and sex discrimination claims on the indirect method, (see R. 41, Am. Compl. at 10-11; R. 127, Pl.'s Resp. at 3-5), this court will apply that framework in its analysis. Under the indirect method of proof, Barren has the initial burden of making out a prima facie case that: (1) she is a member of a protected class; (2) she performed according to Metra's reasonable expectations; (3) she nonetheless suffered an adverse employment action; and (4) similarly situated non-black or male employees were treated more favorably. See Morgan v. SVT, LLC, 724 F.3d 990, 996 (7th Cir. 2013). If Barren is able to satisfy these criteria, the burden shifts to Metra to offer a non-discriminatory reason for the claimed adverse employment action. See Keeton v. Morningstar, Inc., 667 F.3d 877, 884 (7th Cir. 2012). If Metra does so, the burden shifts back to Barren to present evidence that Metra's explanation for the challenged action is nothing more than a pretext for discrimination. See id.

The parties focus primarily on whether Barren suffered an adverse employment action, so the court's analysis begins there. In the context of a discrimination claim, an adverse employment action must represent a "materially adverse change," such as "a demotion evidenced by a decrease in wage or salary, a less [*14] distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 612-13 (7th Cir. 2001) (internal quotations omitted). Barren concedes that she was never terminated, pulled from service, disciplined, suspended, or demoted. (R. 109, DSOF ¶ 5.) Rather, Barren argues that she suffered adverse actions in the form of denied requests for FMLA leave, a delay in receiving disability benefits, being the target of formal investigations, having to recite an emergency exit announcement, being placed on medical disqualification status, and losing the ability to secure a shift of her choice. (R. 127, Pl.'s Resp. at 5; R. 41, Am. Compl. ¶¶ 57, 62.)

Barren's arguments fall short for a number of reasons. Regarding her requests for FMLA leave, Barren does not dispute that she eventually received approved time off from work for the days she claims Metra denied her leave, (R. 109, DSOF ¶ 33, 69), and she fails to present any evidence to show that Metra's initial denials resulted in any materially adverse change to the terms and conditions of her employment. Nor has Barren presented sufficient evidence that she experienced [*15] a delay in receiving disability benefits. She asserts that she "provided copies from AFLAC" that show "changes" in her benefits as a result of Metra's medical department paperwork. (R. 128, Pl.'s Resp. to DSOF ¶ 77.) But she only cites her own affidavit for this conclusion, which simply repeats her assertion and includes no supporting documentation showing the existence or extent of any such delay. As the Seventh Circuit has put it, "summary judgment is the put up or shut up moment in a lawsuit." *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). If Barren has documents indicating that her insurance benefits were withheld or reduced, this was the time to present them. Furthermore, even if Barren is able to show that her benefits were delayed, it is unlikely that such delay would rise to the level of an adverse employment action. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 301 (7th Cir. 2004) (finding a two-month delay in payment was a mere inconvenience, not an adverse employment action)

(citations omitted).

As for the internal investigations, Metra points out that the investigations have not yet occurred and there is no indication that the mere prospect of these investigations has affected Barren's employment in any material way. (See R. 109, DSOF ¶ 70); *see also Holt v. Pennsylvania*, No. 10-5510, 2015 U.S. Dist. LEXIS 109311, 2015 WL 4944032, at *21 (E.D. Pa. Aug. 19, 2015) (noting that initiating [*16] an investigation was not sufficiently adverse "insofar as it is simply a request for the employer to determine whether an employee has violated its policies and is in need of discipline"). Similarly, there is no evidence in this case that failing the efficiency test had any impact on Barren's employment and any alleged reprimand for failing the test would be insufficient by itself to constitute an adverse employment action. *See Grube v. Lau Indus., Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) ("unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions"). Barren admits that all trainmen are required to know the emergency exit announcements, (R. 109, DSOF ¶ 10), and does not allege that any disciplinary action was taken as a result of the failed test.

