# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

FILED CR

11/29/2021

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

EDITH MCCURRY

PLAINTIFF,

VS.

MARS, INC., KENCO LOGISTIC

SERVICES, LLC., HARTFORD LIFE,

THE REED GROUP AND DR. KOEHLER

DEFENDANTS,

1:19 CV 0467

Judge: Sharon Johnson Coleman

Magistrate Judge: Gabriel A. Fuentes

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT

Plaintiff, hereby submits the foregoing response opposing Defendant's motion for Summary Judgement in accordance with _____ and requests that this Honorable Court Defendant's Motion For Summary Judgement for the reasons set forth below:

**Background**

Plaintiff had been employed at the Mars Manteno facility since its inception in 1999, as the HR Administrator. Mars, Inc. employed Kenco as its manager in April of 2013 to replace its former manager 4T's.

To continue employment at the Mars Manteno facility, Plaintiff was required to sign an offer letter of employment according to company policy as a term and condition of her employment with Kenco Mars according to Defendants' company policy.

The offer letter from Kenco Mars outlined Plaintiff's compensation and benefits, such as paid time off, "hereinafter PTO", health, life and disability benefits among other items[1]. In particular, it was indicated in the employee handbook and on the website that the Hartford managed the disability benefits for the employees at the Mars Manteno facility.

Mars, Inc. employed Kenco to manage the Mars Manteno facility. Defendant Kenco acted for and or as an agent for Mars during the relevant times. Mars, Inc. controlled the terms and conditions of the employees, including its manager Kenco and the other employees of the Mars Manteno facility.

## STANDARD

On a motion for summary judgement, (hereafter "MSJ") the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Crawford V. Metro Gov't of Nashville and Davidson County, Tennessee,* 555 U.S. 271, 274 n.129 S. Ct. 846, 172 L.Ed. 2d 650 (2009); *Malen v. MTD Prods., Inc., 628 F.3d 296, 303 (7th Cir. 2010)*; *Stokes v. Board of Educ. of the City of Chicago,* 599 F.3d 617, 619 (7th Cir. 2010).

The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 978 (7th Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Specifically, the moving party may discharge this burden by "'showing'---that is,

---

[1] Plaintiff received the same types of benefits under the management of Kenco as received under the previous management of 4T's; these benefits included: 401K, health, dental, vision, disability (short and long term), life insurance, etc...

pointing out to the court---that there is an absence to support the nonmoving party's case."

*Celotex* 477 U.S. at 325.

## SUMMARY OF THE ARGUMENT

Defendants did not discharge themselves of the initial burden it bore to identify the basis for seeking summary decision against Plaintiff. *Costello v. Grundon,* 651 F.3d 614, 635 (7th Cir. 2011); *Logan at* 979.  Essentially, the burden of establishing a lack of any genuine issue of material fact rests on the movant.   *Ponsetti v. GE Pension Plan,* 614 F.3d 684, 691 (7th Cir. 2010); *Outlaw v. Newkirk,* 259 F.3d 833 (7th Cir. 2001);*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505,* 91 L. Ed. 2d 202 (1986).

## ARGUMENT

## I.    RESPONDENT SHOULD BE ESTOPPED

Defendant is bound by its Judicial Admissions before the Administrative Law Judge and the ARB in ALJ CASE NO. 2019-FDA-00015 *and* ARB CASE NO. 2021-0009. Therefore, Defendant and should be estopped pursuant to the doctrines of the Law of the Case, Res Judicata, Collateral Estoppel, and Judicial Estoppel. And as a direct result of these admissions Defendant is not entitled to a second bite at the apple. A copy of the communication is attached as Exhibit A

**Common core or nucleus of operative facts**

Plaintiff 's claims of retaliation *McCurry v. Kenco et. al. 19-CV-04067 and* ARB CASE NO. 2021-0009 and ALJ CASE NO. 2019-FDA-00015 respectively shares the same common core or

nucleus of operative facts relative to her claims of retaliation.

**Court** of **competent jurisdiction**

The ARB rejected the ALJ's contention that the Hartford made the decision(s) relative to Plaintiff's disability benefits. Vacating and remanding the matter back to the ALJ. The ARB also noted that the ALJ held that issues of material facts relative to existed**.** Exhibit A

**ARGUMENTS WAIVED**

The Defendant/Respondent waived all other arguments relative to Plaintiff's/Complainant's claims of retaliation and misconduct in its Motion for Summary Decision in ALJ CASE NO. 2019-FDA-00015. A copy of the communication is attached as Exhibit B. Nor did Defendant oppose, dispute or contest any of Plaintiff allegations, assertions and supporting evidence in Plaintiff/Complainant's Response Opposing Respondent's Motion for Summary Decision nor on appeal. Exhibit C Therefore, Respondent failed to preserve any rights to any other argument. Unsupported statements, whether in oral argument, *In re: Payne,* 431 F.3d 1055, 1060 (7th Cir.2005), or in briefs do not count." *Sommerfield v. City of Chicago*, 613 F. Supp. 2d 1004 (N.D. Ill. 2009. Therefore, Defendant should not be allowed to raise an argument that it waived; coupled with the fact that when this same argument was raised by the ALJ it was rejected by the ARB. See Exhibit A

**II.     FACTS DEEMED ADMITTED**

Plaintiff set forth in her statement(s) before the ALJ properly supported material facts. These facts were deemed admitted and were not controverted by Defendant. Exhibit A  pg. 4 ¶2 Therefore, as a direct result, of Defendant's decision to not refute or deny any of  Plaintiff's

assertions, theories, conjectures and or allegations regarding and against itself, its retaliatory actions and/or its conduct against Plaintiff, as previously asserted in the litigation, accordingly the facts have been deemed admitted. *See Hispanics United of DuPage v. Village of Addison*, 958 F. Supp. 1320 (N.D. Ill. 1997) citing *Flaherty v. Gas Research Institute*, 31 F.3d 451 at 453 (7th Cir. 1994); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921-22 (7th Cir.1994); *Stewart v. McGinnis,* 5 F.3d 1031 (7th Cir.1993).

## III.     RESPONDENT'S PREVIOUS LEGAL POSITION IS IN CONTRAST TO ITS CURRENT LEGAL POSITION

Defendant/Respondent Kenco's previous position of September 4, 2019, as evidenced in Exhibit B, is in stark contrast to this "newly adopted" legal theory in *McCurry v Kenco 19 Cv 04067* that the Hartford made all the decisions relative to Plaintiff's benefits.  As a result of these inconsistencies Defendant Kenco should be judicially estopped. *Wells v. Coker,* 707 F.3d 756, 760 (7th Cir. 2013); *see also In re Knight-Celotex, LLC,* 695 F.3d 714, 721 (7th Cir. 2012).

Additionally, Defendant represented to this Honorable Court on several occasions and by certification on May 7, 2021 that it did not have a policy from the Hartford.  A copy of the communication is attached as Exhibit D. However, Defendant represented to the ALJ in the matter of ALJ Case NO. 2019-FDA-00015 that it did have a policy from the Hartford in its July 16, 2021 supplemental motion.   A copy of this communication is attached as Exhibit E.  And in support of that contention, Defendant presented a declaration from Cathy Phillips, dated July 12, 2021, that made recitations from the Hartford Policy and references from Defendant's benefit plan.  A copy of this communication is attached as Exhibit F.  A policy that Defendant stated

under oath, to this Honorable Court, that it did not have using the same declarant.  Exhibit G.

Defendant's intentional misrepresentations were brought to the ALJ's attention and in response Defendant's counsel indicated that essentially the representations said the same thing.  A copy of this communication is attached as Exhibit H.  To date, Defendant has not properly addressed these inconsistencies.  Consequently, based upon this egregious conduct it can be easily inferred that it was willful, deliberate and done in bad faith.  Further, Plaintiff asserts that this is the same deceiving and misleading behaviour that Defendant and its counsel regularly implement to "game the judicial system" and to unwittingly dupe litigants out of justice.  i.e. McCurry v. Kenco 16 cv 2273, Seventh Circuit 18-3206, Szplett v. Kenco 19 cv 2500, hereto attached as Exhibit I.

Judicial Estoppel "protects the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine,* 532 U.S. 742, 749-50, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (internal quotations marks and citations omitted).  Consequently, "by making [litigants] choose one position irrevocably, the doctrine of judicial estoppel raises the cost of lying." *Cannon-Stokes v. Potter,* 453 F.3d 446, 448 (7th Cir. 2006) (quoting *Chaveriat v. Williams Pipe Line Co.,*11 F.3d 1420, 1428 (7th Cir. 1993).  Plaintiff further asserts and contends that the courts generally have an interest in both punishing a party's dishonesty and deterring similar misconduct. *Secrease v. Western & Southern Life Ins. Co.*, 800 F.3d 397 (7th Cir. 2015) at 402; *Greviskes v. Universities Research Ass'n,* 417 F.3d 752, 758-59 (7th Cir.2005).

Likewise, this newly adopted theory also gives rise to the fact that "changed or inconsistent

stories may constitute evidence of pretext" *Hasham v. California St. Bd. of Equalz'n,* 200 F.3d 1035, 1047 (7th Cir.2000). This is in lockstep with Defendant's immediate past behaviour's of engaging in pretext as raised by Plaintiff in her complaint and in her most recent for motion for sanctions among other instances.

## IV.    PRETEXT

Plaintiff contends that these inconsistent legal positions of Defendant, coupled with obtaining medical information in September of 2018, hereto attached as Exhibit J, relative to Plaintiff's disability claims after allegedly having discharged itself of any obligation is among other things pretextual; Patterson v. McLean Credit Union, 491 U.S. 164, 187-88, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Plaintiff's discrediting of employer's explanation is entitled to considerable weight, such that Plaintiff should not be routinely required to submit evidence over and above proof of pretext. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 140, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

Consequently, when the Plaintiff has proof of pretext, there are always unresolved questions regarding the employer's actual motive.... This inference (from evidence that purported legitimate reason is false) permits a plaintiff to prevail on the merits solely on the basis of evidence establishing pretext. When the defendants lie about......, it is evidence of pretext." *Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 736 (7th Cir.2006). Therefore, summary judgement is not appropriate.

## V.    RESPONDENT'S NEWLY RAISED ARGUMENT-THE HARTFORD DID IT

Likewise in the alternative, *if* given all facts to be true as now stated by Defendant, there are a number of conflicting, inconsistent statements, suppositions and patently false statements made

by Defendant, with respect to its newly raised argument and its declarant.

## VI.     THE VERACITY OF DECLARANT'S STATEMENTS OF FACTS

### INCREDIBLE STATEMENTS- RULE 56 VIOLATIONS

The Defendant's declarant's declaration is in contravention to Rule 56 as it is deficient; it is not made in good faith and upon personal knowledge and was used to "game the system" by supporting contradicting positions to two (2) separate tribunals. *Friedel v. City of Madison*, 832 F.2d 965 (7th Cir. 1987), AT&T CORP. v. OVERDRIVE, INC., 2006

The movant owes a duty of candor to the court; it may not present only the portions of the record supporting its position while knowingly omitting evidence to the contrary that may raise a genuine issue of material fact. Such conduct arguably warrants the imposition of sanctions under Fed. R. Civ. P. 11or Rule 56(g).-Baseless summary judgment motions are subject to Fed. R. Civ. P. 11 sanctions. *See, e.g., Melrose v. Shearson/Am. Express, 898 F.2d 1209 (7th Cir. 1990);*

### DEFENDANT INTENTIONALLY IGNORED OR MISCHARACTERIZED RELEVANT FACTS IN THE RECORD RAISING A GENUINE DISPUTE AND FAILED TO MEET ITS INITIAL BURDEN. *ISQUITH V. MIDDLE S. UTILS., 847 F.2D 186, 199 (5TH CIR.), CERT. DENIED,488 U.S. 926 (1988).*

More specifically, Defendant's declarant, Cathy Phillips, makes three (3) declarations of which two (2) declarations on the same day, July 12, 2021, that are in contradiction to one another; refer to Exhibits F & G.  As well as, in contradiction to the representations made to the Honorable Court of the Northern District of Illinois by certificate of compliance and other documents that stated Defendant did not have a policy from the Hartford and that if a policy should exist it did

not have it under either circumstance. A copy of that communication is attached as *Exhibit D*.

Moreover, in specific Ms. Phillips makes one (1) of her declarations on July 12, 2021regarding "The Plan" in support of Respondent's {mis}representation to this Honorable Court that they do not have a Policy with the Hartford is hereto attached as *Exhibit G*. And in the other declaration of the same day, July 12, 2021, presented to the Department of Labor, declarant, Phillips gives an exegesis of recitals from "The Policy" that Defendant stated to this Honorable Court that it did have hereto attached as Respondent's July 16, 2021 *Exhibits E & F*. A 'Policy' that it previously stated by certification and declaration, to this Honorable Court, to not have had gotten from the Hartford refer to Exhibit D; a "Policy" that they now use, in support of a contrary position to its original position at the DOL.

Summarily, Ms. Phillips latest declaration, Defendant's Exhibit 1 to its Motion to Summary Judgement is also riddled with equally troubling inconsistent and patently false statements made by Phillips. For example, Ms. Phillips states as a matter of fact that the Hartford only contacts the employee and the employee's physician. This is a patently false statement, as evidenced by Exhibit K. In furtherance of Plaintiff's contention, Defendant Kenco also had claim analysts that corroborated with Plaintiff and the Hartford regarding employee disability leave and is evidenced as shown by Exhibit L; as well as, McCurry Declaration Exhibit M ¶ 26  Also, Ms. Phillips states that the Hartford copied Kenco on correspondence regarding employees as a means of keeping Defendant Kenco apprised; to which Defendant nor its declarant offers any supporting evidence and is disputed by Defendant's own Summary Judgment Exhibit D2 pg. 2 that fails to

---

[2] It should be noted that the valediction of the states that the Hartford is the Administrator of the Kenco Employee Benefit Plan, which is a notable and stark difference from being the "Plan Administrator."

support this contention.

Additionally, Defendant and its declarant Phillips point to a Leave of Absence Policy that was not effectuated when Plaintiff began her leave of absence. What is even more telling is that this policy goes against Defendant's own policy relative to policies applicable to its employees. More specifically, policies that are applicable to employees are to be signed off on a log and evidenced by such by the employee, to which, Defendant has not produced. These records are to be retained according to Defendants record keeping policies such as ISO.QE.4.2.4001, etc. Phillips also points to the fact that The Hartford was unaware of Plaintiff's protected activity; which as evidenced by Exhibit N is patently false and misleading.

Further, Phillips goes on to state in her declaration that either she or one of her subordinates handled employee benefit situations. Tellingly, Ms. Phillips does not state or attest that she has any personal knowledge about Plaintiff's particular matter, how it was handled, who handled it or any pertinent information relative to its transactional history. Nor does Ms. Phillips indicate that each case is handled in the same manner each and every time; nor does she reference any standard operating procedure or policy of the company. Every procedure of Defendant has a written standard operating procedure that is documented, as evidenced by Exhibit BB.

Ms. Phillips declarations are baseless and in contravention to the relevant parts of FRCP 56 because they mischaracterize and ignore facts; they are in contradiction to one another and; are inadmissible because they are not grounded in first-hand knowledge (See *New Hampshire v. Maine,* 532 U.S. 742, 749-50, 121 S. Ct. 1808, 149 L. Ed. 2D 968 (2001) which makes Phillips

and her declarations unreliable. Also see *Pryor v. City of Chicago*, 726 F. Supp. 2d 939 (N.D. Ill. 2010) at 943; *Visser v. Packer Eng'g Assoc.,* 924 F.2d 655, 659 (7th Cir.1991) (en banc). And, thusly Defendant and its Declarant create issues of material facts by contradicting its previously sworn testimony. Consequently, summary judgment is not appropriate under these circumstances.

## DEFENDANT'S DECLARANT AND ITS DECLARATION SHOULD BE BARRED, DISREGARDED AND SANCTIONED

For the immediate aforementioned reasons, Plaintiff contends that Cathy Philips and her declarations should be barred and disregarded. Sinskey v Pharnacia Ophthalmics, Inc., 982 F.2d 494, 498 (Fed. Cir.1992) (stating that affidavit will-be "disregarded" unless party can "provide a satisfactory explanation for the discrepancy"), cert. dented, 113 S. Ct. 2346 (1993); to which, as of to date Defendant and its declarant have not done so. In addition, Defendant and its declarant Phillips should be sanctioned for violations of Fed. R. Civ. P. 11and Rule 56(g) & (h) for filing the baseless and misleading declarations. Fed. R. Civ. P. 11 requires the imposition of sanctions on anyone signing a paper filed in court not well-grounded in fact or warranted by law or a reasonable argument for a change of law.

## VII.   PERJURY

"[P]arties who wish to use the judicial system to settle disputes have certain obligations and responsibilities" and "[o]ne of those responsibilities is to tell the truth" (*quoting Rodriguez v. M & M/Mars*, 1997 WL 349989, *2 (N.D. Ill. June 23, 1997), to which Defendant and its declarant Cathy Phillips have not discharged themselves of the responsibility of telling the truth.

Ms. Phillips declarations have intentional internal inconsistencies. Effectively contradicting each other, to support the exigencies of the moment; which then calls into question the veracity of Cathy Phillips' statements. *BITLER INV. VENTURE v. MARATHONASHLAND PETROLEUM, 779 F. Supp. 2d 858 (N.D. Ind. 2011); See Buie v. Quad/Graphics, Inc., 366 F.3d 496, 505 n.5 (7th Cir. 2004) (stating that [i]nternally contradictory affidavits are* generally disfavored"). Likewise it also raises the inference that the declarant, Ms. Phillips, committed perjury. Or perhaps, in conjecture, unbeknownst to Phillips, Defendant/ Respondent took the liberty of modifying these documents to fit the exigencies of the moment of the various litigation(s). *In re Knight-Celotex, LLC*, 695 F.3d 714 (7th Cir. 2012).

Furthermore, in any of these and other instances, the Courts have reasoned that '[P]erjury strikes at the heart of the integrity of the judicial system....'" *United States v. Stokes*, 211 F.3d 1039, 1046 (7th Cir.2000) and that "lying cannot be condoned in any formal proceeding." *See ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994)("False testimony in a formal proceeding is intolerable.") It "undermines the function and province of the law and threatens the integrity of judgments" *United States v. Alvarez*, 132 S.Ct. 2537, 2540 (2012) and "poisons the life blood of the administration of justice."

## VIII.   OTHER INCONSISTENT STATEMENTS FROM RESPONDENT INCLUDE:

Defendant and its declarant state that all payments came from the Hartford. This contention is in dispute and is false as shown by Exhibit O. Underscoring, Plaintiff's contention that Defendant paid Plaintiff and retaliated against Plaintiff for engaging in protected activity; further evidencing Defendant made yet another intentional misrepresentation. This was a judicial admission and an

undisputed fact in ALJ CASE NO. 2019-FDA-00015.   Also, there is further evidence to dispute Defendant's contention as shown by Exhibit P that supports that Defendant continues to pay the disability bills.


## IX.      OBSTRUCTION OF JUSTICE

Plaintiff maintains that the intentionality of misleading numerous tribunals with conflicting declarations and improperly filed papers is an obstruction of justice.  This conduct  tampers with the administration of justice and is an assault to the judicial system.   *Hazel-Atlas Co. v. Hartford Co.*, 322 U.S. 238, 246, 64 S. Ct. 997, 88 L. Ed. 1250 (1944).

Plaintiff further contends that Defendant's refusal to produce records, such as "The Policy," that is kept in the ordinary course of business, as referenced in the Plan is obstructive and telling. Defendant acknowledged in Plaintiff's First request to admit that it kept its benefits records for seven (7) years, but yet alleges to not have this record.  See Exhibit R- Defendant's response to Plaintiff's request to admit.  Therefore, it can easily be inferred that Defendant's refusal that violates its own policy is telling and indicative that this business record (the policy) contains information that is adverse to Defendant.  Information that can include but is not limited to: pointing to the fact that Defendant is a fiduciary and is a decision maker in the dissemination of disability benefits; that Defendant retaliated against Plaintiff, as well as, the fact that the business relationship described by Defendant and the Hartford is not as suggested, as shown by Exhibits S.  The withholding of this information, further underscores that Defendant retaliated against Plaintiff; using the Hartford as a sword and shield in this process.


It is even more tellingly that even though Defendant had a duty to preserve evidence, it did not;

despite being noticed to do so and foreseeably knowing, as well as, knowing that it had been in employment related litigation since 2013. *Trask-Morton v. Motel 6 Operating, L.P.,* 534 F.3d 672, 681 (7th Cir. 2008); *Danis v. USN Commc'ns, Inc.,* No. 98 C 7482, 2000 WL 1694325, at *37 (N.D. Ill. Oct. 20, 2000); *but cf. Haraburda v. Arcelor Mittal USA, Inc.,* No. 2:11 CV 93, 2011 WL 2600756, at *1 (N.D. Ind. June 28, 2011); (quoting *Larson v. Bank One Corp.,* No. 00 C 2100, 2005 WL 4652509 (N.D. Ill. Aug. 18, 2005)).

## X.  PLAINTIFF FURTHER REJECTS DEFENDANT'S CONTENTION THAT THE ALLEGED HARMS DO NOT INVOLVE ACTIONS TAKEN BY DEFENDANT KENCO FOR THE FOLLOWING REASONS:

McCurry raises genuine issues of fact when she identifies:

1.      Despite making a judicial admission in *McCurry v. Kenco* ALJ CASE NO. 2019-FDA-00015/ ARB CASE NO. 2021-0009 that Defendants sought medical information relative to Plaintiff's disability claims in September of 2018, as shown by Exhibit J, regarding her claims of disability, Defendant failed to address the issue as to why they were seeking information relative to her claims of disability (*Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781 (7th Cir. 2007); *Gordon v. United Airlines, Inc.*, 246 F.3d 878 (7th Cir. 2001) at 889) if , in fact, they had discharged themselves of their obligations to Plaintiff and were not involved in the claim determination process.

Plaintiff further contends that this wholeheartedly supports the drawing of an inference that Defendant was involved in the disability benefits process and decision making.  Plaintiff also asserts that Defendant was motivated by some impermissible reason, when Defendant sought this information, including but not limited to retaliating against Plaintiff.   Valentino v.

Village of South Chicago Heights, 575 F.3d 664, 673-74 (7th Cir.2009)

2.    That Defendant Kenco's conduct of participating in employee benefit decision making

with the Hartford, evidences that the Hartford did not solely make decisions relative to employee

disability benefits, as alleged by Defendant. Exhibit  K & L and McCurry Declaration Exhibit M

¶ 24-27` Undisputed fact in McCurry v. Kenco ALJ CASE NO. 2019-FDA-00015 and ARB

CASE NO. 2021-0009.

3.    That the Hartford's website states that the Hartford provides administrative only services

and services where the insured can make the final decision(s), as shown by Exhibit S

*4.*    That she has personal knowledge that Defendant Kenco was self-insured for its employee

benefits, including disability, as evidenced in McCurry Declaration Exhibit M ¶21 & 46.

Undisputed fact in *McCurry v. Kenco ALJ CASE NO. 2019-FDA-00015/ ARB CASE NO. 2021-*

*0009*

## XI.    PLAINTIFF REJECTS THE CONTENTION THAT HER CONTRACTUAL CLAIMS REGARDING ERISA (DISABILITY) BENEFITS MUST FAIL and; FURTHER REJECTS THE CONTENTION THAT HER UNLAWFUL INTERFERENCE CLAIMS SHOULD FAIL BECAUSE DEFENDANT KENCO INTERFERED WITH PLAINTIFF'S DISABILITY BENEFITS.

For the foregoing reasons Plaintiff" rejects these contentions regarding her contractual and

unlawful interference claims:


Defendant Kenco through its employer Mars, Inc. provided benefits, including disability

benefits, to Plaintiff to which she relied as a part of her employment contract. This was

evidenced by the offer letter tendered to Plaintiff that she was required to sign as a term and

condition of her employment.  A copy of that communication is attached as Exhibit U.

Defendant Kenco's actions of paying Plaintiff disability benefits due and owing to her, as outlined in the Defendant's offer letter to Plaintiff, underscores and supports Plaintiff's contentions.   A copy of that communication is attached as Exhibit O.

Defendant Kenco's conduct of providing conflicting plan's regarding who possessed the authority to administer benefits, infers that Defendant Kenco changed its position and supporting documentation to conceal its actions and continue to further retaliate against Plaintiff through a breach of contract.   A copy of that communication is attached as Exhibit Q.

Defendant Kenco's revocation clause in its plan, infers that Kenco without notice can execute the administrator's role, duties and functions.   A copy of that communication is attached as Defendant's  Motion for Summary Judgement Exhibit B & D pg. 28 and 33 respectively.

Additionally, Plaintiff further objects to the authenticity of the benefit plan(s) due the various versions of the plan.  For example, Defendant produced a plan as recent as May 24, 2021[3] that is in contradiction to its position that it gave Hartford authority to make all decisions, as evidenced by Exhibit Q.  In addition, Defendant controls the narrative of the plan, as the drafter. Notwithstanding the fact that Defendant went against its own policy by not distributing the plan initially and upon amending it, Defendant has also failed to produce any documents, to corroborate the authenticity of any of the versions of the documents presented. i.e. The Policy from Hartford, which US Supreme Court has distinguished as being different from the plan. *Pegram v. Herdrich, 530 U.S. 211 (2000)*

---

[3] Well after the Court's order and it had certified to the court that it did not have any other document.

Defendant Kenco's declarant Cathy Phillips conduct of providing conflicting declarations riddled with intentional internal inconsistencies, patently false statements and insufficient personal knowledge infers that Defendant lacks any credible evidence to support Defendant's contentions. Exhibits E, F, G & Defendant's Exhibit110.25.21 declarant's declaration.

Defendant Kenco's conduct of proffering inconsistent legal positions/theories *that are based upon a common core or nucleus of operative facts supports pretext and estoppel. Exhibits A & B*

Defendant Kenco's conduct of obtaining written medical findings regarding Plaintiff's medical condition on September 26, 2018, in regards to Plaintiff's claims of disability, evidences a nexus that Defendant Kenco executed its authority to interfere with Plaintiff's benefit determinations. A copy of that communication is attached as Exhibit J.   This was also a judicial admission and undisputed fact in *McCurry v. Kenco ALJ CASE NO. 2019-FDA-00015/ ARB CASE NO. 2021-0009*

Defendant Kenco's conduct and history of participating in employee benefit decision making with the Hartford, evidences that the Hartford did not solely make decisions relative to employee disability benefits and that Defendant Kenco interfered with Plaintiff's benefit determinations.  A copy of that communication is attached as Exhibits K. This was also a judicial admission and undisputed fact in *McCurry v. Kenco ALJ CASE NO. 2019-FDA-00015/ ARB CASE NO. 2021-0009*

Defendant Kenco's benefit claim analyst analyzed employee benefit claims and collaborated with

Hartford on employee claims of disability is further evidence that Defendant Kenco participated and/or made decisions relative to employee disability benefits, including adverse decisions in regards to Plaintiff's disability benefits. Exhibit L.

Defendant Kenco's judicial admission and undisputed fact that it retaliated against Plaintiff, further evidences that Defendant interfered with Plaintiff's benefits, including Plaintiff's disability benefits. Exhibit A

Plaintiff has personal knowledge that Defendant Kenco participated in employee benefit decisions with the Hartford. Exhibit K, and McCurry Declaration Exhibit M ¶24-27

Plaintiff has personal knowledge that Defendant Kenco was self-insured for its employee benefits, including disability and other benefits, as evidenced by Exhibit T and McCurry Declaration, Exhibit M ¶ 14. This was also a judicial admission and undisputed fact in *McCurry v. Kenco ALJ CASE NO. 2019-FDA-00015/ ARB CASE NO. 2021-0009*

It was held in *McCurry v. Kenco ALJ CASE NO. 2019-FDA-00015/ ARB CASE NO. 2021-0009* that "the record presented a genuine issue of material facts regarding Complainant engaging in an activity protected under the FSMA and subsequently suffered an adverse action." Exhibit A pg. 4 ¶2

## XII.   PLAINTIFF REJECTS THE CONTENTION THAT SHE WAS NOT SUBJECT TO DISCRIMINATION OR RETALIATION

Plaintiff was retaliated against for engaging in various protected activities, including but not limited to IDHR/EEOC investigations and proceedings, whistleblower investigations among other protected activities, as well as, formal legal proceedings, as shown by Exhibit A and M ¶ 28 McCurry declaration.

Within a relative time or the next available opportunity, Plaintiff's benefits were disrupted erroneously. For example, beginning in 2015 Plaintiff's benefits were erroneously terminated and continually denied, but was reinstated, as evidenced by Exhibit V.

Plaintiff is due and owing monies from as far back as 2015, as shown in McCurry Declaration Exhibit M ¶ 54. The court of Burlington Northern and Santa Fe Railway Co. v. White, 126 S.Ct. 2405 (2006) held that withholding pay was retaliatory and materially adverse and; would likely have "dissuaded a reason- able worker from making or supporting a charge of dis- crimination." *Washington* v. *Illinois Dept. of Revenue*, 420 F. 3d 658, 662 (CA7 2005) The Courts have further reasoned that Retaliation is a form of discrimination and Plaintiff also contends that post-employment discrimination (retaliation) claims are actionable according to Supreme Court law. *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997); *See also Abdullahi v. Prada USA Corp.,* 520 F.3d 710, 712 (7th Cir. 2008). And further, The Supreme Court has made clear that retaliation can consist of actions outside the workplace, *see Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 63-64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)

It was held in *McCurry v. Kenco ALJ CASE NO. 2019-FDA-00015/ ARB CASE NO. 2021-0009*

that "the record presented a genuine issue of material facts regarding Complainant engaging in an activity protected under the FSMA and subsequently suffered an adverse action." Exhibit A pg. 4 ¶2

Plaintiff further contends that Defendant's actions were in bad faith, willful and intentional, as they knew that Plaintiff was ill. Therefore, Defendant's actions and conduct inflicted emotional and economic harm that has caused Plaintiff irreparable physical, emotional, social and economic harms. McCurry Declaration Exhibit M ¶ 55.

In sum: perjury, intentional misrepresentation to various tribunals, the inconsistent in legal positions and declarations, the failure to preserve evidence and other egregious misconduct of Defendant, creates material issues of fact.

Conclusively, Plaintiff contends that she has come forward with appropriate evidence demonstrating that there are pending disputes of material fact." *Payne v Pauley,* 337 F.3d 767 (7th Circuit 2003) at 771 citing *Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir. 1994) at 921.

Additionally, Plaintiff contends that Defendant has failed to articulate with references to the record and to the law, specific reasons why they believe there is no genuine issue of material fact for trial. Therefore, Defendant's arguments must fail based upon the aforementioned reasons. As a result of this failure, Defendant's Motion for Summary Judgment should be denied.

**WHEREFORE,** McCurry prays, that after this Honorable Court reviews this matter applying the standard of summary judgment that "all reasonable inferences drawn from the underlying facts will be viewed and resolved in a light most favorable to McCurry (*Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1032 (7th Cir.1998)) and; that this honorable court will:1) Deny Respondent's motion and; 2)  that Defendant's be estopped and; 3)judicial notice be taken of Defendants inconsistent positions taken at various governmental agencies, tribunals and with this court and; 4) that defendants have intentionally made materially false and misleading statements and; 5) that Defendants actions of providing false and misleading information and documents has been obstructive to the administration of justice and; 6) that Defendants acted in "bad faith" and any other relief that this court deems appropriate under the circumstances.

Executed this 29th day of November 2021.

Edith McCurry
6239 South 13110 East Road
Pembroke Township, IL 60958

## CERTIFICATE OF SERVICE

The undersigned Pro Se Litigant, hereby certifies that on November 29, 2021, she electronically

caused to be filed a copy of the foregoing, **PLAINTIFF'S RESPONSE IN OPPOSITION TO**

**DEFENDANT KENCO'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court

using the CM/ECF system, which will send a notice of the electronic filing to those registered on

the Court's CM/ECF system to:

> Julia Pearce Argentieri
> J. Casey Leech
> Jackson Lewis P.C.
> 150 North Michigan Avenue, Suite 2500
> Chicago, Illinois 60601
> Telephone: (312) 787-4949 Facsimile: (312)787-4995
> julia.argentieri@jacksonlewis.com
> Casey.leech@jacksonlewis

**Exhibit A**

**U.S. Department of Labor**

Administrative Review Board
200 Constitution Ave. NW
Washington, DC 20210-0001



In the Matter of:

EDITH MCCURRY,

     COMPLAINANT,

  v.

KENCO LOGISTIC SERVICES,
LLC,

     RESPONDENT.

ARB CASE NO.  **2021-0009**

ALJ CASE NO.  **2019-FDA-00015**

DATE: April 30, 2021

Appearances:

*For the Complainant:*
    **Edith McCurry;** *pro se*; **Pembroke, Illinois**

*For the Respondent:*
    **Jody Wilner Moran, Esq. and Julia Pearce Argentieri, Esq.;** *Jackson Lewis P.C.*; **Chicago, Illinois**

**Before:** James D. McGinley, *Chief Administrative Appeals Judge*; Thomas H. Burrell, *Administrative Appeals Judge*

## ORDER VACATING AND REMANDING

Edith McCurry (Complainant) filed a complaint under Food Safety Modernization Act[1] (FSMA), and its implementing regulations at 29 C.F.R. § 1987, alleging that her former employer, Kenco Logistic Services, LLC (Respondent), had violated the FSMA's employee protection provisions by denying her long-term disability benefits. On November 2, 2020, an Administrative Law Judge (ALJ)

---

[1]    21 U.S.C. § 399d (2016).

issued a Decision and Order Granting Summary Decision (D. & O.). We vacate and remand the D. & O. for further proceedings consistent with our decision.

## BACKGROUND

Complainant worked for Respondent as a human resources administrator at a plant in Manteno, Illinois.[2] Complainant began receiving short-term disability benefits on January 23, 2015, and was approved for a medical leave of absence on January 25.[3] On January 29, Respondent notified all of its employees at the Manteno plant that they would be laid off in March.[4] After her termination, Complainant elected to continue health care benefits under Respondent's health care plan under the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA).[5] Hartford Life and Accident Insurance Company (Hartford), a third party, administered the plan.[6]

After exhausting her short-term benefits, Complainant transitioned to long-term benefits.[7] Hartford terminated Complainant's benefits in July 2017 based on an erroneous determination that she was capable of part-time work.[8] Hartford reversed the decision in February 2019 and paid her an adjusted rate to compensate for the underpayments.[9] Complainant has filed several legal actions against Respondent and other related parties after her benefits were temporarily terminated, including a discrimination case in United States District Court in which the court granted summary judgment in Respondent's favor.[10]

---

[2]  D. & O. at 4.

[3]  *Id.*

[4]  *Id.* Respondent had lost its contract with the company that it was providing warehouse management services. *Id.*

[5]  *Id.*

[6]  *Id.*

[7]  *Id.*

[8]  *Id.*

[9]  *Id.*

[10]  On August 29, 2016, Complainant filed an action in the United States District Court for the Central District of Illinois against Respondent claiming her supervisors discriminated against her based on her race, sex, age, and disability in violation of several federal statutes, to which the court granted summary judgment in Respondent's favor. *McCurry v. Kenco Logistics Servs.*, No. 16-CV-2273, 2018 WL 10321877 (C.D. Ill. Aug. 14,

On April 20, 2018, Complainant filed a complaint with the Occupational Safety and Health Administration (OSHA), alleging that Respondent unlawfully retaliated against her for engaging in activity protected under the FSMA by temporarily denying her disability benefits.[11] On May 3, 2019, OSHA issued a final determination letter dismissing the complaint because Hartford, not Respondent, made decisions concerning administration of the benefits plan.[12] On June 7, 2019, Complainant objected to the dismissal and requested a hearing with the Office of Administrative Law Judges (OALJ).[13]

On September 4, 2019, Respondent filed a Motion for Summary Decision of the FSMA retaliation claim.[14] Respondent presented two reasons for dismissal of the claim: (1) "[C]ollateral estoppel bars the re-litigation of the same factual issues that were already conclusively decided by the federal court in granting summary judgment"; and (2) "[T]he Department of Labor lacks jurisdiction over [Complainant]'s claim because it is an ERISA dispute against a third-party benefits administrator – not [Respondent] – which has nothing to do with the [FSMA] and cannot be litigated as a FSMA claim."[15]

On September 25, 2019, the ALJ issued an order converting the scheduled November 13, 2019 hearing to a pretrial session and limited its scope to whether the complaint was barred by collateral estoppel and whether Complainant could present evidence that her protected activity could have been a contributing factor in

---

2018). On March 23, 2017, Complainant brought a second action against Respondent and others alleging that it repeatedly changed her benefits plan premiums and medical coverage in retaliation for protected activity while she was employed, which the court dismissed as malicious. *McCurry v. Kenco Logistics Servs.*, No. 18-cv-2093 (C.D. Ill. May 22, 2018). On July 19, 2019, Complainant filed an action in the United States District Court for the Northern District of Illinois against Respondent and others, alleging that the irregularities in her disability benefits were discriminatory and retaliatory in violation of Title VII and § 1981. *McCurry v. Mars, Inc.*, No. 19-cv-04067, 2020 WL 6075872 (N.D. Ill. Jun. 17, 2020). The court denied Respondent's motion to dismiss the discrimination claims because the facts alleged by Complainant differed from the facts alleged in the initial lawsuits enough to avoid claim preclusion. *Id.* at *6.

[11]   D. & O. at 5.

[12]   *Id.* at 2.

[13]   *Id.*

[14]   *Id.*

[15]   Motion for Summary Decision at 1.

the alleged adverse employment action.[16] On October 23, 2019, Complainant filed a response requesting the ALJ to hold the case in abeyance while the federal district court case was on appeal.[17] On October 24, 2019, the ALJ cancelled the November 13 hearing and ordered the case to be held in abeyance.[18]

On April 17, 2020, the ALJ lifted the stay and ordered the complainant "to respond to the Motion for Summary Decision and show cause, by June 15, 2020, why she is not collaterally estopped from pursuing her claim against Kenco in this forum and why her request for a hearing should not be dismissed."[19] Counsel for Complaint withdrew his representation on the same day.[20] On August 6, 2020, the ALJ extended Complainant's time to respond in an order and again ordered the complainant to "respond to the Motion for Summary Decision herself and show cause, by September 30, 2020, why she is not collaterally estopped from pursuing her claim against Kenco in this forum because a federal court had previously found that Kenco did not take adverse action against her related to her post-termination benefits and why her request for a hearing should not be dismissed."[21] Neither order requested Complainant to address whether there was evidence that her alleged protected activity contributed to the disruption of her long-term benefits. On September 30, 2020, Complainant, acting pro se, submitted a Response Opposing Respondent's Motion for Summary Decision.[22]

On November 2, 2020, the ALJ issued the D. & O. granting the motion. The ALJ held that the record presented a genuine issue of material facts regarding whether Complainant engaged in an activity protected under the FSMA[23] and subsequently suffered an adverse action.[24] However, the ALJ found that Complainant failed to present any evidence establishing that the protected activity could have been a contributing factor in the adverse action, stating that it "is

---

[16]     D. & O. at 2.

[17]     *Id.* at 3.

[18]     *Id.*

[19]     Order to Show Cause at 4-5.

[20]     D. & O. at 3.

[21]     Order Extending Time to Respond to Motion for Summary Decision at 4-5.

[22]     D. & O. at 4.

[23]     Complainant claimed that she had testified in a separate FSMA whistleblower retaliation case made by another Respondent employee. *Id.* at 5.

[24]     *Id.* at 8.

beyond peradventure that employees of Hartford, not [Respondent], have taken all actions related to [Complainant]'s disability benefits."[25] The ALJ noted there was no evidence that Respondent had "instructed, suggested, requested, directed, colluded, or conspired with Hartford to deprive [Complainant] of such benefits."[26] The ALJ further concluded that there was no evidence that anyone at Hartford had any knowledge of Complainant's alleged protected activity.[27] Accordingly, the ALJ granted summary decision. However, the ALJ did not base the decision on the two reasons offered by Respondent in support of its motion. Complainant petitioned the Administrative Review Board (Board) to review the decision thereafter.

### JURISDICTION AND STANDARD OF REVIEW

The Secretary of Labor has delegated his authority to the Administrative Review Board to issue final agency decisions in FSMA cases.[28] The Board reviews an ALJ's factual determinations under the substantial evidence standard.[29] The Board reviews the ALJ's legal conclusions de novo.[30]

### DISCUSSION

On appeal, Complainant contests the ALJ's decision to grant summary decision on grounds not raised by Respondent.[31] In its motion for summary decision, Respondent argued that the complaint should be dismissed because of collateral estoppel and lack of jurisdiction. In his D. & O., the ALJ granted summary decision solely because he determined there was a lack of a genuine issue of fact regarding whether Complainant's alleged protected activity contributed to the temporary denial of her long-term disability benefits.

---

[25]   *Id.*

[26]   *Id.*

[27]   *Id.* at 9.

[28]   Secretary's Order No. 01-2020 (Delegation of Authority and Assignment of Responsibility to the Administrative Review Board), 85 Fed. Reg. 13186 (Mar. 6, 2020).

[29]   29 C.F.R. § 1987.110(b).

[30]   *Watts v. Perdue Farms, Inc.*, ARB No. 2017-0017, ALJ No. 2016-FDA-00003, slip op. at 3 (ARB May 28, 2020).

[31]   Complainant raises other arguments in her appeal, including that there were genuine issues of material fact. However, for the reasons discussed herein, we need only discuss her procedural argument.

Under the Department of Labor's Rules of Practice and Procedure for Administrative Hearings Before the Office of Administrative Law Judges, an ALJ may grant summary decision "on grounds not raised by a party" only after providing the parties "notice and a reasonable time to respond."[32] Here, neither party was apprised that the ALJ was considering whether there was a genuine issue of material fact and given an opportunity to respond to the issue. In *Brucker v. BNSF Railway Co.*, the Board stated that an ALJ that "sua sponte, without notice to the parties, first raised and then decided [an] issue" to grant a motion for summary decision likely "prejudiced" the complainant by "fail[ing] to give him notice of his intention to consider the . . . issue."[33] Here, Complainant also was prejudiced because she was unable to respond to the ALJ's rationale for granting summary decision, depriving her of an opportunity to be heard.[34] The ALJ's actions, therefore, did not conform to the procedural requirements for summary decision and compels the Board to vacate and remand the decision.

Respondent in its brief contends that the Board should dismiss Complainant's appeal before reaching its merits because her initial brief fails to conform to the Federal Rules of Appellate Procedure.[35] Respondent cites Rule 28(a) which requires an appellant's brief to contain the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies."[36] Respondent contends that Complainant's opening brief lacks arguments against the ALJ's conclusion that there was no genuine issue of material fact or citations to facts in the record in support of her appeal.

---

[32]    29 C.F.R. § 18.72(f)(2).

[33]    *Brucker v. BNSF Ry. Co.*, ARB No. 2014-0071, 2013-FRS-00070, slip op. at 13 (ARB July 29, 2016) (citing 29 C.F.R. § 18.72(f)(2)). However, the Board did not rule on the issue because the complainant failed to raise it in his brief. *Id.*

[34]    In her response to Respondent's motion, Complainant did present an argument that there was a genuine issues of material fact for her retaliation claim. Response Opposing Respondent's Motion for Summary Decision at 13-18. However, though it is unclear as to why Complainant, acting pro se, included this argument in her response, it was not in response to the ALJ notifying the parties that it was considering the issue because the ALJ only ordered Complainant to address the arguments in Respondent's Motion for Summary Decision and why her claim was not barred by collateral estoppel in the two orders issued after the ALJ lifted the stay on the case.

[35]    In the absence of its own procedural rule, the Board applies the principles employed by federal courts under the Federal Rules of Appellate Procedure. *Henin v. Soo Line R.R. Co.*, ARB No. 2019-0028, ALJ No. 2017-FRS-00011, slip op. at 2 (ARB Feb. 26, 2019).

[36]    Fed. R. App. P. 28(a)(8).

While Complainant's initial brief perhaps fails to meet the procedural standards for submissions to the Board, we note that the Board holds pro se litigants "to lesser standards than legal counsel in procedural matters"[37] and gives them "a certain degree of adjudicative latitude."[38] Complainant identified the ALJ's procedural error in her initial brief and more thoroughly discussed the issue in her reply brief. Because of Complainant's pro se status and the procedural error made by the ALJ, we decline to dismiss Complainant's appeal.

Therefore, we **VACATE** the ALJ's D. & O. and **REMAND** the case to the OALJ for further proceedings to allow the parties an opportunity to respond to the ALJ's grounds for granting summary decision.

**SO ORDERED.**

---

[37]     *Zavaleta v. Alaska Airlines, Inc.*, ARB No. 2015-0080, ALJ No. 2015-AIR-00016, slip op. at 11 (ARB May 8, 2017).

[38]     *Young v. Schlumberger Oil Field Servs.*, ARB No. 2000-0017, ALJ No. 2000-STA-00028, slip op. at 10 (ARB Feb. 28, 2003).

**U. S. DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

<span style="color:blue">**Exhibit B**</span>

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| EDITH MCCURRY, | )      OALJ Case No.: 2019-FDA-00015 |
| | ) |
|     Complainant, | )      OSHA Case No.: 5-1260-18-107. |
| | ) |
|     v. | ) |
| | ) |
| KENCO LOGISTICS SERVICES, LLC, | ) |
| | ) |
|     Respondent. | ) |

## RESPONDENT'S MOTION FOR SUMMARY DECISION

Respondent, Kenco Logistic Services, LLC, by and through its undersigned counsel, hereby submits the foregoing request for summary decision in accordance with 29 C.F.R. §18.72 and requests that the Office of Administrative Law Judges dismiss McCurry's Complaint with prejudice for the reasons set forth below:

### INTRODUCTION

McCurry's FSMA complaint should be dismissed for two reasons.

First and foremost, collateral estoppel bars the re-litigation of the same factual issues that were already conclusively decided by the federal court in granting summary judgment to Kenco. McCurry's continued abuse of the litigation system in filing numerous, overlapping and duplicative claims in several forums is a sanctionable waste of judicial resources and legal fees.

Second, the Department of Labor lacks jurisdiction over McCurry's claim because it is an ERISA dispute against a third-party benefits administrator -- not Kenco -- which has nothing to do with the Food Safety Modernization Act and cannot be litigated as a FSMA claim.

1

For each of these reasons, summary decision is proper and McCurry's complaint should be dismissed with prejudice. Kenco should additionally be awarded reasonable attorney's fees for responding to this duplicative, harassing complaint, given that the original dismissal expressly stated that this was not the proper forum, or the proper respondent, for McCurry to pursue these claims. Any rights to appeal should be denied, given that McCurry cannot continue to re-litigate duplicative issues in numerous forums.

## UNDISPUTED MATERIAL FACTS

1.      Kenco hired McCurry as an HR Clerk for the Manteno, Illinois Mars facility on April 21, 2013 (Exhibit A, *McCurry Dep. 62:4-63:18.*)[1] McCurry did not supervise any employees at Kenco *(McCurry Dep. 98:3-10.)*

2.      McCurry was the only employee in the role of HR Clerk *(McCurry Dep. 63:19-23.)*

3.      As an HR Clerk, McCurry's duties included: handling payroll, generating reports, assisting with employee relations, and other related duties as assigned *(McCurry Dep. 67:22-68:2.)*

4.      On January 29, 2015, Kenco mailed notice to McCurry, and all Manteno, Illinois Kenco employees, informing them that Kenco lost the contract with Mars, and all Manteno employees were being terminated, effective March 29, 2015 *(McCurry Dep. p. 72:5-73:22.)* McCurry has not worked for Kenco since March 29, 2015 *(Id.)*

5.      McCurry does not believe that her termination was discriminatory and agrees that all remaining Kenco employees at the Manteno location were terminated at the same time as she *(McCurry Dep. 79:3-10.)*

---

[1] McCurry refers to her job as an HR Administrator. This distinction is not material. Regardless of what the job title was, her pay, reporting structure and her job duties are undisputed.

6.     Following her termination, McCurry elected to sign up for COBRA. McCurry's COBRA costs changed several times and she furthermore alleges that she did not receive open enrollment paperwork on one occasion *(McCurry Dep. 108:10-109:22.)*

7.     In July 2017, Kenco's third-party benefits administrator issued a determination that McCurry was capable of working 20 hours per week and therefore her long-term disability benefits were reduced *(McCurry Dep. 103:17-104:17.)*

8.     On August 29, 2016, McCurry filed a lawsuit in the U.S. District Court for the Central District of Illinois against Kenco and other defendants, *McCurry v. Kenco et. al.,* 16-CV-2273. This lawsuit was later consolidated with a second lawsuit McCurry filed against Kenco, 16-CV-2277. A copy of the docket for 16-CV-2273 is attached as **Exhibit B.**

9.     Following extensive discovery and the completion of McCurry's deposition, the Court granted summary judgment in Kenco's favor on August 14, 2018 (Dkt. No. 125.) A copy of the summary judgment ruling is attached as **Exhibit C.**

10.    One of the issues decided in the granting of summary judgment was that Kenco is not a proper defendant in McCurry's claims alleging disputes involving McCurry's receipt of post-termination benefits from Kenco's third-party benefits administrator. *Id.* At 15.

11.    McCurry appealed the dismissal of her federal lawsuit and her appeal is presently pending before the Seventh Circuit Court of Appeals, *Edith McCurry v. Kenco Logistic Services, LLC, et. al.,* 18-3206.

12.    On March 23, 2018, McCurry also filed another new lawsuit arising from the same facts in the United States District Court for the Central District of Illinois, *McCurry v. Kenco et. al.,* 18-CV-2093.

13.    On May 22, 2018, the Central District of Illinois Court dismissed McCurry's duplicative lawsuit (18-CV-2093) and stated that "considering that McCurry II involves the same Defendants, as well as the same operative facts, McCurry II appears to be brought in a bad faith attempt to restart the discovery process in McCurry I and cause undue delay to the resolution of Plaintiff's claims against Defendant Kenco and Mars." A copy of the Court's memorandum opinion dismissing McCurry's duplicative litigation is attached as **Exhibit D.**

14.    On April 20, 2018, McCurry filed a complaint with the Department of Labor alleging that she was denied long-term disability benefits on December 26, 2017 (over two years after her employment with Kenco ended) due to engaging in a protected activity under FSMA. A copy of McCurry's online complaint is attached as **Exhibit E.**

15.    On May 3, 2019, the Department of Labor completed its investigation and issued a ruling dismissing the complaint because: (1) Kenco's third-party benefits administrator, not Kenco, made decisions regarding denial of long-term disability benefits and (2) the proper forum for a claim involving ERISA is the Department of Labor's Employee Benefits Security Administration (EBSA). A copy of the Department's ruling is attached as **Exhibit F.**

16.    On June 7, 2019, Counsel for McCurry sent a letter via Certified Mail to the Office of Administrative Law Judges objecting to the dismissal. A copy of this letter is attached as **Exhibit G.**[2]

---

[2] In violation of Section 24.106(a) McCurry failed to send a copy of her objection to Respondent. Respondent was not made aware that any objection had been filed until the OALJ issued a Pre-Hearing Order on July 2, 2019. This alone is a basis for dismissing McCurry's appeal. *See Administrator, Wage and Hour Div., USDOL v. E-Business International, Inc.,* ARB No. 15-082, ALJ No. 2015-LCA-10 (ARB Nov. 12, 2015) (denying appeal where failure to provide proof of service of Respondent's counsel resulted in dismissal).

17.     On June 17, 2019, McCurry filed another duplicative complaint of discrimination

against Kenco in the U.S. District Court for the Northern District of Illinois, *McCurry v. Kenco et.*

*al.,* 19-CV-4067. A copy of the docket is attached as **Exhibit H.**

### STANDARD

An ALJ may issue a summary decision if the pleadings, affidavits, and other evidence or

"matters officially noticed" show that there is no genuine issue of any material fact and the moving

party is entitled to prevail as a matter of law. *See In the Matter of: Robert T. Evans v. T-Mobile,*

*USA, Inc.,* ARB. Case No. 15-037, ALJ No. 2012-SOX-036, slip. op. at 7 (ARB Feb. 27, 2017).

The Food Safety Modernization Act provides protection against retaliation for whistleblowers who

make good-faith reports of food safety violations. The statute states that:

> No entity engaged in the manufacture, processing, packing,
> transporting, distribution, reception, holding, or importation of food
> may discharge an employee or otherwise discriminate against an
> employee with respect to compensation, terms, conditions, or
> privileges of employment because the employee, whether at the
> employee's initiative or in the ordinary course of the employee's
> duties (or any person acting pursuant to a request of the employee)-
>
> (1) provided, caused to be provided, or is about to provide or cause
> to be provided to the employer, the Federal Government, or the
> attorney general of a State information relating to any violation
> of, or any act or omission the employee reasonably believes to
> be a violation of any provision of this Act or any order, rule,
> regulation, standard, or ban under this Act, or any order, rule,
> regulation, standard, or ban under this Act;

21 U.S.C. §399d (Lexis 2017).

To state a *prima facie* case for retaliation under the FSMA, McCurry must establish that:

(1) she engaged in a protected activity; (2) Respondent was aware she engaged in a protected

activity; (3) Kenco took adverse action, or action that would dissuade a reasonable worker from

exercising rights, against her; and (4) the protected activity was a contributing factor in the adverse

action. *Patricia Hindsman v. Delta Air Lines, Inc.*, ARB Case No. 09-023, ALJ Case No. 2008-AIR-013, slip. op. 9 (ARB. June 30, 2010); *Chase v. Bros. Int'l Food Corp.*, 3 F. Supp. 3d 49, **9 (W.D.N.Y. 2014) (discussing elements in context of a FSMA claim). A determination that a violation has occurred may be made only if the complainant has demonstrated by a preponderance of the evidence that protected activity was a contributing factor in the adverse action alleged in the complaint. 29 C.F.R. §1987.109(a). Further, even if that burden is satisfied, relief may not be ordered if the respondent demonstrates by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected activity. 29 C.F.R. §1987.109(b). Pursuant to 21 U.S.C. §399d(b)(3)(D) the Secretary may award to the prevailing employer, reasonable attorney's fees, not exceeding $1,000, to be paid by the complainant, if there is a finding that the complaint is frivolous or has been brought it bad faith. *Id.*

## ARGUMENT

### I. McCurry's Complaint is Barred By Collateral Estoppel.

McCurry has not been employed by Kenco since March 2015. The decisions surrounding McCurry's receipt of post-termination benefits, including long-term disability coverage, are not attributable to Kenco because they are handled by a third-party benefits administrator. Indeed, the federal court already resolved this issue once in *McCurry v. Kenco et. al.*, 16-CV-2273, so McCurry should be estopped from continuing to re-litigate the same facts. Specifically, in her federal employment discrimination lawsuit, 16-CV-2273, McCurry alleged that Kenco discriminated or retaliated against her by reducing her long-term disability benefits more than two years after her termination. (SOF ¶¶ 7, 10.) McCurry's federal lawsuit involved the same set of operative facts and the same parties. Furthermore, the federal court ruled that allegations about post-termination changes in benefits by Kenco's third-party administrator are not attributable to Kenco, and therefore Kenco is not a correct defendant. *See* Exhibit C, p. 15. Factual

6

determinations in a judicial proceeding have preclusive effect in subsequent proceedings between

the same parties. *See Seetharaman v. Stone & Webster, Inc.,* 2009 U.S. Dist. LEXIS 40367, *19

(D. Ma. May 11, 2009) (factual finding of when plaintiff had knowledge of transfer had preclusive

effect in subsequent litigation); *Norals v. Schneider Bros.,* 651 F. Supp. 1324, 1331 (N.D. Ill. Jan.

23, 1987) (employee should not be entitled to re-litigate issues of fact which were already decided

in other proceedings).  Thus, given that a federal court in the Northern District of Illnois already

issued factual determinations that Kenco was not involved in the 2017 decisions to modify

McCurry's post-termination benefits (including long-term disability), McCurry is preempted and

collaterally estopped from re-litigating the factual issues and her claim must be dismissed.

## II.    The OALJ Lacks Jurisdiction Over McCurry's ERISA Complaint Against Kenco's Third-Party Benefits Administrator.

The Department of Labor dismissed McCurry's whistleblower complaint and held that

Occupational Safety and Health Administration was not the correct forum for resolution of her

complaint. The dismissal explained that, "[t]he evidence supports that Complainant received long-

term disability benefits from the Hartford Group, which is a third party benefits administrator. The

proper forum for consideration of this claim is through the Department of Labor's Benefits

Security Administration (EBSA) under the Employee Retirement Income Security Act of 1974

(ERISA)." *See* Ex. F.  To prevail on a claim under the Food Safety Modernization Act, McCurry

must demonstrate that she was subject to adverse employment action on the basis of reporting a

violation or suspected violation of the particular food safety laws or regulations to her employer.

21 U.S.C. §399d.  McCurry's allegations that Kenco's third-party benefits administrator reduced

her long-term disability benefits, more than two and a half years after her termination, do not form

the basis for a FSMA whistleblower claim. *See Watts v. Perdue Farms, Inc.,* ALJ No. 2016-FDA-

3, ARB No. 2017-0017 (ARB. Mar. 5, 2019) (affirming ALJ determination that it lacked authority

to adjudicate a complaint arising under a different statute not within the purview of the Federal Food, Drug and Cosmetic Act). So too, here. The Department did not have jurisdiction over this ERISA complaint, and accordingly, the OALJ lacks jurisdiction over McCurry's appeal because it does not concern the type of conduct protected by the FSMA.

### III.    Kenco is Entitled to Attorney's Fees.

The Department may award reasonable attorney's fees, not exceeding $1,000, to be paid by the complainant, if there is a finding that the complaint is frivolous or has been brought it bad faith. §399d(b)(3)(D). Here, the United States District Court for the Central District of Illinois already held that McCurry's multiple filings arising from the same allegations of retaliation against Kenco were "clearly repetitive, duplicative, and therefore malicious and should be dismissed pursuant to Section 1915(e)(2)(B)(i)." *See* Ex. D. Such a ruling has had no effect on McCurry's continued frivolous filings. Indeed, she continues to object to this ruling, without citing any basis for doing so, even in the face of being advised that this is not the correct forum (or the correct Respondent). McCurry fails to articulate any new factual argument that would invoke the Department of Labor's jurisdiction over an ERISA claim; to the contrary, she had not been employed by Kenco for over two years at the time she filed this administrative complaint and the actions complained of were not taken by Kenco. Instead, McCurry is harassing her former employer by continuing to overwhelm Kenco with frivolous, unwarranted filings that attempt to re-litigate duplicative issues. Under such circumstances, Kenco is entitled to an award of its attorney's fees in accordance with 21 U.S.C. §399d(b)(3)(D).

### CONCLUSION

WHEREFORE, for all the reasons stated herein, Respondent requests that its motion for a summary decision in accordance with 29 CFR §18.72 be granted and Respondent be awarded

attorneys fees for having to respond to this frivolous appeal, and this matter be dismissed with prejudice.

DATED: September 4, 2019   Respectfully submitted,

**KENCO LOGISTIC SERVICES, LLC**

By: /s/Jody Wilner Moran
     One of its Attorneys

Jody Wilner Moran
Julia Pearce Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone: (312) 787-4949
Facsimile: (312)787-4995

9

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on September 4, 2019, I submitted a copy of the foregoing ***Respondent's Motion for a Summary Decision*** via hand delivery and email to:

U.S. Department of Labor, Office of Administrative Law Judges
Attention: Administrative Law Judge Stephen R. Henley
800 K. Street, NW
Washington, DC 20001-8002
FAX: (202)693-7365
Email: kaercher.Alyssa.J@dol.gov

A copy was also sent via electronic and U.S. mail to:

Attorney Jordan Hoffman, Counsel for Complainant
2711 E. New York Ave. Suite 205
Aurora, IL 60502
jthoffmanlaw@gmail.com

By:/s/ Jody Wilner Moran
One of the Attorneys for the Respondent

10

**Exhibit C**

## U. S. DEPARTMENT OF LABOR

## OFFICE OF ADMINISTRATIVE LAW JUDGES

In the Matter of:

EDITH MCCURRY,                                          OALJ Case No.: 2019-FDA-00015

      Complainant,                                    OSHA Case No.: 5-1260-18-107i:

      v.

KENCO LOGISTICS SERVICES, LLC,

      Respondent.

## COMPLAINANT'S RESPONSE OPPOSING RESPONDENT'S MOTION FOR SUMMARY DECISION

Complainant, hereby submits the foregoing response opposing Respondent's request for summary decision in accordance with 29 C.F.R. §18.72 and requests that the Office of Administrative Law Judges deny Respondent's Motion For Summary Decision for the reasons set forth below:

### INTRODUCTION

McCurry's FSMA complaint should not be dismissed for the following reasons:
McCurry rejects the theory and notion that her case is subject to Collateral Estoppel and that this Court does not has jurisdiction over FSMA related cases of retaliation due to engaging in protected activity relative to FSMA.

1. The issues at hand before this court, which are relative to her disability benefits, are not relative to the various employment and COBRA benefit issues that were before the district court in 16 CV 2273. That matter was disposed of in July of 2018 by the district court.

2. More specifically, Respondent Kenco indicated in its motion to dismiss before the court and by way of its supporting exhibits that the issues previously litigated were relative to COBRA benefits.

3. Additionally, according to Respondent's Exhibit E and F it is clear, in Complainant's online claim and the findings on the administrative level at OSHA, the issues at hand here are relative to disability benefits and not COBRA.

4. The administrator for COBRA was US Administration. *Exhibit 1*

5. Also, Respondent identifies in their motion for summary decision an ongoing matter, 19 CV 04067, that is supported by Respondent's Exhibit H, before the district court relative to issues regarding Complainant's disability benefits.

6. Respondent Kenco and their employer Mars, Inc. both responded to allegations relative to Complainant's complaint 19-CV- 04067 at the administrative level regarding McCurry's disability benefits, respectively, during and after the adjudication of the issues before the court in 16 CV 2273. *Exhibit 2*

7. Neither Respondent Kenco, in May of 2018, nor its employer, Mars, Inc., in October of 2018 ever alleged, intimated or suggested implicitly or explicitly that the issues being raised relative to Complainant's disability were or had been adjudicated.

8. It was not until April of 2018, that Complainant became aware that something was awry with her disability benefits.

9. Relative to McCurry's April 20, 2018 FSMA complaint, the most recent adverse action occurred in December of 2017, after McCurry provided written testimony for a whistleblowers case under FSMA before the DOL-2016-FDA-4.

10. According to Respondent's supporting documentation Exhibit D states on page 5 of 7 ¶ 3 that the last day to amend her complaint would have been March 21, 2017 and;

11. According to Respondent's supporting documentation Exhibit E § 3 it states the cause of action before this court occurred on December 26, 2017.

12. Consequently, the issue of Complainant's disability did not occur until well after the date to amend her complaint in the district court; therefore, it could not have been adjudicated and;

13. Additionally, Food Safety and Modernization Act (FSMA) dictates that a complaint be filed with OSHA as a prerequisite to any remedy under FSMA.

14. Complainant timely filed her complaint on April 20, 2018, after realizing that things were unjustly and without merit going awry with her benefits.

15. The adverse action occurred within a relative time of Respondent Kenco becoming aware that Complainant provided written sworn testimony in a whistleblower case before the Department of Labor relative to violations of the FSMA.

16. Respondent Kenco also alleges to this court and misrepresents that it had discharged itself of any responsibility or liability to McCurry in its motion for Summary Decision and that any actions taken relative to her disability benefits was from a 3rd party . i.e. The Hartford.

17. In stark contrast and in great contention to this inaccurate statement and intentional misrepresentation, Defendant Kenco and its employer Mars, Inc., hired another company the Reed Group on or about September 2018 to inquire into McCurry's medical status.

18. The Hartford denies any association with the Reed group. **Exhibit 3**

19. Consequently, several months well after Complainant's case was dismissed in the district court in July of 2018, Respondent Kenco and Mars, Inc. made hard inquiries into the medical condition and status of Complainant in late September of 2018.

20. Respondent Kenco revealed that it had unfettered access to the history and disposition of Complainant's claims and history through discovery in November of 2017 in the matter previously litigated and disposed of in the district court in July of 2018.

21. Respondent Kenco and Mars, Inc. actions and conduct do not support the contention that they were discharged of any responsibility or liability relative to McCurry in 2015 and;

22. These actions are in direct conflict of their statements and contentions made before this court.

23. Complainant contends and asserts that Respondent has not met its burden to establish the basis of the theories of Collateral estoppel.

24. Complainant also contends that it is not proper to dispose of matter where there are material issues

**Complainant rejects the theory of Collateral Estoppel**

Defendant has not met the necessary tenets to satisfy the doctrine of collateral estoppel, as the common core or nucleus of operative facts or the causes of actions are not the same in the past and present legal proceedings.

Issue preclusion prevents a party from relitigating issues that were resolved in a prior legal action. *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014). The party invoking preclusion must show that (1) the issue sought to be precluded [was] the same as that

involved in the prior litigation, (2) the issue [was] actually litigated, (3) the de-termination of the issue [was] essential to the final judgment, and (4) the party against whom estoppel is invoked [was] fully represented in the prior action. *Matrix IV, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.*, 649 F.3d 539, 547 (7th Cir. 2011) (quoting *H-D Mich., Inc. v. Top Quali-ty Serv., Inc.*, 496 F.3d 755, 760 (7th Cir. 2007)). No. 17-1895

Specifically, Defendant has made conclusory statements regarding the alleged sequence of Complainant's prior and present case without pointing to or correlating the specific common core or nucleus of operative facts necessary to satisfy the requirements of the doctrine of Collateral Estoppel. Defendant's "statement is unsupported, and unsupported statements, whether in oral argument, *In re: Payne,* 431 F.3d 1055, 1060 (7th Cir.2005), or in briefs do not count." *Sommerfield v. City of Chicago,* 613 F. Supp. 2d 1004 (N.D. Ill. 2009); *See Woolard v. Woolard,* 547 F.3d 755 (7th Cir.2008); *United States v. Stevens,* 500 F.3d 625, 628-629 (7th Cir. 2007); *IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.,* 437 F.3d 606, 610-611 (7th Cir.2006); *United States ex rel. Feingold v. AdminaStar Federal, Inc.,* 324 F.3d 492, 494 (7th Cir.2003); *Campania Management Co., Inc. v. Rooks, Pitts & Poust,* 290 F.3d 843, 853 (7th Cir.2002).

Complainant contends that this action is a post-employment discriminatory act(s) separate from Complainant's previous claims of employment discrimination.

1. The present legal action is relative to claims of post-employment discrimination (retaliation for engaging in protective activities under FSMA) relative to the terms, conditions and enforcement of Complainant's benefits derived from her employment agreement/contract with her employer.

2. Complainant also contends that post-employment discrimination (retaliation) claims under are actionable according to Supreme Court law. *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997); *See also Abdullahi v. Prada USA Corp.*, 520 F.3d 710, 712 (7th Cir. 2008). The Supreme Court has made clear that retaliation can consist of actions outside the workplace, *see Burlington N. and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 63-64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006).

3. Complainant's previous legal action referenced by Defendants was relative to claims of employment discrimination relative to race, age, sex, failure to promote, hostile work environment and violations of the American's with Disability Act along with other forms of unlawful conduct.

4. Complainant was instructed by the Illinois Department of Human Rights to file charges of actions as they occurred relative to her employment.

5. Complainant filed several sets of formal charges with the Illinois Department of Human Rights and EEOC based upon this information beginning in January of 2015.

6. Complainant filed her initial case *McCurry v. Kenco et al...16-CV-2273* around August 29, 2016 after receiving her first right to sue letter from the EEOC.

7. Complainant filed her second case *McCurry v. Kenco et al...16-CV-2277* around September 6, 2016 based upon her second right to sue letter from the EEOC.

8. Complainant requested that the cases be consolidated and they were consolidated to *McCurry v. Kenco et al...16-CV-2273.*

9. Complainant's last day to amend her complaint was March 21, 2017 in the *McCurry v. Kenco et al...16-CV-2273* Respondent's Exhibit D page 5 of 7 ¶ 3

10. Complainant was issued another right to sue letter on December 15, 2017.

11. As required Complainant timely filed her case in the district court on March 23, 2018.

12. *McCurry v Kenco et al. 18-cv-2093* was filed relative to Complainant's COBRA benefits.

13. Complainant earnestly believes that she did not raise issues relative to her disability benefits in *McCurry v. Kenco et al...16-CV-2273 or 16-CV-2277* or that;

14. There was the same nucleus of facts as alleged by Defendant Kenco or that;

15. Complainant could not have tied her allegations regarding COBRA to the impending case, as the matter had not ran its administrative course until December of 2017, almost nine (9) months after Complainant's last day to amend her then complaint, which was March 21, 2017.  See attached Respondents *Exhibit D page 5 of 7 ¶3*

16. Once again Defendant Kenco participated in the administrative requisites at OSHA and EEOC and failed to raise the issue that the matter was being litigated or re-litigated.

17. Complainant could not have possibly raised claims of post-employment discrimination relative to Complainant's disability benefits, as Complainant did not become aware that:

    a. There was an issue with her disability until April of 2018, after the repeated denial of her benefits that were terminated in 2017.

        i. The Hartford and or the plan administrator refused over a ten (10) month period to properly inform and provide Complainant with records used to make the determination to terminate Complainant's benefits.

            1. Policies relative to record requests were violated by not producing the records within 21 days of the request.

2. A medically unsupported decision to terminate Complainant's benefits.

3. The Independent Medical Examiners initial report/findings was rejected when a decision was made by the Hartford to reverse its decision to terminate McCurry' benefits in the absence of new evidence medical or otherwise.

ii. The plan administrator did not timely respond to Complainant's appeals often times exceeding the forty-five (45) day response time, without informing Complainant of such. These vexatious delays effectively denied Complainant an opportunity to promptly appeal and receive her disability benefits timely, as well as, identify any potential issues related to the denial of her disability. For example the Hartford and or the plan administrator, did not reply until ninety (90) days after one of Complainant's appeals.

iii. The Hartford, the plan administrator acknowledged in October of 2018 that it or its agents failed to contact Complainant's physicians for their input in their decision to terminate/deny Complainant's benefits.

iv. Complainant did not learn of other unlawful acts, such as fraud, that were committed relative to her disability until February of 2019. For example, after filing a complaint with the Illinois Department of Insurance who referred the matter to the Tennessee Department of Insurance Defendants reversed their decision in the absence of any additional information. Complainant also learned that she had been grossly underpaid.

Defendants Kenco, Mars and the Hartford were aware at all relevant times of Complainant's correct benefit amount.

18. Nor does Complainant agree that "Kenco is not a proper Defendant in McCurry's claims alleging disputes involving McCurry's receipt of post-termination benefits."

19. The disability plan(s) were offered as a benefit to Complainant to which she relied upon.

20. This benefit was part of Complainant's employment agreement offered by Kenco Mars.

21. The employment agreement was breached by Defendant(s), when they benefits were terminated without cause.

22. Kenco has been cited to be the Plan Administrator for Complainant's disability benefits.

23. It should also be noted that before litigation commenced both the Hartford and Kenco had both been cited as the Plan Administrator for the disability benefits.

24. Kenco stated that the Hartford managed the disability plans for them.

25. The disability plan was employer funded.

26. A structural conflict exists when an employer funds a disability plan and is the plan administrator.

27. Complainant filed an EEOC charge on April 17, 2018.

28. Complainant filed her OSHA complaint on April 20, 2018. Respondent Exhibit E

29. Defendant Kenco responded to Complainant's EEOC charge in May of 2018 with position statements to the EEOC.

30. Defendant failed to raise any issues relative to the doctrine of Collateral Estoppel. Complainant's case was disposed of in July of 2018.

31. Defendant responded to Complainant's OSHA complaint and failed to raise the issue of Collateral Estoppel.

32. Complainant contends that a matter, this matter, could not be litigated that had yet to occur.

33. Complainant also contends that issues raised under FSMA also follow an administrative prerequisite.

34. Complainant contends that this matter was not realized under any cause of action, as an actionable issue until April of 2018,

35. Complainant also contends that this matter could not have logically sprung forth or reasonably come out of Complainant's other issues before the court.

36. Complainant also asserts that it is with a broad brush that Defendant Kenco asserts that Kenco is not a proper Defendant to post–termination benefits when: 1) the benefits were a part of the contractual agreement between Complainant and Defendants Kenco and Mars; 2) there is a breach of contract; 3) there is breach of fiduciary duty and; 4) there is retaliation for engaging in protected activity relative to whistleblower claims under FSMA 2016-FDA-4 amongst other things.

37. Complainant asserts that claims arising out of a different nucleus of operative facts are actionable against parties who were in privity to an earlier action between the same parties.

38. However, the parties involved in relative to COBRA was US Administration and the party relative to the disability benefits is the Hartford.

39. When analyzing whether a claim is based on the same transaction or occurrence, the courts must be mindful that a claim "arising subsequent to a prior action [is] not barred

by Collateral Estoppel" even if the new claim is "premised on facts representing a

continuance of the same 'course of conduct.'

This is because, as the Supreme Court has directed:

> That both suits involved 'essentially the same course of wrongful conduct' is not
> decisive. Such a course of conduct may frequently give rise to more than a single
> cause of action. While the [prior] judgment precludes recovery on claims arising
> prior to its entry, it cannot be given the effect of extinguishing claims which did
> not even then exist and which could not possibly have been sued upon in the
> previous case. *Lawlor v. Nat'l Screen Serv. Corp., 349 U.S. 322, 327–28, 75*
> *S.Ct. 865, 99 L.Ed. 1122 (1955).*

Additionally, since 1938 The Supreme Court has a "long-settled rule of judicial

administration that no one is entitled to judicial relief for a supposed or threatened injury until

the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding*

*Corp., 303 U.S. 41, 50–51 (1938); McCarthy v. Madigan, 503 U.S. 140, 112 S. Ct. 1081, 117 L.*

*Ed. 2d 291 (1992); Sally v. Hammers, No. 17-1378 (C.D. Ill. May 5, 2018).*

**Defendants Kenco and Mars submitted position statements to OSHA and the EEOC**

Issue exhaustion prior to going to court. "Administrative law does this by requiring

proper exhaustion of administrative remedies, which 'means using all steps that the agency holds

out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Woodford v.*

*Ngo, 548 U.S. 81, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006), Citing  Pozo v. McCaughtry, 286*

*F.3d 1022 (7th Cir. 2002) at 1024 (emphasis in original).*

The classic version of the exhaustion requirement generally necessitates a party to go

through all the stages of an administrative adjudication before going to court.  Both Defendants

Kenco and Mars participated in this process including providing position statements.

This process ensures that the agency action being challenged is the final agency position. It also allows for the resolution of disputes, such as this issue of Collateral Estoppel, before they come to court, thus avoiding potentially unnecessary additions to court dockets.

Defendant Kenco provided its position statement in May of 2018 and Defendant Mars provided their position statement in September of 2018 to EEOC and to OSHA.

The position statements were submitted immediately before and after the dismissal of Complainant's case in July of 2018 by the district court. The position statements raised a number of defenses, but failed to raise Collateral Estoppel as a formable defense in either one. Nor did any of the position statements allude to or suggest implicitly or explicitly that the charges field with the EEOC were in the process of being or had been adjudicated by a court of law. More specifically, the Defendants and their legal counsel were the same in both instances.

Furthermore, the Seventh Circuit has deduced in _Donley v. Stryker Sales Corp.,_ 906 F.3d 635, 638 (7th Cir. 2018) that an employer's EEOC response would not be excluded when offered as an admission of a party opponent. See Fed. R. Evid. 801(d)(2); citing _Starks v. George Court Co.,_ 937 F.2d 311, 314 n.2 (7th Cir. 1991) (using EEOC response as evidence of inconsistencies in employer's reasoning); _E.E.O.C. v. C.G. Schmidt, Inc.,_ 670 F. Supp. 2d 858, 868-69 (E.D. Wis. 2009).

Complainant contends that Defendants argument should be waived as Complainant's allegations are no different today than they were in 2018, when Defendants Kenco and Mars submitted their position statements to OSHA and the EEOC bereft of the affirmative defense of Collateral Estoppel.

## Standard

On a motion for summary decision, (hereafter "MSD") the entire record is considered *See In the Matter of Robert T. Evans v. T-Mobile, USA, Inc.,* ARB. Case No. 15-037, ALJ No. 2012-SOX-036, slip. op. at 7 (ARB Feb. 27, 2017) with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Crawford V. Metro Gov't of Nashville and Davidson County, Tennessee,* 555 U.S. 271, 274 n.129 S. Ct. 846, 172 L.Ed. 2d 650 (2009); *Malen v. MTD Prods., Inc., 628 F.3d 296, 303 (7th Cir. 2010); Stokes v. Board of Educ. of the City of Chicago,* 599 F.3d 617, 619 (7th Cir. 2010).

The party moving for summary judgment carries the initial burden of production to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 978 (7th Cir.1996) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Specifically, the moving party may discharge this burden by "'showing'---that is, pointing out to the court---that there is an absence to support the nonmoving party's case." *Celotex* 477 U.S. at 325.

## ARGUMENT

Defendants did not discharge themselves of the initial burden it bore to identify the basis for seeking summary decision against Complainant. *Costello v. Grundon,* 651 F.3d 614, 635 (7th Cir. 2011); *Logan at* 979. Essentially, the burden of establishing a lack of any genuine issue of material fact rests on the movant. *Ponsetti v. GE Pension Plan,* 614 F.3d 684, 691 (7th Cir. 2010); *Outlaw v. Newkirk,* 259 F.3d 833 (7th Cir. 2001);*Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505,* 91 L. Ed. 2d 202 (1986).

More precisely, the movants in their MSD did not articulate with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact relative to the claims made regarding Complainant's disability benefits, in view of Respondent obtaining information relative to Complainant's medical condition in September of 2018. Well after the matter had been disposed of in July of 2018 and past the time that they alleged to have discharged and obligations to Complainant.

Spuriously, the movants continue to make numerous conclusory statements and mount affirmative defenses devoid of supporting documentation or references to the record to fully discharge themselves of their burden related to the allegations asserted by Complainant.

Respondent points to a deposition of Complainant, but does not provide any meat or substance to support statements taken out of context.

Defendants fail to adequately address issues raised surrounding Complainant's assertions of retaliation under FSMA relative to her long term disability and that defendants did not follow its own policy relative to disability.

a. After McCurry raised issues with the Department of Insurance in Illinois and Tennessee, McCurry's benefits were reinstated after nearly a year and half, in the absence of medical evidence or otherwise in February of 2019.

b. It was also at that time Complainant learned that she had been grossly underpaid and was awarded over $73,000 in back pay.

c. In recent times, in *19 CV 04067* McCurry just learned from the Hartford and its former employer Mars, Inc. that Complainant Kenco was the Plan Administrator.

d. Prior to litigation, the Hartford stated that they were the Plan Administrator for Respondent Kenco.

    e.      Respondent Kenco had always maintained that the Hartford managed their

disability benefits.

    f.      Defendant Kenco participated in a scheme to intentionally withhold and underpay

McCurry's benefits due and owing.

McCurry "specifically refutes facts which allegedly support the employer's claim" *Sirvidas v.*

*Commonwealth Edison Co.,* 60 F.3d 375, 378 (7th Cir.1995). Additionally, *defendants' failure*

*to follow [their] own policies also gives rise to pretext. Rudin v. Lincoln Land Community*

*College,* 420 F.3d 712 (7th Cir. 2005) at 727.

      Additionally, the court of <u>Burlington Northern and Santa Fe Railway Co. v. White, 126</u>

<u>S.Ct. 2405 (2006)</u> held that withholding pay was retaliatory and materially adverse and; would

likely have "dissuaded a reason- able worker from making or supporting a charge of dis-

crimination." *Washington* v. *Illinois Dept. of Revenue,* 420 F. 3d 658, 662 (CA7 2005);

Complainant also contends that post-employment discrimination (retaliation) claims are

actionable according to Supreme Court law. *Robinson v. Shell Oil Co.,* 519 U.S. 337 (1997); *See*

*also Abdullahi v. Prada USA Corp.,* 520 F.3d 710, 712 (7th Cir. 2008). The Supreme Court has

made clear that retaliation can consist of actions outside the workplace, *see Burlington N.*

*and Santa Fe Ry. Co. v. White,* 548 U.S. 53, 63-64, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)

      McCurry raises genuine issues of fact when she identifies the inconsistencies in her

employer's explanation for the adverse action in that the Hartford made the decisions, while

Respondent, Kenco, well after it had allegedly discharged itself of any responsibility or liability

gathered information on Complainant in September of 2018. *Boumehdi v. Plastag Holdings,*

*LLC*, 489 F.3d 781 (7th Cir. 2007); *Gordon v. United Airlines, Inc.*, 246 F.3d 878 (7th Cir. 2001) at 889.

Complainant contends that the timing and termination of her benefits, a post adverse employment decision, was retaliatory because of the protected activity that she engaged in relative to providing written testimony in FSMA matter before the DOL. She also contends that Respondent's inconsistent actions and conduct; such as hiring a 3rd party, the Reed Group-*Exhibit 2*, to seek and obtain information regarding Complainant' medical condition in September of 2018 undermines their contention that they were not a factor in the benefit determination analysis and that they no longer had a fiduciary obligation to Complainant. Complainant also asserts that Respondent misrepresented to Complainant and others, who the Plan Administrator is/was and the roles and responsibilities of the Plan Administrator. This conduct wholeheartedly supports the drawing of an inference that Defendants were involved and motivated by some impermissible reason. *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 673-74 (7th Cir.2009).

Complainant contends that these inconsistent parties, rationale(s) and reason(s) for terminating McCurry's benefits were pretextual; i.e. rejecting the Independent Medical Examiner's opinion and reversing the decision to terminate McCurry's benefit's after almost 2 years in the absence of any new evidence; medical or otherwise. *Patterson v. McLean Credit Union*, 491 U.S. 164, 187-88, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Complainant's discrediting of employer's explanation is entitled to considerable weight, such that Complainant should not be routinely required to submit evidence over and above proof of pretext. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 140, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

"Where an employer's reason for an adverse employment action is without factual basis ..., that is evidence that an employer might be lying about its true motivation," *Hobgood v. Illinois Gaming Board*, 731 F.3d 635, 646 (7th Cir.2013). And, "[W]hen the sincerity of an employer's asserted reasons for an adverse employment decision is cast into doubt, a fact finder may reasonably infer that unlawful discrimination was the true motivation...."*Gordon* at 889

Defendants failed to adequately address the issues raised relative to her disability benefits and that these specific issues before this court had previously been litigated.

Also, Defendants failed to adequately address the issues raised relative to Complainant's allegations of retaliation related to engaging in protected activity related to FSMA; Defendants made conclusory statements in their summary decision that did not underpin that Complainant was not retaliated against for engaging in protected activity relative to a whistleblower case under FSMA before the Department of Labor.

Specifically, to date, Respondent has never denied that Complainant engaged in protected activity under FSMA.

Consequently, Defendants fail to discharge themselves of this burden by not citing specific facts or pointing to the Complainant's initial complaint which identifies that Complainant contends that she engaged in protected activities relative to FSMA. Nor does Defendant cite any authority that refutes participating in a FSMA proceeding as not being engaged in protected activity.

Defendants have created materially undisputable facts due to the conflicting reasons, rationale and supporting documentation that it has and has not offered relative to the claims filed before this court.

Even more precisely, Defendants MSD did not address the specific allegations alleged against them in this matter.

Consequently, the Defendants have failed to articulate with references to the record and to the law, specific reasons why they believe there is no genuine issue of material fact for trial and how they have met the tenants of collateral estoppel and Res Judicata.

*Therefore, defendants' arguments must fail.*

Furthermore, Defendant Kenco failed to even attach any policy or affidavit to support their contentions or refer to any policy or affidavit in the record to support that Hartford was the administrator for the COBRA benefits previously litigated and the current disability benefits in question.

Consequently, Respondent Kenco and the Hartford cannot coexist as the Plan Administrator nor can Respondent Kenco have unfettered access Complainant's medical and payment history without having:1) a fiduciary obligation to Complainant and/or 2) the plan and its administration, including but not limited to a structural conflict and bias decision making.

Consequently, the statements made in Defendants MSD are conclusory and not supported by fact or law.

"An employer's subjective reason for an employment decision may be reasonably viewed as a pretext for discrimination." *Simpson v. Beaver Dam Community Hospitals, Inc.*, 780 F.3d 784 (7th Cir. 2015)

Complainant again asserts, contends and renews her position that the Respondent Kenco and its employer Mars, Inc. contrived to violate Complainant's protected rights in retaliation and

in harassment for Complainant's engagement in protected activities relative to FSMA amongst other things.

Conclusively, Complainant contends that she has come forward with appropriate evidence demonstrating that there are pending disputes of material fact." *Payne v Pauley*, 337 F.3d 767 (7th Circuit 2003) at 771 citing *Waldridge v. American Hoechst Corp.*, 24 F.3d 918 (7th Cir. 1994) at 921. Complainant also has attached the certificate of service for the objection field in July of 2019 and an affidavit.

Additionally, McCurry prays, that after this Honorable Court reviews this matter de novo applying the standard of summary decision that "all reasonable inferences drawn from the underlying facts will be viewed and resolved in a light most favorable to McCurry (*Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir.1998)) and; that this honorable court will:1) Deny Respondent's motion and; 2) that judicial notice be taken of Defendants inconsistent positions taken at various governmental agencies, tribunals and with this court and; 3) that defendants have intentionally made materially false and misleading statements and; 4) that Defendants actions of providing false and misleading information and documents has been obstructive to the administration of justice and; 5) that Defendants acted in "bad faith" and any other relief that this court deems appropriate under the circumstances.

Respectfully Submitted:        September 30, 2020

By: **EDITH MCCURRY**
6239 S. 13110 East Rd.,
Pembroke, IL 60958
Email: remcurry@aol.com

## CERTIFICATE OF SERVICE

I, Edith McCurry, hereby certifies that on September 30, 2020 I submitted a copy of a Complainant's Response to Respondent's Motion for Summary Decision by ***Email and U.S. Mail***:

U.S. Department of Labor Office of Administrative Law Judges

Attention: Administrative Law Judge Stephen R. Henley

800 K. Street, NW

Washington, DC 20001-8002

Email: kaercher.Alyssa.J@dol.gov; oliverio.melina.t@dol.gov

Facsimile: (202) 693-7365

A copy was also sent via electronic mail and U.S. Mail to:

Jackson Lewis PC.

150 North Michigan Avenue

Suite 2500

Chicago, Illinois 60601

Attn: Jody Wilner Moran; Julia Pearce Argentieri

Julia.Argentieri@jacksonlewis.com;

Jody.Moran@jacksonlewis.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

**Exhibit D**

EDITH MCCURRY,                                )
                                             )
                   Plaintiff,                )
         v.                                  )   Case No. 1:19-CV-04067
                                             )
MARS, KENCO LOGISTICS SERVICES,              )   Hon. Judge Sharon Johnson
LLC, THE HARTFORD FINANCIAL                  )   Coleman
SERVICES GROUP, INC., THE REED               )
GROUP, and DR. KOEHLER,                      )   Mag. Judge Gabriel A. Fuentes
                                             )
                   Defendants.               )

### DEFENDANT KENCO LOGISTIC SERVICES, LLC'S
### CERTIFICATE OF COMPLIANCE

Pursuant to Magistrate Judge Fuentes' April 23, 2021 Minute Entry (ECF No. 129),

Defendant Kenco Logistic Services, LLC ("Kenco") hereby certifies that no additional documents

responsive to Plaintiff's Requests for Production Nos. 22, 34, 55, and 71 are known to be in

Kenco's possession, other than the documents already produced by Kenco. Kenco makes this

certification after a reasonable search.

Dated: May 7, 2021                           Respectfully submitted,

                                     By:     **KENCO LOGISTIC SERVICES, LLC**

                                             */s/ Jody Wilner Moran*
                                             Jody Wilner Moran
                                             Julia Pierce Argentieri
                                             J. Casey Leech
                                             Jackson Lewis P.C.
                                             150 North Michigan Avenue #2500
                                             Chicago, IL 60601
                                             (312) 787-4949
                                             Jody.Moran@jacksonlewis.com
                                             Julia.Argentieri@jacksonlewis.com
                                             Casey.Leech@jacksonlewis.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 7, 2021, she caused a true and correct copy

of the foregoing **DEFENDANT KENCO LOGISTIC SERVICES, LLC'S CERTIFICATE OF**

**COMPLIANCE** to be served by email and first class mail delivery to:

Edith McCurry
6239 South 13110 East Road
Pembroke Township, IL 60958
EMcCurry1@gmail.com

By: */s/ Jody Wilner Moran*

**Exhibit E**

**U. S. DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

In the Matter of:                                    )
                                                     )
EDITH MCCURRY,                                       )         OALJ Case No.: 2019-FDA-00015
                                                     )
          Complainant,                               )         OSHA Case No.: 5-1260-18-107
                                                     )
     v.                                              )
                                                     )
KENCO LOGISTICS SERVICES, LLC,                       )
                                                     )
          Respondent.                                )

**RESPONDENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION**
**FOR SUMMARY DECISION**

On June 16, 2021, Chief Administrative Law Judge Stephen R. Henley issued a Briefing

Order on Remand, in which he ordered Respondent, Kenco Logistic Services, LLC to supplement

its Motion for Summary Decision on the issue of whether Complainant Edith McCurry's protected

activity was a contributing factor in the denial of her long-term disability benefits. Kenco submits

the following supplemental memorandum to address this discrete issue, in further support of its

request that the Office of Administrative Law Judges dismiss McCurry's Complaint with

prejudice:

**INTRODUCTION**

McCurry alleges whistleblower retaliation in violation of the Food Safety Modernization

Act ("FSMA"), specifically, that she testified in a whistleblower case involving FSMA violations

made by another Kenco employee, and that Kenco allegedly responded by denying her long-term

disability benefits. *See Decision and Order Granting Respondent's Motion for Summary Decision,*

*at 1, Nov. 2, 2020.*[1]

On September 4, 2019, Kenco filed its Motion for Summary Decision, arguing, in part, that collateral estoppel barred McCurry's FSMA claim because federal courts previously ruled that Kenco did not make the decisions surrounding her long-term disability benefits and that Kenco was not a proper defendant in that federal litigation. On November 2, 2020, Judge Henley granted Kenco's Motion for Summary Decision, not based on the procedural arguments raised in Kenco's motion, but based on a finding that the evidence in the record did not create a genuine issue of material fact as to whether McCurry's alleged protected activity was or could have been a contributing factor in any adverse action. *Id.* at 9.

After McCurry appealed the grant of Kenco's Motion for Summary Decision, on April 30, 2021, the Administrative Review Board issued its Order Vacating and Remanding, finding that this tribunal should have apprised the parties of the alternate basis on which Judge Henley's decision was based. *See Briefing Order on Remand, at 3, June 16, 2021.* Now the parties have been provided the opportunity to brief the narrow issue of whether there is any evidence to support the claim that McCurry's alleged protected activity was a contributing factor in the denial of her long-term disability benefits.[2]

### UNDISPUTED MATERIAL FACTS RELATED TO MCCURRY'S LONG-TERM DISABILITY BENEFITS

1.     During the time period of 2013–2015 Kenco offered short- and long-term disability benefits to its employees through its third-party benefits administrator, The Hartford. *See Exhibit*

---

[1] Although not relevant for the purposes of this supplemental memorandum, Kenco does not concede that McCurry engaged in protected activity under the FSMA, or that she suffered an adverse action. Indeed, Kenco did not make the decisions surrounding McCurry's disability benefits and the alleged delay in her disability benefits does not qualify as an adverse action since ultimately, nothing adverse occurred.

[2] Kenco reasserts and incorporates here its arguments contained in its Motion for Summary Decision.

1, *Decl. of Cathy Phillips, July 12, 2021,* ¶ 5.

2.     As stated in the long-term disability benefits policy in effect when The Hartford served as Kenco's third-party benefits administrator, The Hartford was granted the **sole** discretion to make all determinations regarding benefits. *Id.* at ¶ 7. Specifically, the long-term disability benefits policy states, "[t]he Plan has designated and named **the Insurance Company** as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company **full discretion and authority** to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." *Id. (emphasis added).*

3.     Kenco's Leave of Absence Policy in effect during 2015 states that Kenco's employees "are responsible for contacting The Harford to file a claim for FMLA, disability leaves, and all work-related injury absences." *Id.* at ¶ 8. If a Kenco employee was unable to work due to ongoing medical reasons, the employee was instructed to contact The Hartford. *Id.* at ¶ 9.

4.     When The Hartford served as Kenco's third-party benefits administrator, The Harford worked with Kenco employees and their medical providers to obtain the necessary medical information and approve time off under the Family and Medical Leave Act, in addition to short- and long-term disability benefits. *Id.* at ¶ 10. When an employee filed a claim for disability benefits, Kenco received notice of the claim from The Hartford, in addition to notice regarding whether the claim was approved (and if so, for what time period). *Id.* at ¶ 11. Kenco never requested or received medical information provided to The Hartford by an employee or an employee's medical provider, in connection with a claim for disability benefits. *Id.* at ¶ 12.

5.     Kenco could not, and did not, provide any input regarding The Hartford's decision regarding whether to approve or deny any employee's claim for disability benefits. *Id.* at ¶ 13. Whether an employee's claim for disability benefits was approved or denied was a decision made

solely by The Hartford based on information provided directly by the employee or by his or her medical provider. *Id.* at ¶ 14.

6.     If The Hartford approved disability benefits for a Kenco employee, disability benefits were paid by The Hartford and Kenco was not responsible for such costs. *Id.* at ¶ 15. During the time that Kenco utilized The Hartford as its third-party benefits administrator, Kenco played no role in any decisions regarding disability benefits. *Id.* at ¶ 16.

7.     Kenco received several letters from The Hartford regarding the status of McCurry's claim for disability benefits. *Id.* at ¶ 17.

8.     Kenco did not have any involvement in any decisions related to McCurry's claims submitted to The Hartford for disability benefits. *Id.* at ¶ 19.

9.     Consistent with Kenco's standard practices, Kenco never informed The Hartford that McCurry participated in a whistleblower case involving FSMA violations, nor did Kenco inform The Hartford that McCurry otherwise engaged in any protected activity under the FSMA. *Id.* at ¶ 18.

## ARGUMENT

McCurry has failed to present any evidence to establish that her alleged protected activity in any way contributed to her alleged adverse employment action. All decisions related to McCurry's disability benefits were made by The Hartford, without any input from Kenco, and there is no evidence that anyone at The Hartford had knowledge that McCurry provided testimony in an FSMA retaliation proceeding or otherwise engaged in an activity protected by the FSMA.

### I.     Summary Decision Standard

An administrative law judge may issue a summary decision if the pleadings, affidavits, and other evidence or "matters officially noticed" show that there is no genuine issue of any material

4

fact and the moving party is entitled to prevail as a matter of law. *See In the Matter of: Robert T. Evans v. T-Mobile, USA, Inc.,* ARB. Case No. 15-037, ALJ No. 2012-SOX-036, slip. op. at 7 (ARB Feb. 27, 2017).

**II.     McCurry's Retaliation Claim Fails Because Kenco Did Not Make Any Decisions Surrounding Her Disability Benefits and Did Not Inform The Hartford that McCurry Engaged in Any Protected Activity.**

To state a *prima facie* case for retaliation under the Food Safety Modernization Act, McCurry must establish that: (1) she engaged in protected activity under the FSMA; (2) Kenco was aware she engaged in a protected activity; (3) Kenco took an adverse action, or an action that would dissuade a reasonable worker from exercising rights, against her; and (4) the protected activity was a contributing factor in the adverse action. *Patricia Hindsman v. Delta Air Lines, Inc.,* ARB Case No. 09-023, ALJ Case No. 2008-AIR-013, slip. op. 9 (ARB. June 30, 2010); *Chase v. Bros. Int'l Food Corp.*, 3 F. Supp. 3d 49, **9 (W.D.N.Y. 2014) (discussing elements in context of an FSMA claim). A determination that a violation has occurred may be made only if the complainant has demonstrated by a preponderance of the evidence that the protected activity was a contributing factor in the adverse action alleged in the complaint. 29 C.F.R. § 1987.109(a). Further, even if that burden is satisfied, relief may not be ordered if the respondent demonstrates by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected activity. 29 C.F.R. § 1987.109(b).

McCurry cannot establish a claim of retaliation under the FSMA because there is no evidence that her alleged protected activity was a contributing factor in The Hartford's temporary denial of her long-term disability benefits (which were subsequently approved in full). All factual evidence in the record demonstrates that The Hartford administered Kenco's employee disability benefits and that The Hartford, without any input from Kenco, made all decisions related to McCurry's disability benefits claims.

5

McCurry must prove by a preponderance of evidence that her protected activity was a "contributing factor" in the denial of her claim for long term disability benefits. *See Horton Elaine v. Crossmark, Inc.*, No. 2014-FDA-00004 (ALJ June 8, 2015). "[A] contributing factor is any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Id. (citations and internal quotation marks omitted)*. McCurry relies on nothing but pure speculation to support her claim that her alleged protected activity caused her alleged adverse action. Because she is unable to rely on evidence in the record to support the causation element of her retaliation claim, her claim fails. *See Walter Abbs v. Con-Way Freight, Inc.*, ARB. No. 2012-016, ALJ No. 2007-STA-037, slip. op. at 5-6 (ARB. Oct. 17, 2012) (affirming grant of summary decision based on lack of causation where evidentiary record established no evidence of a link between protected activity and adverse action); *Budri v. Firstfleet, Inc.*, ARB. No. 2018-025, ALJ No. 2017-STA-086, slip. op. 2-3 (ARB. June 19, 2018) (summarily affirming ALJ grant of summary decision where the complainant could not satisfy element of causation because he failed to show that protected activities contributed to the adverse action).

It is settled law that any inference of a causal link between a complainant's protected activity and her subsequent adverse action may be broken by an intervening event or, alternatively, by lack of knowledge of the protected activity by the decision-maker. For example, in a case factually analogous to this one, *Durham v. Tennessee Valley Auth.*, the complainant was denied disability retirement by the Tennessee Valley Authority Retirement System ("TVARS"), a "a legal entity separate and distinct from" complainant's employer, Tennessee Valley Authority ("TVA"). *Durham v. Tennessee Valley Auth.*, 2006-CAA-3, at 5 (ALJ Feb. 13, 2006). The complainant alleged that she was denied disability retirement in retaliation for engaging in protected activity under several statutes. In granting TVA's motion for summary decision, the OALJ found that

6

"none of the TVARS Board members that participated in the decision knew of Complainant or of his asserted protected activity" and that therefore, TVA "did not subject Complainant to the alleged adverse action." *Id.*

Similarly, in *Michael Ben Graves v. MV Transportation, Inc.*, the complainant alleged that he was denied workers' compensation benefits in retaliation for engaging in protected activity under the National Transit Systems Security Act. *Michael Ben Graves v. MV Transportation, Inc.,, et al.*, Case No. 2014-NTS-00001 (ALJ Sept. 10, 2014). In dismissing the complainant's retaliation claim, the OALJ found that the workers' compensation administrator had no knowledge of the complainant's protected activity and that there was no evidence that the workers' compensation administrator and the respondent colluded to deny the complainant's benefits. *Id.* at 11–12. In *Laverne B. Kelly-Lusk v. Delta Airlines, Inc.*, Case No. 2014-TSC-00003 (Feb. 17, 2016), the complainant alleged that a delay in the issuance of her retirement checks was in retaliation for her making complaints to her employer, Delta Airlines, about accidentally drinking methanol at work. In granting Delta's motion for summary decision, the OALJ found there was no evidence as to how the pension administration or "anyone involved in issuing her pension checks would have any knowledge about any of her communications about the ice tea incident" and that therefore, the adverse action had "no nexus to any protected activity." *Id.* at 8–9. *See also Dominick Valenti v. Shintech, Inc.*, Case No. 2010-CAA-00008, (March 14, 2011) (dismissing whistleblower claims where there was no evidence that the person who made the decision to terminate the complainant's employment had any knowledge of the complainant's complaints of environmental concerns).

McCurry claims that she was retaliated against, based on a decision by The Hartford to reduce her disability benefits, due to The Hartford's finding that she was capable of working 20

hours per week.[3]

McCurry has acknowledged that The Harford was the administrator for her disability benefits. *See Complainant's Response Opposing Respondent's Motion for Summary Decision, Sep. 30, 2020.* Her claim is doomed because she cannot cite to any evidence that Kenco was involved in the decisions surrounding her long-term disability benefits, and all undisputed evidence in the record demonstrates that such a decision was made solely by The Hartford. Indeed, the record evidence reflects that (1) Kenco did not provide any input into The Hartford's decision whether to approve or deny any employee's claim for disability benefits, including McCurry's; (2) the decision to approve or deny disability benefits is made solely by The Hartford based on information provided directly by the employee or his or her medical provider, and (3) Kenco did not have any involvement in any decisions related to McCurry's claims submitted to The Hartford for disability benefits. *Exhibit 1 at ¶¶ 7, 13–16, 19.* The evidence demonstrates that Kenco never informed The Hartford that McCurry participated in a whistleblower case involving FSMA violations, nor did Kenco inform The Hartford that McCurry otherwise engaged in any protected activity under the FSMA. *Id.* at ¶ 18.

McCurry's own unsupported assertions that she *believes* Kenco influenced the decisions surrounding her disability benefits are insufficient to establish causation, particularly in the face of all evidence to the contrary demonstrating that the decision came solely from The Hartford. *See Boegh v. Energy Solutions, Inc.,* (W.D.Ky. May 3, 2012) (case below ALJ No. 2006-ERA-26) (the complainant "presented no evidence, other than speculations and conspiratorial … theories, to show that [the individual making the adverse action decision] knew of [the] protected activities or

---

[3] The Hartford later reversed this determination, and McCurry was retroactively paid all benefits at an adjusted rate to compensate for any prior underpayments. (*See Order Granting Summary Decision at p.4).*

was influenced by others with knowledge of his protected activities"); *Hasan v. Enercon Services, Inc.*, 2003-ERA-31 (ARB May 18, 2005) (managers swore they had no knowledge of the complainant's previous whistleblower activities when they made the decision not to hire him and complainant's only response to the motion was speculation that the respondent had not hired him because "some background check" must have disclosed his earlier whistleblower activities or that the affiants must have committed perjury).

There no evidence that Kenco influenced or had any role in The Hartford's decisions regarding McCurry's disability benefits, and there is no evidence that Kenco informed The Hartford about McCurry's participation in the other FSMA case. Because it is impossible for Kenco to have retaliated against McCurry since it did not influence The Hartford's decisions regarding McCurry's disability claims—and since it is likewise impossible for The Hartford to have retaliated against McCurry since it had no knowledge of her alleged protected activity— McCurry's alleged protected activity could not have been a contributing factor in the denial of her long-term disability benefits.

## CONCLUSION

For all the reasons stated herein (and in Kenco's Motion for Summary Decision), Kenco requests that its motion for a summary decision in accordance with 29 CFR §18.72 be granted, that Kenco be awarded attorneys' fees for having to respond to McCurry's frivolous claim, and that this matter be dismissed with prejudice.

Dated: July 16, 2021               Respectfully submitted,

**KENCO LOGISTIC SERVICES, LLC**

*/s/ Jody Wilner Moran*
One of its Attorneys

9

Jody Wilner Moran
Julia Pearce Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue, Suite 2500
Chicago, Illinois 60601
Telephone: (312) 787-4949
Facsimile: (312)787-4995
jody.moran@jacksonlewis.com
julia.argentieri@jacksonlewis.com

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on July 16, 2021, she caused to be submitted a copy of the foregoing *Respondent Kenco Logistic Services, LLC's Supplemental Memorandum in Support of Its Motion for a Summary Decision* via email to:

> U.S. Department of Labor, Office of Administrative Law Judges
> Attention: Administrative Law Judge Stephen R. Henley
> OALJ-Headquarters-DC@dol.gov

A copy was also sent via email and U.S. mail to:

> Edith McCurry
> 6239 South 13110 East Road
> Pembroke Township, IL 60958
> emccurry1@gmail.com

> By: */s/ Jody Wilner Moran*
> One of Respondent's Attorneys

**Exhibit F**

**U. S. DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

| | | |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| EDITH MCCURRY, | ) | OALJ Case No.: 2019-FDA-00015 |
| | ) | |
| Complainant, | ) | OSHA Case No.: 5-1260-18-107 |
| | ) | |
| v. | ) | |
| | ) | |
| KENCO LOGISTICS SERVICES, LLC, | ) | |
| | ) | |
| Respondent. | ) | |

## DECLARATION OF CATHY PHILLIPS

I, Cathy Phillips, am over the age of 18 years and am otherwise competent to give sworn testimony regarding the matters contained in this Declaration. I attest as follows based on my personal knowledge and after conducting a diligent inquiry:

1.      I am a Senior Benefits Manager for Kenco Management Services LLC, a corporate affiliate of Kenco Logistic Services, LLC (collectively, "Kenco").

2.      I have been employed by Kenco for approximately 10 years.

3.      In my role, I oversee the benefits for all Kenco employees, including employees of Kenco Logistic Services, LLC.

4.      I am familiar with Kenco's process for how employee disability claims are handed by our insurance company, and I am also familiar with Kenco's process for retaining records of benefits information received from the insurance company upon making a decision to grant/deny disability benefits.

5.      During the time period of 2013–2015 Kenco offered short- and long-term disability benefits to its employees through its third-party benefits administrator, The Hartford.

1

6.     A copy of the long term disability benefits policy in effect during that time period is attached as Exhibit A.[1]

7.     The policy grants the Harford sole discretion to make all determinations regarding benefits. Specifically, the policy states, "[t]he Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." *See* Ex. A at KENCO000086.

8.     Attached as Exhibit B is a true and correct copy of Kenco's Leave of Absence Policy in effect beginning on February 15, 2015. As stated in the policy, Kenco employees "are responsible for contacting The Harford to file a claim for FMLA, disability leaves, and all work related injury absences." *See* Ex. B at KENCO 000294).

9.     When The Hartford served as Kenco's third-party benefits administrator, if a Kenco employee was unable to work due to ongoing medical reasons, the employee was instructed to contact The Hartford.

10.     The Harford worked with Kenco employees and their medical providers to obtain the necessary medical information and approve time off under Family and Medical Leave Act, in addition to short- and long-term disability benefits.

11.     Kenco received notice from The Hartford when an employee filed a claim for disability benefits. Kenco also received notice regarding the status of the employee's claim, including whether it was approved or denied, and if approved, for what time period.

12.     If medical information was submitted to The Hartford by an employee or the

---

[1] All documents attached to this Declaration have previously been produced to Edith McCurry, including in the federal lawsuit between McCurry and Kenco Logistic Services, LLC, *McCurry v. Kenco Logistics Services, LLC*, Case No. 19-cv-04067, pending in the U.S. District Court for the Northern District of Illinois.

employee's medical provider in connection with the employee's claim for disability benefits, Kenco did not receive the medical information provided to The Hartford.

13.    Kenco could not, and did not, provide any input regarding The Hartford's decision regarding whether to approve or deny disability benefits.

14.    Decisions to approve or deny disability benefits were made solely by The Hartford based on information provided directly by the employee or the employee's medical provider.

15.    If The Hartford approved disability benefits for a Kenco employee, disability benefits were paid by The Hartford and Kenco was not responsible for such costs.

16.    When Kenco utilized The Hartford as its third-party benefits administrator, Kenco played no role in any decisions regarding disability benefits.

17.    Attached as Exhibit C are true and correct copies of letters Kenco received from The Hartford regarding the status of Edith McCurry's claim for disability benefits.

18.    Consistent with Kenco's standard practices, Kenco never informed The Hartford that Ms. McCurry participated in a whistleblower case involving violations of the Food Safety Modernization Act ("FSMA"), nor did Kenco inform The Hartford that Ms. McCurry otherwise engaged in any protected activity under the FSMA.

19.    Kenco did not have any involvement in any decisions related to Ms. McCurry's claims submitted to The Hartford for disability benefits.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: July 12 , 2021

_Cathy Phillips_
CATHY PHILLIPS

**Exhibit G**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

Edith McCurry,

         Plaintiff

      v.

Mars, Kenco Logistics Services, LLC, The
Hartford Financial Services Group, Inc., The
Reed Group and Dr. Koehler,

         Defendants.

Case No. 19-CV-04067

Judge Sharon Johnson Coleman
Magistrate Judge Gabriel A. Fuentes

**DECLARATION OF CATHY PHILLIPS**

I, Cathy Phillips, am over the age of 18 years and am otherwise competent to give sworn testimony regarding the matters contained in this Declaration. I attest as follows based on my personal knowledge and after conducting a diligent inquiry:

1.     I am a Senior Benefits Manager for Kenco Management Services LLC, a corporate affiliate of Kenco Logistic Services, LLC (collectively, "Kenco").

2.     I have been employed by Kenco for approximately 10 years.

3.     In my role, I oversee the benefits for all Kenco employees, including employees of Kenco Logistic Services, LLC.

4.     During the time period of 2013–2015 Kenco offered short- and long-term disability benefits to its employees through its third-party benefits administrator, The Hartford.

5.     I am aware of the documents produced by Kenco to Edith McCurry in the above-referenced action, including the plan documents relative to the short- and long-term disability benefits plan in effect during McCurry's employment with Kenco Logistic Services, LLC.

6.     As of the date I executed this Declaration, Kenco does not possess any additional plan documents relative to the short- and long-term disability benefits plans in effect during

1

McCurry's employment, other than what Kenco has already produced to McCurry.

7.     Kenco has conducted a comprehensive search of the documents in its possession,

it has produced all documents comprising the short- and long-term disability benefits plan in effect

during McCurry's employment with Kenco, and it has complied with the Court's April 23, 2021

Order to supplement McCurry's Document Request Nos. 22, 34, 55, and 71.


Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true
and correct.


Date: July 12, 2021                                    *Cathy Phillips*
                                                        CATHY PHILLIPS

2

**Exhibit H**

**U. S. DEPARTMENT OF LABOR**

**OFFICE OF ADMINISTRATIVE LAW JUDGES**

In the Matter of:

EDITH MCCURRY,                                       OALJ Case No.: 2019-FDA-00015

     Complainant,                                  OSHA Case No.: 5-1260-18-107

     v.

KENCO LOGISTICS SERVICES, LLC,

     Respondent.


## COMPLAINANT'S RESPONSE TO RESPONDENT'S JULY 16, 2021 NEWLY RAISED ARGUMENT AND MOTION FOR SANCTIONS


### Factual Background

On April 20, 2018, Complainant filed an online whistleblower complaint against Mars, Inc. and Kenco Logistics under the Food Safety and Modernization Act, "herein after FSMA" for a series of adverse actions beginning in 2013 to the most recent of December 26, 2017 to the date of filing the April 2018 whistleblower complaint. An adverse decision was entered on May 3, 2019 against Complainant dismissing her complaint. Complainant timely filed an objection with the Department of Labor "herein after DOL";

On September 4, 2019, Respondent filed a Motion for Summary Decision. Respondent only identified as its basis for Summary Decision two (2) questions of law relative to Jurisdiction and Collateral Estoppel. Respondent also asked for sanctions against Petitioner-Complainant. Respondent's Motion for Summary Decision-*Exhibit 1* "herein after"(Rp.MSD) & Complainant's ARB Reply Brief-*Exhibit 2* "herein after" (ARB-Cp.RB pg.1);

**Exhibit E**

**U. S. DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

In the Matter of: )
)
EDITH MCCURRY, )          OALJ Case No.: 2019-FDA-00015
)
    Complainant, )          OSHA Case No.: 5-1260-18-107
)
    v. )
)
KENCO LOGISTICS SERVICES, LLC, )
)
    Respondent. )

**RESPONDENT'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF ITS MOTION**
**FOR SUMMARY DECISION**

On June 16, 2021, Chief Administrative Law Judge Stephen R. Henley issued a Briefing

Order on Remand, in which he ordered Respondent, Kenco Logistic Services, LLC to supplement

its Motion for Summary Decision on the issue of whether Complainant Edith McCurry's protected

activity was a contributing factor in the denial of her long-term disability benefits. Kenco submits

the following supplemental memorandum to address this discrete issue, in further support of its

request that the Office of Administrative Law Judges dismiss McCurry's Complaint with

prejudice:

**INTRODUCTION**

McCurry alleges whistleblower retaliation in violation of the Food Safety Modernization

Act ("FSMA"), specifically, that she testified in a whistleblower case involving FSMA violations

made by another Kenco employee, and that Kenco allegedly responded by denying her long-term

disability benefits. *See Decision and Order Granting Respondent's Motion for Summary Decision,*

*at 1, Nov. 2, 2020.*[1]

On September 4, 2019, Kenco filed its Motion for Summary Decision, arguing, in part, that collateral estoppel barred McCurry's FSMA claim because federal courts previously ruled that Kenco did not make the decisions surrounding her long-term disability benefits and that Kenco was not a proper defendant in that federal litigation. On November 2, 2020, Judge Henley granted Kenco's Motion for Summary Decision, not based on the procedural arguments raised in Kenco's motion, but based on a finding that the evidence in the record did not create a genuine issue of material fact as to whether McCurry's alleged protected activity was or could have been a contributing factor in any adverse action. *Id.* at 9.

After McCurry appealed the grant of Kenco's Motion for Summary Decision, on April 30, 2021, the Administrative Review Board issued its Order Vacating and Remanding, finding that this tribunal should have apprised the parties of the alternate basis on which Judge Henley's decision was based. *See Briefing Order on Remand, at 3, June 16, 2021.* Now the parties have been provided the opportunity to brief the narrow issue of whether there is any evidence to support the claim that McCurry's alleged protected activity was a contributing factor in the denial of her long-term disability benefits.[2]

### UNDISPUTED MATERIAL FACTS RELATED TO MCCURRY'S LONG-TERM DISABILITY BENEFITS

1. During the time period of 2013–2015 Kenco offered short- and long-term disability benefits to its employees through its third-party benefits administrator, The Hartford. *See Exhibit*

---

[1] Although not relevant for the purposes of this supplemental memorandum, Kenco does not concede that McCurry engaged in protected activity under the FSMA, or that she suffered an adverse action. Indeed, Kenco did not make the decisions surrounding McCurry's disability benefits and the alleged delay in her disability benefits does not qualify as an adverse action since ultimately, nothing adverse occurred.

[2] Kenco reasserts and incorporates here its arguments contained in its Motion for Summary Decision.

*1, Decl. of Cathy Phillips, July 12, 2021, ¶ 5.*

2.      As stated in the long-term disability benefits policy in effect when The Hartford served as Kenco's third-party benefits administrator, The Hartford was granted the **sole** discretion to make all determinations regarding benefits. *Id.* at ¶ 7. Specifically, the long-term disability benefits policy states, "[t]he Plan has designated and named **the Insurance Company** as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company **full discretion and authority** to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." *Id. (emphasis added).*

3.      Kenco's Leave of Absence Policy in effect during 2015 states that Kenco's employees "are responsible for contacting The Harford to file a claim for FMLA, disability leaves, and all work-related injury absences." *Id.* at ¶ 8. If a Kenco employee was unable to work due to ongoing medical reasons, the employee was instructed to contact The Hartford. *Id.* at ¶ 9.

4.      When The Hartford served as Kenco's third-party benefits administrator, The Harford worked with Kenco employees and their medical providers to obtain the necessary medical information and approve time off under the Family and Medical Leave Act, in addition to short- and long-term disability benefits. *Id.* at ¶ 10. When an employee filed a claim for disability benefits, Kenco received notice of the claim from The Hartford, in addition to notice regarding whether the claim was approved (and if so, for what time period). *Id.* at ¶ 11. Kenco never requested or received medical information provided to The Hartford by an employee or an employee's medical provider, in connection with a claim for disability benefits. *Id.* at ¶ 12.

5.      Kenco could not, and did not, provide any input regarding The Hartford's decision regarding whether to approve or deny any employee's claim for disability benefits. *Id.* at ¶ 13. Whether an employee's claim for disability benefits was approved or denied was a decision made

solely by The Hartford based on information provided directly by the employee or by his or her medical provider. *Id.* at ¶ 14.

6.     If The Hartford approved disability benefits for a Kenco employee, disability benefits were paid by The Hartford and Kenco was not responsible for such costs. *Id.* at ¶ 15. During the time that Kenco utilized The Hartford as its third-party benefits administrator, Kenco played no role in any decisions regarding disability benefits. *Id.* at ¶ 16.

7.     Kenco received several letters from The Hartford regarding the status of McCurry's claim for disability benefits. *Id.* at ¶ 17.

8.     Kenco did not have any involvement in any decisions related to McCurry's claims submitted to The Hartford for disability benefits. *Id.* at ¶ 19.

9.     Consistent with Kenco's standard practices, Kenco never informed The Hartford that McCurry participated in a whistleblower case involving FSMA violations, nor did Kenco inform The Hartford that McCurry otherwise engaged in any protected activity under the FSMA. *Id.* at ¶ 18.

## ARGUMENT

McCurry has failed to present any evidence to establish that her alleged protected activity in any way contributed to her alleged adverse employment action. All decisions related to McCurry's disability benefits were made by The Hartford, without any input from Kenco, and there is no evidence that anyone at The Hartford had knowledge that McCurry provided testimony in an FSMA retaliation proceeding or otherwise engaged in an activity protected by the FSMA.

### I.     Summary Decision Standard

An administrative law judge may issue a summary decision if the pleadings, affidavits, and other evidence or "matters officially noticed" show that there is no genuine issue of any material

fact and the moving party is entitled to prevail as a matter of law. *See In the Matter of: Robert T. Evans v. T-Mobile, USA, Inc.*, ARB. Case No. 15-037, ALJ No. 2012-SOX-036, slip. op. at 7 (ARB Feb. 27, 2017).

## II. McCurry's Retaliation Claim Fails Because Kenco Did Not Make Any Decisions Surrounding Her Disability Benefits and Did Not Inform The Hartford that McCurry Engaged in Any Protected Activity.

To state a *prima facie* case for retaliation under the Food Safety Modernization Act, McCurry must establish that: (1) she engaged in protected activity under the FSMA; (2) Kenco was aware she engaged in a protected activity; (3) Kenco took an adverse action, or an action that would dissuade a reasonable worker from exercising rights, against her; and (4) the protected activity was a contributing factor in the adverse action. *Patricia Hindsman v. Delta Air Lines, Inc.*, ARB Case No. 09-023, ALJ Case No. 2008-AIR-013, slip. op. 9 (ARB. June 30, 2010); *Chase v. Bros. Int'l Food Corp.*, 3 F. Supp. 3d 49, **9 (W.D.N.Y. 2014) (discussing elements in context of an FSMA claim). A determination that a violation has occurred may be made only if the complainant has demonstrated by a preponderance of the evidence that the protected activity was a contributing factor in the adverse action alleged in the complaint. 29 C.F.R. § 1987.109(a). Further, even if that burden is satisfied, relief may not be ordered if the respondent demonstrates by clear and convincing evidence that it would have taken the same adverse action in the absence of any protected activity. 29 C.F.R. § 1987.109(b).

McCurry cannot establish a claim of retaliation under the FSMA because there is no evidence that her alleged protected activity was a contributing factor in The Hartford's temporary denial of her long-term disability benefits (which were subsequently approved in full). All factual evidence in the record demonstrates that The Hartford administered Kenco's employee disability benefits and that The Hartford, without any input from Kenco, made all decisions related to McCurry's disability benefits claims.

5

McCurry must prove by a preponderance of evidence that her protected activity was a "contributing factor" in the denial of her claim for long term disability benefits. *See Horton Elaine v. Crossmark, Inc.*, No. 2014-FDA-00004 (ALJ June 8, 2015). "[A] contributing factor is any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Id. (citations and internal quotation marks omitted).* McCurry relies on nothing but pure speculation to support her claim that her alleged protected activity caused her alleged adverse action. Because she is unable to rely on evidence in the record to support the causation element of her retaliation claim, her claim fails. *See Walter Abbs v. Con-Way Freight, Inc.*, ARB. No. 2012-016, ALJ No. 2007-STA-037, slip. op. at 5-6 (ARB. Oct. 17, 2012) (affirming grant of summary decision based on lack of causation where evidentiary record established no evidence of a link between protected activity and adverse action); *Budri v. Firstfleet, Inc.*, ARB. No. 2018-025, ALJ No. 2017-STA-086, slip. op. 2-3 (ARB. June 19, 2018) (summarily affirming ALJ grant of summary decision where the complainant could not satisfy element of causation because he failed to show that protected activities contributed to the adverse action).

It is settled law that any inference of a causal link between a complainant's protected activity and her subsequent adverse action may be broken by an intervening event or, alternatively, by lack of knowledge of the protected activity by the decision-maker. For example, in a case factually analogous to this one, *Durham v. Tennessee Valley Auth.*, the complainant was denied disability retirement by the Tennessee Valley Authority Retirement System ("TVARS"), a "a legal entity separate and distinct from" complainant's employer, Tennessee Valley Authority ("TVA"). *Durham v. Tennessee Valley Auth.*, 2006-CAA-3, at 5 (ALJ Feb. 13, 2006). The complainant alleged that she was denied disability retirement in retaliation for engaging in protected activity under several statutes. In granting TVA's motion for summary decision, the OALJ found that

"none of the TVARS Board members that participated in the decision knew of Complainant or of his asserted protected activity" and that therefore, TVA "did not subject Complainant to the alleged adverse action." *Id.*

Similarly, in *Michael Ben Graves v. MV Transportation, Inc.*, the complainant alleged that he was denied workers' compensation benefits in retaliation for engaging in protected activity under the National Transit Systems Security Act. *Michael Ben Graves v. MV Transportation, Inc.*, *et al.*, Case No. 2014-NTS-00001 (ALJ Sept. 10, 2014). In dismissing the complainant's retaliation claim, the OALJ found that the workers' compensation administrator had no knowledge of the complainant's protected activity and that there was no evidence that the workers' compensation administrator and the respondent colluded to deny the complainant's benefits. *Id.* at 11–12. In *Laverne B. Kelly-Lusk v. Delta Airlines, Inc.*, Case No. 2014-TSC-00003 (Feb. 17, 2016), the complainant alleged that a delay in the issuance of her retirement checks was in retaliation for her making complaints to her employer, Delta Airlines, about accidentally drinking methanol at work. In granting Delta's motion for summary decision, the OALJ found there was no evidence as to how the pension administration or "anyone involved in issuing her pension checks would have any knowledge about any of her communications about the ice tea incident" and that therefore, the adverse action had "no nexus to any protected activity." *Id.* at 8–9. *See also Dominick Valenti v. Shintech, Inc.*, Case No. 2010-CAA-00008, (March 14, 2011) (dismissing whistleblower claims where there was no evidence that the person who made the decision to terminate the complainant's employment had any knowledge of the complainant's complaints of environmental concerns).

McCurry claims that she was retaliated against, based on a decision by The Hartford to reduce her disability benefits, due to The Hartford's finding that she was capable of working 20

hours per week.[3]

McCurry has acknowledged that The Harford was the administrator for her disability benefits. *See Complainant's Response Opposing Respondent's Motion for Summary Decision, Sep. 30, 2020.* Her claim is doomed because she cannot cite to any evidence that Kenco was involved in the decisions surrounding her long-term disability benefits, and all undisputed evidence in the record demonstrates that such a decision was made solely by The Hartford. Indeed, the record evidence reflects that (1) Kenco did not provide any input into The Hartford's decision whether to approve or deny any employee's claim for disability benefits, including McCurry's; (2) the decision to approve or deny disability benefits is made solely by The Hartford based on information provided directly by the employee or his or her medical provider, and (3) Kenco did not have any involvement in any decisions related to McCurry's claims submitted to The Hartford for disability benefits. *Exhibit 1 at ¶¶ 7, 13–16, 19*. The evidence demonstrates that Kenco never informed The Hartford that McCurry participated in a whistleblower case involving FSMA violations, nor did Kenco inform The Hartford that McCurry otherwise engaged in any protected activity under the FSMA. *Id.* at ¶ 18.

McCurry's own unsupported assertions that she *believes* Kenco influenced the decisions surrounding her disability benefits are insufficient to establish causation, particularly in the face of all evidence to the contrary demonstrating that the decision came solely from The Hartford. *See Boegh v. Energy Solutions, Inc.*, (W.D.Ky. May 3, 2012) (case below ALJ No. 2006-ERA-26) (the complainant "presented no evidence, other than speculations and conspiratorial … theories, to show that [the individual making the adverse action decision] knew of [the] protected activities or

---

[3] The Hartford later reversed this determination, and McCurry was retroactively paid all benefits at an adjusted rate to compensate for any prior underpayments. (*See Order Granting Summary Decision at p.4*).

was influenced by others with knowledge of his protected activities"); *Hasan v. Enercon Services, Inc.*, 2003-ERA-31 (ARB May 18, 2005) (managers swore they had no knowledge of the complainant's previous whistleblower activities when they made the decision not to hire him and complainant's only response to the motion was speculation that the respondent had not hired him because "some background check" must have disclosed his earlier whistleblower activities or that the affiants must have committed perjury).

There no evidence that Kenco influenced or had any role in The Hartford's decisions regarding McCurry's disability benefits, and there is no evidence that Kenco informed The Hartford about McCurry's participation in the other FSMA case. Because it is impossible for Kenco to have retaliated against McCurry since it did not influence The Hartford's decisions regarding McCurry's disability claims—and since it is likewise impossible for The Hartford to have retaliated against McCurry since it had no knowledge of her alleged protected activity— McCurry's alleged protected activity could not have been a contributing factor in the denial of her long-term disability benefits.

## CONCLUSION

For all the reasons stated herein (and in Kenco's Motion for Summary Decision), Kenco requests that its motion for a summary decision in accordance with 29 CFR §18.72 be granted, that Kenco be awarded attorneys' fees for having to respond to McCurry's frivolous claim, and that this matter be dismissed with prejudice.

Dated: July 16, 2021                    Respectfully submitted,

                                        **KENCO LOGISTIC SERVICES, LLC**

                                        */s/ Jody Wilner Moran*
                                        One of its Attorneys

9

Jody Wilner Moran
Julia Pearce Argentieri
Jackson Lewis P.C.
150 North Michigan Avenue, Suite 2500
Chicago, Illinois 60601
Telephone: (312) 787-4949
Facsimile: (312)787-4995
jody.moran@jacksonlewis.com
julia.argentieri@jacksonlewis.com

## CERTIFICATE OF SERVICE

The undersigned attorney, hereby certifies that on July 16, 2021, she caused to be submitted a copy of the foregoing ***Respondent Kenco Logistic Services, LLC's Supplemental Memorandum in Support of Its Motion for a Summary Decision*** via email to:

> U.S. Department of Labor, Office of Administrative Law Judges
> Attention: Administrative Law Judge Stephen R. Henley
> OALJ-Headquarters-DC@dol.gov

A copy was also sent via email and U.S. mail to:

> Edith McCurry
> 6239 South 13110 East Road
> Pembroke Township, IL 60958
> emccurry1@gmail.com

> By: */s/ Jody Wilner Moran*
> One of Respondent's Attorneys

**Exhibit F**

**U. S. DEPARTMENT OF LABOR**
**OFFICE OF ADMINISTRATIVE LAW JUDGES**

| | |
|---|---|
| In the Matter of: | ) |
| | ) |
| EDITH MCCURRY, | ) OALJ Case No.: 2019-FDA-00015 |
| | ) |
| Complainant, | ) OSHA Case No.: 5-1260-18-107 |
| | ) |
| v. | ) |
| | ) |
| KENCO LOGISTICS SERVICES, LLC, | ) |
| | ) |
| Respondent. | ) |

**DECLARATION OF CATHY PHILLIPS**

I, Cathy Phillips, am over the age of 18 years and am otherwise competent to give sworn testimony regarding the matters contained in this Declaration. I attest as follows based on my personal knowledge and after conducting a diligent inquiry:

1.    I am a Senior Benefits Manager for Kenco Management Services LLC, a corporate affiliate of Kenco Logistic Services, LLC (collectively, "Kenco").

2.    I have been employed by Kenco for approximately 10 years.

3.    In my role, I oversee the benefits for all Kenco employees, including employees of Kenco Logistic Services, LLC.

4.    I am familiar with Kenco's process for how employee disability claims are handed by our insurance company, and I am also familiar with Kenco's process for retaining records of benefits information received from the insurance company upon making a decision to grant/deny disability benefits.

5.    During the time period of 2013–2015 Kenco offered short- and long-term disability benefits to its employees through its third-party benefits administrator, The Hartford.

1

6.    A copy of the long term disability benefits policy in effect during that time period is attached as Exhibit A.[1]

7.    The policy grants the Harford sole discretion to make all determinations regarding benefits. Specifically, the policy states, "[t]he Plan has designated and named the Insurance Company as the claims fiduciary for benefits provided under the Policy. The Plan has granted the Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." *See* Ex. A at KENCO000086.

8.    Attached as Exhibit B is a true and correct copy of Kenco's Leave of Absence Policy in effect beginning on February 15, 2015. As stated in the policy, Kenco employees "are responsible for contacting The Harford to file a claim for FMLA, disability leaves, and all work related injury absences." *See* Ex. B at KENCO 000294).

9.    When The Hartford served as Kenco's third-party benefits administrator, if a Kenco employee was unable to work due to ongoing medical reasons, the employee was instructed to contact The Hartford.

10.    The Harford worked with Kenco employees and their medical providers to obtain the necessary medical information and approve time off under Family and Medical Leave Act, in addition to short- and long-term disability benefits.

11.    Kenco received notice from The Hartford when an employee filed a claim for disability benefits. Kenco also received notice regarding the status of the employee's claim, including whether it was approved or denied, and if approved, for what time period.

12.    If medical information was submitted to The Hartford by an employee or the

---

[1] All documents attached to this Declaration have previously been produced to Edith McCurry, including in the federal lawsuit between McCurry and Kenco Logistic Services, LLC, *McCurry v. Kenco Logistics Services, LLC*, Case No. 19-cv-04067, pending in the U.S. District Court for the Northern District of Illinois.

employee's medical provider in connection with the employee's claim for disability benefits, Kenco did not receive the medical information provided to The Hartford.

13.     Kenco could not, and did not, provide any input regarding The Hartford's decision regarding whether to approve or deny disability benefits.

14.     Decisions to approve or deny disability benefits were made solely by The Hartford based on information provided directly by the employee or the employee's medical provider.

15.     If The Hartford approved disability benefits for a Kenco employee, disability benefits were paid by The Hartford and Kenco was not responsible for such costs.

16.     When Kenco utilized The Hartford as its third-party benefits administrator, Kenco played no role in any decisions regarding disability benefits.

17.     Attached as Exhibit C are true and correct copies of letters Kenco received from The Hartford regarding the status of Edith McCurry's claim for disability benefits.

18.     Consistent with Kenco's standard practices, Kenco never informed The Hartford that Ms. McCurry participated in a whistleblower case involving violations of the Food Safety Modernization Act ("FSMA"), nor did Kenco inform The Hartford that Ms. McCurry otherwise engaged in any protected activity under the FSMA.

19.     Kenco did not have any involvement in any decisions related to Ms. McCurry's claims submitted to The Hartford for disability benefits.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: July 12 , 2021

*Cathy Phillips*

CATHY PHILLIPS

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

**Exhibit G**

Edith McCurry,

          Plaintiff

      v.

Mars, Kenco Logistics Services, LLC, The
Hartford Financial Services Group, Inc., The
Reed Group and Dr. Koehler,

          Defendants.

Case No. 19-CV-04067

Judge Sharon Johnson Coleman
Magistrate Judge Gabriel A. Fuentes

**DECLARATION OF CATHY PHILLIPS**

I, Cathy Phillips, am over the age of 18 years and am otherwise competent to give sworn testimony regarding the matters contained in this Declaration. I attest as follows based on my personal knowledge and after conducting a diligent inquiry:

1.     I am a Senior Benefits Manager for Kenco Management Services LLC, a corporate affiliate of Kenco Logistic Services, LLC (collectively, "Kenco").

2.     I have been employed by Kenco for approximately 10 years.

3.     In my role, I oversee the benefits for all Kenco employees, including employees of Kenco Logistic Services, LLC.

4.     During the time period of 2013–2015 Kenco offered short- and long-term disability benefits to its employees through its third-party benefits administrator, The Hartford.

5.     I am aware of the documents produced by Kenco to Edith McCurry in the above-referenced action, including the plan documents relative to the short- and long-term disability benefits plan in effect during McCurry's employment with Kenco Logistic Services, LLC.

6.     As of the date I executed this Declaration, Kenco does not possess any additional plan documents relative to the short- and long-term disability benefits plans in effect during

1

McCurry's employment, other than what Kenco has already produced to McCurry.

7.    Kenco has conducted a comprehensive search of the documents in its possession, it has produced all documents comprising the short- and long-term disability benefits plan in effect during McCurry's employment with Kenco, and it has complied with the Court's April 23, 2021 Order to supplement McCurry's Document Request Nos. 22, 34, 55, and 71.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: July 12, 2021                                    *Cathy Phillips*
                                                              CATHY PHILLIPS

2

**Exhibit H**

**U. S. DEPARTMENT OF LABOR**

**OFFICE OF ADMINISTRATIVE LAW JUDGES**

In the Matter of:

EDITH MCCURRY,                                    OALJ Case No.: 2019-FDA-00015

      Complainant,                              OSHA Case No.: 5-1260-18-107

      v.

KENCO LOGISTICS SERVICES, LLC,

      Respondent.

## COMPLAINANT'S RESPONSE TO RESPONDENT'S JULY 16, 2021 NEWLY RAISED ARGUMENT AND MOTION FOR SANCTIONS

### Factual Background

On April 20, 2018, Complainant filed an online whistleblower complaint against Mars, Inc. and Kenco Logistics under the Food Safety and Modernization Act, "herein after FSMA" for a series of adverse actions beginning in 2013 to the most recent of December 26, 2017 to the date of filing the April 2018 whistleblower complaint. An adverse decision was entered on May 3, 2019 against Complainant dismissing her complaint. Complainant timely filed an objection with the Department of Labor "herein after DOL";

On September 4, 2019, Respondent filed a Motion for Summary Decision. Respondent only identified as its basis for Summary Decision two (2) questions of law relative to Jurisdiction and Collateral Estoppel. Respondent also asked for sanctions against Petitioner-Complainant. Respondent's Motion for Summary Decision-*Exhibit 1* "herein after"(Rp.MSD) & Complainant's ARB Reply Brief-*Exhibit 2* "herein after" (ARB-Cp.RB pg.1);

On November 2, 2020, the ALJ's Decision and Order "herein after D & O" conclusively resolved the only two (2) issues raised in Respondent's Motion for Summary Decision. The order established that the DOL had Jurisdiction over the causes of actions Petitioner-Complainant brought to OSHA under the FSMA relative to the denial of her benefits. *Ibid* The ALJ's Decision and Order also GRANTED SUMMARY DECISION FOR KENCO ON THE GROUND THAT EMPLOYEES OF HARTFORD, NOT KENCO, HAVE TAKEN ALL ACTIONS RELATED TO MS. MCCURRY'S DISABILITY BENEFITS. (ARB-Cp.RB pg.5) The ALJ's Decision and Order was based on an issue that was not raised by Respondent. (ARB-Cp.RB pg.5-6);

On November 16, 2020 Complainant timely appealed the ALJ's D & O. On April 30, 2021 the ARB Decision and Order remanded the matter back to the Department of Labor. On June 16, 2021 the ALJ directed Respondent to provide supporting evidence to its September 4, 2019 Motion for Summary Decision.

On July 16, 2021, Respondent did not supply supporting evidence, but effectively furthered the argument that the ALJ had raised in his D & O for the first time. This argument was outside of the arguments Respondent initially raised and voluntarily waived in its September 4, 2019 Motion for Summary Decision; an argument in fact that was rejected by the ARB as evidenced by the ARB's remand of the matter back to the Department of Labor.

**PRIOR RULINGS**

OSHA entered a decision on May 3, 2019 against Complainant dismissing her complaint.

The DOL entered a decision on November 2, 2020 dismissing Complainant's complaint.

The ARB entered a decision on April 30, 2021 reversing the DOL November 2, 2020 D&O; remanding it back to the DOL for further proceedings.

## RESPONDENT SHOULD BE ESTOPPED

Respondent should be estopped pursuant to the doctrines of the Law of the Case, Res Judicata, Collateral Estoppel, and Judicial Estoppel, as the matter had been previously litigated and decided on its merits.

Complainant also asserts that the Respondent knew that it had previously conceded, agreed, affirmed, indicated, and argued to the courts two (2) questions of law relative to Jurisdiction and Collateral Estoppel, as well as, a request for sanctions against Petitioner-Complainant as its only issues and as an affirmative defense. And for the first time on appeal furthered the argument raised by the ALJ that it failed to develop and or raise in its MSD. Therefore, Respondent conceded by acquiescence the allegations, assertions and facts asserted by Complainant cited in Rp.MSD Exhibit E-whistleblower complaint, when Respondent only raised an affirmative defense and failed to deny or refute Complainant's allegations in its MSD.

## LAW OF THE CASE

The ARB established the law of the case when it rejected the notion that an argument that was not raised by Respondent in its Motion For Summary Decision could be used as a basis or grounds to grant the Motion For Summary Decision.

The ARB has reasoned in the matter of *Stephenson v. NASA*, ARB No. 98-025, pg. 13 ALJ No. 1994-TSC-5 (ARB July 18, 2000) that:

> The law of the case doctrine "is a prudential principle that 'precludes relitigation of the legal issues presented in successive stages of a single case once those issues have been decided.'" *Field v. Mans,* 157 F. 3d 35, 40 (1st Cir. 1998) (*quoting Commercial Union Ins. Co. v. Walbrook Ins. Co., Ltd.*, 41 F.3d 764, 770 (1st Cir. 1994)). The aspect of law of the case which applies in this circumstance, referred to as the "mandate rule," "instructs an inferior court to comply with the instructions of a superior court on remand." *Field v. Mans*, *supra*, 157 F.3d at 40. *See Law v. Medco Research, Inc.*, 113 F.3d 781, 783 (7th Cir. 1997) (doctrine requires lower adjudicatory body to conform further proceedings in case to

principles set forth in appellate opinion unless there is compelling reason to depart). The doctrine applies within administrative agencies as well. When this Board has ruled on a question of law, the law of the case doctrine binds an administrative law judge acting after a remand of the case. *See, e.g., Ruud v. Westinghouse Hanford Co.*, No. 1988-ERA-33, ALJ RD&O on Remand, Dec. 8, 1988, at 5.

The ARB's ruling and remand is inextricably linked to the fact that Respondent only raised two (2) issues of law relative to Jurisdiction and Collateral Estoppel, as well as, Respondent's request for sanctions against Petitioner-Complainant. (Rp.MSD) & (ARB-Cp.RB pg.1). Consequently, the Law of the Case is as follows:

a. Respondent did not identify those specific portions of the record that it believes demonstrate the absence of a genuine issue of material fact relative to Complainant's contentions, allegations, theories or assertions alleged in the April 20, 2018 whistleblower complaint;

b. Nor did Respondent plausibly deny, refute or oppose any of Complainant's allegations, theories, contentions and/or assertions of being retaliated against by Respondent as cited in the April 20, 2018 complaint filed with OSHA. As cited in McCurry's ARB –Cp.RB pg.8-9 these undisputed and unopposed facts include but are not limited to:

    i. Respondent is the Plan Administrator; (Cp. Opp. Rp.MSD pg. 9 ¶ 22) McCurry Affidavit ¶ 18
    ii. Respondent funded the disability plan; (Cp. Opp. Rp.MSD pg. 9 ¶ 25) McCurry Affidavit ¶ 19
    iii. Respondent's dual function of funding the plan, as well as, being the Plan Administrator created a structural conflict (Cp. Opp. Rp.MSD pg. 9 ¶ 26) and a genuine material issue of fact; ( Cp. Opp. Rp.MSD pg. 18 ¶5)
    iv. Respondent retaliated against Petitioner-Complainant for engaging in protected activity; (Cp. Opp. Rp.MSD pg. 10 ¶ 36 & pg. 14 ¶ 4) McCurry Affidavit ¶ 47, 51-52
    v. Respondent continued to gather medical information in 2018 regarding Petitioner-Complainant well after they alleged to have discharged themselves of their burden in March of 2015 (Cp. Opp. Rp.MSD pg. 3-4 ¶ 16-23) and well after the matter had been disposed of between Petitioner-Complainant and

Respondent; (Cp. Opp. Rp.MSD pg. 14 ¶ 1) & McCurry Affidavit ¶ 37-39 & 41-42

vi. Respondent also had unfettered access to Petitioner-Complainant's disability claim history[4]; (Cp. Opp. Rp.MSD pgs. 4 ¶ 20 & 18 ¶ 5) & McCurry Affidavit ¶ 24 and Exhibit C

vii. Respondent's conduct of unfettered access to Petitioner-Complainant's disability claim and transactional history along with gathering information well beyond the time they alleged to have discharge themselves of their obligation to McCurry created another material issue of fact. Cp. Opp. Rp.MSD pg. 4 ¶ 24, pg. 15 ¶ 3

viii. Pretext Cp. Opp. Rp.MSD pg. 15 ¶ 3, pg. 16 ¶1-2, 17 ¶ 1& 6 McCurry Affidavit ¶ 's 19, 22, 24, 31, 42, 46, & 47 and Exhibits C, D, E, & F and;

ix. The Hartford denied hiring the Reed Group to obtain information about Petitioner-Complainant in September of 2018. McCurry Affidavit ¶ 42 & Exhibit E;

c. Nor did Respondent set forth any evidence to support any contention that they did not retaliate against Complainant; even up to and including the appeal at the ARB and;

d. Nor did the Respondent raise or further the argument that it is now raising with the DOL on appeal with the ARB. (ARB-Cp.RB pg. 6 § II ¶'s 5-6).

Furthermore, it is improper at this stage for Respondent to raise an argument that it intentionally waived and/or forfeited by not raising or making conclusory statements that were not fully developed as required. (Cp. Opp. Rp.MSD pg. 18 ¶ 4) The Seventh Circuit held in *Campania Mgmt. Co., Inc. v. Rooks, Pitts & Poust,* 290 F.3d 843, 853 (7th Cir.2002) that ("[I]t is universally known that statements of attorneys are not evidence."); *United States v. Stevens,* 500 F.3d 625, 628-629 (7th Cir. 2007) and;

e. **It was the movant's burden to identify the basis for seeking summary decision**. *See Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 979 (7th Cir.1996)(ARB-Cp.RB pg.6 § II ¶ 1-8). The movant did not discharge themselves of their burden at any relevant time on the ground THAT THE EMPLOYEES OF HARTFORD, NOT KENCO, HAVE TAKEN ALL ACTIONS RELATED TO MS. MCCURRY'S DISABILITY BENEFITS .

Moreover, it is well settled that the Law of the Case applies to a court's explicit decisions as well as issues decided by necessary implication. (see *Law v. Medco Research, Inc.*, 113 F.3d 781, 783 (7th Cir. 1997). Therefore, allowing Respondent to raise an argument that it intentionally waived, that was the same exact argument that was the subject of the appeal that was rejected by the ARB would be in direct contravention to the precedence of the ARB, Seventh Circuit and U.S. Supreme Court rulings. See *Arizona v. California,* 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 that held "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case."

## Res Judicata

Respondent had an opportunity to raise any issue, at the appropriate time during the course of litigation. It was their right to either raise the issue or waive its right to the issue. Specifically, the Respondent had an opportunity to raise any issue and properly develop it relative to any issue, including the Hartford as being the decision maker relative to Complainant's benefits; or their denial or the refutation or the opposition to: allegations, assertions, claims and theories posited by Complainant in regards to the retaliatory misconduct and actions of Respondent. Furthermore, the Respondent could or should have reasonably foreseen that ligation could ensue beyond the then current litigation. Therefore, since Respondent Kenco failed to raise this and other issues previously, the Respondent Kenco has waived its right to do so.

**ARGUMENTS WAIVED**

The Respondent's Motion for Summary Decision waived all other arguments relative to Complainant's claims of retaliation and misconduct under FSMA. (ARB-Cp.RB pg 1-2).

Therefore, Respondent failed to preserve any rights to any other argument. Unsupported statements, whether in oral argument, *In re: Payne,* 431 F.3d 1055, 1060 (7th Cir.2005), or in briefs do not count." *Sommerfield v. City of Chicago*, 613 F. Supp. 2d 1004 (N.D. Ill. 2009); (Cp. Opp. Rp.MSD pg. 5 ¶ 2)

Complainant also points out again that Respondent did not oppose, dispute or contest any of Complainant's allegations, assertions and supporting evidence in Complainants Response Opposing Respondent's Motion for Summary Decision nor on appeal. Nor did they provide any evidence at any stage to support that Complainant did not establish a Prima Facie Case or to support that they did not retaliate against Complainant. *Ibid*

This case is a clear example of the doctrine of res judicata. Res Judicata applies when there is: (1) a final judgment on the merits, (2) identity of the cause of action in both an earlier and later suit, and (3) identity of parties in the two suits. The principle extends not only to questions which were actually litigated but also to all questions which could have been raised or determined. *Hayes v. City of Chicago*, 670 F.3d 810, 813 (7th Cir. 2012) citing *Allen v. McCurry*, 449 U.S. 90, 94 (1980); *Highway J Citizens Grp. v. U.S. Dep't of Transp.*, 456 F.3d 734, 741 (7th Cir.2006).

## COLLATERAL ESTOPPEL

Respondent Kenco was aware of its previous positions, the legal stances it took, the legal basis of the various positions and how it impacts or would have impacted the matter. This is a clear example of being collaterally estopped. Collateral estoppel is an equitable doctrine, the application of which precludes a party from relitigating an issue decided in a prior proceeding. The Supreme Court has forbidden any use of collateral estoppel that produces unfair results. *See Parklane Hosiery, Inc. v. Shore*, 439 U.S. 322, 331 (1979)

Complainant has consistently asserted and alleged claims of retaliation that began in 2013 to the date of the filing of this complaint and beyond for engaging in protected activity, including activity under the whistleblower provisions of the FSMA.

**JUDICIAL ESTOPPEL**

Respondent received the benefit of having the original case dismissed by OSHA and then by Department of Labor based upon the grounds of the argument the ALJ made that the Hartford made the decisions relative to the denial of Complainant's disability benefits, without supporting evidence. Therefore, Respondent should be judicially estopped as it has now changed its legal position from its Motion for Summary Decision to further the unsupported argument made by the ALJ as a basis to grant Rp.MSD; an argument not raised by Respondent up to and including the ARB appeal.

The Seventh Circuit held in *Campania Mgmt. Co., Inc. at 853* and made it clear that "[p] erfunctory and undeveloped arguments are waived, especially when... a party fails to develop the factual basis of a claim... and, instead, merely draws and relies upon bare conclusions", as well as, that "[I]t is universally known that statements of attorneys are not evidence."

**Respondent Kenco's agreed with Complainant's properly supported theories, facts, assertions and allegations regarding Respondent's retaliatory conduct and actions toward Complainant.**

Of Respondent Kenco's own volition, Respondent admitted to its unlawful misconduct, as evidenced by its conduct, in agreeing with Complainant's assertions, theories, conjectures and or allegations, when Respondent Kenco obviated or failed to deny, refute, oppose or raise any

meaningful plausible deniability to Complainant's assertions, theories, conjectures and or allegations regarding and against Respondent Kenco, its retaliatory actions and/or conduct against Complainant as previously asserted in the litigation. ARB-Cp.RB pg. 2 § 2¶ 1-7.

**FACTS DEEMED ADMITTED**

The courts have reasoned that all properly supported material facts set forth in either party's statement (ie, Def.'s Facts, Pl.'s Add'l Facts or Org. Pl.'s Add'l Facts) are deemed admitted unless properly controverted. *Hispanics United of DuPage v. Village of Addison*, 958 F. Supp. 1320 (N.D. Ill. 1997) citing *Flaherty v. Gas Research Institute*, 31 F.3d 451 at 453 (7th Cir. 1994); *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 921-22 (7th Cir.1994); *Stewart v. McGinnis,* 5 F.3d 1031 (7th Cir.1993). Therefore, Complainant's facts of the occurrences and allegations regarding Respondent retaliating against her have been deemed admitted.

**Respondent's previous legal position is in contrast to its current legal position**

Contrarily, Respondent Kenco's previous position of agreeance is in stark contrast to this "newly adopted and developed" legal theory that the Hartford made all the decisions relative to Complainant's benefits. Therefore, Respondent Kenco should be judicially estopped. *Wells v. Coker,* 707 F.3d 756, 760 (7th Cir. 2013); *see also In re Knight-Celotex, LLC,* 695 F.3d 714, 721 (7th Cir. 2012). Additionally, the purpose of the doctrine is "to protect the integrity of the judicial process . . . by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine,* 532 U.S. 742, 749-50, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001) (internal quotations marks and citations omitted).

Consequently, "by making [litigants] choose one position irrevocably, the doctrine of judicial estoppel raises the cost of lying." *Cannon-Stokes v. Potter,* 453 F.3d 446, 448 (7th Cir. 2006) (quoting *Chaveriat v. Williams Pipe Line Co.,* 11 F.3d 1420, 1428 (7th Cir. 1993). Furthermore, Plaintiff asserts and contends that the courts generally have an interest in both punishing a party's dishonesty and deterring similar misconduct. *Secrease v. Western & Southern Life Ins. Co.*, 800 F.3d 397 (7th Cir. 2015) at 402; *Greviskes v. Universities Research Ass'n,* 417 F.3d 752, 758-59 (7th Cir.2005).

Likewise, this newly adopted theory also gives rise to the fact that "changed or inconsistent stories may constitute evidence of pretext" *Hasham v. California St. Bd. of Equalz'n,* 200 F.3d 1035, 1047 (7th Cir.2000). This is in lockstep with Respondent's immediate past behaviour's of engaging in pretext as raised by Complainant in her response to Rp.MSD and in her appeal to the ARB.

**PRETEXT**

When the plaintiff has proof of pretext, there are always unresolved questions regarding the employer's actual motive.... This inference (from evidence that purported legitimate reason is false) permits a plaintiff to prevail on the merits solely on the basis of evidence establishing pretext. When the defendants lie about......, it is evidence of pretext." *Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 736 (7th Cir.2006). ARB-Cp.RB pg. 10 ¶2

**RESPONDENT'S NEWLY RAISED ARGUMENT**

Likewise in the alternative, *if* given all facts to be true as now stated by Respondent, there are a number of conflicting, inconsistent statements, suppositions and patently false statements made by Respondent, with respect to its newly raised argument and its declarant.

**THE VERACITY OF DECLARANT'S STATEMENTS OF FACTS**

**Incredible Statements**

For example, the declaration is in contravention to Rule 56 as it is deficient; it is not made in good faith and upon personal knowledge. More specifically, Respondent's declarant, Cathy Phillips, makes two (2) declarations on the same day that are in contradiction to one another. As well as, in contradiction to the representations made to the Honorable Court of the Northern District of Illinois be certificate of compliance and other documents that stated Respondent did not have a policy from the Hartford and that if a policy should exist it did not have under either circumstance. A copy of that communication is attached as *Exhibit 3*.

Additionally, in specific Ms. Phillips makes one (1) of her declarations on July 12, 2021 regarding "The Plan" in support of Respondent's {mis}representation to the District Court that they do not have a Policy with the Hartford is hereto attached as *Exhibit 4*. And in the other declaration of the same day, July 12, 2021, presented to this Honorable Tribune of the Department of Labor, declarant, Ms. Phillips gives an exegesis of recitals from "The Policy" Respondent's July 16, 2021 *Exhibit 5*. A 'Policy' that it previously stated by certification and declaration, to the District Court, to not have had gotten from the Hartford. A "Policy" that they now use in support of Respondent's newly raised argument regarding the Hartford as the decision maker.

Furthermore, it can be further reasoned that the declarant does not have firsthand knowledge as claimed and as required under Rule 56 because based upon her declaration and her supporting evidence, Ms. Phillips does not seem to know the difference between "The Policy" she recites from and "The Plan" that was used as her exhibit in support of her declaration. The court of *Pegram v. Herdrich*, 530 U.S. 211 (2000), explained the relationship of the ERISA plan

and the underlying insurance contract, as not being one in the same, a distinction that Phillips did not or could not make. Moreover, in *Pryor v. City of Chicago*, 726 F. Supp. 2d 939 (N.D. Ill. 2010) at 943 states that "an affidavit must be grounded in first-hand observation and experience, not based upon speculation, rumor, or intuition that is remote from such experience. *See Visser v. Packer Eng'g Assoc.,* 924 F.2d 655, 659 (7th Cir.1991) (en banc)." Therefore, her conduct in making the improper distinguishing between "The Plan and The Policy" is fatal to her having the first-hand knowledge as require under Rule 56.

Therefore, any statement that Cathy Phillips has made is not credible and unreliable due to her inability to make that distinguishing, as well as, her deliberate change in positions according to the exigencies of the moment. See *New Hampshire v. Maine,* 532 U.S. 742, 749-50, 121 S. Ct. 1808, 149 L. Ed. 2d 968 (2001)

## Defendants did not comply with Rule 56.

"It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion...." *See* Celotex, 477 U.S. at 328, 106 S.Ct. 2548 (White, J., concurring) Consequently, the failure to comply with the mandatory requirements of Rule 56(e) renders Ms. Phillips declaration fatal and inadmissible evidence during the consideration of the summary judgment motion. *Friedel v. City of Madison*, 832 F.2d 965 (7th Cir. 1987), AT&T CORP. v. OVERDRIVE, INC., 2006

### PERJURY

The two (2) July 12, 2021 declarations, one (1) to the Federal District Court and the other to the DOL, have internal inconsistencies. Effectively contradicting each other and calling into question the veracity of Cathy Phillips statements. *BITLER INV. VENTURE v. MARATHON ASHLAND PETROLEUM*, 779 F. Supp. 2d 858 (N.D. Ind. 2011); *See Buie v. Quad/Graphics, Inc.,*

366 F.3d 496, 505 n.5 (7th Cir. 2004) (stating that "[i]nternally contradictory affidavits are generally disfavored").

Likewise it also raises the inference that the declarant, Ms. Phillips, committed perjury in at least one (1) of these instances, if not in both of the instances.   Or perhaps, in conjecture, Respondent took the liberty of modifying these documents to fit the exigencies of the moment of the various litigation(s). *In re Knight-Celotex, LLC*, 695 F.3d 714 (7th Cir. 2012).

Furthermore, in any of these and other instances, the Courts have reasoned that '[P]erjury strikes at the heart of the integrity of the judicial system….'" *United States v. Stokes*, 211 F.3d 1039, 1046 (7th Cir.2000) and that "lying cannot be condoned in any formal proceeding." *See ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994)("False testimony in a formal proceeding is intolerable.")  It "undermines the function and province of the law and threatens the integrity of judgments" *United States v. Alvarez*, 132 S.Ct. 2537, 2540 (2012) and "poisons the life blood of the administration of justice."

Thus, "[p]arties who wish to use the judicial system to settle disputes have certain obligations and responsibilities" and "[o]ne of those responsibilities is to tell the truth" (*quoting Rodriguez v. M & M/Mars*, 1997 WL 349989, *2 (N.D. Ill. June 23, 1997), to which Respondent and its declarant Cathy Phillips have not discharged themselves of the responsibility of telling the truth.

**OTHER INCONSISTENT STATEMENTS FROM RESPONDENT INCLUDE THAT:**

Respondent narrowed scope of 2013 to 2015 in relevance to its July16, 2021 argument in regards to Hartford.  In contrast, Complainant's 2015 W2 reflects disability payments from Respondent; further evidencing Respondent was the payer and decision maker in the dissemination of disability benefits. (*See Exhibit 6)*.  Also, there is further evidence to support that Respondent continues to pay the disability bills.  (See *Exhibit 7*)

Furthermore, Complainant maintains that the intentionality of misleading a tribunal is an obstruction of justice and an assault to the judicial system. Complainant further objects to the authenticity of the benefit plan(s) due the various versions of the plan, as well as, the fact that Respondent controls that narrative, as the drafter; in addition to the fact that Respondent has failed to produce any documents to corroborate the authenticity of any of the versions of the documents presented.

Respondent's refusal to produce records, such as "The Policy," that is kept in the ordinary course of business is telling; and telling of the fact that Respondent is fiduciary and is a decision maker in the dissemination of disability benefits, as well as, the fact that the business relationship described by Respondent and the Hartford is not as suggested.

It is even more tellingly that even though Respondent had a duty to preserve evidence, it did not; despite foreseeable knowing, as well as, knowing that it had been in litigation since 2013 related to FSMA whistleblower, TITLE VII and other statutes. *Trask-Morton v. Motel 6 Operating, L.P.,* 534 F.3d 672, 681 (7th Cir. 2008). "Corporations are expected to discharge this duty by 'implement[ing] a comprehensive written document preservation plan with specific criteria for finding and securing . . . relevant evidence for the litigation.'" *Danis v. USN Commc'ns, Inc.,* No. 98 C 7482, 2000 WL 1694325, at *37 (N.D. Ill. Oct. 20, 2000); *but cf. Haraburda v. Arcelor Mittal USA, Inc.,* No. 2:11 CV 93, 2011 WL 2600756, at *1 (N.D. Ind. June 28, 2011); (quoting *Larson v. Bank One Corp.,* No. 00 C 2100, 2005 WL 4652509 (N.D. Ill. Aug. 18, 2005)).

In sum: perjury, the failure to preserve evidence and other egregious misconduct of Respondent, further evidences Respondent's conduct of retaliation, pretext, obstruction of justice, willful misrepresentation through the presentment of misleading documents and fables, and patently false statements, during the course of Complainant's litigation(s) with Respondent.

Additionally, the aforementioned and other unopposed and undisputed facts in the record establish genuine issues of material facts, temporal proximity, pretext and knowledge. (ARB-Cp.RB pg. 9)  In addition, these and other unopposed and undisputed facts are now deemed admitted and are the law of the case. *Stephenson v. NASA*, ARB No. 98-025, pg. 13 ALJ No. 1994-TSC-5 (ARB July 18, 2000) Therefore, Respondent is estopped for advancing this newly raised claim or any another claim.

Furthermore, the ALJ is required to accept Complainant's version of events as true for the purpose of summary judgment. See *Kodish v. Oakbrook Terrace Fire Protection District,* 604 F.3d 490, 502 (7th Cir.2010) Additionally, Respondent and is declarant perjured themselves in their newly raised argument and their misrepresentations to this Honorable Tribune and the District Court of Northern Illinois.  It is a well-established supported fact that "lying cannot be condoned in any formal proceeding." *See ABF Freight System, Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994)("False testimony in a formal proceeding is intolerable.")

**Wherefore,** for the aforementioned reasons, the law of the case and its facts Respondent should be estopped from raising and furthering an argument that it waived.  Further, Complainant request that Respondent be sanctioned, for intentionally misleading the court through its perjurious statements of its declarant. As well as, provide any other relief the court deems appropriate along with the denial of Respondent's Summary Decision.

Dated August 15, 2021                    Submitted by: _Edith McCurry_

                                         EDITH MCCURY
                                         6239 S. 13110 East Rd.,
                                         Pembroke, IL 60958
                                         815.735.4281

**CERTIFICATE OF SERVICE**

I, Edith McCurry, hereby certify that on August 16, 2021 I submitted COMPLAINANT'S RESPONSE TO RESPONDENT'S JULY 16, 2021 NEWLY RAISED ARGUMENT AND MOTION FOR SANCTIONS by ***Email and U.S. Mail***:

> U.S. Department of Labor Office of Administrative Law Judges
> Attention: Administrative Law Judge Stephen R. Henley
> 800 K. Street, NW
> Washington, DC 20001-8002
> Email: kaercher.Alyssa.J@dol.gov; oliverio.melina.t@dol.gov
> Facsimile: (202) 693-7365

A copy was also sent via electronic mail and U.S. Mail to:

> Jackson Lewis PC.
> 150 North Michigan Avenue
> Suite 2500
> Chicago, Illinois 60601
> Attn: Jody Wilner Moran; Julia Pearce Argentieri
> Julia.Argentieri@jacksonlewis.com;
> Jody.Moran@jacksonlewis.com

**EXHIBIT I**

*(Ex. B, Declaration of Jay Elliott at ¶ 9.)* McCurry did not supervise any employees at Kenco *(McCurry Dep. 98:3-10.)*

5.  McCurry was the only employee in the role of HR Clerk *(McCurry Dep. 63:19-23.)*

6.  As an HR Clerk, McCurry's duties included: handling payroll, generating reports, assisting with employee relations, and other related duties as assigned *(McCurry Dep. 67:22-68:2.)*

7.  McCurry received her performance reviews from Leonard Szplett, a manager in Human Resources who also handled accounting *(McCurry Dep. 64:7-22.)* She also at times received directives from the warehouse General Manager, Kelvin Walsh *(McCurry Dep. 68:1-7.)*

8.  Kenco hired McCurry at a similar pay to what she had been earning at the predecessor logistics company at the Mars Manteno plant, 4T's Management. Leonard Szplett earned more than McCurry and was also hired at a similar rate of pay to his prior salary *(McCurry Dep. 112:2-10.)*

9.  On October 17, 2014, Kenco hired Lori Varvel as a Human Resources Manager. Varvel started working for Kenco on November 10, 2014 and became McCurry's supervisor *(Ex. B, Declaration of Jay Elliott at ¶ 13)* Varvel is 38 years old (DOB: X/XX/1980; *Id. at ¶ 12.)*

10. McCurry did not apply for the Human Resources Manager position which Lori Varvel was hired to fill *(McCurry Dep. 100:4-10; 11-15.)*

11. Prior to being hired by Kenco, Varvel worked as an HR Manager for Sears Logistics Services (earning $73,600) where she oversaw policies, supervised HR generalists, investigated complaints of harassment and discrimination *(Ex. B, Declaration of Jay Elliott at ¶ 12.)*

12. After being hired at Kenco, Varvel supervised other employees in addition to McCurry, including Valerie Lillie *(McCurry Dep. 83:14-23.)* Varvel approved McCurry's request for overtime when necessary *(McCurry Dep. 69:10-12.)*

3

## IV.   ARGUMENT.

### A. McCurry Has No Evidence of Discriminatory Pay.

McCurry claims without evidentiary support that Kenco engaged in gender discrimination, or race discrimination, by paying her less than the white, male Human Resources manager, Leonard Szplett.[2] This argument must fail, because McCurry was the only employee in her role and she was not a manager. She has no basis for arguing that she should have been paid equal to her manager *(SOF ¶¶ 5, 7.)* McCurry earned $16.44 per hour, plus overtime, and regularly worked overtime *(SOF ¶ 24.)* As an exempt HR Manager, Szplett earned a salary, the equivalent of $32.68 per hour *(Id.)* McCurry has no evidence that this pay differential was made for any reason related to gender or race. First, McCurry acknowledges that Szplett was paid more than her by the predecessor logistics company, 4T's Management, and that Kenco thus hired the employees on at similar rates of pay to what they had been earning at 4T's *(SOF ¶ 8.)* It is well settled that paying McCurry and Szplett consistent with their prior rates of pay is a nondiscriminatory reason for their pay differential. *Leong v. SAP Am., Inc.,* 67 F. Supp. 3d 972, 985 (N.D. Ill. 2014) (granting summary judgment and noting that plaintiff ignored undisputed differences in the two jobs including the number of direct reports.)

Second, and perhaps more importantly, Szplett was not similarly situated to McCurry because *he was her manager* up until the time Lori Varvel was hired (and Szplett went on a leave of absence, as reflected on his pay records) *(SOF ¶¶ 7, 24.)* While both employees worked in

---

[2] McCurry brings race discrimination claims under both Title VII and Section 1981. She alleges that race discrimination occurred because she was paid less than Szplett (her non-African American manager), and when she received a write-up. Defendants will not analyze these legal claims separately, because McCurry's §1981 race discrimination claims fail for the same reasons that the Title VII race discrimination claims fail. Furthermore, as to the §1981 race discrimination and §1985(3) federal conspiracy claims, Defendants will not include a separate analysis regarding the claims against each individually-named defendant, because the defenses for all defendants are the same and those claims fail as a matter of law for the same reasons as the claims against Kenco.



UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

LEONARD A. SZPLETT,                              )
                                                 )
                    Plaintiff,                   )
                                                 )
        v.                                       )      Case No. 1:19-cv-02500
                                                 )
KENCO LOGISTIC SERVICES, LLC, a                  )      Judge Gary Feinerman
Tennessee Limited Liability Company, Mars,       )      Magistrate Judge Young B. Kim
Inc., The Hartford, DAVID JABALEY, MARIO         )
LOPEZ, TAMMI FOWLER, PAULA HISE,                 )
TRACE SPIER, ROBERT COFFEY, TODD                 )
MOORE, JAY ELLIOT. DAVID CAINES,                 )
MICHAEL MANZELLO, DWIGHT CRAWLEY,                )
and KELVIN WALSH,                                )
                                                 )
                    Defendants.                  )

## DEFENDANTS' MOTION TO DISMISS SZPLETT'S SECOND AMENDED COMPLAINT (DKT. NO. 53)

DEFENDANTS, Kenco Logistics Services, LLC, Kelvin Walsh, Paula Hise, Tammi Fowler, David Jabaley, Mike Manzello, David Caines, Trace Spier, Jay Elliott and Dwight Crawley, (collectively "the Kenco Defendants") by and through their undersigned Counsel, move to dismiss Plaintiff Leonard Szplett's Amended Complaint, with prejudice, and in support thereof, state as follows:

1.    On September 19, 2019 the Court dismissed Szplett's Amended Complaint, finding that "the complaint violates Civil Rule 8(a)(2) because its length and disorganization make it incoherent and unintelligible." Dkt. No. 52.

2.    On October 17, 2019, Szplett filed a Second Amended Complaint against the Kenco Defendants, and other Defendants. Dkt. No. 52.

1

3.      Disregarding the Court's dismissal order, Szplett's Second Amended Complaint fails to cure the substantive and procedural defects that were present in his prior complaints; the complaint continues to be incoherent, and time-barred as to the Kenco Defendants.

4.      Kenco employed Leonard Szplett as an office manager at the Manteno, Illinois Mars warehouse until his termination on March 29, 2015. Szplett was terminated when Kenco lost its contract at the warehouse, and all employees at his location were terminated.

5.      More than four year after his termination, Szplett brings this employment discrimination claims against the Kenco Defendants pursuant to 42 U.S.C. §1981.

6.      Taking Szplett's allegations as true for purposes of a Motion to Dismiss, any such claims are time-barred and should be dismissed with prejudice because the four-year statute of limitations applies and therefore, the claims are untimely. 28 U.S.C. §1658.

7.      In accordance with Fed. R. Civ. Pro. 12(b)(6) the Court should dismiss a complaint where the factual allegations do not state a plausible claim for relief. The running of the statute of limitations is an affirmative defense and may be raised on a 12(b)(6) motion to dismiss.

8.      Additionally, Szplett's Second Amended Complaint is largely incoherent and grossly violates the short, plain statement requirements of Fed. R. Civ. Pro. 8(a) and the Court's prior dismissal order. Given that Szplett has now had an opportunity to amend, dismissal with prejudice is appropriate.

9.      The Kenco Defendants reference and incorporate all arguments contained in their Memorandum in Support of their Motion to Dismiss Szplett's Second Amended Complaint as though fully set forth herein.

2

WHEREFORE, for all the reasons stated herein, and in Defendants accompanying memorandum of law, DEFENDANTS, Kenco Logistic Services, LLC, Kelvin Walsh, Paula Hise, Tammi Fowler, David Jabaley, Mike Manzello, David Caines, Trace Spier, Jay Elliott and Dwight Crawley request that the Court dismiss Szplett's Second Amended Complaint with prejudice in accordance with Fed. R. Civ. Pro. 12(b)(6) and grant such additional relief as the Court deems proper.

Dated: November 4, 2019

Respectfully submitted,

**KENCO LOGISTICS SERVICES, LLC, KELVIN WALSH, MIKE MANZELLO, DAVID JABALEY, TAMMI FOWLER, PAULA HISE, TRACE SPIER, DAVID CAINES, DWIGHT CRAWLEY AND JAY ELLIOTT**

By:/   /s/ Jody Wilner Moran
        One of Their Attorneys

Jody Wilner Moran
Julia P. Argentieri
**Jackson Lewis P.C.**
150 North Michigan Avenue
Suite 2500
Chicago, Illinois 60601
Telephone: (312) 787-4949
Facsimile: (312) 787-4995
moranj@jacksonlewis.com
julia.argentieri@jacksonlewis.com

3

## CERTIFICATE OF SERVICE

I, Julia P. Argentieri, an attorney, hereby certify that on November 4, 2019, I electronically

filed a copy of the foregoing **DEFENDANTS' MOTION TO DISMISS SZPLETT'S SECOND**

**AMENDED COMPLAINT PURSUANT TO FED. R. CIV. PRO. 12(b)(6)** with the Clerk of

the Court using the CM/ECF system. I further certify that a copy of the foregoing has been mail

and email to the following non-ECF participant:

> Leonard Szplett
> 3421 W. 1500 NW Road
> Kankakee, IL 60901
> Stkbnd2000@aol.com

> By: /s/ Julia P. Argentieri
> One of the Attorneys for the Defendants

**EXHIBIT J**

**ReedGroup**

## Attending Physician's Statement of Work Capacity and Impairment

Return completed form to Leave of Absence and Accommodations team, P.O. Box 6278, Broomfield, CO 80021 or Fax to 1-847-554-1812.

Note: Your patient has informed ReedGroup that you would be willing to submit clinical information to support his/her disability claim. In accordance with the federal law, GINA, [Genetic Information Nondiscrimination Act of 2008], please do not provide us with any genetic information. More information about GINA is included on the Authorization form [employee/patient] presented to you.

| Patient Information | First Name: _____ | Last Name: McCurry | Claim Number: |
| | Date of Birth  8/26/62 | Gender:  Male  Female | Record Number: |
| Vocational Information | Employer: Kone o Mars | Job Title: HR AD | Date of Hire: ___/___/2015 |

Physical Demand Level per maximum pounds of exertion:
Sedentary (10 lbs.)  Light (20 lbs.)  Medium (50 lbs.)  Heavy (100 lbs.)  Very Heavy (greater than 100 lbs.)

Intellectual Skill Demand:  ☐ Unskilled  ☐ Semi-skilled  ☐ Skilled  ☐ Highly Skilled

| Claim Information | First day of absence: ___/___/16 | Definition of Disability: ☑ Own Job  ☐ Own Occupation  ☐ Any Occupation |
| | Claim Manager: | Phone Number & Ext:    Fax Number: |

| 1. Nature of Treatment & Work Capacity Evaluation | Primary Diagnosis: Major Depression | ICD-9  or  DSM  code(s): 296.32 |
| | Secondary/Co-morbid  Diagnosis impacting work: | ICD-9  or  DSM  code(s): 300.02 |
| | Tertiary/Co-morbid  Diagnosis impacting work: | ICD-9 or DSM code(s): |

Onset of primary condition: ___/___/16

• Hospital stay:  ☐ Not applicable    Admitted on: ___/___/___  Discharged from Hospital on: ___/___/___

• Recent Surgery Date: ___/___/___    Type of Surgery: _____

Name and Address of Hospital: _____

• Medications-name/dosage/frequency: _____

• Other treatment methods: _____

1.) Is the patient's primary condition due to injury or illness arising out of the patient's employment?  ☐ No  ☑ Yes  ☐ Unknown

Contact information for other health care providers treating this patient:  ☑ Not applicable

Name: _____  Phone: _____  Address: _____
Name: _____  Phone: _____  Address: _____

2.) Did you recommend that your patient stay home from work?  ☐ No  ☑ Yes, on the following date ___/___/16

If no, please complete sections 2-3 and provide a work release per section 5, question 5.

If yes, please provide your rationale for recommending disability leave by referencing the patient's signs and symptoms and their relation to functional impairment(s) that precluded work.  Please be sure to explain how this patient's impairment impacted his capacity to perform the physical and/or intellectual demands of his/her job per the definition of disability noted above.  If the disability 'test' is noted to be 'Any Occupation' please explain how impairment was determined to preclude any work which would include work at the sedentary and unskilled levels.

_____

| 2. Treatment Plan | Date of first office visit: ___/___/2016 | Date of last office visit: 10/4/2018 | Next office visit: ___/ In 2 months |

Expected Treatment Frequency:  ☐ Weekly  ☐ Monthly  ☐ Other (specify)

(a)  Is the patient still under your care for the primary disabling condition?
☑ Yes  ☐ No, indicate date service terminated: ___/___/___  or referred ___/___/___

(b)  If patient has been referred to a specialist please list the Provider's Name and Phone number
E. Boyer md

Is surgery planned? ☑ No  ☐ Yes, on ___/___/___  Procedure(s): _____
Procedure Code

Health Care Provider's Initials: _____    Date: 10-4-18

**EXHIBIT**
**14**

Scanned by CamScanner

**Exhibit K**

| | |
|---|---|
| From: | McCurry, Edith |
| To: | Moore, Suzanne; Szplett, Len |
| Subject: | RE: Tyson, Morris **FMLA - Late Med** (SP) |
| Date: | Monday, August 05, 2013 11:00:14 AM |

Morris No adverse employment action was taken against Morris Tyson, as he has always kept us informed of his situation.

Thank you

Edith McCurry

Kenco Logistics Services
1125 Sycamore Rd
Manteno, IL 60950
www.kencogroup.com
Email: Edith.McCurry@KencoGroup.com
Office 815-468-9999, X464
Fax 1-815-468-2468
-----Original Message-----
From: Moore, Suzanne
Sent: Monday, August 05, 2013 9:36 AM
To: McCurry, Edith; Szplett, Len
Subject: FW: Tyson, Morris **FMLA - Late Med** (SP)


-----Original Message-----
From: LM.SAC@HartfordLife.com [mailto:LM.SAC@HartfordLife.com]
Sent: Friday, August 02, 2013 5:20 PM
To: McCurry, Edith; Szplett, Len; Moore, Suzanne
Subject: Tyson, Morris **FMLA - Late Med** (SP)


The leave request for Morris Tyson was denied on 7/22/2013 as no supporting documentation was received within the required timeframes. On 8/1/2013 this employee submitted the required documentation to support their leave request to The Hartford. As the documentation was submitted late to The Hartford and the employee has not advised us of any extenuating circumstances, we are in need of additional information from you at this time.

Has adverse employment action been taken against the employee?

Did the adverse employment action include termination?

If adverse employment action did not include termination, The Hartford will:
designate the entire leave request starting on day 1 through the appropriate duration supported by the certification as FML

If the adverse employment action included termination, The Hartford will:
send no additional communication and take no further action.

As the FML determination is time sensitive, we ask that you respond to this request by 8/6/2013. If you have any questions regarding this e-mail, please contact our office at 800-863-5166.

***************************************************************

McCurry, Edith

**Exhibit L**

From: Smith, Patricia

Sent: Wednesday, May 28, 2014 2:44 PM

To: Walsh, Kelvin; Lilley, Valerie; Manzello, Mike; McCurry, Edith; Szplett, Len

Subject: RE: Tina Harris <3410177908>

Workers' Compensation and FMLA run concurrently, so anytime an employee is losing time due to a work related injury they should contact the Hartford to file for FMLA.

Patricia Smith
Claims Analyst
2001 Riverside Drive - Chattanooga, TN 37406
Office: 423-643-3422

 VOTE
KENCO
A TOP 3PL
We can't do it without you.

The information contained in this email communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.

**Exhibit M**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

EDITH MCCURRY

       PLAINTIFF,

VS.

MARS, INC., KENCO LOGISTIC
SERVICES, LLC., HARTFORD LIFE,
THE REED GROUP AND DR. KOEHLER
       DEFENDANTS,

1:19 CV 0467
Judge: Sharon Johnson Coleman

Magistrate Judge: Gabriel A. Fuentes

## DECLARATION OF EDITH MCCURRY IN SUPPORT OF HER RESPONSE TO DEFENDANT'S MOTION FO SUMMARY JUDGEMENT

Under the penalty of perjury as provided by law, the undersigned certifies pursuant FRCP 56 (c)(4) that I have personal knowledge and that I am competent to testify, when called to testify. The below mentioned are factual statements set forth and are true and correct to the best of my knowledge and information:

## Declaration of Edith McCurry

1.     My name is Edith McCurry, I, am over eighteen (18) years of age and am fully competent to make this Declaration under penalty of perjury under the laws of the United States of America. I have personal knowledge of the facts stated in this Declaration, and those facts are true and correct.

2.     I am the former HR Administrator assisting the HR/Office/Accounting Manager for Mars, Inc. Manteno facility located at 1125 W. Sycamore Rd., Manteno, IL, managed by Kenco Logistics of Chattanooga, TN.

3.     The HR/Office/Accounting Manager for Mars, Inc. Manteno facility located at 1125 W. Sycamore Rd., Manteno, IL, was Leonard Szplett.

4.     I had been performing those HR/Office/Accounting duties at the Mars, Inc. Manteno facility since 1999.

5.     Since its inception in 1999, the Mars, Inc. Manteno facility was a dedicated warehouse for the storage, packaging and distribution of Mars, Inc. food products that included raw materials and finished goods.

6.     At all times my department was responsible for keeping up with the current employment laws, implementing them and applying them correctly. These laws included state and federal laws; the relevant laws were the: Fair Labor Standards Act (FLSA), Family Medical Leave ACT (FMLA), The Americans with Disability Act (ADA), Employment Retirement Income Security Act (ERISA), Health Insurance Portability and Accountability Act (HIPAA), Title VII of the Civil Rights Act, Federal Insurance Contributions Act (FICA), Occupational Safety and Health Act (OSHA), Equal Employment Opportunity (EEO) reporting, The Workers Adjustment and Retraining Notification Act and other laws as outlined .

7.     My department was also responsible for implementing and overseeing company policies.

8.     At all times my department handled the finances, financial modeling including invoicing, budgets and statistics of the Mars, Inc. Manteno facility.

9.     I am very familiar and knowledgeable about with the composition of the line items of the Mars, Inc. Manteno budget which include employee salaries, expenses, including employee benefits amongst other line items.

10. Mars, Inc. passed through their costs on paper to Kenco.

11. Every month Kenco invoiced Mars, Inc. for the employee wages and salaries, as well as, employee benefits, fringe benefits and bonuses.

12. Kenco's management fee was invoiced as well.

13. Because Mars, Inc. ultimately paid these benefits we were acutely aware of how the monies were line itemed and distributed.

14. I am very familiar and knowledgeable about company policies, employment and best practices, including but not limited to how employment policies are implemented, catalogued and logged for compliance.

15. I am very familiar and knowledgeable about company record keeping practices and policies.

16. I am very familiar and knowledgeable that Kenco was hired to manage the Mars, Inc. Manteno facility this included but was not limited to logistics services. Kenco was compensated with a management fee monthly, just as the other employees were compensated at the Mars, Inc. Manteno facility by Mars, Inc.

17. I am very familiar and knowledgeable of the organizational structure of the Mars, Inc. Manteno facility, Mars, Inc. and Kenco Logistics as it relates to the Mars, Inc. Manteno facility.

18. Mars, Inc. provided daily guidance and management to the Mars, Inc. Manteno facility.

19. Mars, Inc. provided this guidance and management through its Regional Distribution Manager and morning meetings with other business units of Mars, Inc.

20.     The Regional Distribution Manager was Robert Coffey.

21.     Upon Kenco managing the Mars Manteno facility it was communicated to myself and Len Szplett by site management, including Robert Coffey, and others that Kenco was self-insured in regards to health, worker's compensation and disability benefits.

22.     It was also communicated by site management, including Robert Coffey, and others that the Hartford managed the Defendant's health, life and disability benefits from an administrative capacity.

23.     Kenco never provided copies of the employee benefits plans, including the disability plans for Len Szplett and myself to distribute to the employees or retain on file as required by law.

24.     I was also aware that the Hartford communicated and collaborated regularly with Kenco about employee disability benefits.

25.     On numerous occasions myself and Len Szplett would regularly communicate and collaborate with Hartford regarding employee disability benefits.  Exhibit K

Additionally, we regularly interacted with employees about their disability leave, benefits, medical disposition, availability for work etc..., as well as, provided that information to those on a as to need know basis.  This would include, Risk Management, Kenco Claim Analyst, Corporate HR, cite management, internal and external legal counsel, etc...

Further, it was common practice for employees to contact Szplett, myself and other cite relevant management about being off of work related to medical, disability, personal or other issues. Likewise, I also engaged in this same practice whenever I was off work due any medical, disability, personal or other issues.  Matter of fat it was Defendant's policy for employees to do so.

26.     On numerous occasions myself and Len Szplett would communicate regularly with Kenco's in-house claims analyst regarding employee disability benefits. Exhibit

27.     It was always my understanding that Kenco participated in all of the decision making regarding employee benefits, including disability.

28.     Beginning in 2013 I engaged in a number of protected activities related to employee civil rights violations under Title VII and other statutes, as well as, food safety, food safety compliance, and safety in general.

29.     After engaging in these and other protected activities, I began be subjected to and suffering adverse employment actions and decisions. i.e. harsher scrutiny and discipline, reduction in duties,  reduction in fringe benefits, etc...

30.     After a series of events, I was forced to take a constructive discharge in the form of a medical leave of absence on January 5, 2015

31.     I began receiving disability benefits on January 23, 2015.

32.     Kenco paid McCurry's disability. Exhibit O

33.     My experience in managing the payroll for the Mars, Inc. facility since 1999 leads me to know that payroll records and W-2 are inextricably linked to the payer. Payroll records reflect where the monies are being designated from. i.e. PTO-paid time off or disability or holiday pay, etc...

34.     For instance the 2015 W-2 reflected the monies paid to me while on disability.

35.     The W2 was issued by Kenco. Exhibit O

36.     While receiving disability benefits, on several occasions my benefits were terminated; usually after engaging in some form of protected activity and vexatiously delayed in getting them reinstated. Exhibit V

37.     In April of 2018, I became aware that something was going awry with my benefits.

38.     One of the things that I discovered was Kenco had unfettered access to my disability claims.

39.     This information was obtained through the discovery process in the 16 CV 2273 matter.

40.     Then the most recent adverse action at that time occurred on December 26, 2017.

41.     This was shortly after Kenco had become aware that I had provided written testimony, by way of a declaration, within weeks of the action.

42.     On April 17, 2018, I filed claims with the Illinois Department of Human Rights and the EEOC regarding my disability benefits.

43.     On April 20, 2018, I also filed a claim with OSHA under FSMA for retaliation relative to the same common core or nucleus of facts.

44.     At this time it had almost been a year since I had received disability benefits.

45.     In May of 2018, Kenco responded to the charges filed at the Illinois Department of Human Rights and the EEOC and several days later I had a deposition with Kenco.

46.     I was questioned about my disability, although it was not a part of the litigation before the district court in 16 CV 2273.

47.    The deposition was hostile, contentious and lengthy.

48.    I was embattled; sometimes misinterpreting and misspeaking about subjects including the disability benefits and not clarifying that it had nothing to do with the matter that was currently being litigated.

49.    I was questioned at length in the deposition about my belief relative to whether or not I believed my termination was lawful.

50.    I was questioned so about my belief that I eventually asked was it a reason or should I be looking at this closer.  Exhibit AA

51.    The matter was disposed of in July of 2018 by the court.  Kenco never provided me with a copy of the deposition prior to filing its summary judgment motion.

52.    I began looking at the matter closely and determined that Defendant had withheld information from me regarding my continued employment and; in doing so violated its own policy in regards to the employee notification process.

53.    In September of 2018 Kenco and Mars, my former employer, sought information about my medical conditions in relation to my disability claims and;

54.    On September 26, 2018, Kenco Mars contacted my physician requesting medical information. Exhibit J

55.    Upon being notified by physician of this request, I questioned the Hartford why they contacted my doctor, Dr. Throupe, after notifying me on the same day with a decision to deny benefits had been made.

56.    October 18, 2018, the Hartford denied having contacted Dr. Throupe on September 26, 2018.  And indicated that it was from the employer-Kenco Mars. Exhibit W

57.    In September of 2019, Defendant Kenco, filed a Summary Decision with the Department of Labor.  Exhibit B

58.    In its Motion for Summary Decision, Defendant Kenco sought sanctions and only raised questions of jurisdiction and collateral estoppel.

59.    Defendant Kenco did not deny any of the allegations, assertions or theories referenced in my response to the motion for summary decision.  This would include that Kenco was self-insured, that they made the decisions, that they contacted my physician in September 2018 etc... Exhibit H

60.    The ALJ in ALJ CASE NO. 2019-FDA-00015 *and* ARB CASE NO. 2021-0009 granted summary decision on an unsupported argument not raised by Kenco that the Hartford made all of the decisions.

61.    The matter was appealed to the ARB.

62.    Kenco still did not deny any of the allegations, assertions or theories referenced in my response to the motion for summary decision nor those made in the appeal. Kenco made judicial admissions through their acquiesces and failure to oppose, refute or deny McCurry's allegations.  Exhibit EE

63.    The ARB vacated and remanded it back to the ALJ.  Exhibit A

64.    Kenco supplemented its motion on July 16, 2021 by raising the argument that had been rejected by the ARB and in support of that argument had it declarant make recitals from the Hartford Insurance Policy that it stated to the District Court in May of 2021 by certification that it did not have. Exhibit E.

65.    On or about May 4, 2021, Kenco certified to the District Court in the Northern District of Illinois that it did not have a policy from the Hartford related to disability benefits and;

66.    That Kenco had produced all the documents it had relative to the Hartford and the Court's order.

67.    After several more exchanges, Kenco produced several other sets of documents on May 24, 2021, well after the court's order and its certification.

68.    These documents included plans allegedly relative to the disability benefits in effect during the relevant time.  Exhibit

69.    One of the plans produced by Kenco on May 24, 2021 was in contradiction to its assertion that it given its authority, as the plan administrator, over to the Hartford to make all decisions relative to disability claims. Refer to #55 Exhibit Q

70.    Additionally, Kenco's other plan documents referenced the fact that at any time they could retract or amend the authority given to Hartford to act as plan administrator.  STD Plan and LTD Plan both state "The Plan Administrator reserves full authority, at its sole discretion, to terminate, suspend, withdraw, reduce, amend or modify the Plan, in whole or in part, at any time, without prior notice."(at 13, Ex. B PID #2624 Document #158-1) and (at 13, Ex. C, PID #2663, Document #158-1).

71.    Kenco failed to produce the "Policy" that it alleges that the Hartford issued.

72.    The "Policy" according to the plans provided by Kenco governs the plans.

73.    The "Policy" outlines the terms and conditions of the business relationship that exists between Kenco and the Hartford.

74.    This can include, but is not limited to Kenco being self-insured and or the policy being that of a stop-gap arrangement or that Kenco made decisions, even up to and including the final decision, etc.

75.    It can also include the scope of services provided, administrative services only and or whether Kenco retained the final decision making authority.

76.    The failure to produce the "Policy" and the denial of its existence is in contradiction to the Cathy Phillips' declaration and Kenco's motion that makes recitals and references from the "Policy" that they repeatedly said they did not have.

77.    This assertion that Kenco does not have the "Policy" is also in contradiction to Kenco's original position it took in response to the initial production requests that they were not producing it because it was not relevant.

78.    I pointed out all of these and other inconsistencies including that there were two (2) declarations made on the same day by the same declarant, Cathy Phillips, in contradiction to each other, to the ALJ in August of 2021 in the matter of ALJ CASE NO. 2019-FDA-00015 *and* ARB CASE NO. 2021-0009.  Exhibit H

79.    In response Kenco stated that essentially both declarations said the same thing.

80.    Kenco is required by the Food Safety and Modernization Act to have a written and documented quality management system. Documenting every task, function or operation. This would include, but would not be limited to Standard Operating Procedures, Work Instructions, Policies, Protocols, Best Practices, and forms, etc.  To ensure accuracy and compliance, each of these Standard Operating Procedures, Work Instructions, Policies, Protocols, Best Practices, and forms, etc... are fully analyzed, vetted and signed off by the owner of the specific process and their manager/superior.  Additionally, these processes are managed by a designated person that oversees the process and compliance on the site and corporate level.  Deviations from any of these processes are not allowed and; if they did occur, they are to be documented and a root cause analysis performed, a corrective action implemented and the results are to be logged and disseminated to the respect persons. Exceptions to any of the

processes were only granted by written request after a business case was made to support this exception/deviation. All of these processes are audited internally, 2nd and 3rd party. Attached is a fair sampling of Defendant's policies regarding their quality management system, documents, and records processes and procedures. Exhibit BB

81.     This quality management system requires that each and every one of Kenco's policies, procedures, protocols, forms and best practices are documented, catalogued, logged and tethered.

82.     For any of Kenco's policies, procedures, protocols, forms and best practices to be binding upon an employee Kenco requires that the employee be on-boarded by the responsible person.

83.     To evidence that employees are on-boarded with Kenco's policies, procedures, protocols, forms and best practices each employee is to either sign an employee acknowledgement form or a log for compliance.

84.     Additionally, each policy, procedure, protocol, form and best practice has an effective date to when that policy, procedure, protocol, form and best practice becomes effective.

85.     Ex. 1, Phillips Decl. at ¶ 7 document #158-01) refers to (Ex. A, Leave of Absence Policy PID #2582 -2595, Doc. No. 158-01) which was not effectuated during the relevant time as it has an effective date beyond when my Leave of Absence began.

86.     Further, the Leave of Absence Policy Employee Acknowledgement form is not signed by MCCURRY (PID # 2590 document #158-01) nor is the Policy supported by a Signature Log with MCCURRY'S signature nor any other employee's signature log was produced; evidencing that this was not an approved policy according to Defendant's policies.

87.    To the best of my knowledge, I have not made short or long term applications for disability.

88.    The Hartford made conclusory and unsupported statements the Court that The Hartford made the decision with regard to McCurry's claim for long-term disability benefits.

89.    In the same breath, the Hartford also made misrepresentations regarding Plaintiff receiving benefits.

90.    The Hartford could in part make decisions, with Defendant Kenco making the final decision.

91.    The Hartford is subject to the directives given and issued by Defendant Kenco that include The Plan Administrator reserves full authority, at its sole discretion, to terminate, suspend, withdraw, reduce, amend or modify the Plan, in whole or in part, at any time, without prior notice."(at 13, Ex. B PID #2624 Document #158-1) and (at 13, Ex. C, PID #2663, Document #158-1).

92.    Also the Hartford only made conclusory statements bereft of any supporting evidence to support this contention.

93.    Likewise the Hartford stated in October of 2018 that the employer, Kenco Mars, sought information from my doctor relative to my claims of disability. Refer to #43 Exhibit W.

94.    Kenco provided directives and made decisions relative to employee benefits with all of its 3rd party administrators.

95.    For example, Kenco concedes that its 3rd party administrator, U.S. Administration stated that Defendant Kenco made a decision relative to Plaintiff's benefits that it executed.  Exhibit  DD.

96.     Phillips in her declaration did not attest to the fact that the information provided Defendant Kenco was obtained by her relative to the detailed claims inquiry and other claim information produced by Defendant Kenco.

97.     Nor did Cathy Phillips address the process used in obtaining detailed claims information.

98.     Nor did Cathy Phillips or Defendant Kenco address why there was a need for this detailed claims information.

99.     Nor did Cathy Phillips or Defendant Kenco address what the need was for to have access to this detailed claims information, if they had no involvement in the process.

100.    Defendant is mandated to have a documented written procedure that addresses any process that it is involved in, including the review process and the outlined the role(s) of the Defendant and Hartford.

101.    McCurry was granted the right to sue letter for the allegations outlined in McCurry II, to which Defendant Kenco did not identify in the investigative stage that there was an overlap in claims.

102.    Kenco construed and comingled a number of factors that mislead the court into believing that the issues were one in the same in McCurry I and II. Ultimately, leading the court to conclude that McCurry II was filed for impermissible reasons.

103.    Kenco further misled the court to believe that the Hartford was the 3rd party administrator for all of the employee benefits, when in fact Defendant had three (3) separate 3rd party administrators.  Including, U.S. Administration for the Cobra and the Hartford for the disability benefits at issue.

104.    Defendant Kenco continued to make misrepresentations of the court regarding other material facts, that includes, but was not limited to Szplett

being the HR manager to prevail in *McCurry v. Kenco Logistics Servs., et al.*, 2018 U.S. Dist. LEXIS 233151, at *1 (C.D. Ill. Aug. 14, 2018)).; As Well as, Szplett not being the HR Manager to prevail in *Szplett v. Kenco Logistics Servs., et al* 19 cv 2500

105.   Defendant Kenco has a pattern and practice of acting in bad faith and intentionally making false and misleading statements to tribunals to "game the system" and make mockery of the judicial system. i.e. *McCurry v. Kenco Logistics Servs., et al.*, 2018 U.S. Dist. LEXIS 233151, at *1 (C.D. Ill. Aug. 14, 2018)); *Szplett v. Kenco Logistics Servs., et al* 19 cv 2500; *McCurry v. Mars, Inc et al.*, 19 cv 04067 and in ALJ CASE NO. 2019-FDA-00015 *and* ARB CASE NO. 2021-0009; to which, I have personal and firsthand knowledge and evidence of such malfeasance.

106.   I am due and owed money as far back as 2015.

107.   As a result of Kenco's actions retaliating against me I was discriminated against.   Kenco's actions were intentional in interfering with my disability benefits and withholding the monies in retaliation, I have suffered great and irreparable financial, physical and emotional harms.

I, Edith McCurry, declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of November 2021.

Edith McCurry
6239 South 13110 East Road
Pembroke Township, IL 60958

**Exhibit N**

```
Report: E401773R                    The Hartford - Benefit Management Services
Office: Minneapolis Claim Office       Comments: Summary Detail Report
Date Of Report:08/30/2017            Date Range: 06/16/2015 - 06/20/2017
                                       For business Role: Examiner
            Claimant: Edith Mccurry Insured Id : 9004534048 Claim Event Id: 15209161
                                          Case: Kenco
                   Claim Owner: Eric P Lee Role: Examiner Office: Minneapolis
```

01/04/2017 02:56:05 p.m. ET Eric P Lee Examiner Minneapolis   PHONE CALL
Type of Call: Outgoing          Date of Call: 01/04/2017                   Call To/From: Employer
Name: Kenco                                                                Conversation with:
Phone: (426) 643-3398      Extension:        Fax Number:

        c/o - number not correct/disconnected


01/04/2017 02:54:39 p.m. ET Eric P Lee Examiner Minneapolis   PHONE CALL
Type of Call: Outgoing          Date of Call: 01/04/2017                   Call To/From: Employer
Name: Kenco                                                                Conversation with:
Phone: (426) 643-3335      Extension:        Fax Number:

        c/o - number not correct/disconnected


01/04/2017 02:52:21 p.m. ET Eric P Lee Examiner Minneapolis   PHONE CALL
Type of Call: Outgoing          Date of Call: 01/04/2017                   Call To/From: Employer
Name: Kenco                                                                Conversation with:
Phone: (423) 643-3417      Extension:        Fax Number:

        c/o - ARL

        AA asked if ER knew anything about the lawsuit that EE has filed against ER? Er adv'd she does not, they had closed her
        file about when ER started there and she knows nothing about it. AA could call either:
        - Kathy Phillips (benefits mgr) 426 643 3335
        - Jay Elliot (legal rep that has been handling her case) 426 643 3398

        AA ack'd, will try those people.


01/04/2017 02:44:08 p.m. ET Eric P Lee Examiner Minneapolis   PHONE CALL
Type of Call: Outgoing          Date of Call: 01/04/2017                   Call To/From: Claimant
Name: Edith Mccurry                                                        Conversation with:
Phone: (815) 735-4281      Extension:        Fax Number:

        EE left vm - rec'd paperwork that AA sent. Gave them to AP, they filled them out, thinks they sent them back to HIG.
        Gave them to her AP and to her mental AP. They said they sent them to you. Unless AA thinks she gave them to the wrong
        AP, not sure.

        c/o - ARL

        AA adv'd that we have never rec'd forms so EE should call AP and have them re-send them. EE ack'd, will call AP.

# Exhibit O

Edith McCurry - 204038 - Kenco Logistics Services, LLC
W-2

**Form W-2 Wage & Tax Statement 2015**
**Copy B - To Be Filed With Employee's FEDERAL Tax Return.**
This information is being furnished to the Internal Revenue Service.

Department of the Treasury - Internal Revenue Service

OMB No. 1545-0008

| a Employee's social security number | 1 Wages, tips, other compensation | 2 Federal Income tax withheld |
|---|---|---|
| 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 | 12391.74 | 4.76 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| Kenco Logistics Services, LLC 2001 Riverside Drive Chattanooga, TN 37406 USA | 12494.64 | 774.75 |
| | 5 Medicare wages and tips | 6 Medicare tax withheld |
| | 12494.64 | 181.12 |
| | 7 Social security tips | 8 Allocated tips |
| | 0.00 | 0.00 |

| b Employer identification number (EIN) | 9 | 10 Dependent care benefits |
|---|---|---|
| 26-1454657 | | 0.00 |

| e Employee's name, address, and ZIP code | 11 Nonqualified plans | 13 Statutory employee ☐   Retirement plan ☑   Third-party sick pay ☑ |
|---|---|---|
| Edith McCurry 6239 S. 13110 E. Rd | 0.00 | |
| Pembroke Township, IL 60958 | 12 See Instructions for box 12  D 102.90  DD 3589.87 | 14 Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| IL | 26-14546570006 | 12391.74 | 28.11 | | | |

KENCO000006

**Form W-2 Wage & Tax Statement 2015**
**Copy 2 - To Be Filed With Employee's State, City, or Local Income Tax Return.**

Department of the Treasury - Internal Revenue Service

OMB No. 1545-0008

| | | |
|---|---|---|
| **a** Employee's social security number<br>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 | **1** Wages, tips, other compensation<br>12391.74 | **2** Federal income tax withheld<br>4.76 |
| **c** Employer's name, address, and ZIP code<br><br>Kenco Logistics Services, LLC<br>2001 Riverside Drive<br>Chattanooga, TN 37406<br>USA | **3** Social security wages<br>12494.64 | **4** Social security tax withheld<br>774.75 |
| | **5** Medicare wages and tips<br>12494.64 | **6** Medicare tax withheld<br>181.12 |
| | **7** Social security tips<br>0.00 | **8** Allocated tips<br>0.00 |
| **b** Employer identification number (EIN)<br>26-1454657 | **9** | **10** Dependent care benefits<br>0.00 |
| **e** Employee's name, address, and ZIP code<br><br>Edith McCurry<br>6239 S. 13110 E. Rd<br>Pembroke Township, IL 60958 | **11** Nonqualified plans<br>0.00 | **13** Statutory employee ☐   Retirement plan ☑   Third-party sick pay ☑ |
| | **12** See Instructions for box 12<br>D     102.90<br>DD    3589.87 | **14** Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| IL | 26-14546570006 | 12391.74 | 28.11 | | | |

KENCO000007

**Form W-2 Wage & Tax Statement 2015**
**Copy C-For EMPLOYEE'S RECORDS.**

This information is being furnished to the Internal Revenue Service. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

Department of the Treasury - Internal Revenue Service                           OMB No. 1545-0008

| a Employee's social security number 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 | 1 Wages, tips, other compensation 12391.74 | 2 Federal income tax withheld 4.76 |
|---|---|---|
| c Employer's name, address, and ZIP code  Kenco Logistics Services, LLC 2001 Riverside Drive Chattanooga, TN 37406 USA | 3 Social security wages 12494.64 | 4 Social security tax withheld 774.75 |
| | 5 Medicare wages and tips 12494.64 | 6 Medicare tax withheld 181.12 |
| | 7 Social security tips 0.00 | 8 Allocated tips 0.00 |
| b Employer identification number (EIN) 26-1454657 | 9 | 10 Dependent care benefits 0.00 |
| e Employee's name, address, and ZIP code  Edith McCurry 6239 S. 13110 E. Rd Pembroke Township, IL 60958 | 11 Nonqualified plans 0.00 | 13 Statutory employee ☐   Retirement plan ☑   Third-party sick pay ☑ |
| | 12 See instructions for box 12 D   102.90 DD   3589.87 | 14 Other |

| 15 State | Employer's state ID No. | 16 State wages, tips, etc | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| IL | 26-14546570006 | 12391.74 | 28.11 | | | |

KENCO000008

## 1. The following information reflects your final pay statement plus employer adjustments that comprise your W-2 statement.

| Earnings Description | Wages, Tips, Other Comp. | Social Security Wages | Medicare Wages |
|---|---|---|---|
| Gross Wages | 12834.10 | 12834.10 | 12834.10 |
| Less Exempt Wages | - 0.00 | - 0.00 | - 0.00 |
| Less Deferred Comp | - 102.90 | | |
| Less Housing/Transportation | - 0.00 | - 0.00 | - 0.00 |
| Less Dependent Care | - 0.00 | - 0.00 | - 0.00 |
| Less Sec 125 | - 339.46 | - 339.46 | - 339.46 |
| Less Excess Wages | | - 0.00 | |
| Taxable Wages (Reported on Form W2) | 12391.74 Box 1 of W-2 | 12494.64 Box 3 of W-2 | 12494.64 Box 5 of W-2 |

## 2. Employee W-4 profile to change your Employee W-4 profile information, file a new W-4 with the payroll department

FIT: S  0          SIT Res: ILSIT  M  9                    SIT Work: ILSIT  M  9

### Notice to Employee

**Do you have to file?** Refer to the Form 1040 Instructions to determine if you are required to file a tax return. Even if you do not have to file a tax return, you may be eligible for a refund if box 2 shows an amount or if you are eligible for any credit.

**Earned income credit (EIC).** You may be able to take the EIC for 2015 if your adjusted gross income (AGI) is less than a certain amount. The amount of the credit is based on income and family size. Workers without children could qualify for a smaller credit. You and any qualifying children must have valid social security numbers (SSNs). You cannot take the EIC if your investment income is more than the specified amount for 2015 or if income is earned for services provided while you were an inmate at a penal institution. For 2015 income limits and more information, visit www.irs.gov/eitc. Also see Pub. 596, Earned Income Credit. **Any EIC that is more than your tax liability is refunded to you, but only if you file a tax return.**

**Clergy and religious workers.** If you are not subject to social security and Medicare taxes, see Pub. 517, Social Security and Other Information for Members of the Clergy and Religious Workers.

**Corrections.** If your name, SSN, or address is incorrect, correct Copies B, C, and 2 and ask your employer to correct your employment record. Be sure to ask the employer to file Form W-2c, Corrected Wage and Tax Statement, with the Social Security Administration (SSA) to correct any name, SSN, or money amount error reported to the SSA on Form W-2. Be sure to get your copies of Form W-2c from your employer for all corrections made so you may file them with your tax return. If your name and SSN are correct but are not the same as shown on your social security card, you should ask for a new card that displays your correct name at any SSA office or by calling 1-800-772-1213. You also may visit the SSA at www.socialsecurity.gov.

**Cost of employer-sponsored health coverage (if such cost is provided by the employer).** The reporting in box 12, using code DD, of the cost of employer-sponsored health coverage is for your information only. **The amount reported with code DD is not taxable.**

**Credit for excess taxes.** If you had more than one employer in 2015 and more than $7,347 in social security or Tier 1 railroad retirement (RRTA) taxes were withheld, you may be able to claim a credit for the excess against your federal income tax. If you had more than one railroad employer and more than $4,321.80 in Tier 2 RRTA tax was withheld, you also may be able to claim a credit. See your Form 1040 or Form 1040A instructions and Pub. 505, Tax Withholding and Estimated Tax.

(Also see Instructions for Employee on the back of Copy C.)

### Instructions for Employee

(Also see Notice to Employee, on the back of Copy B.)

**Box 1.** Enter this amount on the wages line of your tax return.

**Box 2.** Enter this amount on the federal income tax withheld line of your tax return.

**Box 5.** You may be required to report this amount on Form 8959, Additional Medicare Tax. See Form 1040 instructions to determine if you are required to complete Form 8959.

**Box 6.** This amount includes the 1.45% Medicare Tax withheld on all Medicare wages and tips shown in Box 5, as well as the 0.9% Additional Medicare Tax on any of those Medicare wages and tips above $200,000.

**Box 8.** This amount is **not** included in boxes 1, 3, 5, or 7. For information on how to report tips on your tax return, see your Form 1040 instructions.

You must file Form 4137, Social Security and Medicare Tax on Unreported Tip Income, with your income tax return to report at least the allocated tip amount unless you can prove that you received a smaller amount. If you have records that show the actual amount of tips you received, report that amount even if it is more or less than the allocated tips. On Form 4137 you will calculate the social security and Medicare tax owed on the allocated tips shown on your Form(s) W-2 that you must report as income and on other tips you did not report to your employer. By filing Form 4137, your social security tips will be

### Instructions for Employee

(continued from back of Copy C)

**E**—Elective deferrals under a section 403(b) salary reduction agreement

**F**—Elective deferrals under a section 408(k)(6) salary reduction SEP

**G**—Elective deferrals and employer contributions (including nonelective deferrals) to a section 457(b) deferred compensation plan

**H**—Elective deferrals to a section 501(c)(18)(D) tax-exempt organization plan. See "Adjusted Gross Income" in the Form 1040 instructions for how to deduct.

**J**—Nontaxable sick pay (information only, not included in boxes 1, 3, or 5)

**K**—20% excise tax on excess golden parachute payments. See "Other Taxes" in the Form 1040 instructions.

**L**—Substantiated employee business expense reimbursements (nontaxable)

**M**—Uncollected social security or RRTA tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

**N**—Uncollected Medicare tax on taxable cost of group-term life insurance over $50,000 (former employees only). See "Other Taxes" in the Form 1040 instructions.

KENC0000009

credited to your social security record (used to figure your benefits).

**Box 10.** This amount includes the total dependent care benefits that your employer paid to you or incurred on your behalf (including amounts from a section 125 (cafeteria) plan). Any amount over $5,000 is also included in box 1. Complete Form 2441, Child and Dependent Care Expenses, to compute any taxable and nontaxable amounts.

**Box 11.** This amount is (a) reported in box 1 if it is a distribution made to you from a nonqualified deferred compensation or nongovernmental section 457(b) plan or (b) included in box 3 and/or 5 if it is a prior year deferral under a nonqualified or section 457(b) plan that became taxable for social security and Medicare taxes this year because there is no longer a substantial risk of forfeiture of your right to the deferred amount. This box should not be used if you had a deferral and a distribution in the same calendar year. If you made a deferral and received a distribution in the same calendar year, and you are or will be age 62 by the end of the calendar year, your employer should file Form SSA-131, Employer Report of Special Wage Payments, with the Social Security Administration and give you a copy.

**Box 12.** The following list explains the codes shown in box 12. You may need this information to complete your tax return. Elective deferrals (codes D, E, F, and S) and designated Roth contributions (codes AA, BB, and EE) under all plans are generally limited to a total of $18,000 ($12,500 if you only have SIMPLE plans; $21,000 for section 403(b) plans if you qualify for the 15-year rule explained in Pub. 571). Deferrals under code G are limited to $18,000. Deferrals under code H are limited to $7,000.

However, if you were at least age 50 in 2015, your employer may have allowed an additional deferral of up to $6,000 ($3,000 for section 401(k)(11) and 408(p) SIMPLE plans). This additional deferral amount is not subject to the overall limit on elective deferrals. For code G, the limit on elective deferrals may be higher for the last 3 years before you reach retirement age. Contact your plan administrator for more information. Amounts in excess of the overall elective deferral limit must be included in income. See the "Wages, Salaries, Tips, etc." line instructions for Form 1040.

**Note.** If a year follows code D through H, S, Y, AA, BB, or EE, you made a make-up pension contribution for a prior year(s) when you were in military service. To figure whether you made excess deferrals, consider these amounts for the year shown, not the current year. If no year is shown, the contributions are for the current year.

**A**—Uncollected social security or RRTA tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**B**—Uncollected Medicare tax on tips. Include this tax on Form 1040. See "Other Taxes" in the Form 1040 instructions.

**C**—Taxable cost of group-term life insurance over $50,000 (included in boxes 1, 3 (up to social security wage base), and 5)

**D**—Elective deferrals to a section 401(k) cash or deferred arrangement. Also includes deferrals under a SIMPLE retirement account that is part of a section 401(k) arrangement.

**P**—Excludable moving expense reimbursements paid directly to employee (not included in boxes 1, 3, or 5)

**Q**—Nontaxable combat pay. See the instructions for Form 1040 or Form 1040A for details on reporting this amount.

**R**—Employer contributions to your Archer MSA. Report on Form 8853, Archer MSAs and Long-Term Care Insurance Contracts.

**S**—Employee salary reduction contributions under a section 408(p) SIMPLE plan (not included in box 1)

**T**—Adoption benefits (not included in box 1). Complete Form 8839, Qualified Adoption Expenses, to compute any taxable and nontaxable amounts.

**V**—Income from exercise of nonstatutory stock option(s) (included in boxes 1, 3 (up to social security wage base), and 5). See Pub. 525 and instructions for Schedule D (Form 1040) for reporting requirements.

**W**—Employer contributions (including amounts the employee elected to contribute using a section 125 (cafeteria) plan) to your health savings account. Report on Form 8889, Health Savings Accounts (HSAs).

**Y**—Deferrals under a section 409A nonqualified deferred compensation plan

**Z**—Income under a nonqualified deferred compensation plan that fails to satisfy section 409A. This amount is also included in box 1. It is subject to an additional 20% tax plus interest. See "Other Taxes" in the Form 1040 instructions.

**AA**—Designated Roth contributions under a section 401(k) plan

**BB**—Designated Roth contributions under a section 403(b) plan

**DD**—Cost of employer-sponsored health coverage. **The amount reported with Code DD is not taxable.**

**EE**—Designated Roth contributions under a governmental section 457 (b) plan. This amount does not apply to contributions under a tax-exempt organization section 457(b) plan.

**Box 13.** If the "Retirement plan" box is checked, special limits may apply to the amount of traditional IRA contributions you may deduct. See Pub. 590, Individual Retirement Arrangements (IRAs).

**Box 14.** Employers may use this box to report information such as state disability insurance taxes withheld, union dues, uniform payments, health insurance premiums deducted, nontaxable income, educational assistance payments, or a member of the clergy's parsonage allowance and utilities. Railroad employers use this box to report railroad retirement (RRTA) compensation, Tier 1 tax, Tier 2 tax, Medicare tax and Additional Medicare Tax. Include tips reported by the employee to the employer in railroad retirement (RRTA) compensation.

**Note.** Keep **Copy C** of Form W-2 for at least 3 years after the due date for filing your income tax return. However, to help **protect your social security benefits**, keep Copy C until you begin receiving social security benefits, just in case there is a question about your work record and/or earnings in a particular year.

KENCO000010

**Exhibit P**



**ERISA**

**The Following Important Notice
is Provided by Your Employer
for your Information Only.**

**Conforming Instrument**

For the purpose of meeting certain requirements of the Employee Retirement
Income Security Act of 1974, the following information and the attached
Claim Procedures and Statement of ERISA Rights are provided for use with
your booklet-certificate to form the Summary Plan Description.

The benefits described in your booklet are provided under a group plan by
the Insurance Company and are subject to the terms and conditions of that
plan.

A copy of this plan is available for your review during normal working hours
in the office of the Plan Administrator.

1.  **Plan Name**

    Group Short Term Disability Plan for employees of KENCO GROUP,
    INC.

2.  **Plan Number**

    505

3.  **Employer/Plan Sponsor**

    KENCO GROUP, INC.
    3126 Alton Park Boulevard
    Chattanooga, TN 37401-1607

23

KENCO 001637

4. **Employer Identification Number**

62-0799523

5. **Type of Plan**

Welfare Benefit Plan providing Group Short Term Disability.

6. **Plan Administrator**

KENCO GROUP, INC.
3126 Alton Park Boulevard
Chattanooga, TN 37401-1607

7. **Agent for Service of Legal Process**

For the Plan:

KENCO GROUP, INC.
3126 Alton Park Boulevard
Chattanooga, TN 37401-1607

For the Policy:

Hartford Life And Accident Insurance Company
200 Hopmeadow St.
Simsbury, CT 06089

In addition to the above, Service of Legal Process may be made on a
plan trustee or the plan administrator.

24

KENCO 001638

8. **Sources of Contributions** -- The Employer pays the premium for the insurance, but may allocate part of the cost to the employee. The Employer determines the portion of the cost to be paid by the employee.

9. **Type of Administration** -- The plan is administered by the Plan Administrator with benefits provided in accordance with the provisions of the applicable group plan.

10. The Plan and its records are kept on a Policy Year basis.

11. **Labor Organizations**

   None

12. **Names and Addresses of Trustees**

   None

13. **Plan Amendment Procedure**

   The Plan Administrator reserves full authority, at its sole discretion, to terminate, suspend, withdraw, reduce, amend or modify the Plan, in whole or in part, at any time, without prior notice.

   The Employer also reserves the right to adjust your share of the cost to continue coverage by the same procedures.

25

KENCO 001639

## Statement of ERISA Rights

You are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

1. Receive Information About Your Plan and Benefits:

   a) Examine, without charge, at the plan administrator's office and at other specified locations, such as worksites and union halls, all documents governing the plan, including insurance contracts and collective bargaining agreements, and a copy of the latest annual report (Form 5500 Series) filed by the plan with the U.S. Department of Labor and available at the Public Disclosure Room of the Pension and Welfare Benefit Administration.

   b) Obtain, upon written request to the plan administrator, copies of documents governing the operation of the plan, including insurance contracts and collective bargaining agreements, and copies of the latest annual report (Form 5500 Series) and updated summary plan description. The administrator may make a reasonable charge for the copies.

   c) Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

2. Prudent Actions by Plan Fiduciaries:

   In addition to creating rights for plan participants ERISA imposes duties upon the people who are responsible for the operation of the employee benefit plan. The people who operate your plan, called "fiduciaries" of the plan, have a duty to do so prudently and in the interest of you and other plan participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA.

KENCO 001640

**Exhibit R**

## IN THE UNITED STATEDS DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| EDITH MCCURRY, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:19-CV-04067 |
| | ) |
| MARS, KENCO LOGISTICS SERVICES, | ) Hon. Judge Sharon Johnson |
| LLC, THE HARTFORD FINANCIAL | ) Coleman |
| SERVICES GROUP, INC., THE REED | ) |
| GROUP, and DR. KOEHLER, | ) Mag. Judge Gabriel A. Fuentes |
| | ) |
| Defendants. | |

## DEFENDANT KENCO LOGISTIC SERVICES, LLC'S RESPONSES TO PLAINTIFF'S
## REQUESTS TO ADMIT 19, 42 and 55

Defendant KENCO LOGISTIC SERVICES, LLC, ("KENCO"), pursuant to Magistrate

Judge Fuentes April 23 rulings, responds to Plaintiff's Requests to Admit 19, 42 and 55 as follows:

19.     Kenco was the plan administrator for disability benefits.

**RESPONSE:** Denied. Responding further, Kenco admits only that it was the Plan

Administrator of the Group Long Term Disability Plan for employees of KENCO (the "Plan") as

ERISA defines that term, and thus was responsible for certain Plan functions. Kenco denies,

however, that it retained any responsibility for making benefits decisions under the Plan because

it delegated exclusive discretionary authority to make those decisions to The Hartford under Policy

No. GLT-674076 issued by The Hartford to Kenco.

42.     Leonard Szplett did invoicing monthly.

**RESPONSE:** Kenco admits that Leonard Szplett prepared or sent out certain invoices to third
parties generally monthly.

55.     Defendant Kenco was to maintain its records for seven (7) years.

**RESPONSE:** Kenco admits that it maintains documents regarding benefits for seven (7) years.

Dated: May 7, 2021                                Respectfully submitted,

                                         By:   **KENCO LOGISTIC SERVICES, LLC**

                                                */s/ Jody Wilner Moran*
                                                Jody Wilner Moran
                                                Jackson Lewis P.C.
                                                150 North Michigan Avenue #2500
                                                Chicago, IL 60601
                                                (312) 787-4949
                                                Jody.Moran@jacksonlewis.com

| | |
|---|---|
| **From:** | Moore, Suzanne |
| **Sent:** | Thursday, October 23, 2014 9:45 AM |
| **To:** | McCurry, Edith; Szplett, Len |
| **Cc:** | LM.MTL@HartfordLife.com |

**Subject:** FW: ***Response Requested*** Vernon Henry: Leave ID: 498878184798

Please Reply-All with the information requested from Hartford.

This email in reference to Leave ID 498878184798 for Vernon Henry. We are in need of the total amount of hours he has worked from 10/19/2013 through 10/20/2014. Also, if applicable we also need temporary date of hire and hours worked. A decision on his leave is pending until the information is received. Please return this information to us by 12 p.m. on the next scheduled business day of 10/24/2014.

Thank you,

**Suzanne Moore**
Benefits Administrator
2001 Riverside Drive - Chattanooga, TN 37406
Office: 423-643-3415 • Fax: 423-643-3325



The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.

**From:** Tooman, Jill
**Sent:** Wednesday, October 22, 2014 2:40 PM
**To:** LM.MTL@HartfordLife.com
**Cc:** Moore, Suzanne
**Subject:** RE: ***Response Requested*** Vernon Henry: Leave ID: 498878184798

Hi Melissa –

He is not with the Kenco Stryker network so I can't answer.

Jill

**Jill Tooman**
Human Resource Manager
3555 Midlink Drive • Kalamazoo, MI 49048
Office: 269-276-4823 • Mobile: 269-929-4105
Fax: 269-276-4117 • Email: Jill.Tooman@kencogroup.com



The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have

10/23/2014



C C M S I ™

**Exhibit T**

July 10, 2015

Leonard Szplett
3421 W. 1500 North Rd
Kankakee, IL 60950

Dear Mr. Szplett

Cannon Cochran Management Services administers the benefits for Kenco
Logistic Services under their self-insured worker's compensation program.

We have reviewed the compiled information and must advise you that your injury
is not compensable under the Workers' Compensation Act.

Please provide your group health insurance information to your medical
providers.

Sincerely,

Griffin Knight
Claims Representative



**Exhibit U**

P.O. Box 1607
3001 Riverside Drive (37406)
Chattanooga, TN 37401

Phone 423-622-1113
Fax 423-643-3325
www.kencogroup.com

April 2, 2013

EDITH MCCURRY
6239 S. 13110 E. Rd
Pembroke Township, IL 60958

Dear EDITH:

It is a pleasure to confirm our offer of employment to you. You will be employed at our KENCO MARS facility in Manteno, IL as a Clerk on the 1st Shift.

Below are the details of the offer:

- Your start date is April 21, 2013
- Your starting base pay will be $15.81, per hour, paid weekly
- You are eligible for a transition bonus of $1300.00, to be paid out in $433.33 increments following your 30th, 60th and 90th day of employment. If your employment ends within 90 days, the increments that the transition bonus is paid will not be paid in a prorated amount.
- You will begin accruing PTO under Kenco's PTO policy on April 21, 2013.
- The rate that you will accrue PTO under Kenco's PTO Policy will be based off of your 4Ts anniversary date of 6/14/1999.
- Based on completion of defined goals, objectives, and overall financial performance of the Company you may receive an increase in your wage. This will be determined through annual performance evaluations with your manager.

Kenco will be paying for temporary health coverage during the first 90 days of employment through Starbridge. You will have 30 days to elect the coverage level, but regardless of when you enroll, both the coverage and the premium are retroactive to your start date. Enrollment in Starbridge will take place during your new hire orientation. Your temporary health care coverage will end on your 90th day of employment.

You are eligible for the company benefit program on your 91st day of employment. The company's benefit program includes medical, dental and prescription drug coverage, an employer-matched 401(k) plan, short and long-term disability coverage, group life insurance and PTO.

The offer of employment is contingent upon the completion of a successful pre-employment drug screen analysis and criminal background check. We reserve the right to withdraw this offer if the drug screen analysis result or the background check is unfavorable. Your employment with Kenco is at-will and either party can terminate the relationship at any time, with or without cause and with or without notice.



**EXHIBIT**
**3**

7/24/2017                        Employer View: Claims Inquiry - Detailed Claim Status          **Exhibit V**


THE
HARTFORD

If this employee has returned to work, please contact the claim office at the number indicated below.

Claims Status

| Employee Name: | EDITH MCCURRY | | | Type of Absence Status |
| Employee SSN: | 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 | | | |
| Claim Office #: | — | | | Claim Reason |
| Claim Handler: | | | | |
| Claim Appealed: | No | | | |

| Type of Claim | Employee Group | Insured ID | Date of Disability | Benefit Effective Date | Benefits Approved Through |
|---|---|---|---|---|---|
| STD - NST | KLS101-MARS | 9004534048 | 01/05/2015 | 01/19/2015 | 07/19/2015 |

| Status | Effective Date of Status | Status Reason |
|---|---|---|
| TERMINATE | 07/20/2015 | BENEFITS EXPIRE |
| APPROVED | 05/16/2015 | OTHER |
| TERMINATE | 05/16/2015 | NO LONGER MEETS DEFINITION OF DISABILITY |
| APPROVED | 05/01/2015 | OTHER |
| TERMINATE | 05/01/2015 | RELEASED TO RETURN TO WORK |
| APPROVED | 02/02/2015 | OTHER |
| TERMINATE | 02/02/2015 | NO LONGER MEETS DEFINITION OF DISABILITY |
| APPROVED | 01/23/2015 | N/A |
| PENDING | 01/13/2015 | N/A |
| PAPERLESS INTAKE | 01/05/2015 | N/A |

Definitions: AP = attending physician

Claims Payment

| Check Number | Payee | Payment Date | Amount* | Payment From | Payment Through |
|---|---|---|---|---|---|
| EFT | EDITH MCCURRY | 07/17/2015 | $364.43 | 07/13/2015 | 07/19/2015 |
| EFT | EDITH MCCURRY | 07/10/2015 | $364.43 | 07/06/2015 | 07/12/2015 |
| EFT | EDITH MCCURRY | 07/01/2015 | $364.43 | 06/29/2015 | 07/05/2015 |
| EFT | EDITH MCCURRY | 06/26/2015 | $364.43 | 06/22/2015 | 06/28/2015 |
| EFT | EDITH MCCURRY | 06/16/2015 | $1,822.15 | 05/16/2015 | 06/21/2015 |
| EFT | EDITH MCCURRY | 06/01/2015 | $801.75 | 05/01/2015 | 05/15/2015 |
| EFT | EDITH MCCURRY | 04/30/2015 | $291.55 | 04/27/2015 | 04/30/2015 |
| EFT | EDITH MCCURRY | 04/24/2015 | $364.43 | 04/20/2015 | 04/26/2015 |
| EFT | EDITH MCCURRY | 04/14/2015 | $1,093.29 | 03/29/2015 | 04/19/2015 |
| EFT | EDITH MCCURRY | 03/27/2015 | $364.43 | 03/23/2015 | 03/28/2015 |
| EFT | EDITH MCCURRY | 03/20/2015 | $364.43 | 03/16/2015 | 03/22/2015 |
| EFT | EDITH MCCURRY | 03/13/2015 | $364.43 | 03/09/2015 | 03/15/2015 |
| EFT | EDITH MCCURRY | 03/06/2015 | $364.43 | 03/02/2015 | 03/08/2015 |
| EFT | EDITH MCCURRY | 02/25/2015 | $1,457.72 | 02/02/2015 | 03/01/2015 |
| EFT | EDITH MCCURRY | 01/30/2015 | $364.43 | 01/26/2015 | 02/01/2015 |
| EFT | EDITH MCCURRY | 01/23/2015 | $364.43 | 01/19/2015 | 01/25/2015 |

Cancel

© 2017 The Hartford                                    Terms of Use    Security    Privacy Policy    About Us

KENCO001478



If this employee has returned to work, please contact the claim office at the number indicated below.

Claims Status

| Employee Name: | EDITH MCCURRY | | Claim Index |
| Employee SSN: | 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 | | |
| Claim Office #: | – Ext. 2308955 | | |
| Claim Handler: | ERIC LEE | | |
| Claim Appealed: | No | | |

| Type of Claim | Employee Group | Insured ID | Date of Disability | Benefit Effective Date | Benefits Approved Through |
|---|---|---|---|---|---|
| LTD – ABIL | KLS101-MARS | 9004534048 | 01/05/2015 | 07/20/2015 | 07/19/2017 |

| Status | Effective Date of Status | Status Reason |
|---|---|---|
| APPROVED | 07/13/2016 | N/A |
| PENDING | 04/17/2016 | OTHER |
| DENIED | 11/13/2015 | LACK OF ATTENDING PHYSICIAN INFORMATION |
| PENDING | 06/19/2015 | N/A |
| FIRST NOTICE | 06/16/2015 | N/A |

Definitions: AP = attending physician

Claims Payment

| Check Number | Payee | Payment Date | Amount* | Payment From | Payment Through |
|---|---|---|---|---|---|
| EFT | EDITH MCCURRY | 07/18/2017 | $966.89 | 07/01/2017 | 07/19/2017 |
| EFT | EDITH MCCURRY | 06/16/2017 | $1,526.68 | 06/01/2017 | 06/30/2017 |
| EFT | EDITH MCCURRY | 05/17/2017 | $1,526.68 | 05/01/2017 | 05/31/2017 |
| EFT | EDITH MCCURRY | 04/18/2017 | $1,526.68 | 04/01/2017 | 04/30/2017 |
| EFT | EDITH MCCURRY | 03/16/2017 | $1,526.68 | 03/01/2017 | 03/31/2017 |
| EFT | EDITH MCCURRY | 02/16/2017 | $1,526.68 | 02/01/2017 | 02/28/2017 |
| EFT | EDITH MCCURRY | 01/18/2017 | $1,526.68 | 01/01/2017 | 01/31/2017 |
| EFT | EDITH MCCURRY | 12/16/2016 | $1,526.68 | 12/01/2016 | 12/31/2016 |
| EFT | EDITH MCCURRY | 11/16/2016 | $1,526.68 | 11/01/2016 | 11/30/2016 |
| EFT | EDITH MCCURRY | 10/18/2016 | $1,526.68 | 10/01/2016 | 10/31/2016 |
| EFT | EDITH MCCURRY | 09/16/2016 | $1,526.68 | 09/01/2016 | 09/30/2016 |
| EFT | EDITH MCCURRY | 08/17/2016 | $1,526.68 | 08/01/2016 | 08/31/2016 |
| EFT | EDITH MCCURRY | 07/13/2016 | $18,930.83 | 07/20/2015 | 07/31/2016 |

Cancel

© 2017 The Hartford

Terms of Use    Security    Privacy Policy    About Us

KENCO001498



### Claim Notes

| | |
|---|---|
| Employee Name: | EDITH MCCURRY |
| Employee SSN: | 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 |
| Coverage: | STD |
| Date of Disability: | 01/05/2015 |
| Claim Office #: | -- |

| Notes | Date/Time | Category | Subcategory |
|---|---|---|---|
| | 01/06/2017 02:01:00 AM | Absence Management | FMLA HLI |
| | 01/06/2017 02:01:00 AM | Absence Management | FMLA HLI |
| | 06/23/2015 10:35:25 AM | Claim Management | Examiner Claim Management Plan |
| | 06/16/2015 11:08:49 AM | Phone Call | Claimant (Outbound / Unsuccessful) |
| | 06/16/2015 11:07:23 AM | Claim Management | Examiner Claim Management Plan |
| | 06/16/2015 08:52:50 AM | Claim Management | CCM Functional Assessment / Pre-Ex |
| | 06/12/2015 04:16:04 PM | Faxreceipt-EDM | Medical Records-EDM |
| | 06/12/2015 02:42:41 PM | Phone Call | Claimant (Outbound) |
| | 06/12/2015 02:18:41 PM | Phone Call | Physician (Outbound / Unsuccessful) |
| | 06/11/2015 11:32:13 AM | Claim Management | CCM Case Management Plan |
| | 06/11/2015 11:09:46 AM | Claim Management | CCM Case Management Plan |
| | 06/10/2015 08:58:26 AM | Claim Management | Examiner Claim Management Plan |
| | 06/08/2015 11:37:29 AM | Phone Call | Claimant (Outbound) |
| | 06/08/2015 11:30:38 AM | Claim Management | Examiner Claim Management Plan |
| | 06/05/2015 03:33:57 PM | Phone Call | Medical Examiner (Inbound) |
| | 06/02/2015 11:22:49 AM | Faxreceipt-EDM | Medical Records-EDM |
| | 06/01/2015 07:04:00 PM | General | MRC Fax Successful |
| | 06/01/2015 01:31:28 PM | Phone Call | Claimant (Outbound) |
| | 06/01/2015 01:30:42 PM | Claim Management | Examiner Claim Management Plan |
| | 05/31/2015 11:08:49 AM | Absence Management | FMLA HLI |
| | 05/31/2015 11:04:05 PM | Claim Management | Examiner Approval/Denial Recommendation |
| | 05/27/2015 05:19:43 PM | Claim Management | CCM Functional Assessment / Pre-Ex |
| | 05/23/2015 09:45:08 PM | Claim Management | CCM Functional Assessment / Pre-Ex |
| | 05/21/2015 09:52:19 AM | Claim Management | Examiner Claim Management Plan |
| | 05/15/2015 12:18:46 PM | Phone Call | Claimant (Outbound / Unsuccessful) |
| | 05/15/2015 11:52:33 AM | Claim Management | Examiner Claim Management Plan |
| | 05/13/2015 04:09:19 PM | Phone Call | Medical Provider (Inbound) |
| | 05/13/2015 01:30:18 PM | General | MRC Fax Successful |
| | 05/11/2015 05:11:21 PM | Faxreceipt-EDM | Medical Records-EDM |
| | 05/11/2015 02:45:46 PM | Faxreceipt-EDM | Medical Records-EDM |
| | 05/11/2015 02:38:18 PM | Faxreceipt-EDM | Medical Records-EDM |
| | 05/11/2015 02:38:18 PM | Faxreceipt-EDM | Medical Records-EDM |
| | 05/11/2015 12:19:12 PM | Faxreceipt-EDM | Medical Records-EDM |
| | 05/11/2015 10:59:40 AM | Faxreceipt-EDM | Medical Records-EDM |
| | 05/08/2015 10:16:58 AM | General | MRC Fax Successful |
| | 05/08/2015 09:23:34 AM | Phone Call | Claimant (Outbound) |
| | 05/08/2015 09:07:05 AM | Phone Call | Physician (Inbound) |
| | 05/08/2015 09:06:04 AM | Phone Call | Physician (Outbound) |
| | 05/08/2015 09:00:07 AM | Claim Management | Examiner Claim Management Plan |
| | 05/05/2015 06:30:49 AM | Faxreceipt-EDM | Correspondence-EDM |
| | 05/04/2015 03:56:05 PM | Phone Call | Claimant (Inbound) |
| | 04/16/2015 04:20:18 PM | Phone Call | Claimant (Outbound) |
| | 04/14/2015 04:59:59 PM | Phone Call | Claimant (Outbound) |
| | 04/14/2015 02:14:14 PM | Phone Call | Claimant (Inbound) |
| | 04/14/2015 08:37:23 AM | Claim Management | Examiner Approval/Denial Recommendation |
| | 04/14/2015 08:36:39 AM | Absence Management | FMLA HLI |
| | 04/14/2015 07:20:30 AM | Claim Management | CCM Functional Assessment / Pre-Ex |
| | 04/09/2015 03:55:53 PM | Phone Call | Claimant (Outbound) |
| | 04/09/2015 03:46:52 PM | Claim Management | Examiner Claim Management Plan |
| | 04/03/2015 04:34:57 PM | Faxreceipt-EDM | Medical Records-EDM |
| | 04/03/2015 10:41:08 AM | General | MRC Fax Successful |
| | 04/03/2015 09:43:19 AM | Phone Call | Claimant (Inbound) |
| | 04/03/2015 09:32:52 AM | Phone Call | Claimant (Outbound / Unsuccessful) |

KENCO001479

| Notes | Date/Time | Category | Subcategory |
|---|---|---|---|
| | 04/03/2015 09:32:47 AM | Claim Management | Examiner Claim Management Plan |
| | 04/03/2015 09:30:33 AM | Phone Call | Physician (Outbound) |
| | 03/30/2015 06:30:56 AM | Faxreceipt-EDM | APS-EDM |
| | 03/27/2015 05:27:38 PM | Faxreceipt-EDM | APS-EDM |
| | 03/27/2015 02:49:09 PM | Absence Management | FMLA HLI |
| | 03/27/2015 02:48:22 PM | Phone Call | Claimant (Inbound) |
| | 03/25/2015 11:51:49 AM | Claim Management | Examiner Claim Management Plan |
| | 03/23/2015 02:48:54 PM | Phone Call | Claimant (Inbound) |
| | 03/20/2015 02:10:57 PM | Phone Call | Claimant (Inbound) |
| | 03/20/2015 01:30:02 PM | Phone Call | Claimant (Inbound) |
| | 03/20/2015 01:21:13 PM | Phone Call | Claimant (Inbound) |
| | 03/19/2015 10:53:15 AM | Faxreceipt-EDM | Correspondence-EDM |
| | 03/19/2015 10:43:20 AM | Claim Management | Examiner Claim Management Plan |
| | 03/19/2015 10:42:47 AM | Phone Call | Claimant (Outbound) |
| | 03/18/2015 11:43:35 AM | Phone Call | Claimant (Inbound) |
| | 03/18/2015 08:21:01 AM | Claim Management | Examiner Claim Management Plan |
| | 03/17/2015 06:32:00 AM | Faxreceipt-EDM | Correspondence-EDM |
| | 03/17/2015 06:32:00 AM | Faxreceipt-EDM | Correspondence-EDM |
| | 03/17/2015 06:32:00 AM | Faxreceipt-EDM | Correspondence-EDM |
| | 03/17/2015 06:31:56 AM | Faxreceipt-EDM | Correspondence-EDM |
| | 03/16/2015 04:32:25 PM | Phone Call | Claimant (Inbound) |
| | 03/16/2015 09:44:10 AM | Phone Call | Claimant (Inbound) |
| | 02/25/2015 09:41:21 AM | Claim Management | Examiner Approval/Denial Recommendation |
| | 02/25/2015 09:40:37 AM | Phone Call | Claimant (Outbound) |
| | 02/25/2015 09:38:49 AM | Absence Management | FMLA HLI |
| | 02/24/2015 03:17:27 PM | Phone Call | Claimant (Inbound) |
| | 02/19/2015 09:24:39 AM | Claim Management | CCM Functional Assessment / Pre-Ex |
| | 02/18/2015 04:52:46 PM | Phone Call | Claimant (Outbound) |
| | 02/18/2015 01:52:35 PM | Claim Management | CCM Functional Assessment / Pre-Ex |
| | 02/18/2015 01:23:46 PM | Phone Call | Claimant (Outbound) |
| | 02/18/2015 12:30:15 PM | Claim Management | Examiner Claim Management Plan |
| | 02/17/2015 05:49:04 PM | Phone Call | Claimant (Inbound) |
| | 02/16/2015 02:35:37 PM | Phone Call | Claimant (Inbound) |
| | 02/16/2015 06:31:07 AM | Faxreceipt-EDM | Medical Records-EDM |
| | 02/12/2015 08:59:31 AM | Claim Management | Examiner Claim Management Plan |
| | 02/11/2015 09:12:19 AM | Claim Management | Examiner Claim Management Plan |
| | 02/06/2015 05:09:16 AM | General | MRC Fax Successful |
| | 02/03/2015 10:37:55 AM | Phone Call | Claimant (Inbound) |
| | 02/03/2015 10:35:14 AM | General | MRC Fax Successful |
| | 02/03/2015 10:17:04 AM | Phone Call | Claimant (Outbound) |
| | 02/03/2015 10:16:14 AM | Claim Management | Examiner Claim Management Plan |
| | 01/30/2015 05:13:18 PM | Phone Call | Claimant (Inbound) |
| | 01/29/2015 07:45:59 PM | Phone Call | Claimant (Outbound) |
| | 01/29/2015 10:33:34 AM | Claim Management | Examiner Claim Management Plan |
| | 01/23/2015 04:43:17 PM | Phone Call | Claimant (Outbound) |
| | 01/23/2015 09:10:28 AM | Absence Management | FMLA HLI |
| | 01/23/2015 09:10:14 AM | General | Initial Decision Tracker |
| | 01/23/2015 09:02:13 AM | Claim Management | Examiner Approval/Denial Recommendation |
| | 01/20/2015 04:46:51 PM | Phone Call | Claimant (Inbound) |
| | 01/20/2015 09:57:41 AM | Phone Call | Claimant (Outbound / Unsuccessful) |
| | 01/20/2015 09:51:54 AM | Claim Management | Examiner Claim Management Plan |
| | 01/19/2015 02:42:04 PM | Faxreceipt-EDM | APS-EDM |
| | 01/19/2015 11:00:10 AM | Phone Call | Claimant (Inbound) |
| | 01/19/2015 10:40:33 AM | Phone Call | Claimant (Inbound) |
| | 01/13/2015 04:27:23 PM | Phone Call | Claimant (Outbound) |
| | 01/13/2015 08:58:42 AM | Claim Management | Examiner Claim Management Plan |
| | 01/12/2015 05:06:20 PM | Claim Management | Clinical Impression |
| | 01/12/2015 05:04:04 PM | General | Initial Decision Tracker |
| | 01/12/2015 05:04:02 PM | Telephonic | Physician |
| | 01/12/2015 01:23:11 PM | Faxreceipt-EDM | APS-EDM |
| | 01/12/2015 01:23:07 PM | Faxreceipt-EDM | APS-EDM |
| | 01/12/2015 11:19:39 AM | Phone Call | Claimant (Inbound) |
| | 01/09/2015 03:08:01 PM | Phone Call | Claimant (Outbound / Unsuccessful) |
| | 01/05/2015 08:46:29 AM | Telephonic | Employer |
| | 01/05/2015 08:46:07 AM | Absence Management | FMLA HLI |
| | 01/05/2015 08:46:07 AM | Telephonic | Employee |
| | 01/05/2015 08:46:06 AM | General | Causality |

KENCO001480

| Notes | Date/Time | Category | Subcategory |
|-------|-----------|----------|-------------|
|       | 01/05/2015 08:39:17 AM | Claim Management | Financial Management |

Cancel

---

© 2017 The Hartford

KENCO001481

**Exhibit W**



**THE HARTFORD**

October 19, 2018

Jordan T. Hoffman, Esquire
Law Office Of Jordan Travaille Hoffman Pc
2711 East New York St
Aurora, IL 60502

| | |
|---|---|
| Policy Holder: | Kenco |
| Claimant: | Edith Mccurry |
| Insured ID: | 9004534048 |
| Policy Number: | GLT674076 |

Dear Mr. Hoffman:

This letter is regarding your client's Long Term Disability (LTD) benefits.

In response to your letter dated 10/10/18:

The Information provided by Kenco detailed that Ms. McCurry's job title was Administrative Assistant and that is why it was communicated that way in the denial letter. I have attempted to contact Kenco to clarify her position but have received no response. I have reviewed the Vocational Case Manager's employability analysis and it was actually prepared using Ms. McCurry's stated position of HR Administrator. As such, the determination was made based on Ms. McCurry's stated job title of HR Administrator rather than Administrative Assistant.

As detailed in the denial letter, Dr. Troupe was very much included in the overall analysis of Ms. McCurry's claim. Our Behavioral Health Case Manager sent Dr. Troupe a letter on 7/11/18 seeking to clarify Ms. McCurry's restrictions. No response was received. The independent outside medical professional reviewed the entire file, including Dr. Troupe's office visit notes. That professional also attempted to contact Dr. Troupe on 8/1/18, 8/2/18 (twice) and 8/3/18. Dr. Troupe did call back on 8/2/18 and leave a voice message but did not respond otherwise. A copy of the independent peer report was sent to Dr. Troupe on 8/31/18 for comment. Dr. Troupe did not respond.  All of this information just recited (except for the last line detailing that the report was sent to Dr. Troupe) was detailed in the denial letter.

As to reduced benefits, there is no provision in the Policy that calls for reduced benefits unless Ms. McCurry is paid an Other Income Benefit (such as Social Security Disability) or if she is working and has Current Monthly Earnings. As set forth in the denial letter, the determination is that Ms. McCurry is capable of a level of work that would allow her to earn more than the sum of her Indexed Pre-disability Earnings and the Benefit Percentage as detailed in the definitions of Disability and of Any Occupation. As she does not meet the definition of Disability, she is not entitled to benefits as of 7/20/17.

Benefit Management Services
Minneapolis Disability Claim O[...]
The Hartford
P.O. Box 14305
Lexington, KY 40512-4305
800-549-6514
Fax (866) 411-5613

EXHIBIT 19

As set forth in the letter, if you disagree with the determination, you may appeal the decision and submit any additional medical information you wish to have considered and our appeals department will evaluate it.

Finally, the Attending Physician Statement sent from the Reed Group was not sent by the Hartford. The Reed Group is a different company. It would normally be sent to initiate a period of Disability from work. If Ms. McCurry is or has been working during the last 2 years, please provide details of her work including employer, job title and paystubs.

If you have any questions, please call Customer Service at 800-549-6514. Our hours are Monday through Friday, between 8:00 AM - 8:00 PM CST.

Sincerely,

*Eric Lee*

Eric Lee, Senior Ability Analyst
Hartford Life and Accident Insurance Co.

Benefit Management Services
Minneapolis Disability Claim Office
The Hartford
P.O. Box 14305
Lexington, KY 40512-4305

| | |
|---|---|
| **From:** | Moore, Suzanne |
| **Sent:** | Thursday, October 23, 2014 9:45 AM |
| **To:** | McCurry, Edith; Szplett, Len |
| **Cc:** | LM.MTL@HartfordLife.com |

**Subject:** FW: ***Response Requested*** Vernon Henry: Leave ID: 498878184798

Please Reply-All with the information requested from Hartford.

This email in reference to Leave ID 498878184798 for Vernon Henry. We are in need of the total amount of hours he has worked from 10/19/2013 through 10/20/2014. Also, if applicable we also need temporary date of hire and hours worked. A decision on his leave is pending until the information is received. Please return this information to us by 12 p.m. on the next scheduled business day of 10/24/2014.

Thank you,

**Suzanne Moore**
Benefits Administrator
2001 Riverside Drive · Chattanooga, TN 37406
Office: 423-643-3415 · Fax: 423-643-3325



The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have received this communication in error, please notify the sender immediately by return email, and destroy this communication and all copies of it, including all attachments.

**From:** Tooman, Jill
**Sent:** Wednesday, October 22, 2014 2:40 PM
**To:** LM.MTL@HartfordLife.com
**Cc:** Moore, Suzanne
**Subject:** RE: ***Response Requested*** Vernon Henry: Leave ID: 498878184798

Hi Melissa –

He is not with the Kenco Stryker network so I can't answer.

Jill

**Jill Tooman**
Human Resource Manager
3555 Midlink Drive · Kalamazoo, MI 49048
Office: 269-276-4823 · Mobile: 269-929-4105
Fax: 269-276-4117 · Email: Jill.Tooman@kencogroup.com



The information contained in this electronic communication and any accompanying document is confidential and is intended only for the use of the addressee. Unauthorized use, disclosure or copying of this communication, or any part of it, is strictly prohibited and may be unlawful. If you have

10/23/2014



**Exhibit Y**



## IMPORTANT AND TIME SENSITIVE UPDATE REGARDING ERISA DISABILITY CLAIMS PROCEDURES

*NOTE: THE FOLLOWING NOTICE PERTAINS ONLY TO PLANS GOVERNED BY THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974 ("ERISA").*

Dear Plan Sponsor,

As we have informed you, the Department of Labor ("DOL") amended the ERISA claim regulations for claims requiring a determination of disability and they will apply to claims filed on or after April 1, 2018. The Hartford has updated our disability claims procedures for claims filed on or after April 1, 2018 in order to ensure full compliance with the new requirements. Click here to access the new updated claims procedures ›

### For Fully Insured Plans

The Hartford's claims procedures are set forth in your Booklet-Certificate, at the end in the "ERISA Notice" section. **The current claims procedures will continue to be applicable to claims filed before April 1, 2018.** If your Booklet-Certificate is reissued after April 1st, the ERISA Notice will contain the revised claims procedures. **In the meantime, because The Hartford will be adjudicating claims in accordance with the updated claims procedures, it is important that you, as plan fiduciary, distribute the updated claim procedures to your participants by April 1st, and incorporate the revised claims procedures into your Disability Benefit Plan.**

### For Administrative Services Only (ASO, or Self-Funded) Plans

If The Hartford provides administrative services to your self-funded ERISA plan, this letter serves as notice that The Hartford is changing its disability claims procedures for claims filed on or after April 1, 2018 as a result of the amended regulations.

**If The Hartford provides Claim Fiduciary Services for your ERISA plan**, you have delegated to us responsibility, discretion, and authority to construe and interpret all terms of the plan in accordance with your Administrative Services Agreement. **Because The Hartford will be adjudicating claims in accordance with the updated claims procedures, it is important that you, as plan fiduciary, distribute the updated claim procedures to your participants by April 1st, and incorporate the revised claims procedures into your Disability Benefit Plan.**

- **If you make the final decision on claims**, you may wish to review the revised procedures to determine if such procedures should be incorporated into your disability benefit plan document.

*Please note: For ASO plans managing an appeals process outside of The Hartford, you must ensure changes to the ERISA claim regulations are addressed within your own policies and procedures.*



### Need More Information?

Please access these Frequently Asked Questions, and be advised that this notice is also available electronically via Employer View® to Policyholders who are registered Employer View users. Contact your Hartford Representative should you have any further questions.

*The Hartford makes no representations with regard to your plan sponsor or plan fiduciary obligations and this letter should not be construed as legal advice. We encourage you to discuss any questions you may have with respect to your legal obligations with your benefits counsel.*

**Prepare. Protect. Prevail. With The Hartford.®**

Privacy Policy      |      Contact Us

The Hartford® The Hartford Financial Services Group, Inc. and its subsidiaries including issuing companies Hartford Life Insurance Company and Hartford Life and Accident Insurance Company. Home office is One Hartford Plaza, Hartford, CT 06155 United States. This is an insurance advertisement.

**APPENDIX A**
**To the**
**WAREHOUSE MANAGEMENT AGREEMENT**
**between**
**MARS**
**and**

## <u>FINAL OPERATING BUDGET</u>

<u>Rates and Charges</u>:  MARS will pay Contractor for the Management Services in accordance with the rates and charges to be set forth in this Appendix A.

The final Operating Budget may be revised from time to time due to changes in the assumptions underlying the foregoing calculations, but only with the prior written approval of Mars, not to be reasonable withheld.

The balance of this page intentionally left blank

DEF000029

**Mars RFP Pricing Template**

*Only submission is back, in this format, will be considered*

*Please note Mars only expects your inputs in blue cells, like this one*

| Category/Cost Component | Cost Model | Quantity | Price per Piece | Annual Cost | Total Cost by Subsection | Mars Comments | 3PL Comments |
|---|---|---|---|---|---|---|---|
| **Storage Expense Section:** | | | | | | | |
| HVAC Maintenance & Repair | Pass Thru | | | $79,800 | $79,800 | 3PL to contract and pay vendor, then pass thru costs - Mars | |
| **Other Building, Land & Assets:** | | | | | | | |
| BL&A - Warehouse Lease | Direct | | | | | Mars handles this directly | |
| BL&A - Taxes | Direct | | | | | Mars handles this directly | |
| BL&A - Fire Protection | Direct | | | | | Mars handles this directly | |
| BL&A - Insurance | Direct | | | | | Mars handles this directly | |
| BL&A - License - Business | Pass Thru | | | $0 | $0 | Mars provided the 2013 estimate | Calculated into the G&A costs included in "Other Misc Expense" below |
| BL&A - Rack Expense/Amortization | Direct | | | | | Mars handles this directly | |
| **System Expense (Transitional Setup):** | | | | | | | |
| System Related Equipment | Pass Thru | | | $0 | | | |
| System Related Equipment Maintenance & Repair | Pass Thru | | | $0 | $55,354 | | |
| System Related Site Preparation | Pass Thru | | | $46,500 | | | |
| System Related Travel | Pass Thru | | | $9,434 | | | Three (3) weeks for IT resource on-site...#41 only |
| **System Expense (Stable, Steady State):** | | | | | | | |
| System Related Equipment | Pass Thru | | | $18,050 | | Anticipate tune ups potentially required | |
| System Related Equipment Maintenance & Repair | Pass Thru | | | $43,200 | $125,395 | | On-going support |
| System Related Site Preparation | Pass Thru | | | $57,851 | | | |
| System Related Travel | Pass Thru | | | $6,285 | | Anticipate travel and tune ups potentially required | Four (4) trips annually for training of Power Users (2) |
| **Utilities:** | | | | | | | |
| Electric | Pass Thru | | | $487,407 | | Mars provided the 2013 estimate | |
| Gas | Pass Thru | | | $32,500 | $596,992 | Mars provided the 2013 estimate | |
| Waste Disposal | Pass Thru | | | $43,316 | | Mars provided the 2013 estimate | |
| Water/Sewage | Pass Thru | | | $33,774 | | Mars provided the 2013 estimate | |
| **Warehouse Expense:** | | | | | | | |
| Alarm System Monitoring | Pass Thru | | | $15,434 | | Mars provided the 2013 estimate | |
| Guard Service / Security | Pass Thru | | | $262,080 | | | Two (2) guards on duty included on a schedule of 24/7 |
| Pest Control Service | Pass Thru | | | $41,856 | | | Pest control cost would be on a two year agreement with the vendor |
| Fogging | Pass Thru | | | $4,171 | $339,370 | | Fogging is available in Martenco, as indicated per facility tour |
| Insurance | Pass Thru | | | $0 | | | Covered in "Other Expense" section below |
| Tax - Personal Property | Pass Thru | | | $20,000 | | | |
| Trailer Repairs - Carrier | Pass Thru | | | | | 3PL to pay taxes, then pass thru costs - no estimate needed | |
| **Maintenance & Repair:** | | | | | | | |
| Maint & Rep Building / Sprinklers | Pass Thru | | | $264,997 | | Mars provided the 2013 estimate | |
| Maint & Rep Doors / Docks | Pass Thru | | | $90,479 | | Mars provided the 2013 estimate | |
| Maint & Rep Grounds | Pass Thru | | | $86,396 | | Mars provided the 2013 estimate | |
| Maint & Rep Sanitation | Pass Thru | | | $206,559 | $670,350 | Mars provided the 2013 estimate | |
| Maint & Rep Racks | Pass Thru | | | $19,919 | | Mars provided the 2013 estimate | |
| Maint & Rep Other | Pass Thru | | | $2,000 | | Mars provided the 2013 estimate | |
| **Equipment & Supplies:** | | | | | | | |
| Floor Cleaning - Cleaning Supplies | Pass Thru | | | $54,900 | | | Cleaning supplies, janitorial service for office, breakroom and restroom cleaning |
| Pest Control | Pass Thru | | | $5,000 | | | Striping and sanitation lines upkeep, along with initial re-striping |
| Safety | Pass Thru | | | $2,500 | $125,039 | | Safety equipment, signage, training |
| Lighting | Pass Thru | | | $6,000 | | | |
| Other - Equipment & Supplies | Pass Thru | | | $56,639 | | | Cost for scrubber, golf cart (1), scissor lift, and stretchwrappers (2) |
| **External Storage Sell Off Space:** | | | | | | | |
| Market Price Charged to External Parties | Pass Thru | | $0 | $0 | | This is passing a credit back to Mars, based on the price | Not applicable in Martenco per Q&A response |
| Fee Charged to Mars for the Service of Selling Space | Pass Thru | | $0 | $0 | $0 | What is the fee per pallet charged to Mars for selling our | Not applicable in Martenco per Q&A response |
| | | | | | | | |
| **Handling Expense Section:** | | | | | | | |
| **Spotting (without labor):** | | | | | | | |
| Outside Service | Pass Thru | | | $0 | | | |
| Cost / Lease | Pass Thru | | | $27,309 | | | |
| Insurance | Pass Thru | | | $4,200 | $97,586 | | |
| Maintenance & Repair | Pass Thru | | | $15,135 | | | |
| Fuel | Pass Thru | | | $50,943 | | | |
| **Pallets:** | | | | | | | |
| Pallets Purchase (GMA Grade A) | Pass Thru | 425,047 | $6.15 | $2,614,042 | $2,614,042 | | Current market rate for Grade A GMA pallets, volume was given by Mars in Q&A |
| Pallets Repair/Credit/Reimbursement | Pass Thru | | | $0 | | This is passing a credit back to Mars | |
| **Operating Supplies:** | | | | | | | |
| Dunnage / Dessicant | Pass Thru | | | $7,452 | | Mars provided 2013 estimate | Basic plastic seals |
| Seals - Truck | Pass Thru | 27,360 | $0.125 | $3,420 | | | |
| Supplies | Pass Thru | | | $55,531 | | Mars provided 2013 estimate | |
| Slipsheets | Pass Thru | 5,054 | $1.17 | $5,913 | $203,465 | | Assume 5% replace for partial pallet shipments of inbound slips |
| Reefer Refueling - Snack | Pass Thru | | | $66,454 | | | |
| Stretchwrap | Pass Thru | 808,680 | $0.08 | $64,694 | | | Limited or no re-cycle opportunity, as indicated on tour. When re-cycle is implemented, Mars will be given the $$$ |
| Recycling Proceeds | Pass Thru | | | $0 | | This is passing a credit back to Mars | |
| **CHEP Pallets:** | | | | | | | |
| Issue Fee | Pass Thru | 34,695 | $2.650 | $91,941 | | | Cost benchmarked against a Kenco-operated facility. Actual rates would have to be negotiated as unless Mars rates |
| Delivery Fee | Pass Thru | 34,695 | $0.104 | $3,608 | | | Fuel Surcharge |
| Transfer Charge | Pass Thru | 34,695 | $1.140 | $39,552 | $137,730 | | |
| Daily Rental Charge / Adjustment | Pass Thru | 90,838 | $0.047 | $4,269 | | | Quantity is Days |
| In Transit Charge / (Credit) | Pass Thru | 34,695 | $-0.047 | (1,631) | | | |
| Loss / Shortage Charge | Pass Thru | | | $0 | | | |
| **Trailer Fumigation:** | | | | | | | |
| Trailer Fumigation | Pass Thru | | | $0 | $0 | | Not applicable in Martenco, as indicated on facility tour. If needed, this would be a carrier expense |
| **Product Destruction:** | | | | | | | |
| Product Destruction | Pass Thru | | | $0 | $0 | | Cost of equipment and pickup would be provided by feed company. Kenco's labor is already included in labor section |
| **Payroll/Labor: (only include if applicable)** | | | | | | | |
| Management/Overhead - GM, Operations, Facilities, etc | Pass Thru | 2.0 | $121,742 | $243,484 | | | General Manager (1), Operations Manager (1) |
| Warehouse Supervisor | Pass Thru | 5.0 | $90,312 | $451,559 | | | Warehouse Supervisors |
| - Warehouse Supervisor Overtime | Pass Thru | 6.0 | $27,477 | $164,864 | | | See org chart |
| - Clerical Overtime | Pass Thru | 6.0 | $4,666 | $27,994 | | This should not include Customer Service | |
| Team Leader(s) | Pass Thru | 7.0 | $44,785 | $313,494 | | | See org chart |
| - Team Leader(s) Overtime | Pass Thru | 7.0 | $4,710 | $32,973 | | | |
| Warehouse Associates | Pass Thru | 50.0 | $43,513 | $2,175,745 | $4,669,852 | | See org chart |
| - Warehouse Associates Overtime | Pass Thru | 50.0 | $4,312 | $215,599 | | | |
| Spotting | Pass Thru | 6.0 | $47,643 | $285,860 | | Labor should not be included in the above "Spotting" sect | |
| - Spotting Overtime | Pass Thru | 6.0 | $5,606 | $33,638 | | Labor should not be included in the above "Spotting" sect | |
| Support/Other | Pass Thru | 4.0 | $81,154 | $324,615 | | | Office Supervisor (1), Quality/Industrial Engineer (1), Power Users (2) |
| - Support/Other Overtime | Pass Thru | - | $0 | $0 | | | |
| Customer Service | Pass Thru | - | $0 | $0 | | Customer Service should not be included in the Clerical a | Out of scope per information during site visit |
| - Spotting Overtime | Pass Thru | | | $0 | | | Bonus plus employee benefits |
| Maintenance & Repair / Safety Champion | Pass Thru | 2.0 | $55,765 | $111,531 | | | Category changed from Human Resources, added per presentation meeting with Mars |
| Payroll processing | Pass Thru | | | $24,019 | | Explain any "Other" payroll costs | Cost for Kenco to process the weekly payroll |
| Cycle Count Personnel | Pass Thru | 1.0 | $44,360 | $44,360 | | Explain any "Other" payroll costs | Count entire facility once per quarter |
| Lean Champion | Pass Thru | 1.0 | $94,426 | $94,426 | | Explain any "Other" payroll costs | Track and administer Lean objects and projects thoughout warehouse and office |
| | | | | | | | |
| **Management Fee:** | Direct | | | 7% | | To be entered as a percentage. Example - Pass through p | |
| | | | | | | | |
| **Material Handling:** | | | | | | | |
| MHE Lease/Amortization | Direct | | | | | Mars handles this directly | |
| MHE Maintenance & Repair | Pass Thru | | | $72,273 | $72,273 | Mars provided the 2013 estimate | |
| MHE Short Term Material Handling Rental | Pass Thru | | | $0 | | | With the equipment that is on-hand, no equipment should be needed |
| | | | | | | | |
| **Uniforms - Warehouse:** | Pass Thru | | | $0 | | | Not applicable |
| | | | | | | | |
| **Office Expense:** | | | | | | | |
| Telephone - Local & Long Distance | Pass Thru | | | $37,570 | | Mars provided 2013 estimate | Assume that this cost is the base service and the cellphone charges would be in addition to this cost and passed thru |
| Travel & Entertainment | Pass Thru | | | $12,250 | | | Travel for site management and personnel to travel to Mars and Kenco Corporate Office |
| Maintenance & Repair | Pass Thru | | | $2,700 | | | If Mars equipment has maintenance included in rate, this cost would be zero. |
| Office Equipment | Pass Thru | | | $0 | $99,594 | | Provided by Mars, based in Your information |
| Office Furniture | Pass Thru | | | $0 | | | Provided by Mars, based in Your information |
| PC Software | Pass Thru | | | $0 | | | Provided by Mars, based in Your information |
| Postage/Subscriptions/Other | Pass Thru | | | $5,250 | | | |
| Freight (Overnight / UPS) | Pass Thru | | | $0 | | | Estimate based on staffing level |
| Office Supplies | Pass Thru | | | $41,825 | | | |
| **Miscellaneous Expense:** | | | | | | | |
| Employee Relations | Pass Thru | | | $1,680 | | | Two (2) events annually |
| Pre-Employment/Medical Testing | Pass Thru | 91.3 | $437 | $39,861 | $471,045 | | Average of $442 per associate for hiring cost |
| Training | Pass Thru | | | $27,688 | | | |
| Other - Miscellaneous Exp. | Pass Thru | | | $401,816 | | 3PL explanation required for any entry on this line | G&A |
| **Warehouse Fumigation:** | | | | | | | |
| Whole Warehouse Fumigation | Pass Thru | | | $0 | $0 | This would be event driven, and only as needed | Not applicable in Martenco, as indicated on facility tour |
| | | | | | | | |
| **External Handling Sell Off Space:** | N/A | | | | | 3PL retains the handling fee charged to the 3rd party | |
| | | | | | | | |
| **Other Expense Section:** | | | | | | | |
| **Insurance:** | | | | | | | |
| General Liability | Pass Thru | | | $56,993 | $94,143 | From FRP Brief Attachment F | |
| Warehouseman's Legal Liability | Pass Thru | | | $37,150 | | From RFP Brief Attachment F - $25M requirement | |
| **Amortization Percentage:** | | | | Prime plus 2.0% | | In the event Mars requests the 3PL to amortize an expens | |
| **Payment Terms:** | | | | 90 days | | What payment terms are offered? Net 90 preferred, but | |

| | | |
|---|---|---|
| Total Costs | $10,452,426 | |
| Management Fee | $679,420.68 | $576,538  6.5% on all expenses except pallets.  Pallets are calculated at 3% |
| Grand Total Costs | $11,132,567 | |

1 The only property taxes included in the Contractor proposal are for the equipment that was purchased by the Contractor. Mars is responsible for all other property taxes

DEF000030

Continuous Improvement:

- Effective in Year 2 of this agreement, Kenco shall actively seek opportunities for continuous improvement in its warehouse management practices for application in the Services provided hereunder.  For each year, periods 1-13, as part of Kenco's continuous improvement efforts, Kenco will achieve either 1) efficiency improvements of 5% to the sites budgeted productivity for warehouse and contract labor personnel, or 2) savings of $85,000 to the site budget.  The parties acknowledge that the budget is built on certain volume and order profile expectations and mutually agree to evaluate the impact of certain business profile parameters on productivity.  The parties agree that these cost savings are cumulative and, as such, any cost savings achieved by Kenco in excess of the goal for a given year will carry over to the next year and will be applied as a credit to the cost savings goals for the following year.  In the event that the cost savings goal is not met for a given year, the parties will calculate the difference between the savings goal and actual savings, and Kenco will reimburse the difference to Mars based upon a mutually agreed upon reconciliation.

DEF000031

**APPENDIX B**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**


## SCOPE OF SERVICES


The scope of services is the receipt, warehousing, yard management, and fulfillment of order for Goods.

The following are specifically out of scope:

- Inbound and Outbound Transportation
- Material Handling Equipment leasing
- Mars WMS (MARC, Red Prairie, or SAP)  and IT Infrastructure
- Facility leases
- Various small categories (ex – facility and grounds maintenance)

Services:

- Contractor shall perform only those Services that are set forth herein in accordance with Mars communicated standards and guidelines.  Contractor shall ensure that its SOP's and performance hereunder are in compliance with such standards and guidelines.
- Mars may, at any time, request changes to the Services through the Change Order process.  Each such Change Order shall be executed by authorized representatives of both Mars and Contractor and shall be deemed an amendment to the applicable scope of work.
- Mars may invite Contractor to bid on services not included within the scope of work.  In the event that Mars elects to retain Contractor to perform such additional services, the parties agree that a new scope of work shall be entered into by the parties to address such work.
- 

Inbound:
A significant percentage of the inventory will be shipped to the Warehouse on quality hold, as specified in the Mars WMS and not immediately available for customer orders.  Inventory will be released by MARS' Quality Assurance associates either in transit to the Warehouse or after receipt.  The Goods shall include Wrigley, and any other applicable subsidiary of Mars, inventory which will most often arrive in a released status.  There will be times when inventory either needs to be placed on hold status or released from hold status and this will be via a notification to the Warehouse via request by Phone, Fax, Internet, E-Mail and/or EDI from MARS and upon such notification the Warehouse will manually update the status in the WMS system.  Chicago/Burr Ridge material is not in WMS, it is in SAP.  Wrigley, and other applicable subsidiaries of Mars, outside overflow storage is housed in the Contractor's WMS.

The Inbound process is:
- A carrier will be identified by MARS to handle Inbound trucking from manufacturing, import or other MARS regional distribution centers.
- All Chocolate inbound carrier arrivals are preceded by an ASN notice of shipment including inventory description and code date and quantity. Wrigley, other applicable subsidiaries of Mars, Mars Chocolate Co-pack and Co-manufacturing inbound arrivals will not have an ASN.
- The carrier arrives at the Warehouse and is gated, as defined by the applicable SOP, in by the Contractor.
- The truck is either put directly in a door for immediate unloading or dropped in yard for unloading later in shift.
- The Contractor will move the trailer from the yard to the door for unloading when loads are "dropped" by carrier.

4

- Contractor review Advance Notice of Receipt against the actual inbound receipt for correct item UPC, item quantity, item lot, zone within MARS' WMS and generates the putaway locations when ready to begin unloading.
- All pallets must be scanned at the door, MARS' WMS then generates a put away location for the forklift operator.
- Contractor will inspect all inbound trailers for visible damage. If the trailer is visibly damaged or trailer number does not match Bill of Lading ("BOL"), Contractor will note on BOL and timely contact Mars providing necessary detail to receive instructions for processing the trailer.
- All inbounds will be inspected for apparent over, short and damage and processed per Mars' guidelines.
- If any product posses an infestation threat or is hazardous, as defined by applicable law which would include poisons, flammables, or explosives, Mars will make best efforts to remove such material from the facility immediately, and make every reasonable effort to remove such material within one business day of Contractor's notification to Mars of such.
- The Contractor proceeds to the putaway location and confirms on the RF unit that the pallet is putaway, the RF unit instructs the forklift operator to move to the next task.
- Contractor will pick up inbounds for the on-site co-packer as designated by Mars WMS

Outbound:
- Outbound customer shipments will be a combination of approximately 80% straight pallets of 1 item and 20% pallets containing multiple items built by Contractor (case-pick).
- Outbound orders are processed through the Mars WMS for shipment.
- The Mars WMS directs the forklift operator to specific locations within the Warehouse to build customer orders. This may be full pallets from bulk storage or in the example of case pick; the operator will be given specific commands to build pallets from multiple items. Once a pick-pallet is complete it is shrink- wrapped, labeled and moved to the staging area for shipment. Straight pallets of 1 item will be moved directly from a location within bulk storage area to staging for outbound shipment. A count back procedure or manual physical audit process shall be implemented when picking case pick orders.
- Contractor will utilize the Transportation Management Execution System, as provided by Mars, for tendering shipments to carriers.
- Contractor is responsible for facilitating on-time carrier performance of pick up of shipments and managing 3PL/Warehouse/Carrier relationship with performance management through Mars Distribution Manager.
- Contractor is responsible for inspecting trailers for cleanliness, in accordance with Mars Quality Manual, prior to loading.
- Contractor is responsible for loading trucks according to Mars instructions, per a mutually approved SOP.
- From the staging area or directly from picking, pallets are loaded to the truck, scanned out and the truck ID is manually input to the RF gun.
- The spotter moves the trailer from door to the location within the yard (for drop orders) or moves the trailer directly to the gate for pick up if live load.
- Contractor must place seals on each load prior to leaving the yard.

Additional notes:

   o Inventory will frequently be received on quality hold status within the Mars WMS. Once inventory is released by MARS' QA associates, the Mars WMS will be updated automatically making inventory available for shipment to customers.
   o Contractor shall design the layout in the Mars WMS to maximize efficiencies through zoning and reduction of travel time within the space operated by the Contractor.
   o Contractor shall establish a case pick area considering product dimensions and volume projections as provided by Mars to maximize efficiency of the operation.
   o The WMS will generate replenishment moves from bulk storage into case pick area as needed.
   o Contractor shall provide a daily operation report to MARS' Regional Distribution Manager as well as ad hoc reports as requested in a mutually agreed upon timeframe.
   o Contractor will move and stage product to the on-site co-packer as determined by Mars WMS.

DEF000033

Inventory Management

- Contractor shall perform cycle counts as requested and in accordance with Mars guidelines.
- The cycle count process for Wrigley items requires a frequency of 1x every 60 days, vs MARS' Goods of 1x every 90 days. The Wrigley cycle count process requires blind counts, whereas, the MARS process provides item information for the location being counted. Cycle counts for other subsidiaries will be mutually agreed upon by the parties.
- Contractor will maintain a segregated area for damaged product, on hold and awaiting pick-up or disposal.
- Contractor is responsible for tracking CHEP pallet movements to and from the warehouse and will reconcile CHEP pallet inventory levels within a mutually agreed upon time frame.
- Contractor will follow Mars' guidance and direction as it pertains to product holds, nonconforming products, recalled products, and expired products.

Warehouse Standards:

- Records must be kept in compliance with local, state, and Federal legislation.
- Contractor shall maintain documented procedures that describe how they will meet the standards below:
  - Contractor shall perform tracing hold and release by receiving a request by an authorized Mars representative via Phone (live voice, no voicemail messages), Fax, Internet, E – Mail, EDI 24 hours/day, 7 days/week.
  - Contractor shall perform tracing hold and release by receiving a request with any of the following: Batch code, serial shipping container code, best-before date, bill of lading, pallet license plate number.
  - The Mars WMS is capable of maintaining multiple hold status independent of volumes.
  - Contractor shall trace Goods within a 4-hour period upon the request of an authorized Mars representative.
  - Contractor shall be able to trace 24 hours a day / 7 days a week.
  - For those warehouses that do not operate 24/7, there must be a tracing procedure in place (names, contact hierarchy, email address, and telephone numbers (cell and/or home) for all incidents outside normal opening time.
  - Contractor shall identify full dispatch details, address, date of dispatch, quantities cases, carrier, and trailer number.
- Contractor is responsible for arranging facility maintenance, pest control and sanitation. Contractor will ensure that the facility is serviced by a licensed pest control operator.
- Contractor is responsible for monitoring facility temperatures with Mars provided equipment to ensure all products are stored according to the Mars supplied quality agreement.
- Contractor will adhere to security requirements as provided by Mars.

Quality:

- Contractor will comply with the Mars North American Quality Agreement as set forth in Appendix 1 to Exhibit B. Mars will notify Contractor when any material charges are made to this Appendix.
- Contractor will ensure that the facility is registered with the US Food and Drug Administration.
- Contractor will maintain training records, sanitation logs and temperature charts for seven (7) years.

**Key Performance Indicators, Forecasting, and Reporting**

- Contractor will report KPIs to Mars no later than the 5th business day of each period using the following calculations:

Contractor will be held accountable for the following KPI's as outlined below:

6

DEF000034

| KPI | Chocolate | Food |
|---|---|---|
| **Operations** | | |
| Rec & Put Away (standard shipments) | < 48 hrs | < 48 hrs |
| Rec & Put Away (priority shipments) | < 12 hrs | < 12 hrs |
| Load Ready Time Compliance | 99% | 99% |
| Over, Short & Damage | < 2.0% | < 2.0% |
| Warehouse Cuts | 10% | 10% |
| Warehouse Loss & Damage | < 0.005% | < 0.005% |
| Cycle Count Accuracy | 99.7% | 99.7% |
| Productivity (t-put pallets per man hour) | > 7.85 | |
| **Customer Service** | | |
| Required Response Time | < 1 hr | < 1 hr |
| Orders Appointed (OTR Planned) | > 95% | > 95% |
| Order/Invoice Accuracy | N/A | N/A |
| Orders Tendered | < 2 hrs | < 2 hrs |
| Truck Weight (lbs) | > 30,000 | > 30,000 |
| Truck Cube | > 1,460 | > 1,460 |
| OTA | 92.50% | 0.925 |
| **Management/Site** | | |
| Safety/OSHA Reportables (TRIR) | < 5.5 | < 5.5 |
| Mars Quality & Food Safety (Q&FS) Audit | > 99% | > 99% |

- Productivity is measured by Total Throughput Pallets/Hour.  The average goal for the entire year is 7.85 pallets /hour and we will have a progressive target to this metric to account for a learning curve:
- P5 Pallet/Hour Target = 85% of avg (6.67)
- P6 Pallet/Hour Target = 90% of avg (7.06)
- P7 Pallet/Hour Target = 95% of avg (7.45)
- 
- Contractor will provide reporting on a mutually agreed upon time frame for an agreed upon set of volume, profile, and service metrics.
- Mars and Contractor acknowledge that volumes, inventories, and/or space requirements may fluctuate from month to month as a result of demand, seasonality, unexplained, or unanticipated events.  Mars also acknowledges that its ability to accurately forecast operation volumes could ultimately affect Contractor's information of forecasted operation volumes (to be mutually defined), schedule changes, or any other issue that may have an effect on Contractor's performing its obligations and pricing under this agreement.  Mars will:
  - Deliver an annual forecast at least 3 months prior to the beginning of each calendar year during the term of this agreement.
  - Deliver a period forecast on a rolling basis.

**Operating Assumptions**

Goods may be received via several different sized trailers.  Goods are received on CHEP pallets, wood pallets, and slip sheets.

Inbound receipts:

- Inbound Goods arrive directly from the MARS' production facility; approximately 68% on slip sheets, 5% on CHEP and 27% on GMP pallets.
- Current outbound order profile is as follows:  80% straight pallets and 20% of pallets containing multiple items.
- Live unloads must be unloaded within 2 hours of arrival at the gate, during scheduled hours of operation.

7

DEF000035

**Volume Assumptions:**

| Category-Inbound | | | | | |
|---|---|---|---|---|---|
| PD | Trucks | Tonnes | Pounds | Pallets | Cases |
| 1 | 1,190 | 11,784 | 25,979,180 | 39,832 | 1,635,508 |
| 2 | 1,097 | 13,612 | 30,010,681 | 37,277 | 1,818,191 |
| 3 | 1,228 | 15,504 | 34,180,481 | 52,130 | 2,024,296 |
| 4 | 1,473 | 15,644 | 34,489,971 | 54,509 | 2,223,852 |
| 5 | 1,635 | 18,846 | 41,548,986 | 59,971 | 2,309,570 |
| 6 | 1,845 | 19,517 | 43,027,813 | 69,045 | 2,272,889 |
| 7 | 1,780 | 19,547 | 43,094,301 | 63,885 | 2,228,324 |
| 8 | 1,729 | 20,383 | 44,937,365 | 64,001 | 2,505,817 |
| 9 | 1,581 | 16,178 | 35,667,851 | 53,540 | 2,316,301 |
| 10 | 1,604 | 16,547 | 36,481,054 | 54,586 | 2,366,577 |
| 11 | 1,488 | 15,204 | 33,518,960 | 48,048 | 2,172,604 |
| 12 | 1,354 | 13,727 | 30,262,923 | 44,189 | 2,067,337 |
| 13 | 1,459 | 13,751 | 30,315,901 | 48,738 | 2,020,529 |
| **Totals** | **19,463** | **210,244** | **463,515,467** | **689,751** | **27,961,795** |

| Category-Outbound | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PD | Orders | Trucks | Tonnes | Pounds | Avg. Lines | Pallets | Cases | Case pick cases |
| 1 | 2,553 | 1,110 | 13,729 | 30,267,989 | 6.9 | 41,569 | 1,869,245 | 258,188 |
| 2 | 2,256 | 1,038 | 12,992 | 28,643,488 | 8.8 | 36,119 | 1,677,156 | 321,825 |
| 3 | 2,360 | 1,252 | 16,401 | 36,158,318 | 9.3 | 47,743 | 1,908,594 | 352,823 |
| 4 | 2,400 | 1,268 | 15,556 | 34,295,675 | 7.9 | 48,627 | 1,862,630 | 263,390 |
| 5 | 2,660 | 1,363 | 18,454 | 40,684,727 | 7.9 | 54,365 | 2,244,627 | 295,362 |
| 6 | 2,935 | 1,429 | 21,346 | 47,060,353 | 7.4 | 59,270 | 2,272,835 | 323,018 |
| 7 | 2,748 | 1,378 | 20,889 | 46,053,022 | 7.6 | 62,667 | 2,272,765 | 294,936 |
| 8 | 2,899 | 1,580 | 21,516 | 47,435,150 | 7.5 | 70,367 | 2,508,912 | 300,974 |
| 9 | 2,760 | 1,475 | 20,184 | 44,499,580 | 8.3 | 60,096 | 2,238,379 | 317,989 |
| 10 | 2,932 | 1,521 | 20,237 | 44,616,196 | 8.9 | 60,704 | 2,478,631 | 376,494 |
| 11 | 2,661 | 1,298 | 16,561 | 36,511,490 | 8.3 | 47,994 | 2,147,514 | 350,835 |
| 12 | 2,848 | 1,305 | 16,763 | 36,956,753 | 7.3 | 46,843 | 2,173,763 | 343,942 |
| 13 | 3,065 | 1,371 | 17,802 | 39,247,005 | 6.8 | 52,875 | 2,117,627 | 312,861 |
| **Totals** | **35,077** | **17,388** | **232,431** | **512,429,746** | **7.9** | **689,239** | **27,772,678** | **4,112,637** |

MARS anticipates volume growth of approximately 4 % - 5 % per year.

**Facility:**

The Warehouse is approximately 571,000 sq ft. The facility is racked with approximately 79,000 pallet positions. The site is defined as at capacity when volume hits 85% of the racked positions. Contractor operates in approximately 478,000 sq ft.

**Min Inventory:** 44,000 pallets
**Avg Inventory:** 58,500 pallets
**Max Inventory:** 75,500 pallets

DEF000036

**Orders:**

Customer orders will be received throughout the day Monday through Friday. Customer orders are picked, staged, and shipped on daily basis subject to customer order volume. Inbound product received on slipsheets will need to be palletized at receipt, prior to put-away, on GMP white wood pallets. Prior to shipping to the Customer, the Contractor, as directed by the Mars WMS, may need to transfer Goods from GMP white wood pallets to CHEP pallets before shipping.

Case fill will be optimized to include product that arrives on site within 16 hours of planned outbound departure.

**General:**

Hours of Operation:

- o Minimum business hours are 7:00 AM to 5:30 PM U.S. CST, Monday through Friday for office personnel.
- o Warehouse operations are expected to tender orders to Mars designated carriers so to facilitate delivery of all customer orders on time to appointment.
- o Contractor shall support emergency requests or occasional volume spikes beyond normal business hours and days of operation
- o Contractor shall have a 7 day by 24 hour communication plan

Holidays:

Observed holidays will mirror Mars U.S. Holiday Schedule, which may vary from year to year but generally includes: New Years Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the Day after Thanksgiving, Christmas Eve, Christmas Day, and one floating holiday.

Material Handling Equipment ("MHE") maintenance is the responsibility of the Contractor, however MARS shall reimburse Contractor for such costs. All MHE must be maintained in accordance with the MHE lease which MARS shall provide to Contractor. Contractor may select the maintenance provider, however, the selection will be reviewed by MARS' MHE Services Auditor.

**Contractor WMS (WES) System:**

If for any reason the Services Agreement is terminated, CONTRACTOR agrees to provide transition assistance to MARS as outlined below.
1.      CONTRACTOR agrees to leave the Contractor WMS operating on our servers supporting the Mars's site or sites until such time as Mars makes a decision on the successor WMS system that will be used in its sites. CONTRACTOR will provide user help desk support for any installed instances of the Contractor WMS and will assist Mars in making a smooth transfer and conversion of its data and history to the new software system.

Modifications to the Contractor WMS system will not be made if another 3PL or operator assumes operation of the warehouse during the interim period. The interim period begins on the date that the Services Agreement ends and continues for a period not to exceed 9 months. The software will be used "as is" during the interim period. Contractor will continue to provide software support to Mars during the interim period for a monthly software maintenance fee to be negotiated between the parties. Fees will depend on amount of data being stored, number of sites using the WMS, and other costs related to providing the WMS to Mars. In the event of non-payment of the monthly maintenance fees by the invoice due date, Contractor may suspend all access to the system.
Any new interfaces between WES and another operator's systems will be estimated and priced per hour at the then prevailing hourly billing rate for Contractor's IT services. Payment of invoices for interfaces is required in advance of

9

any work being performed.

2.      CONTRACTOR will assist with the Mars's I.T. staff to protect Mars data residing on the Contractor WMS servers.   See section 4 for details.

3.      Contractor will assist the Mars's I.T. staff in transferring Mars data to the new WMS servers at such time as the new system is ready to receive this data.  Data will be copied to CD or tape and sent via overnight courier.  Fees for this assistance will either be factored into the monthly software maintenance fee outlined in Section 1 above, or will be priced per hour at the then prevailing hourly billing rate for Contractor's I.T. services.  Invoices for data conversion fees will be based upon an estimate prepared by the Contractor IT staff.  Payment for data conversion invoices is required in advance of any work being performed.

4.      Contractor will retain a copy of Mars's data on the Contractor WMS server until Mars indicates, in writing, that data has transferred successfully to the new server environment.  Upon receipt of this written confirmation, Contractor will delete all Mars data files from our WMS servers.  During the interim period, Contractor is relieved of all responsibility and obligation to maintain Mars data, and any liability related to retaining Mars's data.

5.      Real-time data backup will remain in place during the interim period.  Fees for the use of these data protection services will be factored into the monthly software maintenance fee outlined in Item 1 above.

6.      Mars shall continue to pay the cost of data connectivity to the Contractor data center from its wide area network.  In the event of non-payment of the connectivity fees by the invoice due date, Contractor may suspend all access to the system.

7.      Contractor will retain Mars ship of the WMS source code.  In no circumstances will Mars have right to the WES source code as a result of paying license fees for the use of this software.


Representation/Warranty – Contractor represents and warrants (i) that the IT services performed pursuant to this Agreement will be performed in a professional manner by individuals qualified to perform such work; (ii) that Contractor has no obligations, legal or otherwise, inconsistent with the terms of this Agreement or with Contractor's undertaking this relationship with MARS; (iii) that the performance of the IT services called for by this Agreement do not and will not violate any applicable law, rule or regulation or any proprietary or other right of any third party; and (iv) that Contractor has not entered into any agreement in conflict with this Agreement.
 NOTWITHSTANDING THE ABOVE, CONTRACTOR MAKES NO WARRANTIES, EXPRESSED OR IMPLIED, INCLUDING BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, ASSOCIATED WITH THE IT SERVICES AND/OR ANY SPECIFIC IT PROJECT.

DEF000038

**EXHIBIT 1 TO APPENDIX B**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

## <u>MARS' NORTH AMERICA QUALITY MANUAL</u>

Contractor will follow the Quality & Food Safety Standards for Transport & Storage of Mars NA Semi-finished Wrapped and Finished Goods Quality Manual
September 2012

DEF000039

**APPENDIX C**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

**OPERATING ASSETS LIST**

The following are the Operating Assets for the purposes of Section 13H of the Agreement. This Appendix may be amended, modified, expanded or diminished only with the prior written consent of MARS. Any computer generated listing must be prepared in the following format:

**Contractor Asset Listing:**

| | Item Description | Leased from | Leased amount (monthly) | Lease Terms | Kenco paid amount | Penalties | Notes |
|---|---|---|---|---|---|---|---|
| 1 | 2014 Ottowa Yard Spotter | Ryder | $ 2,276.00 | 24 months | $ - | $ 2,276 would need to be paid monthly, until its relocated to new operation | |
| 2 | Tennant Model 7300 Electric Scrubber | KFS | $ 720.00 | 60 months | $ - | $720 would need to be paid through the 60 months. | |
| | 2010 Kalmar Ottowa Yard Spotter | | | | | | Kenco will buy this from 4T's and pass expense through to Mars. See Depreciable tab for details |
| | Scissors Lift | | | | | | |
| 3 | Golf Carts (2) | | | | $ 51,690.00 | | |
| 4 | MHE Batteries (56) | Wells Fargo | $ 7,466.48 | 60 months | $ - | Remaining lease will have to be paid out | Lease started in July 2012 ends July 2017 |
| 5 | MHE Batteries (56) | Raymond | $ 8,097.60 | 60 months | $ - | Remaining lease will have to be paid out | Lease started in July 2011 ends July 16 2016 |
| 6 | Cascade Carton Clamp | KFS | $ 388.00 | 24 months | $ - | $ 388 would need to be paid through the 24 months | |
| | **IT Equipment** | | **Total Amount** | | | | |
| | (3) Laptop Computers | | $ 9,929.93 | 36 months | $ - | In the event that Kenco's assignment is ended after the 24 months, the site will continue to pay for equipment until it can be relocated to another site | |
| | (5) UPS / (2) Printers | MCA | $ 1,570.11 | 36 months | $ - | | |
| | (1) UPS / (1) Printer | | $ 262.21 | 36 months | $ - | | |
| | (3) Zebra Printers | BARCOM | $ 4,773.46 | 36 months | $ - | | |
| | Misc Juniper / SRX Services Gateway 220 | | $ 3,977.08 | 36 months | $ - | | |
| | Misc Juniper and support equipment | Enteredge | $ 3,989.81 | 36 months | $ - | | |
| | | | $ 24,502.60 | | | | |

12

Contractor Asset Amortization Schedule

AMORTIZATION SCHEDULE - Normal Amortization

| | Date | Payment | Interest | Principal | Balance |
|---|---|---|---|---|---|
| Loan | 5/1/13 | | | | 51,690.00 |
| 1 | 6/1/13 | 2,469.56 | 226.14 | 2,243.42 | 49,446.58 |
| 2 | 7/1/13 | 2,469.56 | 216.33 | 2,253.23 | 47,193.35 |
| 3 | 8/1/13 | 2,469.56 | 206.47 | 2,263.09 | 44,930.26 |
| 4 | 9/1/13 | 2,469.56 | 196.57 | 2,272.99 | 42,657.27 |
| 5 | 10/1/13 | 2,469.56 | 186.63 | 2,282.93 | 40,374.34 |
| 6 | 11/1/13 | 2,469.56 | 176.64 | 2,292.92 | 38,081.42 |
| 7 | 12/1/13 | 2,469.56 | 166.61 | 2,302.95 | 35,778.47 |
| 2013 Totals | | 17,286.92 | 1,375.39 | 15,911.53 | |
| | | | | | |
| 8 | 1/1/14 | 2,469.56 | 156.53 | 2,313.03 | 33,465.44 |
| 9 | 2/1/14 | 2,469.56 | 146.41 | 2,323.15 | 31,142.29 |
| 10 | 3/1/14 | 2,469.56 | 136.25 | 2,333.31 | 28,808.98 |
| 11 | 4/1/14 | 2,469.56 | 126.04 | 2,343.52 | 26,465.46 |
| 12 | 5/1/14 | 2,469.56 | 115.79 | 2,353.77 | 24,111.69 |
| 13 | 6/1/14 | 2,469.56 | 105.49 | 2,364.07 | 21,747.62 |
| 14 | 7/1/14 | 2,469.56 | 95.15 | 2,374.41 | 19,373.21 |
| 15 | 8/1/14 | 2,469.56 | 84.76 | 2,384.80 | 16,988.41 |
| 16 | 9/1/14 | 2,469.56 | 74.32 | 2,395.24 | 14,593.17 |
| 17 | 10/1/14 | 2,469.56 | 63.85 | 2,405.71 | 12,187.46 |
| 18 | 11/1/14 | 2,469.56 | 53.32 | 2,416.24 | 9,771.22 |
| 19 | 12/1/14 | 2,469.56 | 42.75 | 2,426.81 | 7,344.41 |
| 2014 Totals | | 29,634.72 | 1,200.66 | 28,434.06 | |
| | | | | | |
| 20 | 1/1/15 | 2,469.56 | 32.13 | 2,437.43 | 4,906.98 |
| 21 | 2/1/15 | 2,469.56 | 21.47 | 2,448.09 | 2,458.89 |
| 22 | 3/1/15 | 2,469.56 | 10.67 | 2,458.89 | 0.00 |
| 2015 Totals | | 7,408.68 | 64.27 | 7,344.41 | |
| | | | | | |
| Grand Totals | | 54,330.32 | 2,640.32 | 51,690.00 | |

Last interest amount decreased by 0.09 due to rounding.

13

DEF000041

Manteno Site Support Vendor Contracts:

| VENDOR | Type of Svc | Status | Main Contact | Phone | Email | Term | $ Exposure >24 months | Exit option |
|---|---|---|---|---|---|---|---|---|
| Aqua Illinois | Utility City water to whse. | Complete | Customer Service | 877-987-2782 | n/a | monthly | $ - | on notice |
| City of Kankakee | Utility Sewer discharge Pat Schatz 815-933-0487 | Complete | Pat Schatz | 815-933-0487 | peschatz@citykankakee-il.gov | monthly | $ - | on notice |
| Nicor Gas | Utility Nat gas delivery pipes | Complete | Customer Service | 630-983-4040 | | monthly | $ - | on notice |
| Orkin | Pest control | Complete | Kevin Haddox | 980-253-0114 | khaddox@rollins.com | 24 months | $ - | Kenco Corporate Agreement |
| S&K Security | Security -Alarm system Burg | Complete | Steven Dehaan | 708-946-6133 | sandksecurity@hotmail.com | 12 months | $ - | 30-day notice |
| SDG | Security -Guard service | Complete | Thomas Harwood | 815-509-5360 | thomash@sdgglobalinc.com | 12 months | $ - | 30-day notice |
| Staples | office supplies | Complete | Heather Walker | 865-859-0352 | Heather.Walker@Staples.com | Kenco Corporate Agreement | $ - | Kenco Corporate Agreement |
| Xpedx | Pallets | Complete | Cindy Butler | 423-240-9271 | cindy.butler@ipaper.com | Kenco Corporate Agreement | $ - | Kenco Corporate Agreement |
| Xpedx | warehouse and packaging supplies | Complete | Cindy Butler | 423-240-9271 | cindy.butler@ipaper.com | Kenco Corporate Agreement | $ - | Kenco Corporate Agreement |
| Access One | Utility Local/Long distance phone svc. | Forms in Process, on schedule | Alison Balthazor | 312-441-9959 | ABalthazor@accessoneinc.com | 24 months | $ - | 24-months, can cancel if cease operations |
| Grainger | misc materials | Forms in Process, on schedule | Amy Stewart | | | Kenco Corporate Agreement | | Kenco Corporate Agreement |
| Constellation Gas | Utility Gas | Forms Submitted, on schedule | Phyllis DeCoste | 262.506.6617 | Phyllis.DeCoste@constellation.com | month to month | $ - | on notice |
| MidAmerican Energy | Utility Electricity | Forms Submitted, on schedule | Cheryl Bergmann | 563-333-8564 | CLBergmann@midamerican.com | month to month | $ - | on notice |
| EJ Equipment | Fuel/spotter repairs | Legal Review | Kory Mann | 815-370-7673 | kory@ejequipment.com | month to month | $ - | on notice |
| Hometown Vending | Vending machines | Legal Review | Ken Martin | 708-514-0259 | trivendken2@sbcglobal.net | no charge | $ - | on notice |
| Innovative Refrig. | HVAC maintenance | Legal Review | Linsey Diehl | (540)941-1992 | ldiehl@r717.net | 12 months | $ - | tbd |
| Kankakee/AJ | Disposal Waste pick-ups/product destructions | Legal Review | Eric Tillotson | 815-932-1115 | etillotson@homewooddisposal.com | month to month | $ - | on notice |
| Servicemaster | Cleaning services | Legal Review | Timothy McGrath | 815-937-0585 | servicemasterk3@yahoo.com | month to month | $ - | on notice |
| Thyssen-Krupp | Elevator maintenance | Legal Review | Steve Gilles | 309-258-0672 | steve.gilles@thyssenkrupp.com | 24 months | $ - | 30-day notice |
| Cintas | Uniforms /mats/medical supplies? shop rags/dry mops | Negotiations | Mike Sealy | 219-313-4988 | sealym@cintas.com | tbd | tbd | tbd |
| Crystal Clean | Haul away hazardous material: used oil, light bulbs, electronic waste, etc. | no historical contract | John Beilfuss | 219-384-3656 | john.beilfuss@crystal-clean.com | as required | $ - | on notice |
| Crown | MHE repairs/parts | Proposal Rejected | John Paternostro | 708-516-7151 | john.paternostro@crown.com | tbd | $ - | n/a |
| United Radio | Hand radios Paul Kuzel 815-693-7029 | waiting on proposal | | | | as required | $ - | on notice |
| Fred's | Mowing/salting/snow removal | waiting on proposal | Fred | 815-693-3767 | n/a | month to month | $ - | on notice |
| Raymond | LT battery lease | waiting on proposal | Dan Mcauliffe | 630.588.7642 | dmcauliffe@associated-solutions.com | 38 months | $ 104,530.72 | sell-out |
| Simplex Grinnell | Alarm system Fire | waiting on proposal | Elizabeth Coy | 219-406-7799 | ecoy@simplexgrinnell.com | 12 months | $ - | 30-day notice |
| Wells Fargo | LT battery lease | waiting on proposal | Linda Haroldson | 800-570-3607 | Linda.Haroldson@wellsfargo.com | 51 months | $ 218,635.20 | sell-out |
| | | | | | | **Estimated Exposure beyond 24 months** | **$ 323,165.92** | |

DEF000042

**APPENDIX D**
**TO THE**
**WAREHOUSE MANAGEMENT AGREEMENT**
**BETWEEN**
**MARS**
**and**

**TRANSITION COSTS**

**Transition Costs:**

Contractor will incur certain costs and expenses during the transition period preparing to perform the Management Services ("Transition Costs"). MARS will pay Contractor for the Transition Costs in accordance with the rates and charges to be set forth in this Appendix D.

Prior to agreement between Mars and Contractor on the total Transition Costs, Contractor agrees to provide backup for Transition Costs as may be reasonably requested by Mars. At the conclusion of the sixty (60) day Transition period, Mars and Contractor agree to review and update the table set forth in Appendix D to reflect total actual Transition Costs, including approved Transition Costs in excess of or less than the total cost as set forth in this Appendix D.

Contractor will issue monthly invoices to Mars with appropriate backup and justification for the Transition Cost invoices.

15

DEF000043

| Operations Start Up - Detail | | | |
|---|---|---|---|
| Transition Project Management | | | |
| Salary Project Manager | 10.5 Weeks | $ | 44,573 |
| Travel Expenses for PM | | $ | 16,509 |
| Lean Implementation | | $ | 48,162 |
| Quality Assessment | | $ | 4,500 |
| *Subtotal* | | $ | 113,743 |
| Transition Hiring/Training | | | |
| Testing/screening | | $ | 22,823 |
| Training (pre-hire employees) | | $ | 62,260 |
| Travel - Corp. Resources | | $ | 12,390 |
| *Subtotal* | | $ | 97,473 |
| Transition Building Preparation | | | |
| Fire Extinguishers | | $ | - |
| Dock hardware | | $ | - |
| Office Supplies Startup | | $ | - |
| Vacation true-up | | $ | 29,000 |
| Initial Physcial Inventory | | $ | 16,890 |
| Signage | | $ | 2,096 |
| *Subtotal* | | $ | 47,986 |
| **Operations Start Up Total** | | $ | 259,202 |
| **Startup Cost Discount** | | $ | (105,608) |
| | | | |
| **Start Up Total** | | $ | 153,594 |

| IT Start Up - Detail | | |
|---|---|---|
| WMS Software Integration Fee | $ | 30,000 |
| WMS Training / Implementation / Installation | $ | 25,934 |
| **IT Start Up Total** | $ | 55,934 |
| **Mars Portion of Start Up Fees** | $ | 209,527 |

Kenco's Contribution  to the
Sign On Bonus  $   47,544   no payment due in startup expense

16

**APPENDIX E**

**TO THE
WAREHHOUSE MANAGEMENT AGREEMENT
BETWEEN
MARS
and**

**2013 Vendor Incentive to be added at a later date**

**Mars, please provide commencement date, timeline, and requirements to include Contractor in the Mars Vendor Incentive Program.**

17

DEF000045

**Exhibit AA**

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             CENTRAL DISTRICT OF ILLINOIS
 3                  URBANA DIVISION
 4
         EDITH McCURRY,                )
 5                                     )
                  Plaintiff,           )
 6                                     )
             vs                        )   2:16-cv-02273-CSB-EIL
 7                                     )
         KENCO LOGISTIC SERVICES,      )
 8       LLC., a Tennessee            )
         Limited Liability            )
 9       Company, MARS, INC.,         )
         KELVIN WALSH, MIKE           )
10       MANZELLO, DAVID JABALEY,     )
         TAMMI FOWLER, and MARIO      )
11       LOPEZ,                       )
                                       )
12                Defendants.
13
14             The deposition of EDITH McCURRY called
15       for examination pursuant to notice and pursuant to
16       the Federal Rules of Civil Procedure for the United
17       States District Courts pertaining to the taking of
18       depositions taken before JO ANN LOSOYA, Certified
19       Shorthand Reporter within and for the County of Cook
20       and State of Illinois at 150 North Michigan,
21       Chicago, Illinois, on April 18, 2018 at the hour of
22       10:00 o'clock a.m.
23
24
```

Page 79

1    in the lawsuit.

2          Q.    The questions --

3          A.    I'm going by this letter.  So, I mean, if

4    this letter means something else, then I mean...

5          Q.    Let me try asking it this way:  Do you

6    think the only reason that you were terminated from

7    Kenco is because Kenco lost the contract with Mars?

8          A.    At this time.

9          Q.    That's -- was that yes?

10         A.    Yes, at this time.

11         Q.    I don't know what you mean by "at this

12   time."

13         A.    Because you are asking me these

14   questions, and it is just making me think maybe now

15   there is something else I should be looking at, but

16   I don't know.  So I mean, I only went by this

17   letter.

18         Q.    I am not trying to make you think that

19   there should be something else.  The reason that

20   we're here is we are trying to gather the

21   information about what you are claiming.

22         A.    I filed what I was claiming.

23         Q.    Okay.

24         A.    And I just took this as its word.

**Exhibit BB**



| Document Number: | Title: | | | |
|---|---|---|---|---|
| **CP-BP-4.2.1.001** | **QMS DOCUMENTATION** | | | |
| Original Date:<br>**06/07/06** | Revision Date:<br>**07/12/12** | Revision #:<br>**1** | Effective Date:<br>**08/01/12** | **1 of 4** |

Author: **Quality Assurance and Regulatory Affairs Director, Best Practices/Date**

*[signature]*                    **07/16/12**

Approval: **QC, Best Practices/Date**

*[signature]*                    **07/16/12**

Approval: **VP, Best Practices/Date**

*[signature]*                    **07/16/12**

## 1.0 PURPOSE / SCOPE

The purpose of this document is to define the documentation requirements and implementation of the Quality Management System (QMS).

This document applies to all divisions, sites, departments, and functions.

## 2.0 ROLES AND RESPONSIBILITIES

**Kenco Management Services (KMS) – Quality Assurance, Best Practices –** responsible for the maintenance of this procedure.

**Site Quality Coordinator –** ensures this procedure is properly implemented at the site.

**Author Group Quality Coordinator –** processes exceptions from sites for documents written by their respective group.

**Site Management –** ensures that this procedure is enforced at the site.

**All Associates –** are responsible to understand the structure and process of a Quality Management System.

## 3.0 POLICY

All Kenco sites are required to maintain compliance to the Kenco Quality Management System (KQMS) and its documentation requirements.  All sites must use this procedure as the minimum standard for:

- Documenting a Quality Policy
- Documenting Quality Objectives
- Controlling the addition, changes, and removal of controlled documents within their QMS
- Development of quality plans, appendices, and other documents filed in the Quality Manual



| Document Number: CP-BP-4.2.1.001 | Title: QMS DOCUMENTATION | | | |
|---|---|---|---|---|
| Original Date: **06/07/06** | Revision Date: **07/12/12** | Revision #: **1** | Effective Date: **08/01/12** | **2 of 4** |

- Development of documents, including records necessary to ensure the effective planning, operation, and control of processes

## 4.0 PROCEDURE

**4.1** A Quality Policy must be developed and documented appropriate to the organization, include commitments to both meeting requirements and improvement and provide a framework for review of the Quality Objectives. The Quality Policy must be communicated and personnel must demonstrate understanding and their role in carrying out the policy. The Quality Policy must be reviewed for continued suitability.

**4.2** Quality Objectives must support and align with the Quality Policy. Methods to measure this support are alignment of performance of everyday work to the objectives. The Quality Objectives must be established at the relevant group, site, department, and shift responsibility level.

**4.3 Document Types**

   **4.3.1** Best Practices (BP), Control Procedures (CP), and Policies (POL) are created and maintained by any approved group and distributed to sites through kencoconnection.com.

   **4.3.2** Rivermill Procedures (RMP) are created and maintained by any approved group and apply to Kenco Rivermill activities.

   **4.3.3** Quality Plans (QPs), Standard Operating Procedures (SOP), Work Instructions (WI), Standard Work (SW), Job Descriptions (JD), and Forms can be written and issued by personnel at departments and sites in accordance with department and site policies that control this process and/or *ISO-BP-4.2.3.001 Control of Documents.*

**4.4 Creating BPs, CPs, QPs, SOPs, WIs, SW, and Forms**

   **4.4.1** Development of new documents is determined by management, quality, and subject matter experts. Once the content is confirmed, a template from kencoconnection/quality is used to create the document. Review of the document will include personnel indicated in the Roles and Responsibilities section of the document. Participants in the development of forms will reference the associated document's Roles and Responsibilities. Flowcharts should be created prior to the documentation of a process.

   **4.4.2** Final document approval is executed by management and quality with a signature and date. The author signs as the subject matter creator but not as approval.

**4.5 Adding and Removing Documents to the Control Procedure Manual or Site Quality Manual**



| Document Number: | Title: | | | |
|---|---|---|---|---|
| **CP-BP-4.2.1.001** | **QMS DOCUMENTATION** | | | |
| Original Date: | Revision Date: | Revision #: | Effective Date: | **3 of 4** |
| **06/07/06** | **07/12/12** | **1** | **08/01/12** | |

**4.5.1** Documents must be added to manuals on their effective date. New and revised processes "Go Live" on the effective date with personnel trained and signed off by the trainer (reference *CP-QE-6.2.2.001 Job Training and Certification Program*). Training is completed after documents are approved with appropriate signatures and dates but prior to or on the effective date. Update the appropriate master list.

**Note: Process changes may be implemented immediately if a safety or risk hazard must be mitigated. The specific failure for the safety or risk hazard must be documented in the corrective action document.**

**4.5.2** Previous versions of CPs are removed from the manual and destroyed. The originals are maintained by Best Practices and filed with the corresponding DCN. A new Appendix F (on kencoconnection.com) must be printed and placed in the CP manual.

**4.5.3** Previous versions of a site document are removed and filed with the corresponding DCN. Update "*Appendix A*" (reference *ISO-BP-4.2.3.001 Control of Documents*) in the SQM and update any controlled copies.

**4.6 BPs and CPs Releases and Exceptions**

**4.6.1** New and revised BPs, CPs, and related forms releases are scheduled on the 15th of each month by Best Practices on the kencoconnection "New Releases and Revisions page".
**Note: Releases may occur other than the 15th of each month as "Special Releases".**

**4.6.2** Review the document with necessary personnel, management, quality and appropriate advocate or site subject matter expert.

**4.6.3** Determine if an exception is needed. Exceptions are granted for valid business reasons only. Exceptions must be approved by the Author Group that wrote the document. If the Site Manager and Quality Coordinator determine that an exception is needed, submit a *CP-QE-4.2.1.001-2 Exception Form*, stating the business case (justification) and the section of the document in question, to the listed email address on the form: KQMS.Exceptions@kencogroup.com .

**4.6.4** Once the exception is received by the Author Group QC, it is documented on the exception form and within 45 business days the exception must be closed out.

**4.6.5** If the exception is approved, the Author Group QC will scan and forward a signed copy of the exception form for the site to file, and the Site QC will indicate the exception on the site's "*Appendix D*".

**4.6.6** If the site does not receive an exception, the Author Group will inform the site of the reason for the rejection.

**4.6.7** Sites must develop a document to meet the requirements for a Best Practice. Best Practices are not filed at the site level.



| Document Number:<br>**CP-BP-4.2.1.001** | Title:<br>**QMS DOCUMENTATION** | | | |
|---|---|---|---|---|
| Original Date:<br>**06/07/06** | Revision Date:<br>**07/12/12** | Revision #:<br>**1** | Effective Date:<br>**08/01/12** | **4 of 4** |

**4.7   SOPs, WIs, SW, and Forms Releases**

    **4.7.1**   Departments and sites schedule releases of their documents.  Appropriate time for training after approval of a document but prior to effective date must be considered as a part of document development.  Effective documents will be filed in the Site Quality Manual as described in *ISO-BP-4.2.3.001 Control of Documents*.

## 5.0 REFERENCES

*ISO-BP-4.2.3.001 Control of Documents*
*CP-BP-4.2.3.001-2 Exception Form*
*CP-QE-6.2.2.001 Job Training and Certification Program*

## 6.0 REVISION TABLE

| Revision # | Revision Date | Description |
|---|---|---|
| 0 | 06/07/06 | Document created. |
| 1 | 07/12/12 | Complete revision. |

# KENCO

# KQMS Request for Exception

| | |
|---|---|
| **Document Number:** | |
| **Document Title:** | |
| **Document Subsection(s):** | |
| **Site Name/Location:** | |

| Date: | | Site QC Name: | |
|---|---|---|---|

**Justification:**

| Author Group Receipt Date | | Proposed Close Date | |
|---|---|---|---|

| **Author Group Approval** | | Signature: | |
|---|---|---|---|
| ☐ Accepted ☐ Rejected | | Date: | |

| **Operations Approval Required?** | ☐ Yes (Required) ☐ No (Not Required) |
|---|---|

**Author Group Comments:**

| **Operations Approval** | | Signature: | |
|---|---|---|---|
| ☐ Accepted ☐ Rejected | | Date: | |

**Operations Comments:**

**Notes:**
- Site Quality Coordinators along with Site Management will evaluate top tier documents and determine need for exceptions
  - o Exceptions are not necessary for sites outside the scope listed in the document in question
  - o Exception descriptions must be specific to section(s) in the document
  - o Complete Blue Section and Email this exception form to the following email: KQMS.exceptions@kencogroup.com
- The Author Group Quality Coordinator for the document in question will log the date the exception was received and the tenative 45 business day close date, process the approval of exceptions (Yellow Section, and Green section, if necessary) on this form and return a scanned copy to the Site Quality Coordinator. Original signed forms are maintained by the Author Group
- If exception is rejected, the Author Group must inform the Site Quality Coordinator and Site Manager of the reason for rejection, and ensure the justification is documented on this form
- After obtaining exception, the signed copy of this form is filed by the Site Quality Coordinator, and the exception is listed on Appendix D of the Site Quality Plan
- Proof of Exception (this signed form) for any exception entry on Appendix D must be provided to Kenco Management Services or representative upon request



| Document Number: | Title: | | | |
|---|---|---|---|---|
| **ISO-BP-4.2.3.001** | **CONTROL OF DOCUMENTS** | | | |
| Original Date: **04/07/06** | Revision Date: **07/16/12** | Revision #: **1** | Effective Date: **08/01/12** | **1 of 8** |

| Author: **Quality Assurance and Regulatory Affairs Director, Best Practices/Date** |
|---|
| **07/17/12** |
| Approval: **QC, Best Practices/Date** |
| **07/17/12** |
| Approval: **VP, Best Practices/Date** |
| **07/17/12** |

## 1.0 PURPOSE / SCOPE

The purpose of this document is to identify actions and responsibilities for ensuring the control of all quality documents pertaining to Kenco's Quality Management System (KQMS).

This document applies to all Kenco functions and operations and encompasses all internal and external documents used to manage, perform, or verify work including those included at the top tier level as Policies (POLs), Control Procedures (CPs), Best Practices (BPs), ISO Control Procedures (ISOs), Rivermill Procedures (RMPs), and at the site level in Quality Plans (QPs), Standard Operating Procedures (SOPs, Work Instructions (WIs), Standard Work (SW), and Forms.

## 2.0 ROLES AND RESPONSIBILITIES

**Kenco Management Services (KMS) – Best Practices** – has overall responsibility for the document control system, including the issuance and maintenance of this procedure. KMS-Best Practices controls and maintains all electronic information systems and the distribution, as well as, both hard copy and electronic copies of Policies (POL), ISO Control Procedures (ISO), Control Procedures (CP), Best Practices (BP), and Rivermill Procedures (RMP). All proposed changes and other suggestions for improvement of these procedures can be submitted online via the kencoconnection.com page.

**Site Quality Coordinator** – controls and maintains all electronic information systems and the distribution of related information, as well as, both hard copy and electronic copies of the Site Quality Manual, all SOPs, Job Descriptions (JD), and all forms ( and formats) used to create quality records.

**Designated Approval Authorities** – responsible to approve, reapprove and ensure adequacy of documents prior to release.

**Site Managers** – ensure conformance to this procedure at their site.

**All Associates** – are responsible to understand the structure and process of the Control of Documents Control Procedure.

*Proprietary Information - Kenco*



| Document Number: | Title: | | | |
|---|---|---|---|---|
| **ISO-BP-4.2.3.001** | **CONTROL OF DOCUMENTS** | | | |
| Original Date: | Revision Date: | Revision #: | Effective Date: | **2 of 8** |
| **04/07/06** | **07/16/12** | **1** | **08/01/12** | |

## 3.0 POLICY

**3.1**  The primary objective of the document control process is to ensure that documents are available to achieve the desired results. Document control is a critical factor in achieving standardization and measurement to achieve customer satisfaction, process effectiveness and improvement. The document control process provides adequate control for all documents and media, including hard copy, firmware, and software control.

**3.2**  KMS-Best Practices controls, maintains, and distributes Quality Management system (QMS) documentation via kencoconnection for POLs, ISOs, CPs, BPs, and RMPs.

**3.3**  POL, ISO, CP, BP, and RMP documents are approved for adequacy prior to release for use by a cross-functional panel called the Quality Review Board (QRB). Records of signed approvals are maintained by KMS-Best Practices.

**3.4**  The sites control, maintain, and distribute all customer-provided and site generated documents such as quality plans, related inspection/test procedures, specifications, etc., including all QPs, SOPs, WIs, SW, JDs, Forms, or other documents as defined by the customer or site needs.

**3.5**  Site documents are approved for adequacy by the Site Manager and Quality Coordinator (QC) prior to release, and personnel are trained after approval but before the documents are effective.

**3.6**  Approved Author Groups will review top tier documents annually, and the documents are reviewed for policy and accuracy, availability and legibility. All document updates and changes are approved prior to re-issue.

**3.7**  Site leadership will review site documents annually, and the documents are reviewed for process accuracy, availability and legibility. All document updates and changes are approved prior to re-issue.

**3.8**  External documents are identified on Appendix B and their distribution controlled.

**3.9**  Records are a special type of document and are controlled in accordance with provisions contained in this procedure and *ISO-QE-4.2.4.001 Control of Records*.

**3.10**  Obsolete documents are processed and maintained as described in Section 4.7 of this procedure.

## 4.0 PROCEDURE

**4.1**  Documents will be identified with a unique identification number including the date of issue, which indicates the revision, appearing on all pages of the document.

**4.2**  **Identification of Top Tier Procedures**



| Document Number: **ISO-BP-4.2.3.001** | Title: **CONTROL OF DOCUMENTS** | | | |
|---|---|---|---|---|
| Original Date: **04/07/06** | Revision Date: **07/16/12** | Revision #: **1** | Effective Date: **08/01/12** | **3 of 8** |

**4.2.1** Documents including POLs, BPs, CPs, ISOs, and RMPs will be identified with a unique identification number including a 2-digit code which indicates the approved author group which created the document.

**4.2.2** The document number will be numbered as: **[Document Type]** – **[Author Group Code]** – **[ISO Clause]**.**[Sequential Number]**. For example: The **third Control Procedure** written by **Human Resources** discussing **Training (Clause 6.2.2 in ISO)** would be: **CP-HR-6.2.2.003**.

**Note:** Forms add a dash then a number to the document number which relates to them. The training form for the above procedure would be **CP-HR-6.2.2.003-1.**

**4.2.3** The **Document Type** would be **POL** for Policies, **ISO** for ISO Procedure, **CP** for Control Procedure, **BP** for Best Practices or **RMP** for Rivermill Procedure.

**4.2.4** The **Author Group Code** from the list below will follow the document type:

| Approved Author Groups | Code |
|---|---|
| Best Practices | BP |
| Executive Management | EM |
| Finance | FN |
| Human Resources | HR |
| Internal Communications | IC |
| Insurance | IN |
| Information Technology | IT |
| Logistics Engineering | LE |
| Legal | LG |
| Operations | OP |
| Procurement | PO |
| Quality Engineering | QE |
| Risk Management | RM |
| Sales/Marketing | SA |
| Training | TR |

**4.2.5** The **Appropriate ISO Clause** will follow the **Author Group Code**. Consult the "Cracking the Case of ISO 9001:2008 for Service" book by Cianfrani and West.

**4.2.6** To find the next **Sequential Document Number** for a given ISO Clause, the QC must view the complete document list for their Author Group.

**4.2.7** **ISO Procedures (ISO)** – ISO Procedures are procedures developed by KMS-Best Practices Department that directly controls the KQMS. These ISO procedures are identified as ISO-BP-##. An example can be found in the header of this document.



| Document Number: | Title: | | | |
|---|---|---|---|---|
| **ISO-BP-4.2.3.001** | **CONTROL OF DOCUMENTS** | | | |
| Original Date: | Revision Date: | Revision #: | Effective Date: | **4 of 8** |
| **04/07/06** | **07/16/12** | **1** | **08/01/12** | |

**4.2.8** **Rivermill Procedures (RMP)** – Rivermill Procedures are documents developed by approved author groups that only apply to the Rivermill office. These procedures will be identified as RMP-(Author Group Code)-##.

**4.2.9** **Best Practices (BP)** – Best Practices are documented practices that provide guidance to sites in the development of SOPs. The sites must address the content of these documents in their procedures, however, the BPs themselves are not retained by the sites. All Best Practices are identified as BP-(Author Group Code)-##.

**4.2.10** **Control Procedures (CP)** – Control Procedures are directives. These procedures will be identified as CP-(Author Group Code)-##.

**4.2.11** **Policies (POL)** – Policies are documents developed by approved author groups describing general principles and identified as POL-(Author Group Code)-##.

**4.3** **Numbering Identification of Site Documents**

**4.3.1** The document number will be numbered as: **[Document Type]-[ISO Clause].[Sequential Number]**. For example: The third **SOP** written discussing **Training (Clause 6.2.2. in ISO)** would be: **SOP-6.2.2.003**.

Note: Forms add a dash then a number to the SOP number which relates to them. The training form for the above procedure would be **SOP-6.2.2.003**-1.

**4.3.2** The Document Type would be SOP for Standard Operating Procedure or JD for Job Description, WI for Work Instruction, SW for Standard Work, etc.

**4.3.3** The appropriate ISO Clause follows the Document Type: Consult the "Cracking the Case of ISO 9001:2008 for Service" book by Cianfrani and West.

**4.3.4** To find the next Sequential Document Number for a given ISO Clause. The QC must view the complete document list for their site.

**4.3.5** **Standard Operating Procedures (SOP)** – SOPs will be identified as SOP ## with the number of the SOP corresponding to the associated Site Quality Plan (SQP) clause. For example: "SOP-6.2.2.001 indicates the SOP corresponds to Clause 6.2.2 of the site's SQP and is procedure 001.

**4.3.6** **Job Descriptions (JD) –** JDs will be identified as JD-5.5.1.## with the number of the JD corresponding to the associated SQP 5.5.1 Clause (Responsibility and Authority). For example, "JD-5.5.1.001" indicate the first JD in the system.



| Document Number: | Title: | | | |
|---|---|---|---|---|
| **ISO-BP-4.2.3.001** | **CONTROL OF DOCUMENTS** | | | |
| Original Date: | Revision Date: | Revision #: | Effective Date: | **5 of 8** |
| **04/07/06** | **07/16/12** | **1** | **08/01/12** | |

**4.3.7** All forms applicable to a document will be identified as **[Document Type]-[ISO Clause].[Sequential Number]-[Form Number]**. **Effective Date** in the footer at the bottom of the form. For example: **SOP-7.5.1.001-2 Effective 04/01/08**. This example is the second form attached to **SOP-7.5.1.001** and was **last revised on 04/01/08**. The identification number, effective date of issue or revision date will be shown on all pages of documents.

**4.4 Document Approval –** The first page of each document will identify:

    **4.4.1** The Author as the Subject Matter Expert that is responsible for developing the document or changes.

    **4.4.2** The QC as the reviewer/approver responsible for its periodic review for compliance with KQMS requirements, consistency with established policy and objectives, update and maintenance.

    **4.4.3** The relevant approval authority (i.e. VPs or Directors are assigned approval authority for top tier documents, Site Manager is assigned overall responsibility in the QP for managing the process and authorizing release of site documents).

**4.5 Master Lists –** At a minimum, the following master lists will be established and maintained. These lists must contain a date identifying when the list was last updated:

    **4.5.1** A master list of Site KQMS Documents (SOPs, JDs, WIs, and SW) is maintained as Appendix "A" of the QP.

    **4.5.2** A master list of all external documents, customer procedures and manuals are maintained in Appendix "B" of the QP.

    **4.5.3** A master list of quality plans, specifications, and related inspection/test procedures are maintained in Appendix "C" of the QP.

    **4.5.4** A master list of exceptions to top tier documents is maintained in Appendix "D" of the QP. Exceptions are obtained per instructions in *CP-BP-4.2.1.001 QMS Documentation*.

    **4.5.5** A master list of site distribution of manuals is maintained in Appendix "E" of the QP.

    **4.5.6** A master list of Control Procedures is maintained by KMS-Best Practices and the sites print this as Appendix "F" of their QP.

    **4.5.7** A master list of records is recorded in the Index of Quality Records. Reference *ISO-QE-4.2.4.001 Control of Records*.

**4.6 Document Issue and Retrieval**



| Document Number: **ISO-BP-4.2.3.001** | Title: **CONTROL OF DOCUMENTS** | | | |
|---|---|---|---|---|
| Original Date: **04/07/06** | Revision Date: **07/16/12** | Revision #: **1** | Effective Date: **08/01/12** | **6 of 8** |

**4.6.1** Hard copy master signed originals of all controlled documents will be identified with original signature and dates of the relevant approval authority. Controlled copies will be clearly identified with a red ink stamp identifying the document as a "CONTROLLED COPY". A controlled copy stamp signifies the QC guarantees that the controlled copy is identical to the master signed copy.

**Note:** Controlled copy stamps may only be applied to documents which the QC is in possession of master signed copies (in indelible ink). Verification of accuracy of controlled copies cannot be guaranteed without physical comparison to the master site copy.

**4.6.2** Uncontrolled copies may be made, but the recipient of these documents must be advised that they are for information only and cannot be guarantee of their accuracy once copied.

**4.6.3** Sites that must maintain compliance of documentation for regulatory agencies, [i.e. Food and Drug Administration (FDA)] will be provided current controlled copies of ISOs and CP-QE/BPs from Best Practices. Best Practices and site's QCs will complete *ISO-BP-4.2.3.001-3 Controlled Copy Distribution Form* as controlled copies are distributed, obsolete, and destroyed.

**4.7 Document Changes**

**4.7.1** KMS-Best Practices uses a *Document Change Notice (DCN) ISO-BP-4.2.3.001-1* to request and document any changes to the POL, BP, CP, RMP or forms.

**4.7.2** Sites use a DCN to request and document any changes to QPs, SOPs, WIs, SW, JDs, or forms.

**4.7.3** The following steps describe how to use DCNs in the internal document change control process:

**4.7.3.1** The personnel requesting a document change completes the applicable part of the DCN and forwards the DCN to the QC.

**4.7.3.2** The QC will review the recommended change to the document and submit to the relevant approval authority with related comments concerning any policy or procedural issues. The QC will keep a log of the DCN to track the progression of the document change process. See *DCN System Control Log (ISO-BP-4.2.3.001-2).*

**4.7.3.3** The QC will keep their DCN Log up-to-date in their Quality folder on the Kenco network drive, or if no access is available they will send a copy of the DCN Log to KMS-Best Practices on the first Tuesday of every month.

**4.7.3.4** The relevant approval authority will utilize SMEs to determine if the change is required, effectiveness of the change, safety issues and possible related processes that may be affective by the change. Once the SME has completed the determination and adjusted the content of the document back to the approval authority for final review.



| Document Number: | Title: | | | |
|---|---|---|---|---|
| **ISO-BP-4.2.3.001** | **CONTROL OF DOCUMENTS** | | | |
| Original Date: | Revision Date: | Revision #: | Effective Date: | **7 of 8** |
| **04/07/06** | **07/16/12** | **1** | **08/01/12** | |

**4.7.3.5** If the relevant approval authority decides to implement the proposed change, they will approve the DCN and return it along with any related comments and recommendations to the QC for preparation of a final "ready for signature" copy of the revised document.

**4.7.4** Upon receiving the approval authority signature, the QC will:

**4.7.4.1** Change the appropriate portion of the document. The revised document must be reissued in its entirety.

**4.7.4.2** Update the Revision Date, Revision #, and Effective Date in the header of the document.

**4.7.4.3** Submit the "ready for signature" copy of the document to the author for signature as the SME of the process.

**4.7.4.4** Submit the "ready for signature" copy of the document to the relevant approval authority for signature. The approval authority will verify the accuracy and legibility of the document before approving. The QC must also approve the document.

**4.7.4.5** Reissue the document in its entirety. The revised documents may be accompanied by a memo summarizing the nature of the change or providing instructions regarding disposition of obsolete documents or pages.

**4.7.4.6** Retrieve the obsolete controlled document(s).

**4.7.4.7** Archive the obsolete master (signed) controlled document and file with the DCN (destroy the obsolete controlled copies).

**4.7.4.8** Update the applicable master list.

**4.7.4.9** Coordinate with the designated trainer to ensure the timely provision of needed training if deemed necessary, (i.e. the change impacts the policy or procedure). Simple grammatical or typographical changes (administrative changes) do not require training.

**4.7.5** If the relevant approval authority decides not to implement the proposed change, they will reject the DCN and contact the originator with an explanation.

- If the originator chooses to dispute the rejection, they can submit the DCN and any related comments to the QC for mediation. If the QC rejects the DCN, the rejection will be communicated to the relevant approval authority and originating associate. If the QC determines that the proposed change (or a modified version of the initial proposed change) merits further review, they will initiate a new DCN and forward it to the relevant approval authority with related comments and recommendations.

*Proprietary Information - Kenco*



| Document Number: **ISO-BP-4.2.3.001** | Title: **CONTROL OF DOCUMENTS** | | | |
|---|---|---|---|---|
| Original Date: **04/07/06** | Revision Date: **07/16/12** | Revision #: **1** | Effective Date: **08/01/12** | **8 of 8** |

## 5.0 REFERENCES

*CP-BP-4.2.1.001 QMS Documentation*
*ISO-BP-4.2.3.001-1 DCN Change Notice Form*
*ISO-BP-4.2.3.001-2 DCN System Control Log*
*ISO-BP-4.2.3.001-3 Controlled Copy Distribution List*
*ISO-QE-4.2.4.001 Control of Records*

## 6.0 REVISION TABLE

| Revision # | Revision Date | Description |
|---|---|---|
| 0 | 04/07/06 | Document created. |
| 1 | 07/16/12 | Complete revision. |



| Document Number: **ISO-QE-4.2.4.001** | Title: **Control of Records** | Effective Date: **03/01/10** |
|---|---|---|
| Procedure Owner: **Manager, Kenco Management Services – Quality Engineering** | | |
| Created Date: **04/07/06** | | **Page 1 of 5** |

| Approval: **QC, Kenco Management Services – Quality Engineering** | Approval: **Director, Kenco Management Services – Quality Engineering** |
|---|---|

## 1.0 PURPOSE/SCOPE

The primary objective of the record control system defined in this procedure is to standardize the identification, use, and maintenance (storage) of all records that provide evidence of conformity to requirements and the effective operation of our Kenco Quality Management System (KQMS).

This document identifies and sets minimum record-keeping requirements for Kenco facilities. Record control also plays a critical role in providing data used to monitor, measure and analyze customer satisfaction, process effectiveness and operational efficiency.

This procedure applies to all Kenco functions and operations and encompasses all records used to demonstrate conformance to regulatory and quality system requirements including those specified in Control Procedures and Standard Operating Procedures.

## 2.0 ROLES AND RESPONSIBILITIES

**Kenco Management Services (KMS) - Quality Engineering** - has overall responsibility for the record control system, including the issuance and maintenance of this procedure and minimum record-keeping requirements. All proposed changes and other suggestions for improvement of this procedure can be submitted online via the "kencoconnection.com" Quality Page.

**Site Quality Coordinator** - controls and monitors recordkeeping systems at the site in accordance with this procedure. This includes *Index of Quality Records*, a comprehensive list of all hard copy and electronic records kept at the site which are necessary to demonstrate conformance to requirements.

**Site Managers**- responsible to ensure records are kept in accordance with this procedure

**Identified Record Holders** – Those listed as Record Holders on the site Index of Quality Records must read and understand this policy; are responsible to follow the general record keeping guidelines set forth in this policy and the more specific requirements listed in the site's *Index of Quality Records.*

## 3.0 POLICY/PROCEDURES

**Process Summary**

The Site Quality Coordinator controls and maintains all Kenco forms and record formats used to create quality records in accordance with provisions contained in *ISO-QE-4.2.3.001 Control of Documents.* All employees are responsible for creating legible and accurate records using the forms or other record formats prescribed by the controlling document governing the process they are performing, such as a Control Procedure or Standard Operating Procedure.

Record holders are responsible for complying with established record storage, retention, and disposition instructions identified in the site *Index of Quality Records.*

*Proprietary Information – Kenco*





| Document Number:<br>**ISO-QE-4.2.4.001** | Title:<br>**Control of Records** | Effective Date:<br>03/01/10 |
|---|---|---|
| Procedure Owner: **Manager, Kenco Management Services – Quality Engineering** | | |
| Created Date: **04/07/06** | | Page 2 of 5 |

## 3.1 Identification

Records are identifiable to the product, person, or event to which they pertain. Records are grouped to facilitate their retrieval.

### 3.1.1 General Record Completion Rules:

- All entries must be made in ink and must be legible.
- Documents and forms used to create records should be completed fully, entering all required information. If a given item does not apply, enter "N/A" in the space provided.
- Documents requiring a signature should be signed with the first and last name of the person authorized to sign the form. If necessary, the first initial and complete last name may be used. All signatures should be dated.
- All Kenco Sites that meet the requirements of the Food and Drug Administration (FDA) must have handwritten dates with all handwritten signatures.

### 3.1.2 General record error-correction rules:

- Errors or corrections are to be made by drawing a single line through the error. Write the correct information next to the error.
- The individual making the correction must initial and date the change.
- The use of opaque correction fluid ("white out") or similar methods obscuring the changed area are prohibited.

## 3.2 Identification of Key Records

### 3.2.1 Key records are defined at multiple levels and will differ among Kenco sites because of differences in the scope of work at the site. Some of the sources that affect record-keeping are:

- **Regulatory requirements:** (OSHA, DOT, EEOC, FDA, DEA) Examples include personnel files, driver qualification files, safety training files, pest control records.
- **Kenco Quality Management System and ISO 9001:2000 requirements:** Examples include Document Change Notices (DCN), Management Review Outputs, Material Deficiency Reports (MDR), Corrective Preventive Action Request (CPAR)
- **Control Procedures:** Examples include Employee Qualification and Training records, Safety Training Metrics
- **Site SOPs and processes:** Examples include Bill of Lading, Purchase Orders, Equipment inspections, EIP observations, etc.
- **Customer Requirements:** Examples include Proof of Delivery, Purchasing Documents (for Pass-Through)

### 3.2.2 The Quality Coordinator must ensure that records that are required from these sources are entered into the master list of record-keeping, the site *Index of Quality Records.* The Quality Coordinator, with input from all responsible managers, is responsible for keeping the site *Index of Quality Records* current.

## 3.3 Storage requirements

- Records are normally stored by the same department that initially established the record.
- Records are stored in a dry and clean environment.
- Cabinets containing records are clearly labelled to display their contents. Also a numbering system should be developed for the files.
- Confidential records may be stored in labelled and locked file locations (file cabinets, file rooms) however; records and other quality documents may not be stored in private desk drawers or other obscure locations that are not generally known.
- Records are retained by record holders in either their active location or their final storage locations as identified in the site *Index of Quality Records.*

- Records must be filed, stored, and retained such that they are readily retrievable.



| Document Number:<br>**ISO-QE-4.2.4.001** | Title:<br>**Control of Records** | Effective Date:<br>**03/01/10** |
|---|---|---|
| Procedure Owner: **Manager, Kenco Management Services – Quality Engineering** | | |
| Created Date: **04/07/06** | | **Page 3 of 5** |

**3.4 Document Retention**
- Recent records are kept active (filed) in a clearly marked storage location and then put into long term storage until expiration of the retention period.
- All records are retained for a minimum of seven years, unless otherwise prescribed by the document governing the process or product to which they relate.
- The Site Manager is responsible for records in long term storage.
- Product verification records are available to the customer or the customer's representative for evaluation upon request for the life of the record.

**3.5 Disposal**
- Records retained beyond their specified retention period must be clearly marked "historical or obsolete records" and placed in the archive location.
- Records not retained are destroyed (i.e. shredded or deleted) as soon as practical after the retention period has lapsed.

**3.6 Creation of the Index of Quality Records**

**3.6.1** Quality Coordinator downloads the ***ISO-QE-4.2.4.001-1 Index of Quality Records*** form.
*Note: The first five entries of the form are completed as examples.*

**3.6.2** The Quality Coordinator will complete the site *Index of Quality Records* by:

- **a.** Typing in the name of the Site and removing the document control number and date from the bottom. Change the "Last Updated" field to the current date.
- **b.** Identifying all records actually being kept, and who(by title) is responsible
- **c.** Reviewing regulatory requirements with appropriate management (Check for Gaps in actual)
- **d.** Reviewing Control Procedures and Site SOPs for other record requirements (Check for Gaps in actual)
- **e.** Organizing record location structure (it is advised that sites letter each file cabinet and number the drawers, for example they can denote "File E3- Shipping Office"" and "File C1 Supervisors Office" as a clear indication of record location.
- **f.** Completing all columns of the form. Notice that the form is broken into the following columns:

  - **Record Name-** Enter the name of the collection of forms that are attached and filed together (an example could be "Outbound Paperwork" which consists of outbound manifest, pick list, seal paperwork stapled together).
  - **Form Number-** Use this column to list any Form numbers that make up a record (or enter "free format" if there is no form, such as minutes from a meeting, etc.). Remember that a collection of multiple forms could make up a record**.**
  - **Record Holder-** Enter the person (by job title) who is responsible for the filing and upkeep of that record.
  - **Controlling Document-** Enter the Document or Cause for the record to be kept. (An example "SOP-7.5.1.009" would signify that the "Outbound Paperwork" record is filed as a result of that SOP.)
  - **Active Location-**Enter the current location in which newly created records are placed. This could be "*File D4 – front office*".
  - **Archive Location-** Enter the long term storage location for aging records. Typically, locations may store these in a rack location or records retention area.

  - **Retention Time-** Enter how long a record is to be kept. Records must be kept long enough to ensure compliance over time. The standard retention length should be



| Document Number: **ISO-QE-4.2.4.001** | Title: **Control of Records** | Effective Date: **03/01/10** |
|---|---|---|
| Procedure Owner: **Manager, Kenco Management Services – Quality Engineering** | | |
| Created Date: **04/07/06** | | **Page 4 of 5** |

seven years, unless otherwise denoted in the controlling document.

**3.6.3** The site *Index of Quality Records* is kept up to date by the Quality Coordinator for the site and master copy is contained in the Site Quality Manual as a master list located behind the Site Quality Plan. Post controlled copies of the Index of Quality Records in record storage locations.

**3.6.4** Each Record Holder identified on the *Index of Quality Records* must receive documented training on this procedure, their specific recordkeeping responsibilities, and the location and use of the site *Index of Quality Records*.

**3.7   Assessment of Recordkeeping Effectiveness**

The Quality Coordinator assesses the effectiveness/efficiency of the record control system through self assessment and/or as a result of internal audits conducted per *ISO-QE-8.2.2.001 Internal Audit*, and initiates appropriate corrective/preventive actions per *ISO-QE-8.5.1.001 Continual Improvement*.

## 4.0 REPORTS/METRICS

*ISO-QE-4.2.4.001-1 Index of Quality Records Form*
*ISO-QE-8.2.2.001 Internal Audit*
*ISO-QE-8.5.1.001 Continual Improvement*



| Document Number: **ISO-QE-4.2.4.001** | Title: **Control of Records** | Effective Date: **03/01/10** |
|---|---|---|
| Procedure Owner:  **Manager, Kenco Management Services – Quality Engineering** | | |
| Created Date: **04/07/06** | | **Page 5 of 5** |

**Please ensure that all associates at your site listed in Roles and Responsibilities (Section 2.0) sign and date this log indicating they have read and understand the current content of this procedure.**

| PRINT NAME | SIGNATURE | DATE |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Trainer:_____Signature:_____Date:_____

Trainer:_____Signature:_____Date:_____

**A training file is to be kept at each site containing copies of all training records for Control Procedures. These training logs are completed and retained for all newly released and revised procedures.  All current employees must be trained prior to the effective date as procedure changes occur.  Affected new employees will sign off on the logs within 60 days of hire.  These records are to be filed by procedure, and are maintained by the Quality Coordinator.**

 **Note:  You may print additional copies of this page for additional space to record training.**

*Proprietary Information – Kenco*

**Exhibit CC**

**INTENTIONALLY LEFT BLANK**

**Exhibit DD**



February 19, 2016

Ms. Edith McCurry
6239 S 13110E Rd
Pembroke Township, IL  60958

Dear Ms. McCurry:

Recently you received notification from USAdmin that your former employer, Kenco, had incurred a premium rate change effective 01/01/16 resulting in an increase in premiums.

Kenco has made the decision to delay the effective date of the rate change to 02/01/16.

If you have already paid the premium increase, this will result in a credit towards your next premium due date.

Revised coupons are enclosed for your convenience. If you have any questions, please contact our office at 423-266-5100.

Sincerely,

COBRA Administration

KENCO001469

Case No. 2021-0009

**Exhibit EE**

**U. S. DEPARTMENT OF LABOR**

**ADMINISTRATIVE REVIEW BOARD**


**Edith McCurry**
**Petitioner-Complainant,**

**v.**

**Kenco Logistic Services, LLC.**
**Respondent**


Petition for Review from the U.S. Department of Labor, Office of Administrative Law Judges

Case No. 2019-FDA-00015, OSHA Case No. 5-1260-18-107


_____

PETITIONER-COMPLAINANT REPLY BRIEF


**Edith McCurry**

Pro Se
EDITH MCCURRY
6239 South 13110 East Rd.
Pembroke Township, IL 60958
815-735-4281

PETITIONER-COMPLAINANT REPLY BRIEF

TABLE OF CONTENTS

TABLE OF CONTENTS ..... .............................................................................i

TABLE OF AUTHORITIES .......................................................................iii

STATEMENT OF THE ISSUE ................................................................pg. 1

SUMMARY OF THE CASE ....................................................................pg. 1

SUMMARY OF THE ARGUMENT...........................................................pg. 5

ARGUMENT   ....................................................................................pg. 5

    I.     THE ALJ ERRED IN GRANTING SUMMARY DECISION FOR KENCO ON THE GROUND THAT EMPLOYEES OF HARTFORD, NOT KENCO, HAVE TAKEN ALL ACTIONS RELATED TO MS. MCCURRY'S DISABILITY BENEFITS. .......................................................pg. 5

    II.    THE ALJ ERRED WHEN THE ALJ RAISED ISSUES THAT THE MOVANT HAD NOT RAISED IN THEIR MOTION FOR SUMMARY DECISION. ...........................................................................pg. 6

    III.   THE ALJ ERRED WHEN HE DID NOT CONSIDER APPELLANT'S EVIDENCE AND WITH ALL REASONABLE INFERENCES DRAWN IN FAVOR OF THE NONMOVANT AND ALL FACTUAL DISPUTES RESOLVED IN FAVOR OF THE NONMOVANT.  .............................pg. 7

    IV.   THE ALJ ERRED WHEN HE DID NOT VIEW THE EVIDENCE OF PRETEXT IN THE LIGHT MOST FAVORABLE TO APPELLANT. ....pg.9

    *V.*    MCCURRY'S RELIANCE ON THE RULING IN *MCCURRY V. KENCO ET. AL. 19-CV-04067 IS NOT MISPLACED.* .......................................pg.11

    *VI.*   APPELLATE RULE 28. ..........................................................pg.12

CONCLUSION  ...................................................................................................pg.14

TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

*Anderson v. Hardman*,

    241 F.3d 544 at 545 (7th Cir. 2001) ........................................................................pg. 13

*Anderson v. Liberty Lobby, Inc.*,

    477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ....................................pg. 7

*Branch v. Smith*,

    538 U.S. 254, 273, 123 S. Ct. 1429, 155 L. Ed. 2d 407 (2003) .................................pg.12

*Campania Mgmt. Co., Inc. v. Rooks, Pitts & Poust*,

    290 F.3d 843, 853 (7th Cir.2002) .............................................................................pg. 6

*Celotex Corp. v. Catrett*,

    477 U.S. 317, 323,106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) .....................................pg. 3

*Clark v. Coats & Clark, Inc.*,

    929 F.2d 604, 606-9 (11th Cir. 1991) .......................................................................pg. 7

*Crawford V. Metro Gov't of Nashville and Davidson County, Tennessee*,

    555 U.S. 271, 274 n.129 S. Ct. 846, 172 L.Ed. 2d 650 (2009) ....................................pg. 8

*Costello v. Grundon*,

    625 F.3d 342 (7th Cir. 2010) at 363 .................................................................pg. 2 & 5

*Flaherty v. Gas Research Institute*,

    31 F.3d 451 at 453 (7th Cir. 1994) ..........................................................................pg. 6

***Haines v. Kerner*,**

    ***404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam)*** .............................pg. 13

*Hobgood v. Illinois Gaming Bd.*,

    731 F.3d 635, 646 (7th Cir. 2013) ............................................................................pg. 4

iii.

*IFC Credit Corporation v. Aliano Bros. Gen. Contractors, Inc.*,
 437 F.3d 606, 610-611 (7th Cir. 2006)........................................................pg. 6

*In re Payne*,
 431 F.3d 1055, 1060 (7th Cir.2005) ........................................................pg. 3

*JEM Ag Supply, Inc. v. Pioneer Hi-Bred International, Inc.*,
 534 U.S. 124, 141-44, 122 S. Ct. 593, 151 L. Ed. 2d 508 (2001) .............................pg.12

*Kodish v. Oakbrook Terrace Fire Protection Dist.*,
 604 F.3d 490 (7th Cir. 2010) ........................................................pg. 7 & 10

*Logan v. Commercial Union Ins. Co.*,
 96 F.3d 971, 979 (7th Cir. 1996) ........................................................pg. 1, 6 & 7

*Malen v. MTD Prods., Inc.*,
 *628 F.3d 296, 303 (7th Cir. 2010)* ........................................................pg. 8

*Malhotra v. Cotter & Co.*,
 885 F.2d 1305, 1310 (7th Cir. 1989) ........................................................pg. 5

**McCormick v. City of Chicago,**
 **230 F.3d 319, 325 (7th Cir.2000)** ........................................................pg. 13

*Milligan v. Bd. of Trs.*,
 686 F.3d 378, 388 (7th Cir. 2012) ........................................................pg.11

*Mills v. First Federal Sav. & Loan Ass'n*,
 83 F.3d 833, 846 (7th Cir. 1996) ........................................................pg. 4

*Patterson v. McLean Credit Union*,
 491 U.S. 164, 218, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989) ................................pg. 4

*Plair v. EJ Brach & Sons, Inc.*,
 105 F.3d 343,349 (7th Cir. 1997) ........................................................pg. 4

*Pourghoraishi v. Flying J, Inc.*,
    449 F.3d 751, 765 (7th Cir. 2006) ............................................................................pg. 2

*Randolph v. IMBS, Inc.*,
    368 F.3d 726 at 730 (7th Cir. 2004) ......................................................................pg. 12

*Reeves v. Sanderson Plumbing Products, Inc.*,
    530 U.S. 133, 140, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) ..................pg. 4 & 10

*Robert T. Evans v. T-Mobile, USA, Inc.,*
    ARB. Case No. 15-037, ALJ No. 2012-SOX-036, slip. op. at 7 (ARB Feb. 27, 2017) .....pg. 8

*Russ v. International Paper Co.*,
    943F 2d 589, 591-593 (5th Cir. 1991) (per curiam). *cert. denied,* .............................pg. 7

*Santiago-Ramos v. Centennial P.R. Wireless Corp.*,
    217 F.3d 46, 53 (1st Cir. 2000)." Slip op. at n.47 ....................................................pg. 10

*Simpson v. Beaver Dam Community Hospitals, Inc.*,
    780 F.3d 784 (7th Cir. 2015 ........................................................................................pg. 4

*Sommerfield v. City of Chicago*,
    613 F. Supp. 2d 1004 (N.D. Ill. 2009) ........................................................................pg. 3

*Stokes v. Board of Educ. of the City of Chicago,*
    599 F.3d 617, 619 (7th Cir. 2010) ..............................................................................pg. 8

*Sublett v. John Wiley & Sons, Inc.*,
    463 F.3d 731, 736 (7th Cir. 2006) ..........................................................pg. 4, 5, & 10

*US ex rel. Feingold v. AdminaStar Federal, Inc.*,
    324 3d 492, 494 (7th Cir. 2003) ................................................................................pg. 6

*US v. Stevens*,
    500 F.3d 625, 628-629 (7th Cir. 2007) ......................................................................pg. 6

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,

    133 S. Ct. 2517, 2533 (2013) ...............................................................................pg.11

*Woolard v. Woolard*,

    547 F.3d 755 (7th Cir. 2008) ...............................................................................pg. 6

STATUTES

Food Safety Modernization Act ..............................................................pg. 1, 2, 11 & 14

OTHER AUTHORITIES

29 CFR 9.32 .....................................................................................................pg.12

29 CFR 18.95 ...................................................................................................pg.12

29 CFR 1987.110 .............................................................................................pg.12

42 U.S.C 1981 ..................................................................................................pg.11

Federal Rule of Appellate Procedure 28 .........................................................pg.12

Title VII ...........................................................................................................pg.11

**STATEMENT OF THE ISSUE**

Whether the ALJ erred in granting Summary Decision for Kenco on McCurry's claim of whistleblower retaliation, in violation of the Food Safety Modernization Act, ("FSMA"), on the ground that employees of Hartford, not Kenco, have taken all actions related to Ms. McCurry's disability benefits.

**Summary of the case**

**The Basis for Seeking Summary Decision**

Respondent bore the initial burden of identifying the basis for seeking summary decision. *See Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 979 (7th Cir.1996). Respondent only identified as its basis for Summary Decision two (2) questions of law relative to Jurisdiction and Collateral Estoppel. Respondent also asked for sanctions against Petitioner-Complainant. Respondent's Motion for Summary Decision "herein after" (Rp.MSD)

**Conclusively Resolved**

The ALJ's Decision and Order conclusively resolved the only two (2) issues raised in Respondent's Motion for Summary Decision. The order established that the DOL had Jurisdiction over the causes of actions Petitioner-Complainant brought to OSHA under the Food Safety Modernization Act relative to her benefits.

The resolution of the Jurisdictional question resolved all outstanding and subsequent issues of the Respondent. The Respondent raised no other defenses of questions of law or fact. Nor did the Respondent in any way implicitly or explicitly deny, refute, rebuff, reject, disagree or oppose any of the assertions and allegations Petitioner-Complainant brought forth in its Whistleblower complaint filed under FSMA. (Rp.MSD) & Petitioner-Complainant Opposition to Respondent's Motion for Summary Decision "herein after" (Cp. Opp. Rp.MSD) pgs. 14 ¶ 4, 17 ¶ 2 & 3, and 18 ¶ 1 & 2.

Consequently, Respondent waived all other arguments relative to Petitioner-Complainant's claims.

**Arguments Waived**

The Respondent's Motion for Summary Decision waived all other arguments relative to Petitioner-Complainant's claims of retaliation under FSMA, except those questions of law relative to Jurisdiction and Collateral Estoppel, which were unequivocally and conclusively resolved in the ALJ's Order Granting Summary Decision dated 11/2/2020

Accordingly, the party opposing summary decision (judgment) is not required to respond to grounds that were not raised by the movant. *See, e.g., Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 736 (7th Cir.2006) ("[I]f the moving party does not raise an issue in support of its motion for summary decision (judgment), the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision."); *Pourghoraishi v. Flying J, Inc.,* 449 F.3d 751, 765 (7th Cir.2006) ("The party opposing summary judgment has no obligation to address grounds not raised in a motion for summary judgment.").[1]

**Undisputed and Unopposed**

Respondent's did not dispute or contest Petitioner-Complainant's assertions and supporting evidence in Petitioner-Complainants Response Opposing Respondent's Motion for Summary Decision that further demonstrated in relevant part that:

1. Respondent is the Plan Administrator; (Cp. Opp. Rp.MSD pg. 9 ¶ 22)[2] & McCurry Affidavit ¶ 18

2. Respondent funded the disability plan (Cp. Opp. Rp.MSD pg. 9 ¶ 25) & McCurry Affidavit ¶ 19

3. Respondent's dual function of funding the plan, as well as, being the Plan Administrator created a structural conflict (Cp. Opp. Rp.MSD pg. 9 ¶ 26) and a material issue (Cp. Opp. Rp.MSD. pg. 18 ¶ 5)

---

[1] The Court has stated in *Costello v. Grundon*, 625 F.3d 342 (7th Cir. 2010) at 363 that it was unaware of any authority that required the party to marshal all the evidence that they had on an issue that was not asserted by the party seeking summary judgment.

[2] Prior to litigation Respondent and The Hartford had been cited as both being the Plan Administrator for the disability Plans. ((Cp. Opp. Rp.MSD pg. 9 ¶ 23) McCurry Affidavit ¶ 18) Additionally, the plan was originally referred to as the Kenco Employee Benefit Plan. McCurry Affidavit ¶ 21 Exhibit B

4.  Respondent retaliated against Petitioner-Complainant for engaging in protected activity. (Cp. Opp. Rp.MSD pg. 10 ¶ 36 & pg. 14 ¶ 4) & McCurry Affidavit ¶ 47, 51-52

5.  Respondent continued to gather medical information in 2018 regarding Petitioner-Complainant well after they alleged to have discharged themselves of their burden in March of 2015 (Cp. Opp. Rp.MSD pg. 3-4 ¶ 16-23) and well after the matter had been disposed of between Petitioner-Complainant and Respondent. (Cp. Opp. Rp.MSD pg. 14 ¶ 1) & McCurry Affidavit ¶ 37-39 & 41-42

6.  Respondent also had unfettered access to Petitioner-Complainant's disability claim history.  (Cp. Opp. Rp.MSD pgs. 4 ¶ 20 & 18 ¶ 5) & McCurry Affidavit ¶ 24

7.  Respondent's unfettered access and conduct created another material issue of fact. (Cp. Opp. Rp.MSD pg. 4 ¶ 24 &  pg. 15 ¶ 3)

Petitioner-Complainant also pointed out that the movants did not articulate with any reference to the record and/or to the law specific reasons why it believed that there was no genuine issue of material fact relative to the claims made regarding Petitioner-Complainant's disability benefits. (Cp. Opp. Rp.MSD pg. 14 ¶ 1 – 2, pg. 17 ¶ 2-5, & pg. 18 ¶1-2).  Nor did they provide any evidence to support that Petitioner-Complainant did not establish a Prima Facie Case. Unsupported statements, whether in oral argument, *In re: Payne,* 431 F.3d 1055, 1060 (7th Cir.2005), or in briefs do not count." *Sommerfield v. City of Chicago*, 613 F. Supp. 2d 1004 (N.D. Ill. 2009);  (Cp. Opp. Rp.MSD pg. 5 ¶ 2)

**The Court of CELOTEX**

Respondent's raised affirmative defenses and did not articulate why it believed there was no genuine issue of material fact.

The Court of CELOTEX states "Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

**Specific Facts**

Likewise, Petitioner-Complainant did not rest upon her mere allegations, but was able to set forth specific facts showing that there were genuine issues of material fact.

Petitioner-Complainant was able to specifically refute and identify inconsistencies in Respondent's facts regarding Petitioner-Complainant's disability benefits. Cp. Opp. Rp.MSD pgs. 15 ¶ 3 & 16 ¶ 1-2) *Plair v. E. J. Brach & Sons, Inc.,* 105 F.3d 343, 349 (7th Cir.1997); *Mills v. First Federal Savings & Loan Ass'n,* 83 F.3d 833, 846 (7th Cir.1996), "An employer's subjective reason(s) for…..may be reasonably viewed as a pretext for discrimination." *Simpson v. Beaver Dam Community Hospitals, Inc.*, 780 F.3d 784 (7th Cir. 2015) (Cp. Opp. Rp.MSD pg. 18 ¶6)

**Pretext**

Petitioner-Complainant's evidence refuting and identifying Respondent's alleged facts was sufficient to preclude summary decision in Respondent's favor. (Cp. Opp. Rp.MSD pg. 15 ¶ 3, pg. 16 ¶1-2 & pg. 17 ¶ 1) *Patterson v. McLean Credit Union,* 491 U.S. 164, 218, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989).

Complainant's discrediting of employer's explanation is entitled to considerable weight, such that Complainant should not be routinely required to submit evidence over and above proof of pretext. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 140, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)( Cp. Opp. Rp.MSD pg. 16 ¶ 2).

"Where an employer's reason for …..is without factual basis ..., that is evidence that an employer might be lying about its true motivation," *Hobgood v. Illinois Gaming Board,* 731 F.3d 635, 646 (7th Cir.2013).

Pretext creates a genuine issue of disputed fact (Cp. Opp. Rp.MSD pg. 17 ¶ 6).

## SUMMARY OF THE ARGUMENT

The ALJ erred, after conclusively resolving the two (2) questions of law forming the sole basis of Respondent's Summary Decision, when he dismissed Petitioner-Complainant's claim of whistleblower retaliation in violation of the ON THE GROUND THAT EMPLOYEES OF HARTFORD, NOT KENCO, HAVE TAKEN ALL ACTIONS RELATED TO MS. MCCURRY'S DISABILITY BENEFITS.

## ARGUMENT

I.   THE ALJ ERRED IN GRANTING SUMMARY DECISION FOR KENCO ON THE GROUND THAT EMPLOYEES OF HARTFORD, NOT KENCO, HAVE TAKEN ALL ACTIONS RELATED TO MS. MCCURRY'S DISABILITY BENEFITS.

"When a party moves for summary judgment on ground A, his opponent is not required to respond to ground B — a ground the movant might have presented but did not." (quoting *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1310 (7th Cir.1989)). *Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 736 (7th Cir.2006)

Theoretically, based upon prevailing case law, Petitioner-Complainant was not required to "marshal all the evidence that they had on an issue that was not asserted by the party seeking summary judgment" *Costello v. Grundon*, 625 F.3d 342 (7th Cir. 2010) at 363 and The Court of Costello went on to say that it was unaware of any authority that required a party to do such a thing.

Furthermore, it was not reasonable and/or foreseeable that Petitioner-Complainant would or should have to address issues not raised in the movant's summary decision. Let alone theorize from the ALJ's perspective issues that he sought to resolve over and beyond those presented by the movant in their summary decision.

Therefore, Summary Decision is not appropriate and cannot be affirmed on a ground the movant might have presented but did not.

II.    THE ALJ ERRED WHEN THE ALJ  RAISED ISSUES THAT THE
       MOVANT HAD NOT RAISED IN THEIR MOTION FOR SUMMARY
       DECISION

Respondent in its motion for Summary Decision made cursory statements about the Hartford

being the 3rd Party Administrator in its Collateral Estoppel Affirmative Defense that was raised.

The mere denial of a particular fact without specific references to the affidavits, parts of the

record, and other supporting materials is insufficient. *Flaherty v. Gas Research Institute*, 31 F.3d

451 at 453 (7th Cir. 1994). Where a properly supported factual assertion is met with such a

naked denial, the fact may be deemed admitted. *Id*

       This cursory statement of the Hartford being the 3rd party Administrator was not even

supported by policy or affidavit (Cp. Opp. Rp.MSD pg. 18 ¶ 4) The Seventh Circuit held in

<u>*Campania Mgmt. Co., Inc. v. Rooks, Pitts & Poust,*</u> 290 F.3d 843, 853 (7th Cir.2002) that ("[I]t is

universally known that statements of attorneys are not evidence.").

       Additionally, the Courts have further clarified that ("[A]rguments in a ... brief,

unsupported by documentary evidence, are *not* evidence." (emphasis in original)); *United States*

*v. Stevens,* 500 F.3d 625, 628-629 (7th Cir. 2007); *see also Woolard v. Woolard,* 547 F.3d 755

(7th Cir.2008); *IFC Credit Corp. v. Aliano Brothers General Contractors, Inc.,* 437 F.3d 606,

610-611 (7th Cir.2006); *United States ex rel. Feingold v. AdminaStar Federal, Inc.,* 324 F.3d

492, 494 (7th Cir.2003)

       Furthermore, it was the movant's burden of identifying the basis for seeking summary

decision and not that of the ALJ. *See Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 979 (7th

Cir.1996).  The movant did not discharge themselves of their burden on the ground THAT THE

EMPLOYEES OF HARTFORD, NOT KENCO, HAVE TAKEN ALL ACTIONS RELATED

TO MS. MCCURRY'S DISABILITY BENEFITS and; The movant did not identify those specific portions of the record that it believes demonstrate the absence of a genuine issue of material fact relative to this contention. *Id*. Citing *Russ v. International Paper Co.,* 943 F.2d 589, 591-93 (5th Cir.1991) (per curiam), *cert. denied,* 503 U.S. 987, 112 S.Ct. 1675, 118 L.Ed.2d 393 (1992), and *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 606-09 (11th Cir. 1991),

The Court of Logan went on to say at 978 that:

> <u>477 U.S. at 322-23, 106 S.Ct. at 2552</u>. The Court took pains to make clear, however, that by this it did not intend to relieve the movant of its initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Additionally, on summary judgment, a court may not decide which inferences should be drawn from the facts. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Kodish v. Oakbrook Terrace Fire Prot. Dist.,* 604 F.3d 490, 507 (7th Cir.2010).

Conclusively, Summary Decision is not appropriate and cannot be affirmed on an unsupported cursory statement of the movant and when a movant has not discharge themselves of their initial burden.

III.    THE ALJ ERRED WHEN HE DID NOT CONSIDER PETITIONER-PETITIONER-COMPLAINANT'S EVIDENCE AND WITH ALL REASONABLE INFERENCES DRAWN IN FAVOR OF THE NONMOVANT AND ALL FACTUAL DISPUTES RESOLVED IN FAVOR OF THE NONMOVANT

On a motion for summary decision, (hereafter "MSD") the entire record is considered *See In the Matter of Robert T. Evans v. T-Mobile, USA, Inc.,* ARB. Case No. 15-037, ALJ No. 2012-SOX-036, slip. op. at 7 (ARB Feb. 27, 2017) with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Crawford V. Metro Gov't of Nashville and Davidson County, Tennessee,*555 U.S. 271, 274 n.129 S. Ct. 846, 172 L.Ed. 2d 650 (2009); *Malen v. MTD Prods., Inc., 628 F.3d 296, 303 (7th Cir. 2010)*; *Stokes v. Board of Educ. of the City of Chicago,* 599 F.3d 617, 619 (7th Cir. 2010) (Cp. Opp. Rp.MSD pg. 13 ¶1).

The ALJ did not consider at a minimum any of the nine (9) undisputed, uncontested and unopposed assertions and supporting evidence that:

1. Respondent is the Plan Administrator; (Cp. Opp. Rp.MSD pg. 9 ¶ 22)[3] McCurry Affidavit ¶ 18

2. Respondent funded the disability plan; (Cp. Opp. Rp.MSD pg. 9 ¶ 25) McCurry Affidavit ¶ 19

3. Respondent's dual function of funding the plan, as well as, being the Plan Administrator created a structural conflict (Cp. Opp. Rp.MSD pg. 9 ¶ 26) and a genuine material issue of fact; ( Cp. Opp. Rp.MSD pg. 18 ¶5)

4. Respondent retaliated against Petitioner-Complainant for engaging in protected activity; (Cp. Opp. Rp.MSD pg. 10 ¶ 36 & pg. 14 ¶ 4) McCurry Affidavit ¶ 47, 51-52

5. Respondent continued to gather medical information in 2018 regarding Petitioner-Complainant well after they alleged to have discharged themselves of their burden in March of 2015 (Cp. Opp. Rp.MSD pg. 3-4 ¶ 16-23) and well after the matter had been disposed of between Petitioner-Complainant and Respondent; (Cp. Opp. Rp.MSD pg. 14 ¶ 1) & McCurry Affidavit ¶ 37-39 & 41-42

6. Respondent also had unfettered access to Petitioner-Complainant's disability claim history[4]; (Cp. Opp. Rp.MSD pgs. 4 ¶ 20 & 18 ¶ 5) & McCurry Affidavit ¶ 24 and Exhibit C

---

[3] Prior to litigation Respondent and The Hartford had been cited as both being the Plan Administrator for the disability Plans. ((Cp. Opp. Rp.MSD pg. 9 ¶ 23) & McCurry Affidavit ¶ 18). Kenco was cited as administering the plan. Additionally, the plan was originally referred to as the Kenco Employee Benefit Plan. McCurry Affidavit ¶ 21 Exhibit B

7. Respondent's conduct of unfettered access to Petitioner-Complainant's disability claim and transactional history along with gathering information well beyond the time they alleged to have discharge themselves of their obligation to McCurry created another material issue of fact. Cp. Opp. Rp.MSD pg. 4 ¶ 24, pg. 15 ¶ 3

8. Pretext Cp. Opp. Rp.MSD pg. 15 ¶ 3, pg. 16 ¶1-2, 17 ¶ 1& 6 McCurry Affidavit ¶ 's 19, 22, 24, 31, 42, 46, & 47 and Exhibits C, D, E, & F and;

9. The Hartford denied hiring the Reed Group to obtain information about Petitioner-Complainant in September of 2018. McCurry Affidavit ¶ 42 & Exhibit E

Additionally, the ALJ did not consider that the movant had not opposed or disputed any of the Petitioner-Complainant's assertions and supporting documentation. Which included, Petitioner-Complainant's affidavit in relevant part ¶ 19, 20, 21, 24, 31, 38, 39, 42, 44, 47 and inclusive of Exhibits C, D, E, & F. As well as, Petitioner-Complainant's response to Respondent's motion for Summary Decision in relevant part (Cp. Opp. Rp.MSD) pg. 9 ¶'s 18-26. These and other unopposed and undisputed facts in the record established genuine issues of material facts, temporal proximity and knowledge.

Not only did these and other factors establish genuine issues of material facts, temporal proximity and knowledge, but it also established pretext.

IV.    THE ALJ ERRED WHEN HE DID NOT VIEW THE EVIDENCE OF PRETEXT IN THE LIGHT MOST FAVORABLE TO PETITIONER-COMPLAINANT

---

[4] Respondent was able to view in its entirety the transactional history of Appellant's claim from inception until the date it generated the report in July of 2017. McCurry Affidavit ¶ 24 Exhibit C. Additionally, they were able to produce several different types of reports, all well past the time that Respondent contends to have discharged itself of its obligation to McCurry.

The ALJ is to have accepted Petitioner-Complainant's version of events as true for the purpose of summary judgment. *Kodish v. Oakbrook Terrace Fire Protection District,* 604 F.3d 490, 502 (7th Cir.2010)

The ALJ declined to credit the Petitioner-Complainant's claims of pretext (Cp. Opp. Rp.MSD pg. 15 ¶ 3, pg. 16 ¶1-2, & pg. 17 ¶ 1& 6) & McCurry Affidavit ¶ 's 19, 22, 24, 31, 42, 46, & 47 and Exhibits C, D, E, & F). The ARB has cited authority for the proposition that a "'party's own affidavit, containing relevant information of which he has first-hand knowledge, may be self-serving, but it is nonetheless competent to support or defeat summary judgment.' *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000)." Slip op. at n.47. *See also id* at 13.

When the plaintiff has proof of pretext, there are always unresolved questions regarding the employer's actual motive.... This inference (from evidence that purported legitimate reason is false) permits a plaintiff to prevail on the merits solely on the basis of evidence establishing pretext. When the defendants lie about ......, it is evidence of pretext." *Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 736 (7th Cir.2006)

At the summary judgment stage this is tantamount to a compulsory inference. The circuits that require evidence beyond proof of pretext are not drawing 'all justifiable inference' in the nonmovant's favor. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 140, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The ALJ committed clear error by conducting a "deliberation on the specific evidence submitted" by the parties and concluding that "the substantial evidence of record discredited pretext.

## V. MCCURRY'S RELIANCE ON THE RULING IN *MCCURRY V. KENCO ET. AL. 19-CV-04067* IS NOT MISPLACED

McCurry contends that her reliance on the District Court's ruling on Respondent's Affirmative Defenses of Res Judicata, Overlapping claims with the DOL and other theories is not misplaced. McCurry also contends that her reliance is not displaced in contrast to Respondent's theories and affirmative defenses it presented to the ALJ in its Motion for Summary Decision in that: The Department of Labor Lacked Jurisdiction over McCurry's claims of retaliation under FSMA and that McCurry's claim(s) were Collaterally Estopped.

**Common core or nucleus of operative facts**

*McCurry v. Kenco et. al. 19-CV-04067* and Petitioner-Complainant's claims of retaliation share the same common core or nucleus of operative facts that were to be adjudicated under different statutes. i.e. Title VII, 42 U.S.C. 1981, etc… vs FSMA.

**The required standard for causation**

Under FSMA the required standard for causation is the "contributing factor. However, Title VII, 42 U.S.C. 1981 and other statutes require a "but-for or motivating factor." *Milligan v. Bd. of Trs.*, 686 F.3d 378, 388 (7th Cir. 2012); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) (causation standard). These standards of causations are more rigorous and have a higher burden to reach than the "contributing factor" causation standard.

**Court** of **competent jurisdiction**

McCurry contends that the District Court is a Court of competent jurisdiction, who was presented with the same common core or nucleus of operative facts, who ruled against Respondent's affirmative defense of Res Judicata-a much broader affirmative defense than Collateral Estoppel that deals strictly with claims that have been litigated from being re-litigated.

This same competent Court also concluded that there was no overlap in claims in the District Court and at the DOL and that all federal claims against Kenco remain. *McCurry v. Kenco et. al. 19-CV-04067 DKT. #96 PG. 17.*

In the Court of Randolph the Seventh Circuit looked to the U.S. Supreme Court precedent and:

> Found that for one federal statute to preclude another, there must be "either irreconcilable conflict between the statutes or a clearly expressed legislative decision that one replace the other." *Randolph v. IMBS, Inc.*, 368 F.3d 726 at 730 (7th Cir. 2004). ("When two federal statutes address the same subject in different ways, the right question is whether one implicitly repeals the other — and repeal by implication is a rare bird indeed.") (citing <u>Branch v. Smith,</u> 538 U.S. 254, 273, 123 S.Ct. 1429, 155 L.Ed.2d 407 (2003); <u>J.E.M. AG Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.,</u> 534 U.S. 124, 141-44, 122 S.Ct. 593, 151 L.Ed.2d 508 (2001)).

Consequently, McCurry contends that her ability to retain her claims against Respondent undermines Respondent's theories purported before the DOL in its Motion for Summary Judgement.

### VI.    APPELLATE RULE 28

**The Mercy of the Board**

Petitioner-Complainant seeks the mercy of the ARB. Undoubtedly, Petitioner-Complainant did not conform to Appellate Rule 28 with regards to the brief's construct, as pointed out by Respondent. Prior to Petitioner-Complainant being stricken with COVID, Petitioner-Complainant diligently searched and reviewed several rules such as 29 CFR 9.32 and 18.95, along with 1987.110. These rules did not point Petitioner-Complainant to the Appellate rules.

Several days after Petitioner-Complainant's petition for review was accepted, Petitioner-Complainant began feeling ill and prior to Thanksgiving learned that she had been stricken with COVID, Petitioner-Complainant was quarantined, ill and suffering brain fog, fatigue along with other ailments; Consequently, Petitioner-Complainant was not at herself or at her best and undoubtedly dropped the ball. To date, Petitioner-Complainant has still not fully recovered and continues to be fraught with vertigo and other post COVID aliments.

However, Petitioner-Complainant did gleam from the rules that Petitioner-Complainant was to identify the areas and or facts of the **case** and/or the evidence introduced that do not support the judge's decision. ...or issues that were not considered or cited instances that went beyond the scope of the issues raised in the Motion for Summary Decision among other basis for an appeal.

Petitioner-Complainant is hopeful that she substantively addressed the issues with supporting authority in its abridged opening brief "herein after" referred to as (Cp. OB) relative to the: **1) ALJ err in dismissing** Petitioner-Complainant's complaint based on issues not raised by Respondent in its Motion for Summary Decision-Opening brief ¶ 21, ¶ 27 pg. 7 § 3 & pg. 8 § 2 and footnote #3; **2) Collateral Estoppel** ¶1 page 8 of opening brief, (Cp. Opp. Rp.MSD pg. 2 ¶'s 2-7, pg. 3 ¶ 11, pg. 4 ¶ 23- pg. 12, pg. 10 ¶31; **3) Jurisdiction** (Cp. Opp. Rp.MSD pg. 1 ¶2, pg. 3 ¶13, pg. 5 ¶ 2 § 1, pg. 10 ¶ 33) and in her opening brief ¶'s 2-11; **4) Pretext** Opening brief ¶ 21, ¶27 pg. 7 § 3. *Anderson v. Hardman*, 241 F.3d 544 at 545 (7th Cir. 2001).

Although it was not Petitioner-Complainant's intent to not comply, the extenuating circumstances of having COVID since November of 2020 and having limited access to information and internet, caused Petitioner-Complainant to make a misstep. Again, Petitioner-Complainant is apologetic, falls on her sword and is hopeful that this Board, for good cause, will be similarly situated in its thinking and philosophy to the Courts and "liberally construe" Petitioner-Complainant's pleadings *Haines v. Kerner, 404 U.S. 519, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (per curiam); McCormick v. City of Chicago, 230 F.3d 319, 325 (7th Cir.2000),* Additionally, Petitioner-Complainant is grateful for the courtesy and the extension of time that the Board extended her to be able to submit this Reply Brief.

**CONCLUSION**

In conclusion for the foregoing reasons Petitioner-Complainant contends that the ALJ erred in dismissing Petitioner-Complainant claims of retaliation under FSMA.

      **WHEREFORE,** Petitioner-Complainant requests this Honorable Board to rule in her favor and remand this case for further proceedings, as well as, any other relief available that may be available to her.

Dated April 5, 2021                          Submitted by:

EDITH MCCURY
6239 S. 13110 East Rd.,
Pembroke, IL 60958
815.735.4281

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type volume limitation imposed by Federal Rules of Appellate Procedure 32(a)(7)(B). The brief was prepared using Microsoft Word 2007 and contains no more than 4,025words of proportionally spaced text. The type face is Times New Roman, 12-point font.

Pro Se
EDITH MCCURRY
6239 South 13110 East Rd.
Pembroke Township, IL 60958
815-735-4281

**CERTIFICATE OF SERVICE**

I, undersigned, hereby certify that on April 5, 2021, I submitted a copy of the foregoing

PETITIONER-COMPLAINANT REPLY BRIEF IN SUPPORT OF PETITION FOR

REVIEW FROM THE DISMISSAL OF THE OF APPEAL ISSUED BY THE

DEPARTMENT OF LABOR-ADMINISTRATIVE REVIEW BOARD with the ARB to be

electronically filed with the ARB and have served the persons identified on the docket's service

list through Notice of Electronic Filing generated by the Court's CM/ECF system:

Pro Se
EDITH MCCURRY
6239 South 13110 East Rd.
Pembroke Township, IL 60958
815-735-4281