Barren's medical disqualification status also has no adverse impact on the terms of her employment. (Id. ¶ 82.) In fact, a medically disqualified employee no longer has to periodically submit medical paperwork to Metra's medical department to justify their continued medical leave of absence. (See id. ¶ 80.) Although Barren alleges in her complaint that being medically disqualified prevents her from returning to her [*17] position, she now concedes that if she recovers from her medical condition, she can return to work as long as she passes a physical examination. (Id. ¶ 81.)

Next, Barren has not presented evidence indicating that her inability to secure a shift of her choice constitutes an adverse employment action. The inability to work a particular schedule generally does not amount to an actionable adverse employment action. *Peters v. Wal-Mart Stores East*, LP, 512 Fed. App'x 622, 626 (7th Cir. 2013) (citing *Porter v. City of Chi.*, 700 F.3d 944, 955 (7th Cir. 2012)); *Grube*, 257 F.3d at 729-30 (transfer to the second shift was not an adverse employment action). Furthermore, Barren was allowed to choose a shift on November 9, 2012, after having spent less than four

days on the extra board. (See R. 129, PSOF ¶ 6.) She does not argue that her change in shift had material consequences or that her new shift is somehow inferior to her previous one. Therefore, Barren has not submitted sufficient evidence from which a reasonable jury could find that her schedule change was materially adverse.

Barren's remaining argument that her wage loss from November 6, 2012, qualifies as an adverse employment action is more persuasive. According to the CBA, someone who chooses to bump another employee must inform the proper authority in sufficient time to permit the displaced [*18] trainman to receive notification of the bump prior to the end of her assignment. (See R. 113-2, Ex. 5 at 11.) If the bumped trainman does not exercise her right to choose an available assignment within six hours "after being released from the last service which [she] performed," she is then placed on the extra board. (R. 113-2, Ex. 5 at 11.) Metra argues that Barren missed her six-hour window because the CMC notified her via voicemail during her shift on November 5, 2012, but she failed contact the CMC until about twenty four hours later. (R. 108, Def.'s Mem. at 4.) Barren says she never received those voicemails and contends that because Metra did not provide her with actual notice before her shift ended, she should have been allowed to work her former shift on November 6, 2012. (R. 127, Pl.'s Resp. at 5.) The CBA provisions cited by the parties do not specify whether a notice of displacement must be actual or constructive, nor do they explain what happens if a trainman receives notice of a bump after the end of her scheduled shift. Furthermore, the parties offer contrasting views on whether Barren had an obligation to respond to the CMC's voicemail and to have her phone turned on [*19] to receive calls. (See R. 109, DSOF ¶¶ 14-17; R. 129, PSOF ¶ 1.)

At any rate, regardless of whether Barren was entitled to payment for November 6, 2012, Metra prevails for other reasons. First, the Seventh Circuit has found that the loss of one day's wages is not substantial enough to qualify as an adverse employment action in the Title VII context. See Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 505 (7th Cir. 2004); Herron v. DaimlerChrysler Corp., 388 F.3d 293, 303 (7th Cir. 2004) (non-payment during a disputed work absence is not a quantitative or qualitative change in conditions of employment). Second, even assuming Barren could show that her wage loss or any of Metra's other alleged actions were

materially adverse, there is no evidence from which a reasonable jury could conclude that similarly situated non-black or male employees were treated more favorably.

The only evidence of disparate treatment Barren cites to in her response is her testimony that two white male trainmen, David Lipski and Ivan Lewinski, were allowed to use their FMLA leave on more favorable terms and without being subject to investigations or disciplinary action. (R. 129-8, Barren Aff. ¶¶ 7-8.) More specifically, she says that Lipski "was allowed to use FMLA [to] resign[] from his position and was rehired or allowed to return to work[,]" [*20] (id. ¶ 7), and that Lewinski was allowed to use FMLA leave by the hour whereas Barren had to use her leave on a whole-day basis, (id. ¶ 8.)

As an initial matter, Barren provides no corroborating evidence to support these statements, nor does she name any similarly situated bumped employee who was not placed on the extra board despite exceeding the six-hour window. See Bunn v. Khoury Enters., Inc., 753 F.3d 676, 685 (7th Cir. 2014) (stating that the similarly-situated "inquiry is too fact-intensive for us to rely on conjecture alone"); Bass v. Joliet Pub. Sch. Dist. No. 86, 746 F.3d 835, 841-42 (7th Cir. 2014) ("Without at least a name to test, the district court had no choice but to grant summary judgment."). But even assuming the truth of her bare assertions, Barren's reliance on Lipski is misguided because it is based on the faulty premise that Barren will not be allowed to return to her position because of medical disqualification. As already discussed above, Barren has conceded that being medically disqualified will not prevent her from resuming her position if she passes a physical exam. (R. 109, DSOF ¶ 82.)

As for Lewinski, Barren admitted in her deposition that she did not personally know Lewinski's race or his FMLA status, (R. 111, Barren Dep. Vol. II at 23:11-27:2), so her assertions about his favorable treatment [*21] are based purely on inadmissible hearsay at best, see Schindler v. Seiler, 474 F.3d 1008, 1011 (7th Cir. 2007). Furthermore, Barren has not shown that Lewinski is "directly comparable" to her "in all material respects . . . with other possible explanatory variables eliminated." See Hutt v. AbbVie Prods. LLC, 757 F.3d 687, 692 (7th Cir. 2014) (internal quotation marks omitted); see also Langenbach v. Wal-Mart

*Stores, Inc.*, 761 F.3d 792, 803 (7th Cir. 2014) (the similarly-situated analysis is the same under the indirect method as it is under the direct method). In fact, Barren's affidavit only states that Lewinski is a white male conductor. (See R. 129-8, Barren Aff. ¶ 8.) No reasonable jury could find, based solely on Barren's conclusory statement, that her race or sex explains the difference between the terms of Lewinski's FMLA leave and her own. She has not shown, for example, that Lewinski's serious health condition is comparable to hers in any way, or that his duties as a conductor were similar to her duties as an assistant conductor. She also does not cite to evidence that she requested to take FMLA leave on an hourly basis and was denied. For all these reasons, Barren's proposed comparators fail to support an inference that discrimination may have been a factor in any of Metra's alleged actions.

Even if Barren is able to meet her initial burden of showing a prima [*22] facie case, Metra has articulated legitimate, nondiscriminatory reasons for its actions. Barren does not dispute that Metra initially denied her requests for FMLA leave because of a clerical error, (R. 109, DSOF ¶¶ 32-33), and because her FMLA approval did not provide her with time off for her own doctor's appointments, (id. ¶ 69); *see Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 498 (7th Cir. 2014) (finding that the denial of a leave request for time falling outside of approved FMLA parameters "did not deny [plaintiff] any right under the FMLA"). In response to Barren's allegation that her return-to-work date was inaccurate, Metra explained its legitimate practice of evaluating employees for medical disqualification after one year of leave and requesting additional documentation from employees' doctors before extending their medical leave. (See R. 109, DSOF ¶¶ 78-79; R. 116-1, Ex. 11, Collins Dep. at 52:5-53:7.) Metra has also explained its decision to initiate investigations into Barren's alleged failure to respond to voicemails and her refusal to accept extra board placement, citing written policies and telephone recordings as corroboration.[3] (See R. 109, DSOF ¶¶ 34,

36-38, 50-53, 63-65.) Specifically, Metra has produced recordings of the voicemails [*23] the CMC left for Barren on November 5, 2012, as well as recorded conversations in which Barren refutes her placement on the extra board and then states that she cannot work the assigned shift. (See id.) As for asking Barren to recite the emergency exit announcement, Barren does not dispute that trainmen are required to know such announcements and that Metra supervisors regularly conduct efficiency tests. (Id. ¶¶ 7, 10, 24-25.) Barren has provided little to no evidence refuting Metra's explanations. Thus, even if the court assumes Barren has established a prima facie case under the indirect method, her claims still fall short because she fails to cast doubt on Metra's nondiscriminatory reasons for the employment actions she challenges. *See Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 511 (7th Cir. 2012). Given that the evidence Barren has marshalled falls short of creating a genuine dispute of material facts, Metra is entitled to summary judgment on her race and sex discrimination claims.

## B. Retaliation Claims

Barren also claims that Metra's actions constitute retaliation against her for having filed EEOC charges and for having sought FMLA leave. Title VII prohibits an employer from retaliating against an employee for engaging in protected activity, such as complaining about discrimination in the workplace. *See* 42 U.S.C. § 2000e-3. Similarly, an employer cannot retaliate against an employee for exercising her rights under the FMLA. *See Scruggs v. Carrier Corp.*, 688 F.3d 821, 826 (7th Cir. 2012). Although a plaintiff may establish a prima facie case of retaliation using either the direct method or the indirect method, Barren chose to proceed under the direct method so the court will apply that framework here. *See Weber v. Univs. Research Ass'n, Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). Under the direct method, Barren must present evidence from which a jury could conclude that: (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; [*25] and (3) a causal link exists between

---

[3] Barren asserts that Metra's medical department falsified documents related to her return-to-work date. (R. 41, Am. Compl. ¶¶ 79-84.) She also alleges that Metra's recordings of CMC calls have been altered or somehow tampered with. (See R. 110, Barren Dep. Vol. I [*24] at 145:13-20.) But because she offers no evidence in support of her bare assertions, the court disregards them. *See Rand v. CF*

*Indus.*, 42 F.3d 1139, 1146 (7th Cir. 1994) (inferences must be based on more than "speculation, hunches, intuitions, or rumors," otherwise there would be no summary judgment in discrimination cases); *see also Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived.").

the two. *See Benuzzi v. Bd. of Educ. of City of Chi.*, 647 F.3d 652, 664 (7th Cir. 2011). The court assumes, as the parties do, that Barren engaged in statutorily protected activity by filing EEOC charges and by requesting FMLA leave. The court's inquiry thus focuses on the second and third elements. The Supreme Court has held that Title VII's anti-retaliation provision covers a wider range of employer conduct than the antidiscrimination provision. *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173, 131 S. Ct. 863, 178 L. Ed. 2d 694 (2011). Under this broader construction, the pertinent inquiry in a retaliation claim is whether an employer has acted in a way that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).

The alleged adverse employment actions Barren identifies in support of her retaliation claim are the same as those she alleged in her discrimination claims. But even with the more generous standard governing retaliation claims, most of the alleged acts fail to meet the adverse employment action standard. First, the fact that Metra initiated formal investigations is insufficient to make a prima facie retaliation case, especially in light of Metra's legitimate explanation for commencing the investigations. *See, e.g., Nichols v. S. Ill. University-Edwardsville*, 510 F.3d 772, 786-87 (7th Cir. 2007) (finding that initiating an investigation [*26] of an employee, even when the employee is placed on paid administrative leave pending its completion, is not a materially adverse action in the retaliation context). Barren has failed to contradict Metra's assertion that medical disqualification is not in fact adverse, (R. 109, DSOF ¶ 82), and as already discussed, Barren has not presented evidence indicating that her disability benefits were delayed. Even if she had, she has not shown what harm she suffered as a result of the alleged delay. *See Dennis v. Potter*, No. 08 CV 198, 2012 U.S. Dist. LEXIS 40034, 2012 WL 8251513, at *16 (N.D. Ind. Mar. 23, 2012) (finding that having to submit additional medical documentation and a delay of one pay period on two occasions do not constitute materially adverse actions in the retaliation context). Similarly, Barren has not articulated how Metra's initial denials of her requests for FMLA leave constitute harms significant enough to rise to the level of materially adverse actions which would dissuade her from engaging in protected

activity. *See id.*

As for having to recite the emergency exit announcement, Barren admits that knowing the announcement was a job requirement and that efficiency tests are a part of a trainman's training process. (R. 109, DSOF ¶¶ 7, 10.) In *Burlington*, the Supreme Court made clear [*27] that context matters to the determination of what constitutes a materially adverse action. 548 U.S. at 69. Here, Barren does not dispute that trainmen are regularly subjected to efficiency tests, and she fails to present any evidence to show that there was anything remarkable about being asked to recite the announcement. Also, Barren's inability to secure a shift of her choice, as a result of being bumped by a more senior trainman, is unremarkable in that it is consistent with the terms of the CBA to which she agreed to be bound. (See R. 109, DSOF ¶¶ 6, 12, 19.) For these reasons, the court concludes that a rational jury could not find that the treatment Barren received would dissuade a reasonable worker from participating in a protected activity.

Barren's placement on the extra board and her loss of wages from November 6, 2012, come closer to qualifying as materially adverse employment actions for purposes of pursuing a retaliation claim. But as discussed above with respect to Barren's discrimination claims, scheduling changes, *see Peters*, 512 Fed. App'x at 626; *Grube*, 257 F.3d at 729-30, and the loss of one day's wages, *see Rhodes*, 359 F.3d at 505, generally do not constitute materially adverse employment actions. And despite the broader reach of Title VII's anti-retaliation [*28] provision, the Seventh Circuit has made clear that Title VII does not authorize courts to act as a "super-personnel department intervening whenever an employee feels [she] is being treated unjustly." *Cardoso v. Robert Bosch Corp.*, 427 F.3d 429, 435 (7th Cir. 2005) (internal citations and quotations omitted). The scheduling of an employee's work hours and shifts is a determination made in the ordinary course of business by an employer, *see Beverly v. Kaupas*, No. 05 CV 6338, 2008 U.S. Dist. LEXIS 15570, 2008 WL 624045, at *14 (N.D. Ill. Feb. 29, 2008), and Metra's decisions to place Barren on the extra board and deny her a day's pay because she failed to communicate are facially legitimate, *see Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002) ("courts do not sit as super personnel departments to second guess

an employer's facially legitimate business decisions"). As such, the court finds that Barren's short stint on the extra board and her wage loss do not qualify as adverse employment actions.

Even assuming, however, that a reasonable jury could find that Metra's scheduling actions were materially adverse, Barren fails to offer sufficient evidence of a causal connection between Metra's decisions and her EEOC charges and FMLA leave requests. Under the direct method of proof, a plaintiff may offer direct or circumstantial evidence to satisfy the causation element of retaliation. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005). Direct evidence requires [*29] something akin to an admission of retaliatory conduct by the employer. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006). Since Barren does not present such evidence, she must instead offer a "convincing mosaic of circumstantial evidence" that, when taken as a whole and viewed in the light most favorable to Barren's case, could convince a reasonable jury that she was the victim of retaliation. *See Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013). The Seventh Circuit lists the following categories of circumstantial evidence from which a plaintiff can build that mosaic: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* at 643-44 (quotation and citation omitted).

Aside from making a vague reference to "other evidence" indicating a causal connection between her protected activities and Metra's alleged adverse actions, Barren appears to rely solely on timing to satisfy the causation element. (R. 127, Pl.'s Resp. at 6-7.) Her reliance is misguided for a few reasons. First, suspicious timing is rarely [*30] sufficient by itself to create a triable issue. *See Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). To survive summary judgment, a plaintiff must point to other evidence that supports the inference of a causal link beyond close temporal proximity. *See Lang v. Ill. Dep't of Children & Family Servs.*, 361 F.3d 416, 419 (7th Cir. 2004). Second, for a suspicious-timing argument alone to give rise to an inference of causation, the plaintiff must demonstrate

not only that an adverse employment action followed "close on the heels" of the protected activity, but also that the person who decided to impose the adverse action knew of the protected activity. *Lalvani v. Cook Cnty.*, 269 F.3d 785, 790 (7th Cir. 2001). Here, Barren does not even address Metra employees' knowledge in her statement of additional facts or her brief and fails to identify evidence regarding who knew what and when about her protected activities. *See Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) ("A claim of retaliation based on suspicious timing depends on what the relevant decision-makers knew and when[.]"). Third, as already discussed above, Metra has provided reasonable explanations for why it acted as it did with respect to scheduling and Barren's requests for FMLA leave. Accordingly, Barren's temporal proximity argument fails.

Metra does admit that Carbonelli told Barren during a meeting the week of November 7, 2012, that occasionally the demands [*31] of Barren's job may not allow her to attend to personal matters. (R. 109, DSOF ¶ 62.) Setting aside the fact that Barren makes no mention of this remark in her brief or statement of additional facts, Carbonelli's comment is far from an admission of retaliatory motive. According to Barren, Carbonelli made that statement during a discussion about Barren's refusal to take an assignment from the extra board because she was at her mother's house "dealing with things." (R. 110, Barren Dep. Vol. I at 141:7-145:2; 161:4-18.) Even if an inference of bias could be read into Carbonelli's comment, nothing about the context surrounding the remark suggests that retaliatory motive played a role in the decision to place Barren on the extra board. And at any rate, an isolated comment standing alone is insufficient to overcome summary judgment. *See Fleishman v. Continental Cas. Co.*, 698 F.3d 598, 604-05 (7th Cir. 2012); *see also Hobgood*, 731 F.3d at 644 ("[A] reasonable jury could not infer that a plaintiff was a victim of illegal discrimination or retaliation based on one isolated 'bit' or 'piece'."). Barren's evidence is therefore insufficient to survive summary judgment on her retaliation claims under the direct method.

## C. ADA Claim

Barren next claims that Metra discriminated against her on [*32] the basis of her mental illness, by delaying her

benefits and placing her on medically disqualified status. (R. 41, Am. Compl. ¶¶ 79-84.) The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of [her] disability" in regard to the terms, conditions, and privileges of employment. 42 U.S.C. § 12112. To establish a violation of the ADA, Barren must show: (1) that she is disabled; (2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) that Metra took an adverse job action against her because of her disability or failed to make a reasonable accommodation. *See Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000) (citations omitted). While the parties do not dispute that Barren is disabled, Metra contends that her claim fails under the second and third prongs. (R. 108, Def.'s Mem. at 15.) The court agrees. For reasons already discussed, Barren has not shown that Metra took an adverse job action against her. Furthermore, her assertion that she can perform her job duties with or without accommodation is belied by the fact that she has been out on medical leave since November 20, 2012. (See R. 109, DSOF ¶ 70.) In her opposition brief, Barren does not argue that [*33] she is fit to return to work or that she requested to do so and was denied. Rather, she accuses Metra of failing to participate in an interactive process with her because, according to Barren, medical disqualification is something she neither desired nor requested. (R. 127, Pl.'s Opp. at 7.) But she bases her argument on an admitted misunderstanding of medical disqualification as a bar on her returning to work. Specifically, she concedes that the medical disqualification does not prevent her from returning to work as long as she passes a physical examination. (R. 109, DSOF ¶ 81.) In short, there is insufficient evidence in the record to support Barren's ADA claim.

## D. Breach of Contract Claim

Lastly, Barren asserts that Metra breached the Mediation Agreement by failing to: (1) issue "special written instructions" to the CMC regarding requests for FMLA leave; (2) schedule a discussion with Metra's medical department and Barren about each party's responsibilities regarding FMLA paperwork; (3) ensure that Barren's FMLA requests are processed in a timely manner consistent with FMLA regulations and Metra

policies; and (4) remind the medical department that employees' medical issues are confidential. [*34] (See R. 109, DSOF ¶ 30; R. 129, PSOF ¶¶ 16-20; R. 77, Suppl. Compl., Ex. 1.) In order to establish a case for breach of contract under Illinois law, Barren must present evidence to show: (1) the existence of a valid and enforceable contract; (2) her performance of all required contractual conditions; (3) Metra's breach of the terms of the contract; and (4) damages resulting from the breach. *See Lindy Lu LLC v. Ill. Cent. R.R. Co.*, 2013 IL App (3d) 120337, P21, 984 N.E.2d 1171, 368 Ill. Dec. 701 (2013). Metra does not contest the first two elements, but argues that Barren cannot show that it breached the Mediation Agreement or that she suffered damages as a result. (See R. 108, Def.'s Mem. at 15.)

Only one sentence in Barren's brief directly responds to Metra's breach-of-contract arguments, and that sentence makes a vague reference to evidence "stated earlier, pursuant to the record" and damages in the form of "at least one unpaid day off." (See R. 127, Pl.'s Opp. at 9.) General averments without factual support in the record will not defeat a motion for summary judgment. *See Jones v. Merchants Nat'l Bank & Trust Co.*, 42 F.3d 1054, 1058 (7th Cir. 1994). Moreover, Barren cites no affirmative evidence supporting her allegations that Metra failed to issue special instructions, schedule a discussion regarding FMLA paperwork, or remind the medical department about confidentiality. [*35] Instead, she relies entirely on the *absence* of evidence that Metra met its obligations. (See R. 129, PSOF ¶¶ 15-20.) Barren's reliance is misguided, however, because although Metra has the burden of showing there is no genuine issue of fact, Barren is not relieved of her own burden of producing affirmative evidence that would support a jury verdict in her favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). This remains true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff has had an opportunity to complete discovery. *Id.* Here, Barren does not deny that she had the full benefit of discovery, including the opportunity to depose Metra employees in the medical department. And although she submitted an affidavit, she did not attest therein that Metra failed to hold a discussion with her about FMLA paperwork as required by the Agreement, even though she presumably has personal knowledge of whether the discussion took place. (See R. 129-8, Barren Aff.) Nor does she direct

the court's attention to any of her own testimony, or testimony from Metra employees, from which a fact-finder could reasonably infer that Metra did not give special instructions to the CMC or remind its [*36] medical department about the importance of maintaining confidentiality. Barren makes much of the fact that Metra has no conclusive evidence proving it issued "special" instructions, (R. 128, Pl.'s Resp. to DSOF ¶ 30), but it is Barren's burden to produce affirmative evidence of Metra's alleged breaches—a burden Barren fails to carry, *see Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 75, 866 N.E.2d 85, 310 Ill. Dec. 274 (2006); *Chrysler Credit Corp. v. Anthony Dodge, Inc.*, No. 92 CV 5273, 1996 U.S. Dist. LEXIS 9056, 1996 WL 509886, at *10 (N.D. Ill. June 21, 1996) (granting summary judgment to defendant where plaintiff offered "no evidence whatsoever" proving defendant's breach).

Barren gains some traction, however, with her assertion that Metra has failed to ensure that her FMLA requests are processed in a timely manner consistent with FMLA regulations and Metra policies. She claims that the initial denials of her requests for FMLA leave on September 28 and November 20, 2012, are evidence of Metra's breach. First, Metra admits that although it approved Barren's request for intermittent FMLA leave in early September 2012, the CMC did not receive notice of that approval until almost a month later on October 3, 2012, because of a clerical error. (R. 109, DSOF ¶ 32.) Second, Barren testified that she gave Metra two months' notice of her November 20, 2012 doctor's appointment. (See R. 110, Barren Dep. Vol. I at [*37] 74:17-75:8.) When an employer has enough information to determine whether requested leave is being taken for a FMLA-qualifying reason, the employer must notify the employee whether the leave will be counted as FMLA leave within five business days absent extenuating circumstances. 29 C.F.R. § 825.300(d). If the employer determines that the leave will not be designated as FMLA-qualifying (e.g., if the leave is not for a reason covered by FMLA), the employer must notify the employee of that determination. *Id.* Here, Metra contends that it initially denied Barren's request for leave to cover her November 20, 2012 appointment, because medical appointments fell outside of her FMLA approval. (R. 109, DSOF ¶ 69.) But assuming the truth of Barren's testimony, Metra knew that Barren was requesting leave for a doctor's appointment two months ahead of time and yet did not notify her of its decision to deny her request until the day of her requested leave. (See R. 128, Pl.'s Resp. to DSOF ¶ 69.) Accordingly, Barren has produced sufficient evidence to create a genuine dispute as to whether Metra breached its obligation to timely process her FMLA requests.

That being said, Barren's breach of contract claim nonetheless fails [*38] because there is insufficient evidence to show she suffered damages resulting from any alleged breach. She argues that she suffered damages in the form of "at least one unpaid day off," (R. 127, Pl.'s Opp. at 9), but fails to present any evidence to show that any wage loss resulted from Metra's breach of the Mediation Agreement. For example, she has not shown how Metra's alleged failure to timely process her FMLA requests or to properly enforce its FMLA policies somehow prevented her from working or being paid on November 6, 2012, the day she claims she lost wages. Barren also alleges that she suffered emotional distress and "emotional damages." (See, e.g., R. 41, Am. Compl. ¶¶ 53, 70; R. 77, Suppl. Compl. ¶ 87.) Under Illinois law, emotional distress damages are generally unavailable in breach of contract claims except where the breach was wanton or reckless and caused bodily harm, or where the defendant had reason to know that its breach would cause mental suffering. *See Parks v. Wells Fargo Home Mortg., Inc.*, 398 F.3d 937, 940 (7th Cir. 2005) (citing *Maere v. Churchill*, 116 Ill. App. 3d 939, 944, 452 N.E.2d 694, 72 Ill. Dec. 441 (1983)). Here, there is no evidence that Metra acted wantonly or recklessly, and Barren does not allege that she suffered physical injuries. And even if Metra had reason to know that emotional distress would be [*39] a likely result of its breach, the record indicates only that Barren was "stunned" and "upset" by Metra's initial denials of her requests for FMLA leave. (See R. 110, Barren Dep. Vol. I at 72:15-76:13.) Such vague testimony regarding emotional distress is generally insufficient to overcome summary judgment in cases where such damages are available. *See, e.g., Diedrich v. Ocwen Loan Servicing, LLC*, No. 13 CV 693, 2015 U.S. Dist. LEXIS 53996, 2015 WL 1885630, at *9 (E.D. Wisc. Apr. 24, 2015) (finding that while plaintiffs need not prove emotional distress with expert testimony or documentary evidence, their testimony that they experienced 'stress' and 'worry' based on 'everything' defendant had done was conclusory and vague); *cf. Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 696 (7th Cir. 2011) (denying

summary judgment on breach of contract claim where plaintiffs' testimony was not conclusory and "described their emotional turmoil in reasonable detail").

Barren admits that her FMLA requests were ultimately granted and that she was not subject to any discipline as a result. (See id.; R. 109, DSOF ¶¶ 33, 69.) Furthermore, Barren has not even alleged, let alone presented evidence, that she was injured because the CMC made improper comments relating to her FMLA leave or because the medical department violated the confidentiality of her condition. Barren bears the burden of proving [*40] that she sustained damages resulting from Metra's alleged breach and establishing both the correct measurement of damages and the final computation of damages based on that measurement. *See Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 518 (7th Cir. 2011) (applying Illinois law) (citations omitted). Because she failed to do so here, Metra is entitled to summary judgment on her breach of contract claim.

**Conclusion**

For the foregoing reasons, Metra's motion for summary judgment is granted.

/s/ Young B. Kim

**Young B. Kim**

**United States Magistrate Judge**

End of Document